## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ANTHONY D. RAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No.  06-1673 (RWR)** |
| | ) | |
| **BUREAU OF PRISONS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Anthony D. Ray, a convicted murderer proceeding *pro se*, brings this action seeking declaratory and injunctive relief against the United States Federal Bureau of Prisons ("BOP"), pursuant to the Freedom of Information Act, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a ("FOIA/PA").  Plaintiff, who is incarcerated, seeks to have the BOP release certain records related to a random urine sample he submitted on November 9, 2005, which subsequently tested positive for cocaine.

Defendant BOP, by and through the United States Attorney for the District of Columbia, respectfully moves this Court for summary judgment, pursuant to Fed. R. Civ. P. 56.  As the FOIA/PA records Plaintiff seeks have been released, subject to FOIA Exemptions (b)(2), (b)(4), (b)(6), and (b)(7)(C)©, no genuine issue of material fact exists.  Therefore, Defendant is entitled to judgment in its favor as a matter of law.

Plaintiff should take notice that any factual assertions contained in the attached Memorandum in Support of this Motion and supporting exhibits may be accepted by the Court as true unless the Plaintiff submits his own affidavit or other documentary evidence contradicting

the assertions therein.  *See Neal v. Kelly*, 963 F.2d 453 (D.C. Cir. 1992).  Furthermore, the

Federal Rules of Civil Procedure provide:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); *see Fox v. Strickland*, 837 F.2d 507 (D.C. Cir. 1988) ( *pro se* party may

lose if he fails to respond to a dispositive motion); Local Rule 56.1 ("the court may assume that

facts identified by the moving party in its statement of facts are admitted, unless such a fact is

controverted in the statement of genuine issues filed in opposition to the motion").

In support of this Motion, the Court is referred to the (1) accompanying Memorandum of

Points and Authorities; (2) Statement of Material Facts As to Which There is No Genuine Issue;

(3) supporting Exhibits, (4) Declaration of Wilson Moorer, and (5) the proposed Order attached

hereto.

Respectfully  submitted,


____Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


____Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


__/s/ Sherease Pratt_____
SHEREASE PRATT
Special Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
202-307-0895/ FAX 202-514-8780
sherease.louis@usdoj.gov
Counsel for Defendant

Of Counsel:
Wanda Hunt, Esq.
Federal Bureau of Prisons
Washington, D.C.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ANTHONY D. RAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.  06-1673 (RWR)** |
| | ) | |
| **BUREAU OF PRISONS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Freedom of Information Act and the Privacy Act ("FOIA/PA") provide the district courts with jurisdiction to ensure that agency records are not improperly withheld.  *See* 5 U.S.C. § 552(a); 5 U.S.C. § 552a.  Plaintiff filed suit pursuant to the FOIA/PA, seeking the release of certain records related to a random urine sample he submitted in November 2005, which subsequently tested positive for cocaine.  Compl. ¶ 3; Moorer Decl. ¶ 3.  As Defendant has redacted all information that was exempt from disclosure, pursuant to FOIA Exemptions (b)(2), (b)(4), (b)(6), and (b)(7)(C), and released all responsive FOIA/PA documents, no genuine issue of material fact exists.  *See* Government Exhibit C, Records Released to Plaintiff.  Because no issue of material fact is in dispute, the Court should grant summary judgment in Defendant's favor.  *See* Fed. R. Civ. P. 56.

**BACKGROUND**

Plaintiff Anthony D. Ray,  Register Number 04077-000, is an inmate at the Federal Correctional Institution in Cumberland, Maryland, and is currently serving a life sentence for murder while armed, possession of a firearm, and carrying a deadly weapon, in violation of

Title 22 §§ 2401, 3204(B), and 3204 of the District of Columbia Criminal Law code.  *See*

Moorer Decl. ¶ 3.  On November 9, 2005, Plaintiff submitted a urine sample, Specimen Number

B01652926, for drug analysis as part of the BOP's random Urine Surveillance and Narcotic

Identification program.  *Id.*  After Specimen Number B01652926 subsequently tested positive for

cocaine, Plaintiff filed a request, pursuant to the FOIA/PA, for

> a copy of all records created by the Bureau of Prisons(BOP) in regards to the
> National Toxicology Laboratories, Inc.(NTL) urine specimen #BOI652926; a
> copy of the contract between the BOP and NTL; a copy of any Operations
> Memoranda or policies regarding urine analysis; and the names of NTL personnel
> who conducted the urine test.

*See* Government Exhibit A, Letter from Anthony Ray, dated January 13, 2006.  Due to a

processing error, Plaintiff's FOIA/PA request was initially misdirected to the BOP's Mid-Atlantic

Regional Office ("MARO") for processing.  *See* Moorer Decl. ¶ 5.  As a result, BOP's

Washington Office did not become aware of Plaintiff's FOIA/PA request until they were served

with the summons and complaint.  *Id.*

In response to Plaintiff's request for a copy of the contract between the BOP and National

Toxicology, Inc., BOP's Procurement Office caused a search to be made of all of its national

contracts.  *Id.* ¶ 6.  As a result of the search, the Procurement Office retrieved and reviewed

approximately three hundred twenty-five pages of information to determine if the information

was responsive to Plaintiff's FOIA request.  *Id.*   In response to Plaintiff's request for a copy of

the records created by BOP concerning Plaintiff's urine specimen and the names of NTL

personnel who conducted the urine test, the Legal Department of the BOP's Mid-Atlantic

Regional Office ("MARO") caused a search to be made of Plaintiff's Inmate Central File.  *Id.*

¶ 7.  The search revealed 12 pages of records  responsive to Plaintiff's request.   Finally, in

2

response to Plaintiff's request for a copy of the BOP's operations memoranda or policies regarding urine analysis, the BOP caused a search to be made of the BOP's index of policies and program statements. *Id.* The search revealed a 12 page document entitled "Program Statement 6060.08, Urine Surveillance and Narcotic Identification." *Id.*

On October 1, 2007, a total of ninety-seven pages of responsive information was released to Plaintiff. *Id.* ¶ 8. The BOP did not release two hundred fifty-two records that consisted of independent consumer studies and questionnaires filled out by private individuals concerning Phamatech, Inc. ("Phamatech"), as they were not responsive to Plaintiff's FOIA request. *Id.* ¶ 6. Of the ninety-seven pages that were released to Plaintiff, ninety-two pages of records were released in their entirety; four pages were released with redactions, pursuant to 5 U.S.C. §§552(b)(2), (b)(4); and one page was released with redactions, pursuant to 5 U.S.C. §§ 552(b)(6) and (b)(7)(C). *Id.* ¶ 8; *see* Government Exhibit B, Letter from BOP to Anthony Ray, dated October 1, 2007.

## STANDARD OF REVIEW

FOIA cases are typically decided on motions for summary judgment. *See Cappabianca v. Comm'r, U.S. Customs Serv.*, 847 F.Supp. 1558, 1562 (M.D. Fla. 1994) ("once documents in issue are properly identified, FOIA cases should be handled on motions for summary judgment") (*citing Miscavige v. U.S. Internal Revenue Serv.*, 2 F.3d 366, 368 (11th Cir. 1993)). In a FOIA suit, an agency is entitled to summary judgment once it demonstrates that no material facts are in dispute and that each document that falls within the class requested either has been produced, not withheld, is unidentifiable, or is exempt from disclosure. *Students Against Genocide v. Dept. of State*, 257 F.3d 828, 833 (D.C. Cir. 2001); *Weisberg v. U.S. Dept. of Justice*, 627 F.2d 365, 368

(D.C. Cir. 1980). In moving for summary judgment, an agency must establish a proper basis for

withholding responsive documents. "In response to this special aspect of summary judgment in

the FOIA context, agencies regularly submit affidavits . . . in support of their motions for

summary judgment against FOIA Plaintiffs." *Judicial Watch v. U.S. Dept. of Health and Human*

*Services,* 27 F. Supp. 2d 240, 242 (D.D.C. 1998). Once an agency provides the Court and the

Plaintiff with affidavits or declarations and other evidence which show that the documents in

question were produced or are exempt from disclosure, the grounds for summary judgment are

satisfied. *Hayden v. NSA*, 608 F.2d 1381, 1384, 1386 (D.C. Cir. 1979), *cert. denied*, 446 U.S.

937 (1980); *Church of Scientology v. U.S. Dept. of Army*, 611 F.2d 738, 742 (9th Cir. 1980);

*Trans Union LLC v. FTC*, 141 F. Supp.2d 62, 67 (D.D.C. 2001) (summary judgment in FOIA

cases may be awarded solely on the basis of agency affidavits "when the affidavits describe 'the

documents and the justifications for non-disclosure with reasonably specific detail, demonstrate

that the information withheld logically falls within the claimed exemption, and are not

controverted by either contrary evidence in the record nor by evidence of agency bad faith.'")

(quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). *See also Public*

*Citizen, Inc. v. Dept. of State*, 100 F. Supp.2d 10, 16 (D.D.C. 2000), *aff'd in part, rev'd in part*,

276 F.3d 634 (D.C. Cir. 2002).

## ARGUMENT

The FOIA generally provides that any person has a right, enforceable in court, of access

to federal agency records, except to the extent that such records (or portions thereof) are

protected from mandatory disclosure by one of nine exemptions. *See* 5 U.S.C. § 552(b). Once

an agency releases materials, however, there is no further need for judicial function under the

FOIA statute. *Atkins v. Dep't of Justice*, 946 F.2d 1563 (D.C.Cir. Sept.18, 1991) (unpub.)("The question whether DEA complied with the Freedom of Information Act's . . . time limitations in responding to [plaintiff's] request is moot because DEA has now responded to this motion."); *Landmark Legal Foundation v. E.P.A.*, 272 F.Supp.2d 59, 62-63 (D.D.C. 2003); *Trueblood v. U.S. Dept. of Treasury, I.R.S.*, 943 F.Supp. 64, 67 (D.D.C. 2003)("[r]egardless of how long it took the defendant to comply with a plaintiff's FOIA request, the case or controversy evaporates when the documents are released."); *Hornbostel v. U.S. Dept. of Interior*, 305 F.Supp.2d. 21 (D.D.C. 2003).

I.      **Plaintiff Has Received the Information He Is Entitled to Receive.**

As discussed *supra*, the BOP responded to Plaintiff's FOIA/PA request by releasing ninety-seven pages of information found to be responsive to his request. Moorer Decl. ¶ 4; Government Exhibit C, Records Released to Plaintiff. Of the ninety-seven pages that were released to Plaintiff, Defendant released ninety-two pages of documents in their entirety. Of the five remaining pages, four pages were released with redactions, pursuant to 5 U.S.C. §§ 552(b)(2) and (b)(4), and one page was released with redactions pursuant to 5 U.S.C. §§552(b)(6) and (b)(7)(C). *See* Government Exhibit B, Letter from Federal Bureau of Prisons to Anthony Ray, dated October 1, 2007; Moorer Decl.¶ 8.

A.      **Defendant Has Submitted Proper *Vaughn* Indices**.

Wilson Moorer is a Paralegal Specialist at the Federal Bureau of Prisons, Office of General Counsel, Freedom of Information Act Section, Washington, D.C. *See* Moorer Decl. at ¶ 1. Mr. Moorer has been employed in his position since April 2003, and has been employed with the Bureau of Prisons since July of 1988. *Id.* His duties include assisting the Chief,

Freedom of Information Act/Privacy Act Section and Freedom of Information Administrator in

the review and possible release of information requested from the BOP via the Freedom of

Information Act. *Id.* As such, Mr. Moorer is familiar with the procedures followed by the BOP

in responding to FOIA requests, and with the facts surrounding Plaintiff's FOIA/PA request. *See*

Moorer Decl. at ¶¶1-8. Mr. Moorer's declaration explains the justification for the assertion of the

exemptions claimed, and is based upon his review of the official files and records of BOP, on his

experience with the procedures, and on the basis of information acquired by him in the

performance of his official duties. *Id*. at ¶¶1, 3-11. The declaration provides a summary of

BOP's processing of the FOIA/PA request and a justification for the exemption cited to withhold

information from disclosure. *Id.* As set forth above, the declaration submitted in support of this

motion meets the requirements of *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*,

415 U.S. 977, 94 S.Ct. 1564 (1974), and, together with this memorandum, provides the Court

with the requisite factual and legal basis to grant Defendant's motion for summary judgment.

     **B.   Defendant Has Performed Adequate Searches**.

     In responding to a FOIA request, an agency is under a duty to conduct a reasonable search

for responsive records*. Oglesby v. U.S. Dept. of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *Cleary,*

*Gottlieb, Steen & Hamilton v. Dept. of Health and Human Services, et al.*, 844 F. Supp. 770, 776

(D.D.C. 1993); *Weisberg v. U.S. Dept. of Justice*, 705 F.2d 1344, 1352 (D.C. Cir. 1983). This

"reasonableness" standard focuses on the method of the search, not its results, so that a search is

not unreasonable simply because it fails to produce relevant material. *Cleary* at 777 n.4. Simply

stated, the adequacy of the search is "dependent upon the circumstances of the case." *Truitt v.*

*Dept. of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). The fundamental question is not "whether

there might exist any other documents responsive to the request, but rather whether the search for those documents was adequate." *Steinberg v. Dept. of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (*quoting Weisberg v. Dept. of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).  Thus, an agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located.  *Oglesby*, 920 F.2d at 68.

In response to Plaintiff's request for a copy of the contract between the BOP and National Toxicology, Inc., the BOP caused searches to be made of all of its national contracts.  Moorer Decl. ¶ 6.  This search revealed three hundred twenty-five pages of records.  *Id.*  Because the BOP's Procurement Office performed a search of all of its national contracts, the BOP believes it has searched all files and areas likely to contain responsive records, documents, and materials in response for a copy of the contract at issue. *Id.*

In response to Plaintiff's request for a copy of the records created by BOP concerning Plaintiff's urine specimen, and the names of NTL personnel who conducted the urine test, the BOP caused a search to be made of Plaintiff's Inmate Central File, which is an inmate's main file for any and all information regarding an inmate. *Id.* ¶ 7.  This main file contains all of the information related to an inmate's incarceration.  *Id.*  While there may be files in other locations that may also contain information regarding an inmate, any of these other files would only contain duplicate records copied from an inmate's central file.  *Id.*  The BOP's search of the Plaintiff's Inmate Central File revealed 12 pages of information that were responsive to the Plaintiff's request for a copy of the records created by BOP concerning Plaintiff's urine specimen, and the names of NTL personnel who conducted the urine test.  Because an Inmate's Central File contains all of the information related to an inmate's incarceration, the BOP believes

it has searched all files and areas reasonably likely to contain responsive records regarding the records created by BOP concerning Plaintiff's urine specimen, and the names of NTL personnel who conducted the urine test. *Id.*

Lastly, in response to Plaintiff's request for a copy of the BOP's operations memoranda or policies regarding urine analysis, the BOP caused searches to be made of the BOP's index of policies and program statements, which lists all of the current BOP policies governing the incarceration of BOP inmates. *Id.* The search revealed a twelve page document entitled "Program Statement 6060.08, Urine Surveillance and Narcotic Identification." Because the BOP's index of policies and program statements lists all of the current BOP policies governing the incarceration of BOP inmates, the BOP believes it has searched all files and areas reasonably likely to contain responsive records regarding the BOP's operations memoranda or policies regarding urine analysis. *Id.* Thus, the BOP has performed an adequate search in response to Plaintiff's FOIA/PA request.

**C.    Defendant Properly Applied Exemption (b)(2) to Withhold the Office Telephone Numbers and the Personal Telephone Numbers of Phamatech Employees.**

The D.C. Circuit established the standard for reviewing agency decisions to withhold documents pursuant to 5 U.S.C. § 522(b)(2) in *Crooker v. ATF,* 670 F.2d 1051 (1981). An agency may properly justify withholding material under Exemption 2 if the material 1) "meets the test of predominate internality;" and 2) disclosure of that material would "significantly risk circumvention of federal statutes or regulations." *Id.* at 1053. Thus, if an agency demonstrates that the information at issue is "predominantly internal" it has met it burden. See *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1114 (D.D.C. 2007)(upholding application of

8

Exemption 2 "to shield certain internet addresses"); quoting *Schwaner v. Dep't of the Air Force*, 898 F.2d 793, 795 (D.C.Cir.1990).

Defendant properly applied Exemption (b)(2) to exempt from mandatory disclosure records relating solely to the internal personnel rules and practices of an agency. Moorer Decl. ¶ 10. Material is predominately internal if it is used for internal purposes, it pertains to investigative techniques, or if it does not contain any "secret law," or any attempt to regulate the public at large. *Id.* at 1073*; see also Nat'l Treasury Employees Union v. U.S. Customs Serv.*, 802 F.2d 525, 528 (D.C. Cir. 1986) ("cover[s] personnel rules and practices that are 'not the subject of legitimate public interest'") *(quoting Crooker*, 670 F.2d at 1065)); *Wisenfelder v. Riley*, 959 F.Supp. 532, 535-36 (D.D.C. 1997) (deference is given to regulations governing agency law enforcement investigations and decisions). Thus, individual telephone extensions and individual cell phone numbers fall into the category of information that is predominantly internal.

If the BOP released the telephone numbers, Plaintiff would learn both the direct work telephone extensions and the personal cellular telephone numbers of Phamatech employees. *Id.* Phamatech is the company that contracts with the BOP to perform the laboratory tests on the random urine samples collected from the prisoners. *Id.* ¶ 6. Phamatech employees certify the laboratory test results of the urine samples. *Id.* ¶ 10. A release of this information could cause Plaintiff or Plaintiff's friends or family to attempt to contact these individuals. Thus, BOP properly withheld the office and cellular telephone numbers of Phamatech employees pursuant to Exemption (b)(2).

9

**D.      Defendant Properly Applied Exemption (b)(4) to Withhold the Trade Secrets, Commercial or Financial Information.**

Exemption 4 provides that the FOIA does not apply to "commercial[1] or financial information obtained from a person[2] [that is] privileged or confidential."  5 U.S.C. § 552(b)(4). In analyzing whether information is confidential, the D.C. Circuit has applied the following two-part test:

> commercial or financial matter is "confidential" for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.

*National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974).  More recently, the District Court in *Changzhou Laosan Group v. U.S. Customs and Border* began its analysis by examining whether the information at issue was provided to the government voluntarily or involuntarily, in order to determine the applicable test:

> "[F]inancial or commercial information provided to the Government on a voluntary basis is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass*, 975 F.2d at 879. Information provided involuntarily will not be considered confidential unless disclosure will "(1) ... impair the government's ability to obtain necessary information in the future; or (2) cause

----

[1]      The D.C. Circuit has held that records are commercial so long as the submitter has a "commercial interest" in them.  *Pub. Citizen Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983); *see also Judicial Watch, Inc. v. Export-Import Bank*, 108 F.Supp.2d 19, 28 (D.D.C. 2000)("the terms "commercial" and "financial" should be given their ordinary meanings").

[2]      Courts have applied the term "person" "to a wide range of entities, including corporations, associations and public or private organizations."*Id.*, citing, *e.g.*, *Allnet Communication Services, Inc. v. Federal Communications Commission*, 800 F.Supp. 984, 988 (D.D.C.1992), *aff'd*, No. 92-5351 (D.C.Cir. May 27, 1994).  Thus, because Phamatech is incorporated, it is a corporation and therefore falls under the Court's broad definition of a person.

substantial harm to the competitive position of the person from whom the information was obtained." *Nat'l Parks*, 498 F.2d at 770 (footnote omitted). . . .

Competitive injury, however, is a requirement of the *National Parks* test for involuntarily submitted information and is irrelevant under the *Critical Mass* test for voluntarily submitted information. Because the information was submitted voluntarily, it will be exempt from disclosure if the defendant carries its burden of establishing that the documents are the kind of information that would not customarily be released to the public. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 147-48 (D.C.Cir.2001); *Critical Mass*, 975 F.2d at 879.

*Changzhou Laosan Group v. U.S. Customs and Border*, 374 F.Supp.2d 129, 132 (D.D.C. 2005). Thus, a determination of whether the information at issue is privileged or confidential turns "on whether the information was provided to the government voluntarily or if it was required to be provided." *Id.*

In this case, the information redacted pursuant to Exemption (b)(4) was provided to BOP pursuant to a bidding procedure and subsequent award of a contract between Phamatech and BOP. Moorer Decl. ¶ 10. If the information is considered voluntarily provided it qualifies as exempt because it "would customarily not be released to the public by the person from whom it was obtained." *Changzhou Laosan Group v. U.S. Customs and Border* at 132. However, if the information is considered to have been provided involuntarily, it also qualifies as exempt, as disclosure could "cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.*

### 1.    Redaction of Phamatech's Taxpayer Identification Number

The BOP applied Exemption (b)(4) to redact Phamatech's taxpayer identification number. Moorer Decl. ¶ 10. The BOP redacted the tax identification number because Phamatech uses its tax identification number on its tax returns to file for certain tax exemptions or credits. *Id.* ; *see*

11

*Church of Scientology of California v. I.R.S.*, 484 U.S. 9, 12-15 (1987)( finding identifying

taxpayer information exempt from disclosure).  While the BOP applied Exemption (b)(4) to

redact the information, the taxpayer identification number is also exempt from disclosure under

Exemption (b)(3), which exempts from disclosure "information specifically exempted from

disclosure by statute."  Pub. L. No. 89-487, 80 Stat. 250, 251 (1966)(subsequently amended); *Tax*

*Analysts v. I.R.S.*, 410 F.3d 715, 717 (D.D. C. 2005) (taxpayer information exempt from

disclosure under 26 I.R.C. § 6103[3] is likewise exempt from disclosure under FOIA Exemption

(b)(3)).  Because identifying tax information is not the type of information that would normally

be released to the public, and because disclosure of taxpayer identification information could

cause substantial harm to Phamatech's competitive position if the information were used for an

improper purpose, the BOP properly redacted this information as exempt from release under

(b)(4).

## 2.    Redaction of Phamatech's Financial Numbering System

The BOP also applied Exemption (b)(4) to redact Phamatech's financial numbering

system.  Moorer Decl. ¶ 10.   BOP redacted Phamatech's financial numbering system because

Phamatech's financial numbering system contains Phamatech's bank routing number that

Phamatec uses to receive payment from the BOP for the services Phamatech provides.  *Id.*  In

*Judicial Watch v. Export-Import Bank*, the court held that certain banking information, including

bank account numbers, is exempt from disclosure.  *Judicial Watch v. Export-Import Bank*, 108

F.Supp 2d  at 37 ("[d]isclosing personal bank account numbers would constitute a clearly

---

[3]      26 I.R.C. § 1603 forbids disclosure of taxpayer return information by federal
officers or employees.

unwarranted invasion of personal privacy because the information could be used for nefarious purposes.  In addition, there is no public interest in this information.").

Similarly, in this case, a disclosure of Phamatech's financial numbering system could result in the information being used for nefarious purposes.  If disclosure of Phamatech's financial numbering system enabled someone to use Phamatech's bank routing information for nefarious purposes, it would undoubtedly cause substantial harm to Phamatech's competitive position.  Additionally, as Plaintiff has not demonstrated that a disclosure of Phamatech's financial numbering system would serve any useful public purpose, the Court should find that the BOP properly redacted this information.  Because Phamatech's financial numbering system is not the type of information that would normally be released to the public, and because disclosure of this information could cause substantial harm to Phamatech's competitive position, if the information were used for an improper purpose, the BOP properly redacted this information as exempt from release under (b)(4).

### 3.    Redaction of Phamatech's Unit Price Material Used for Urine Specimen Testing

The BOP also redacted the method by which Phamatech calculates the unit price for its urine specimen testing.  Moorer Decl. ¶ 10.  The method by which Phamatech calculates the unit price for its urine specimen testing is not the type of information that would normally be released to the public.  *Id.*  The BOP's believes that if this information is released, it would reveal the specific prices used by Phamatech in bidding on and ultimately winning its contract with the BOP.  *Id.*  The BOP believes that if this occurred, future bidders could gain a competitive advantage when the contract with Phamatech is announced for renewal.  *Id.*  If the unit pricing

were to be released, it could cause harm to Phamatech's competitive position because other competitive bidders would learn the method used by Phamatech in calculating their unit pricing, which resulted in the award of the contract to Phamatech.  *Id.*   Because future bidders could gain a competitive advantage if Phamatech's unit pricing is released to the public, which could cause substantial harm to Phamatech's competitive position when the contract is announced for renewal, the Court should find that the BOP properly redacted this information.

### E.   Defendant Properly Applied Exemption (b)(6) to Withhold Personnel, Medical, and Similar Files, the Disclosure of Which Would Constitute An Unwarranted Invasion of Personal Privacy.

Exemption 6 permits the government to withhold all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute an unwarranted invasion of personal privacy."  *See* 5 U.S.C. § 552(b)(6).  The threshold issue to be determined in the application of Exemption 6 was firmly established in *U.S. Dept. of State v. Washington Post Co.*, 456 U.S. 595 (1982).  The Supreme Court made clear that all information that "applies to a particular individual" meets the threshold requirement for protection under Exemption 6.  *Id.* at 602.  The materials withheld in this matter would identify the name of the laboratory employee who certified that the results of Plaintiff's urine specimen tested positive for cocaine.  Moorer Decl. ¶ 10.  Thus, the information is contained in a "similar" file and as such meets the threshold requirements for protection under Exemption 6.  *See Washington Post Co.*, 456 U.S. at 602.

"The next step under Exemption 6 involves identifying the relevant privacy interests in non-disclosure and the public interests in disclosure, and determining 'whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy.'" *Reed v. National*

14

*Labor Relations Board, et al.*, 927 F.2d 1249, 1251 (D.C. Cir. 1991) *(quoting National Ass'n of Retired Federal Employees v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989) *cert. denied*, 494 U.S. 1078 (1990). "'The phrase 'clearly unwarranted invasion of personal privacy' enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information.'" *Dept. of the Air Force v. Rose*, 425 U.S. 352, 372 (1976).

Clearly, the privacy interests of a laboratory employee who as part of his/her employment duties must certify the test results of prisoners' urine specimens, some of whom have been convicted of murder and other violent crimes, as is the case here, mandate the withholding of the name from prisoners seeking this information. The public interest which would be served in the release of this information, if indeed any exists, does not outweigh the privacy interests involved and does not negate the clearly unwarranted invasion of personal privacy which would occur with disclosure. Thus, the BOP appropriately applied Exemption (b)(6) to redact a certain document that contained the name of the laboratory employee who certified the results of the urine specimen.

**F.    Defendant Properly Applied Exemption (b)(7)(C) to Withhold the Name of the Laboratory Employee Who Certified the Results of Plaintiff's Urine Specimen.**

The FOIA, does not apply to matters that are:

> (7)  records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy. . . .

This exemption protects the identities of persons who are identified in agency records in connection with law enforcement investigations. *Reporters Comm. for Freedom of the Press*, 489 U.S. 748, 780 (1980); *Computer Prof'ls for Social Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996). Indeed, an agency in a FOIA case may categorically assert Exemption 7(C) to protect the identities of witnesses or other persons mentioned in law enforcement files in such a way as to associate them with criminal activity. *Reporters Comm. for Freedom of the Press*, 489 U.S. at 780; *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 893, 895-896 (D.C. Cir. 1995), *SafeCard Servs., Inc.*, 926 F.2d 1197, 1206 (D.C. Cir. 1991). In analyzing whether Exemption 7(C) applies, the court engages in a balancing of "the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1115 (D.D.C. 2007), quoting *Davis v. U.S. DOJ*, 968 F.2d 1276, 1281 (D.C.Cir.1992). Further,

> the requester must "(1) show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake, and (2) show the information is likely to advance that interest." *Boyd*, 475 F.3d at 387 (internal quotation marks omitted) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004)).

*Id*. The names of law enforcement officers who work on criminal investigations have traditionally been protected against release by Exemption 7(C). *Davis v. U.S. Dept. of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992); *Lesar v. U.S. Dept. of Justice*, 636 F.2d 472, 487-488 (D.C. Cir. 1980). Similarly, individuals who provide information to law enforcement authorities, like the law enforcement personnel themselves, have protectable privacy interests in their anonymity. *Computer Prof'ls for Social Responsibility*, 72 F.3d at 904; *Farese v. U.S. Dept. of Justice*, 683 F. Supp. 273, 275 (D.D.C. 1987). The fact that the requester might be able to figure

out the individuals' identities through other means or that their identities have been disclosed

elsewhere does not diminish their privacy interests. *Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir.

1990); *Weisberg v. Dept. of Justice*, 745 F.2d 1476, 1491 (D.C. Cir. 1984).

Once a privacy interest has been established, as here, it must be balanced against the

public interest, if there is any, that would be served by disclosure. *Albuquerque Publ'g Co. v.

Dept. of Justice*, 726 F. Supp.851, 855 (D.D.C. 1989). As with Exemption (b)(6), the public

interest in disclosure is limited to the FOIA's "core purpose" of shed[ing] light on an agency's

performance of its statutory duties." *Reporters Comm. for Freedom of the Press*, 489 U.S. at

773. This standard is not easily satisfied when law enforcement information pertaining to

individuals is sought, for there "is no reasonably conceivable way in which the release of one

individual's name . . . would allow citizens to know 'what their government is up to.'" *Fitzgibbon

v. CIA*, 911 F.2d 755, 768 (D.C. Cir. 1990). *See also Albuquerque Publ'g Co.*, 726  F.Supp. at

855-56 (no public interest in disclosure of sensitive information DEA obtained about individuals

and their activities, where such material would not shed light on DEA's conduct with respect to

the investigation). Furthermore, the requester must not only demonstrate the existence of the

public interest but also that the public interest is both significant and compelling in order to

overcome legitimate privacy interests. *Perrone v. FBI*, 908 F.Supp. 24, 26 (D.D.C. 1995) (*citing,

Senate of Puerto Rico*, 823 F.2d at 588); *Stone v. F.B.I.*, 727 F. Supp. 662, 667-69 (D.D.C. 1990).

In this case, BOP applied Exemption 7© to redact a certain document that contained the

name of the laboratory employee who certified the results of Plaintiff's urine specimen, which

tested positive for cocaine. Moorer Decl. ¶¶ 3, 10. The release of this information would

17

constitute an unwarranted invasion of personal privacy of the laboratory employee mentioned in the records. *Id.* Thus, BOP properly withheld the information pursuant to Exemption 7©.

### G.    SEGREGABILITY

The Court of Appeals for the District of Columbia Circuit has held that a District Court considering a FOIA action has "an affirmative duty to consider the segregability issue *sua sponte.*" *Trans-Pacific Policing Agreement v. United States Customs Service*, 177 F.3d 1022, 1028 (D.C. Cir. 1999). The FOIA requires that if a record contains information that is exempt from disclosure, any "reasonably segregable" information must be disclosed after deletion of the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions." 5 U.S.C. § 552(b); *Mead Data Cent., Inc. v. United States Dept. of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

In order to demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" rather than "conclusory statements." *Mead Data*, 566 F.2d at 261. The agency is not, however, required "to provide such a detailed justification" that the exempt material would effectively be disclosed. *Id.* All that is required is that the government show "with 'reasonable specificity'" why a document cannot be further segregated. *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996). Moreover, the agency is not required to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Mead Data*, 566 F.2d at 261, n.55.

Here, as clearly expressed in Mr. Moorer's declaration, BOP evaluated each document, and each page contained in each document, for segregability. Moorer Decl. ¶¶ 10, 11. All

18

information withheld was exempt from disclosure pursuant to a FOIA or Privacy Act exemption.

*Id.* at 11.  No reasonably segregable non-exempt portions were withheld from Plaintiff.  *Id.*  The

BOP provided Plaintiff with all information that did not reveal information protected by statute

and which, if disclosed, would not violate the personal privacy or commercial interests of third

parties. *Id*.

## II.    Plaintiff Is Not Entitled To Fees or Costs.

In attempting to seek costs "and other and further relief," Plaintiff appears to

misunderstand the purpose of the FOIA, and the remedies available under the Act.  Namely, the

primary purpose of a FOIA lawsuit is to gain access to, and obtain copies of, agency records.

Once the responsive records have been provided, there is no additional relief that can be

obtained.  This is true even if the records were released after the federal complaint was filed, as in

this case. *See Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987) ("[H]owever fitful or

delayed the release of information . . . if we are convinced that [the agency has] belatedly released

all non-exempt material, we have no further judicial function to perform under the FOIA.")

(quoting *Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982)); *see also Webb v. Dep't of Health*

*and Human Services,* 696 F.2d 101, 107-08 (D.C. Cir. 1982) ("Granting full access to the

requested documents . . . terminates a FOIA action . . . .").  In short, Defendant's admitted delay

in providing the responsive information to Plaintiff does not warrant judicial relief, as Plaintiff

ultimately received all of the information which he legally is entitled to receive under the FOIA.

To the extent Plaintiff's Complaint could be read to seek attorney's fees, Plaintiff is not

entitled to attorney's fees because he is representing himself in this lawsuit.  Section 552(a)(4)(E)

of the FOIA provides that a court "may assess against the United States reasonable attorney fees

and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed."  In *Benavides v. Bureau of Prisons*, 993 F.2d 257, 259 (D.C. Cir. 1993), the Court of Appeals reversed its earlier position set forth in *Cox v. United States Dept. of Justice*, 601 F.2d 1 (D.C. Cir. 1979), and held that *pro se* litigants are *not* entitled to attorney fees under section 552(a)(4)(E).  *See also Trueblood v. Internal Revenue Service*, 943 F.Supp. 64, 69 (D.D.C. 1996).  Accordingly, there is no legal basis to award Plaintiff -- who is *pro se* -- attorney fees.

Further, Plaintiff is entitled to neither attorney fees or litigation costs because he has not "substantially prevailed" within the meaning of the statute.  In *Oil, Chemical And Atomic Workers Int'l Union v. Department of Energy*, 288 F.3d 452 (D.C. Cir. 2002), the Court of Appeals held that the Supreme Court's recent opinion in *Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health and Human Resources*, 121 S.Ct. 1835 (2001) – rejecting the "catalyst" theory for determining whether a party has "prevailed" for purposes of fee-shifting statutes -- applies in the FOIA context.  Specifically, the Court of Appeals held that "in order for plaintiffs in FOIA actions to become eligible for an award of attorney's fees, they must have 'been awarded some relief by [a] court,' **either in a judgment on the merits or in a court-ordered consent decree**."  *See Oil, Chemical And Atomic Workers*, at 456-57 (emphasis added).[4]

---

[4]    Although this sentence does not mention costs, the Court of Appeals makes it clear elsewhere in its opinion that its holding applies to both fees and costs.  *See, e.g., id.* at 454, 457; *see also* 5 U.S.C. § 552(a)(4)(E) (the same standard – "substantially prevailed" –  applies to both fees and costs).

Here, Plaintiff has not been awarded any court-ordered relief, either by a judgment on the merits or by a consent decree.  On the contrary, all of the records responsive to Plaintiff's request were voluntarily released by Defendant.  Accordingly, Defendant respectfully submits that Plaintiff is entitled to neither attorney's fees nor litigation costs in this case.

**III.    Plaintiff Fails to Satisfy Any Element of the Test That Must Be Satisfied Before a Court May Issue Injunctive Relief.**

**A.    The Standard of Review for a Preliminary Injunction.**

Although Plaintiff's prayer for relief requests a preliminary injunction, Plaintiff has failed to satisfy any element of the test that must be satisfied before a court may issue injunctive relief. The standards for injunctive relief, in the form of either a preliminary injunction or a temporary restraining order, are well established:

> [T]he moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *e .g., Mova Pharm. Corp.*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)) (internal quotation marks omitted).  A district court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed*, 58 F.3d at 747.  If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak.  *Id.*

*See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Sea Containers, Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir. 1989); *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 673-74 (D.C. Cir. 1985); *Washington Metropolitan Area Transportation Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843-44 (D.C. Cir. 1977); *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Thus, a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also Yakus v. United States*, 321 U.S. 414 (1944); *Emily's List v. Federal Election Comm'n*, 362 F.Supp.2d 43, 51 (D.D.C. 2005), 362 F.Supp.2d at 51; *National Head Start Ass'n v. Department of Health and Human Services*, 297 F.Supp.2d 242, 246 (D.D.C. 2004); *Varicon Int'l v. Office of Personnel Management*, 934 F.Supp. 440 (D.D.C. 1996); *Kahane v. Secretary of State*, 700 F.Supp. 1162, 1165 (D.D.C. 1988).

The Court should balance the strengths of the movant's arguments in each of these required areas. *CityFed Fin. Corp.*, 58 F.3d at 747. It is particularly important, however, for the movant to demonstrate a substantial likelihood of success on the merits. *See Emily's List*, 362 F.Supp.2d at 51 (citing *Barton v. Dist. of Columbia*, 131 F.Supp.2d 236, 242 (D.D.C. 2001) and *Benton v. Kessler*, 505 U.S. 1084, 1085 (1992)). If the movant is unable to do so, the movant must then present a "very strong showing" with respect to the other preliminary injunction factors. *See Emily's List*, 362 F.Supp.2d at 51-52 (quoting *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999)) (emphasis added).

This Circuit has set a high standard for irreparable injury. First, the injury "'must be both certain and great; it must be actual and not theoretical.'" *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) (*per curiam*)). The moving party must show "'[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Id*. Second, the injury must be beyond remediation. *See Chaplaincy*, 454 F.3d at 297.

22

As the D.C. Circuit has explained:

> The key word in this consideration is <u>irreparable</u>. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*See Chaplaincy*, 454 F.3d at 297-98 (*quoting Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674

(D.C.Cir.1985) and *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958))

(internal quotation marks omitted); *see also Sampson v. Murray*, 415 U.S. 61, 88-90 (1974).

An "injury held insufficient to justify a stay in one case may well be sufficient to justify it in

another, where the applicant has demonstrated a higher probability of success on the merits."

*Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925.  "An injunction may be justified for example,

where there is a particularly strong likelihood of success on the merits even if there is a relatively

slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747.  An essential

prerequisite to injunctive relief is a sufficient showing by the plaintiff that he will suffer

irreparable harm if the injunctive relief is not granted.  *See, e.g., Davenport*, 166 F.3d at 360.

### B.    Plaintiff Has Failed to Demonstrate That An Injunction Should Issue.

A delayed response to a FOIA/PA request is not a ground for injunctive relief.   Because

Plaintiff's requested records have been released, he lacks standing to seek an injunction.  Further,

Plaintiff has offered no evidence, other than the vague, over-generalized, conclusory allegation,

that BOP has a "practice of not responding at all to FOIA/PA requests."  Hence, Plaintiff has not

shown a substantial likelihood of success on the merits.  Moreover, Plaintiff will not sustain an

irreparable injury if injunctive relief is denied in this case, as the requested records have already

been released.  Because Plaintiff has not demonstrated that he would be irreparably harmed if an

injunction is not granted, or that the public interest would be furthered by an injunction,

injunctive relief is clearly unwarranted.  Further, Plaintiff's lawsuit is moot.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of the

Defendant.

Respectfully  submitted,

_____ Jeffrey A. Taylor _____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____ Rudolph Contreras _____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

__ /s/ Sherease Pratt _____
SHEREASE PRATT
Special Assistant United States Attorney
United States Attorney's Office

Of Counsel:                         555 4th Street, N.W.
Wanda Hunt, Esq.                    Washington, D.C. 20530
Federal Bureau of Prisons          Counsel for Defendant
Washington, D.C.

24

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANTHONY D. RAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.  06-1673 (RWR)** |
| ) | |
| **BUREAU OF PRISONS,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 5th day of October, 2007, I caused a copy of the foregoing Motion for

Summary Judgement to be served upon Plaintiff by depositing a copy of it in the U.S. Mail, first

class postage prepaid, addressed to:

**ANTHONY D. RAY**
R# 04077-000
Cumberland F.C.I.
P.O.B. 1000
14601 Burbridge Road, SE
Cumberland, Maryland  21501-1000

    /s/ Sherease Pratt                           
SHEREASE PRATT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY D. RAY,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        Civil Action No.  06-1673 (RWR)
                                         )
BUREAU OF PRISONS,                       )
                                         )
                    Defendant.           )
_____)

## DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Defendant respectfully submits the following statement of material facts as to which there is no genuine issue:

1.      Plaintiff Anthony D. Ray,  Register Number 04077-000, is an inmate at the Federal Correctional Institution at Cumberland, Maryland ("FCI Cumberland").  *See* Complaint, caption.

2.      Plaintiff is serving a life sentence for murder while armed, possession of a firearm, and carrying a deadly weapon, in violation of Title 22 §§ 2401, 3204(B) and 3204 of the District of Columbia Criminal Law code, and is eligible for parole in 2015. *See* Moorer Decl. ¶ 3.

3.      On November 9, 2005, Plaintiff submitted a urine sample, Specimen Number B01652926, for drug analysis as part of the BOP's random Urine Surveillance and Narcotic Identification program.  *Id.*

4.      Specimen Number B01652926 subsequently tested positive for cocaine.  *Id.*

5.      Plaintiff mailed a letter dated January 13, 2006, containing a request made pursuant to the FOIA and the Privacy Act ("FOIA/PA Request") to BOP, by delivering it to prison authorities with first-class postage prepaid and addressed to: Federal Bureau of Prisons, 320 first Street, N.W., Washington, D.C. 20001.  *See* Government Exhibit A, Letter from Anthony D. Ray to the Federal Bureau of Prisons, dated January 13, 2006. *Id.* ¶ 4; Exhibit A, Letter from Ray to BOP, dated January 13, 2006.

6.      Plaintiff's FOIA/PA request sought  "a copy of all records created by the Bureau of Prisons (BOP) in regards to the National Toxicology Laboratories, Inc. (NTL) urine specimen #BOI652926; a copy of the contract between the BOP and NTL; a copy of any Operations Memoranda or policies regarding urine analysis; and the names of NTL personnel who conducted the urine test."  *Id.*

7.      The BOP did not respond to Plaintiff's January 13, 2006, letter within twenty work days.  Complaint  ¶¶ 7, 10.

8.      Plaintiff's FOIA/PA request was erroneously forwarded to the BOP's Mid-Atlantic Regional Office ("MARO") for processing.  *See* Declaration of William Moorer ¶ 5.

9.      The BOP's FOIA database shows the request was received by the MARO, and was logged in and assigned FOIA Request Number 2006-02881.  *Id.*

10.      The MARO reviewed FOIA Request Number 2006-02881 and determined the request should be answered by the BOP's FOIA Office, Washington, D. C. *Id.*

11.      The MARO returned FOIA Request Number 2006-02881 to the BOP's FOIA Office in Washington, D.C. for further processing.  *Id.*

2

12.     BOP is unable to determine whether FOIA Request Number 2006-02881 that was forwarded by MARO was received by BOP's Washington, D.C. office.  *Id.* ¶ 5.

13.     On April 29, 2006, Plaintiff mailed to the U.S. Department of Justice, Office of Information and Privacy ("OIP"), a letter appealing the BOP's failure to respond to Plaintiff's request for disclosure of records.  Complaint ¶ 8.

14.     On July 25, 2007, the BOP was served with a summons and complaint. *See* Docket Entry No. 8, Return of Service/Affidavit of Summons and Complaint Executed as to Federal Bureau of Prisons.

15.     After the Washington, D.C. BOP office became aware of the FOIA request, the Washington D.C. office of the BOP reopened Plaintiff's FOIA Request.  Moorer Decl. ¶¶ 5, 6.

16.     Based on Plaintiff's FOIA/PA request, the BOP retrieved and reviewed approximately 325 pages of information to determine if the information was responsive to Plaintiff's FOIA request. *Id.*  ¶ 6.

17.     By letter dated October 1, 2007, the BOP responded to FOIA Request Number 2006-02881, and informed Plaintiff that ninety-seven pages of information were found to be responsive to his request. *Id.* ¶ 8.

18.     Of the ninety-seven pages that were released to Plaintiff, ninety-two pages of documents were released in their entirety; four pages were released with redactions, pursuant to

5 U.S.C. §§552(b)(2), (b)(4); and one page was released with redactions, pursuant to 5 U.S.C.

§§ 552(b)(6) and (b)(7)(C).  *See* Government Exhibit B, Letter from Federal Bureau of Prisons to

Anthony Ray, dated October 1, 2007; Declaration of William Moorer ¶ 10.

<div style="margin-left:40%">

Respectfully  submitted,

___Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

___Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

__/s/ Shereas Pratt_____
SHEREASE PRATT
Special Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
202-307-0895/ FAX 202-514-8780
shereas.louis@usdoj.gov

Counsel for Defendant

</div>

Of Counsel:
Wanda Hunt, Esq.
Federal Bureau of Prisons
Washington, D.C.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANTHONY D. RAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | )  Civil Action No.: 06-1673 (RWR) |
| | ) |
| BUREAU OF PRISONS | ) |
| | ) |
| Defendant. | ) |

### DECLARATION OF WILSON J. MOORER

I, Wilson J. Moorer, do hereby declare and state the following:

1. I am currently a Paralegal Specialist at the Federal Bureau of Prisons, Office of General Counsel, Freedom of Information Act Section, Washington, D.C. I have been employed in this position since April 2003; however, I have been employed with the Bureau of Prisons since July of 1988. My duties include assisting the Chief, Freedom of Information Act/Privacy Act Section and Freedom of Information Administrator in the review and possible release of information requested from the Bureau of Prisons via the Freedom of Information Act.

2. The Freedom of Information Act, commonly referred to as FOIA, is a statute governing the release of government records. In general, FOIA provides that any person has a right, enforceable in court, to obtain access to federal agency records, except to the extent that such records (or portions of them) are protected from public disclosure by one of nine exemptions or by one of three (3) special law enforcement record exclusions.

1

3. The Plaintiff, Anthony D. Ray, Register Number 04077-000 is currently serving a life sentence for murder while armed, possession of a firearm, and carrying a deadly weapon, in violation of Title 22 Section 2401, 3204(B), 3204 of the District of Columbia Criminal Law code, and is eligible for parole in 2015. On November 9, 2005, Plaintiff submitted a urine sample, Specimen Number B01652926, for drug analysis as part of the BOP's random Urine Surveillance and Narcotic Identification program. Specimen Number B01652926 subsequently tested positive for cocaine.

4. The Plaintiff filed a complaint alleging the Bureau of Prisons (BOP) failed to respond to his FOIA request in which he requested the following information: a copy of all records created by the Bureau of Prisons(BOP) in regards to the National Toxicology Laboratories, Inc.(NTL) urine specimen #BOI652926; a copy of the contract between the BOP and NTL; a copy of any Operations Memoranda or policies regarding urine analysis; and the names of NTL personnel who conducted the urine test. See Letter from Anthony D. Ray, to the Federal Bureau of Prisons dated January 13, 2006, a true and correct copy of which is attached here to as Exhibit A.

5. At the time Mr. Ray's FOIA request was initially received at the BOP's FOIA Office, Washington, D.C., a processing error occurred which caused the Plaintiff's FOIA request to be forwarded to the BOP's Mid-Atlantic Regional Office (MARO) for processing. The BOP's FOIA Data Base shows the request was received by the MARO, logged in and assigned FOIA Request Number 2006-02881. The MARO reviewed the request and determined the request should be answered by the BOP's FOIA Office, Washington, D.C. The MARO returned the request to the BOP's FOIA Office, Washington, D.C. for further processing; however, it cannot

2

be determined if the request was ever received by the Washington, D.C. office.  The Washington, D.C. office became aware of the FOIA request when the Plaintiff filed this civil action.

     6.  After careful review of the complaint and consultation with its counsel (Special Assistant United States Attorney Sherease Pratt), the BOP reopened FOIA Request Number 2006-02881.  To locate the contract that was requested in Plaintiff's FOIA Request, a request was submitted to the BOP's Administration Division, Procurement Executive Office, Washington, D.C. to determine if a contract existed between the BOP and NTL.  The Procurement Executive Office is the central office for maintaining all national contracts.  The Procurement Office conducted a search of all national contracts files to determine which file, if any, was responsive to Plaintiff's FOIA Request.  The Procurement Office search found a file containing 325 pages of information comprising the Phamatech, Inc. contract.  Phamatech, Inc. is the company that contracts with the BOP to perform the laboratory tests on random urine sampling collected from BOP inmates.  A review of the contract revealed 73 pages of information were responsive to Plaintiff's FOIA Request.  The 252 pages of the contract that were not responsive to Plaintiff's FOIA Request consisted of independent consumer studies and questionnaires filled out by private individuals concerning Phamatech's Test Kits.  The non-responsive pages were information obtained by Phamatech, Inc. that was not essential to the basic request of the Plaintiff which was a copy of the Phamatech, Inc. contract.  The Procurement Office searched all files and areas likely to contain responsive records/documents/materials were searched with respect to Plaintiff's FOIA Request.

7. To locate the remaining documents that were requested in Plaintiff's FOIA Request, a request was submitted to the BOP's MARO Legal Department. The Legal Department caused a search to be made of all the files and areas likely to contain responsive records, documents, or materials concerning this section of Plaintiff's FOIA Request. It was determined the Plaintiff's Inmate Central File contained any/all information responsive to the FOIA Request. The Inmate Central File contains information related to the inmate's daily incarceration in the BOP. This is the main file for any/all information regarding an inmate. Although there may be other locations that may have information regarding an inmate, these files would only contain duplicate information that is originally found in the Inmate Central File. The search revealed 12 pages of information that were responsive to the request. The BOP's index of policies/program statements were searched to locate any/all policies regarding urine testing. The index of policies/program statements contains/lists all current BOP policies governing the incarceration of BOP inmates. The search revealed a 12 page document entitled Program Statement 6060.08, Urine Surveillance and Narcotic Identification. Because an Inmate Central File contains any/all information related to an inmates's incarceration, all files and areas reasonably likely to have contained responsive records regarding this section of Plaintiff's FOIA Request were searched.

8. BOP responded to FOIA Request Number 2006-02881 on October 1, 2007, stating 97 pages of information were found to be responsive to his request. The responsive documents were released in the following manner: 92 pages of documents were released in their entirety, 4 pages were released with redactions pursuant to 5 U.S.C. §552(b)(2), (b)(4), and one page was released with redactions pursuant to 5 U.S.C. §552(b)(6) and (b)(7)(C). See Letter from Federal Bureau

4

of Prisons to Anthony Ray, dated October 1, 2007, a true and correct copy of which is attached

here to as Exhibit B.

9. Exemption (b)(2) exempts from mandatory disclosure records relating solely to the

internal personnel rules and practices of an agency the disclosure of which would risk

circumvention of a legal requirement. Exemption (b)(4) exempts from disclosure records that

would disclose trade secrets and commercial or financial information obtained from a person that

is privileged or confidential, including information voluntarily submitted. Exemption (b)(6)

exempts personnel and medical files and similar files the disclosure of which would constitute a

clearly unwarranted invasion of personal privacy. Exemption (b)(7)(C) provide for the

withholding of records or information compiled for law enforcement purposes which could

reasonably be expected to constitute an unwarranted invasion of personal privacy. A true and

correct copy of the documents released in their entirety and the documents released in redacted

form are attached here to as Exhibit C.

10. The exemptions were applied in the following manner:

Exemption (b)(2) was used to exempt from mandatory disclosure records relating solely to

the internal personnel rules and practices of an agency. If the information were to be released, an

inmate would be aware of the direct telephone number extensions of Phamatech, Inc. employees

and personal cellular telephone numbers of Phamatech, Inc. employees.

Exemption (b)(4) was used to exempt from disclosure records that would disclose trade

secrets and commercial or financial information obtained from a person that is privileged or

confidential, including information voluntarily submitted. The information that was redacted

5

pursuant to Exemption (b)(4), pertains to the tax identification number which was redacted from the document because it disclosed information that is used to file for certain tax exemptions or credits that are only allowed for individuals who are making a legal deduction. The financial numbering system of Phamatech, Inc. was redacted from the document because it disclosed the routing number used by Phamatech, Inc. to receive payment from the BOP for the service being provided. The unit price of Phamatech, Inc. material used for urine specimen testing and the method by which Phamatech, Inc. calculates the unit price for its urine specimen testing were redacted from the document because if released the information would reveal specific prices used by Phamatech, Inc. to determine the amount they believe could be charged to assist them in obtaining the contract. If awarded the contract, as they were, the release of this information would give others a competitive advantage when the contract is announced for renewal. If the unit pricing were to be released it could cause substantial harm to Phamatech, Inc. competitive position because other competitive bidders would discover the method by which Phamatech, Inc. calculated their unit pricing.

Exemption (b)(6) and (b)(7)(C) were both used to redact a certain document because the document contained information regarding an individual the disclosure of which would constitute an unwarranted invasion of personal privacy. The document in question contained the name of the laboratory employee who certified the results of the urine specimen.

11. As described above, no reasonably segregable non-exempt portions were withheld from Plaintiff. Accordingly, all redacted information was exempt from disclosure pursuant to a FOIA exemption or was not reasonably segregable because it was so intertwined with protected

material that segregation was not possible or its release would have revealed the underlying

protected material. All documents which relate to plaintiff's requests were processed to achieve

maximum disclosure consistent with the provisions of the FOIA.

I declare under the penalty of perjury, pursuant to Title 28 U.S.C. § 1746, the foregoing is

true and correct to the best of my information, knowledge and belief.

Executed this _____ day of October 2007, at Washington, D.C.

Wilson J. Moorer
Paralegal Specialist
Federal Bureau of Prisons
Washington, D.C.

7

Date: January 13, 2006

OFFICE OF THE GENERAL COUNSEL

FEDERAL BUREAU OF PRISONS

CENTRAL OFFICE

320 FIRST STREET, N.W.

WASHINGTON, D.C. 20001

RE:  FREEDOM OF INFORMATION AND PRIVACY ACT REQUEST
     PURSUANT TO TITLE 5 U.S.C. §552, §552(a) (FOIA/PA)

Dear   Sir/Madam          ;

Please consider this a Formal Request under the FOIA/PA. Your immediate and strict
compliance with this request is fully expected, pursuant to Section 552(a)(6)(A)(i).

Because there is an exceptional need and urgency for the information sought, I
expect a response to this request withing the twenty (20) working day period provided
under the law. The requested information, when disclosed, will relieve the requestor
of Constitutional deprivations. Therefore, the requestor asks that this FOIA/PA
request be given priority and expeditious consideration.

In order to help determine my status, and to assess fees, you should know that I
am a Federal Inmate, and herein certify that I am a pauper within the meaning of
28 U.S.C. §1915, and I am unable to pay for search and copy fees. I request a
waiver of fees for this request. Disclosure of the requested information to me is
in the public interest, as it is likely to contribute significantly to the
clarification of Constitutional and/or legal issues. The information requested is
for personal use and will not be used for any commercial purposes.

The information and documents I am requesting are outlined herein as follows:

Copies of all records created by the BOP and/or the National Toxicology Laboratories,
Inc. (NTL), regarding urine specimen # BOI652926, including chain-of-custody records,
relevant portions of any ledgers kept by respective custodians, laboratory results/
reports, etc.   I also request copies of the contract between the BOP and NTL under
which specimen # BOI65926 was tested, and copies of any Operations Memoranda or
other documents which set forth procedure, protocol, standards or guidelines estab-
lished to ensure the reliability and accuracy of urine analysis.  Finally, I request
disolsure of the identities of NTL personnel involved in the analysis of (see attched)

I am also attaching an information and data sheet to assist you in locating the
requested materials in compliance with 28 C.F.R. Section 16.41.

This request is to include all local records, as well as records stored or filed
at the Central Office of the Agency from which the request is made.

Sincerely yours,

Anthony Ray

:ATTACHMENTS

FOIA/PA REQUEST, p. 2 of 2
1/13/06

specimen BOI65926, the number and type of tests conducted on said specimen, whether
the entire specimen was consumed in testing, and the disposition of both the tested
and any untested portions of the specimen.

If you determine that any portion of the specimen remains in the custody or
control of either the BOP or NTL, I hereby request that such remaining portions
of the specimen be preserved as evidence material to resolution of judicial
proceedings.

My final request is for copies of documents and/or disclosure of information
refered to in disciplinary proceedings based on Incident Report # 1403543.
See attached DHO Report, p. 2 at D., 1. thru 4.  More specifically, as
regards D.,4., I request a copy of the "memorandum" submitted to the DHO
by LCDR R. Byrd, as well as copies of any publications and/or the source
and substance of any unpublished information "reviewed" by R. Byrd which
led him to conclude that the "metabolism and chemical structure of a dental
anesthetic given to [me near time of submission of urine sample showed]
no comparison...[to] cocaine metabolites that would cause a false positive
urine test result."

**U.S. Department of Justice**

Federal Bureau of Prisons

OCT 1 2007

_Washington, DC 20534_

Anthony Ray
Register Number 04077-000
Federal Correctional Institution
P.O. Box 1000
Cumberland, Maryland 21501-1000

For Further Inquiry Contact:
Federal Bureau of Prisons
320 First Street. N.W.
Room 841, HOLC Building
Washington, D.C. 20534
Attn: FOIA/Privacy Act Office

RE:  Request for Information, FOIA Request No. 2006-02881

Dear Mr. Ray:

This is in response to your Freedom of Information Act request for a copy of all records created by the Bureau of Prisons(BOP) in regards to the National Toxicology Laboratories, Inc.(NTL) urine specimen #BOI652926; a copy of the contract between the BOP and NTL; a copy of any Operations Memoranda or policies regarding urine analysis; and the names of NTL personnel who conducted the urine test.

We have located 73 pages of documents in response to your request for a copy of the contract between the BOP and NTL.  You are being provided 69 pages in their entirety; however, portions of the remaining 4 pages are being redacted pursuant to 5 U.S.C. §552(b)(2) and (b)(4).

Exemption (b)(2) exempts from mandatory disclosure records relating solely to the internal personnel rules and practices of an agency the disclosure of which would risk circumvention of a legal requirement.

Exemption (b)(4) exempts from disclosure records that would disclose trade secrets and commercial or financial information obtained from a person that is privileged or confidential, including information voluntarily submitted.

In reference to your request for a copy of all records created by the Bureau of Prisons(BOP) in regards to the National Toxicology Laboratories, Inc.(NTL) urine specimen #BOI652926; a copy of any Operations Memoranda or policies regarding urine analysis; and the names of NTL personnel who conducted the urine test, a total of 24 pages of documents were located in response to your request.

Page 2
Anthony Ray
FOIA Request Number 2006-02881


   You are being provided 23 pages in their entirety; however, a
portion of the remaining one page is being redacted pursuant to
5 U.S.C. §552(b)(6) and (b)(7)(C).

   Exemption (b)(6) exempts personnel and medical files and
similar files the disclosure of which would constitute a clearly
unwarranted invasion of personal privacy.

   Exemption (b)(7)(C) provide for the withholding of records
or information compiled for law enforcement purposes which could
reasonably be expected to constitute an unwarranted invasion of
personal privacy.

   Pursuant to 28 C.F.R. § 16.9, if you are dissatisfied with
this response, you may appeal to the Attorney General by filing a
written appeal within sixty (60) days of the date of this letter.
The appeal should be addressed to the **Office of Information and
Privacy, U.S. Department of Justice, 1425 New York Ave., NW,
Suite 11050, Washington, D.C. 20530-0001.**  Both the envelope and
appeal letter should be marked **"Freedom of Information Act
Appeal."**

   I trust this has been responsive to your request.  If you
have any questions or concerns please contact Wilson J. Moorer,
Paralegal.

                              Sincerely,



                              Wilson J. Moorer, Paralegal
                              Wanda M. Hunt
                              Chief, FOIA/PA Section


Enclosure: 97 pages

cc: File



# PHAMATECH
## Who We Are

### CORPORATE BEGINNINGS

Phamatech was founded in 1991 by a small group of dedicated scientists and business executives. Combining clinical experience, technical expertise and sound business strategies, we have grown steadily over the years to become a major provider of rapid medical diagnostic devices for home healthcare and clinical settings worldwide. Relying on sophisticated, state-of-the-art technologies, Phamatech has successfully developed easy-to-use test devices that provide valuable, reliable, medical information at truly affordable prices. Phamatech is committed to manufacturing products and providing services that enhance our customer's medical care, health awareness and quality of life by aiding in the early diagnosis of medical conditions in a cost-effective manner.

### CREATIVITY AND BEYOND

Creative thinking is the driving force at Phamatech. On October 16, 1998, Phamatech revolutionized drug testing with the announcement that we received FDA-clearance on the United States' first over-the-counter drug test. Our products are now sold in thousands of retail drug stores nationwide, and throughout the world. Phamatech has focused on increasing sales of our own brand name products, building a strong foundation for continued growth and brand equity. Our accomplishments cannot solely be attributed to strong leadership and dedicated hard-working employees. We grew and prospered because we found great partners and distributors who have given loyal support along the way.

### UNITY

Phamatech believes teamwork is the key to success. Providing unparalleled service and support to our distributors, partners and clients, we achieve and maintain loyal alliances unmatched in the industry. We strive to inspire customer loyalty by providing the highest quality products at affordable prices. Our objective is to be the best in the industry. If you value products and services that enhance quality-of-life and believe in long lasting partnerships, we would like you to join Phamatech's family of domestic and international clients. Please contact us for more information about our company and our mutually beneficial partnerships.

**Phamatech, Inc.**
**10151 Barnes Canyon Road**
**San Diego, CA 92121, USA**

An ISO 9001/13485 Certified Company

**Toll-free: (888) 635-5840**
**Local: (858) 643-5555**
**Fax: (858) 635-5843**
**Email: sales@phamatech.com**
**Internet: www.phamatech.com**



# PHAMATECH
## Drug Testing Laboratory

Phamatech operates a fully-functional Drugs-of-Abuse Testing Laboratory in our San Diego, California facility.

We also enjoy strong collaboration with two of the best drug testing labs in the country. These partnerships allow us to provide unparalled service to law enforcement and corrections, the workplace, drug rehabilitation, clinical and even the home testing markets. Combining our own resources with that of our lab partners gives us nationwide coverage and depth-of-resources, allowing us to service clients both large and small, while providing them with the response times, security and redundancy they require.

We use the newest technologies and employ some of the best scientists in the country to give you test results that you can trust. We offer amazingly fast results, easy account set-up, fantastic customer service, and state-of-the art electronic reporting options.

*When it comes to drug testing, doesn't it make sense to go with the company that manufactures the test?*

**Phamatech, Inc.**
**10151 Barnes Canyon Road**
**San Diego, CA 92121, USA**

An ISO 9001/13485 Certified Company

**Toll-free: (888) 635-5840**
**Local: (858) 643-5555**
**Fax: (858) 635-5843**
**Email: sales@phamatech.com**
**Internet: www.phamatech.com**



**PHAMATECH**

10151 Barnes Canyon Road
San Diego, CA 92121 USA
TOLL FREE (888) 635-5840
FAX (858) 635-5843
TEL (858) 643-5555
www.phamatech.com

March 19, 2007

*Dear Jan,*

*This is the letter/package that every location is receiving.*

*If you have any questions, please do not hesitate to call me.*

*Regards,*

*John*

### Special Welcome from
### Phamatech, Inc.
### BOP Awardee of Instant Drug Test Cups

Dear _____:

I am the Account Manager for the entire Bureau of Prisons Contract to supply our Instant Drug Test Cups and supplies to your department.

Allow me to officially welcome you to our growing list of worldwide satisfied clients.

Two of my assistants and I will be placing a call to every location in the next few days to introduce ourselves and to confirm your drug testing needs. We will avail ourselves to answer any questions or concerns and feel free to contact us anytime.

Additionally, enclosed please find a welcome packet with drug testing literature, order forms, a training CD, contact list, etc.

Once again, welcome.

Sincerely,

John Polanco
Governments Contracts Manager

PHAMATECH, INC.
CONTACT LIST

FOR BOP DEPT

| CONTACT | OFFICE EXT. 8AM-5PM PST | CELL (24 HR) | RESPONSIBILITY: ORDERING SUPPLIES | TECHNICAL QUESTIONS | PROBLEMS | ON CALL 24 HR | EXP WITNESS NOTIFICATION | 8AM-5PM PST |
|---|---|---|---|---|---|---|---|---|
| JOHN POLANCO john@phamatech.com | 888-635-5840 | (b)(2)Low | X | X | X | X | X | X |
| JOHN TOMA toma@phamatech.com | 888-635-5840 | (b)(2)Low, (b)(4) | X | X | X | X | X | X |
| BONNIE FILOSA bonnie@phamatech.com | 888-635-5840 | (b)(2)Low | X | | | | | |
| LYDIA JACKSON lydia@phamatech.com | 888-635-5840 | (b)(2)Low | X | | | | | X |
| KRISTI MACPHERSON kristina@phamatech.com | 888-635-5840 | | X | | | | | X |
| DARRELL TATE dtate@phamatech.com | 888-635-5840 | | X | | | | | X |

10151 Barnes Canyon Rd.
San Diego, CA 92121 USA

GOVERNMENT CONTRACT SALES
800-635-5840
www.phamatech.com
govsales@phamatech.com

# DRUGS OF ABUSE

| DRUG | | TRADE NAMES | STREET NAMES | CLASSIFICATION | CLINICAL EFFECTS/SYMPTOMS | PHYSICAL/PSYCHOLOGICAL DEPENDENCE | METHOD OF ADMINISTRATION | PHYSICAL APPEARANCE | APPROXIMATE DETECTION TIME IN URINE |
|---|---|---|---|---|---|---|---|---|---|
| Amphetamines | Methamphetamine | Desoxyn® | Uppers, pep pills, bennies, moth, crank, Speed, meth, crystal | Central nervous system stimulants | Auditory, visual, tactile, olfactory, hallucinations, delusions of crawling insects/worms, euphoria | Possible/high | Swallowed or injected | Coarse powders, crystals, "chunks," capsules or tablets of various sizes and colors | 24 to 48 hours |
| | Amphetamine | Dexedrine® | Dexies, hearts, whites, black beauties | | | | | | |
| Barbiturates | Phenobarbital | Luminal® Phenobarbital | Barbs, downers, goofballs Barbs | Depressancy sedative+hypnotic | Sedation, anti-anxiety, euphoria, anesthesia | High/moderate | Swallowed or injected | Tablets, capsules, liquid (injectable), white powder | Short acting (e.g., secobarbital) 1 day; Long acting (e.g. phenobarbital) 2-3 weeks |
| | Secobarbital Pentobarbital Amobarbital Butalbital | Seconal® Nembutal® Amytal® Fiorinal® | Reds, Yellow jackets, Blue devils | | | | | | |
| Benzodiazepines | Chlordiazepoxide | Librium® | Tranks, downers | Minor tranquilizers, anti-anxiety/sedative | Hypnotic, anti-anxiety, anti-convulsant | Low | Swallowed or injected | White or pale yellow crystalline powders, tablets, capsules, liquid (injectable). | 3 days (therapeutic dose) |
| | Diazepam Oxazepam Lorazepam Flurazepam Clorazepate | Valium® Serax® Ativan® Dalmane® Tranxene® | Blues, yellows | | | | | | |
| Cannabinoids | Marijuana | | Grass, pot, joint, weed, ragweed, Thai sticks, Columbian, Sinsemilla, Acapulco gold, ace, bhang, ganja, reefer, Napalese fingers, black Afghan | Hallucinogen | Hallucinations, euphoria, relaxed inhibitions | Unknown/moderate | Swallowed or smoked | Dry crushed leaves (marijuana), hand-rolled cigarettes (joints). | Acute dosages of 1 or 2 joints — 2-3 days; Chronic use of more than 5 joints/day — 14 to 18 days |
| | Hashish | | | | | | | Hard chunks of resin of various colors (hashish). | |
| | Hashish Oil | | | | | | | Dark viscous liquid (hashish oil) | |
| Cocaine | Cocaine | | Coke, snow, nose candy, toot crack, stardust, flake, White Lady, blow, Coia, Bolivian rock, Peruvian flake, mother of pearl | Stimulant/local anesthetic | Motor and verbal hyperactivity, mood elevation, inflated self-esteem, grandiose delusions | Possible/high | Sniffed, swallowed, or injected | Odorless white crystalline powder with bitter numbing taste | 1 to 5 days |
| Methadone | Methadone | Dolophine® Methadone | Dolly | Narcotic, opioid, analgesic | Euphoria, drowsiness | High/high-low | Swallowed | White, crystalline powder, tablets, liquid (injectable). | 3 days |
| Methaqualone | Methaqualone | | Ludes, sopors, quaaludes, stumble cookies | Sedative, hypnotic | Sedation, hypnosis | High/high | Swallowed | White crystals, tablets | 14 days |
| Opiates | Morphine | Morphine sulphate | M, morph, Miss Emma | Narcotic analgesic | Euphoria, analgesia, drowsiness, respiratory depression | Morphine - High, Heroin - High, Codeine - Moderate, Hydromorphone - High, Oxycodone - High | Swallowed or injected | White, brown, or black powder, (injectable), tablets, capsules of various sizes and colors | 2 days |
| | Heroin | | Smack, junk, horse, H, gum, dust, Mexican brown, China white | | | | | | |
| | Codeine | Codeine | Schoolboy | | | | | | |
| | Hydromorphone | Dilaudid® | Juice, dillies, D's, No. 2's, No. 4's | | | | | | |
| | Oxycodone | Percodan® | Percs | | | | | | |
| Phencyclidine | Phencyclidine | | PCP, angel dust, killer weed, supergrass, hog, PeaCe Pill | Hallucinogen, dissociative anesthetic | Psychedelic reaction, hallucinations, catatonia, combativeness | Unknown/high | Smoked, swallowed, or injected | PCP encountered on streets as pills, capsules, powders of various colors, white crystalline powder. | 8 days (overdose) |
| Propoxyphene | Propoxyphene | Darvon® | | Narcotic, analgesic, opioid | Analgesic, euphoria, intoxication | High/high/high-low | Swallowed | Capsules, tablets of various sizes and colors | 6 hours to 2 days |

Detection times vary depending on analytical method used, drug metabolism, patient's physical condition, fluid intake and ...

**PHAMATECH, INC.**
**10151 BARNES CANYON ROAD**
**SAN DIEGO, CA 92121**
888-635-5840
govsales@phamatech.com
www.phamatech.com

# HOW LONG AFTER USING DRUGS CAN THEY BE DETECTED IN URINE? *(Approximate values)*.

Each drug is cleared through the body at different rates. The amount of a drug (the concentration) in the body, how often the drug is taken, how the drug was taken (swallowed, inhaled, smoked or injected) as well as user age, weight, diet and metabolic rate all play a part in detection times. **A general guideline for drug detection periods follows:**

| DRUG | APPOXIMATE DETECTION TIMES | |
|------|------------------|------------|
| | *Minimum* | *Maximum* |
| Amphetamine | 2 – 7 hours | 2 – 4 days |
| Cocaine Metabolite | 1 – 4 hours | 2 – 3 days |
| Methamphetamine | 2 – 7 hours | 2 – 4 days |
| Opiates | 2 – 3 hours | 2 – 3 days |
| Marijuana (THC) | 6 – 18 hours | up to 28 days |

**TABLE OF CONTENTS**

Solicitation/Contract/Order for
Commercial Items

**2**    **Statement of Work (SOW)**

**3**    **Exhibit 1** – 510K Clearance

**4**    **Exhibit 2** – Chain of Custody Sample
BOP's Attachment A preprinted on back

**5**    **Exhibit 3** – Drug Cross Reaction Chart

**6**    **Exhibit 4** – Accuracy Summary (see
Third Party Studies for details)

**Exhibit 5** – Third Party Studies

**Exhibit 6** – Client Support

**9**    **Exhibit 7** – Expert Witness Credentials

**10**    **Exhibit 8** – ISO Certificate

**11**    **Exhibit 9** – Past Performance
(Using BOP's Attachment B form)

**12**    **Exhibit 10** – BOP's original SOW

OMB No.          1103-0016
Expiration Date

| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS | | | | | 1. REQUISITION NUMBER | | PAGE OF PAGES | |
| OFFEROR TO COMPLETE BLOCKS 12,17,23,24, & 30 | | | | | 0021-2007 | | 1 | 3 |

| 2. CONTRACT NO | 3. AWARD EFF DATE | 4. ORDER NUMBER | | 5. SOLICITATION NUMBER | | 6. SOLICITATION ISSUE DATE |
| | | | | RFQ-NAS-0021-2007 | | 12/19/2007 |

| 7. FOR SOLICITATION INFORMATION CALL | a. NAME | | b. TELEPHONE NUMBER (No collect calls) | 8. OFFER DUE DATE LOCAL TIME |
| | JAN R. JOHNS | | 202-616-6150 | 01/29/2007 |
| | | | | 12:00 p.m. |

| 9. ISSUED BY          CODE | | 10. THIS ACQUISITION IS | |

FEDERAL BUREAU OF PRISONS
ACQUISITIONS BRANCH
NATIONAL ACQUISITIONS SECTION
320 FIRST ST. N. W.  ROOM 5006
WASHINGTON                    DC  20534

| [X] UNRESTRICTED OR [ ] SET ASIDE: ____ % FOR | |
| [ ] SMALL BUSINESS | [ ] EMERGING SMALL BUSINESS |
| [ ] HUBZONE SMALL BUSINESS | 8(a) |
| [ ] SERVICE DISABLED VETERAN-OWNED SMALL BUSINESS |

NAICS:    424210
SIZE STANDARD:  0100 EMPLOYEES

| 11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED [ ] SEE SCHEDULE | 12. DISCOUNT TERMS 2%10, N30 | 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) 13b. RATING | 14. METHOD OF SOLICITATION [X] RFQ  [ ] IFB  [ ] RFP |

| 15. DELIVER TO          CODE | | 16. ADMINISTERED BY          CODE |

FEDERAL BUREAU OF PRISONS
VARIOUS INSTITUTIONS THROUGHOUT
CONTINUOUS UNITED STATES, HAWAII
AND PUERTO RICO

FEDERAL BUREAU OF PRISONS
ACQUISITIONS BRANCH
NATIONAL ACQUISITIONS SECTION
320 FIRST ST. N. W., ROOM 5006
WASHINGTON                    DC  20534

| 17a. CONTRACTOR/          CODE OFFEROR | FACILITY CODE | 18a. PAYMENT WILL BE MADE BY          CODE |

PHAMATECH, INC.
10151 BARNES CANYON ROAD
SAN DIEGO, CA  92121

PHONE 888-635-5840  FAX 858-635-5843

FEDERAL BUREAU OF PRISONS
VARIOUS INSTITUTIONS

| [ ] 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED [ ] SEE ADDENDUM |

| 19. ITEM NO | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |

The Federal Bureau of Prisons (BOP)
has the requirement for on-site urine
test cups. All requirements for the
on-site urine test cups shall be
provided in accordance with the

Refer to          Refer to
Fedbid.com        Fedbid.com

| 25. ACCOUNTING AND APPROPRIATION DATA | 26. TOTAL AWARD AMOUNT (For Govt. Use Only) |

| [ ] 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED.  ADDENDA [ ] ARE [ ] ARE NOT ATTACHED |
| [ ] 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED.  ADDENDA [ ] ARE [ ] ARE NOT ATTACHED |

| [X] 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN ____1____ COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN. | [ ] 29. AWARD OF CONTRACT: REF _____ OFFER DATED _____. YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS: |

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER) |

| 30b. NAME AND TITLE OF SIGNER (TYPE OR PRINT) JOHN POLANCO GOVERNMENT CONTRACTS | 30c. DATE SIGNED 22/2/11 | 31b. NAME OF CONTRACTING OFFICER (TYPE OR PRINT) | 31c. DATE SIGNED |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 3-2005)
Prescribed by GSA - FAR (48 CFR) 53.212

| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS<br>Continuation Sheet | | 1. SOLICITATION NUMBER<br>2001-2007 | | | | PAGE 2 | PAGES 3 |
|---|---|---|---|---|---|---|---|
| 2. CONTRACT NO. | | 3. AWARD EFF. DATE | | 4. SOLICITATION NUMBER<br>RFQ-NAS-H021-2007 | | | |
| 19<br>ITEM NO | 20<br>SCHEDULE OF SUPPLIES/SERVICES | | 21<br>QUANTITY | 22<br>UNIT | 23<br>UNIT PRICE | | 24<br>AMOUNT |

Request for Quotes and Statement of Work in Section A/B - Description of Supplies/Services of the solicitation.

This requirement shall be awarded as a single award, requirements type task order contract with firm fixed unit prices based on a General Services Administration (GSA) Federal Supply Schedule (FSS) contract for the acquisition of the on-site urine test cups. The contractor shall provide the technical information and past performance information to:

Jan R. Johns
Contracting Officer
320 First Street, N. W.
Room 5006
Washington, DC 20534

See Section A.1 - Schedule of Supplies Service for information with regards to submitting pricing information for the Request for Quotes. All items provided shall be available under the contractor's GSA FSS contract.

GSA FSS Contract Number:
GS07F5786P

Tax ID Number:

(b)(4)

(b)(4)

DUNS Number:

The contractor is advised to submit any and all information requested in the Request for Quotes. If all information is not submitted, it may disqualify the contractor from consideration of award.



| | PAGE OF PAGES |
| --- | --- |
| | 3    3 |

| CONTRACT NO. | REQUISITION NUMBER 0071-2007 | AWARD EFF DATE |
| --- | --- | --- |

ADDITIONAL INFORMATION:

Bureau of Prisons Solicitation
Solicitation Number: RFQ-NAS-0021-2207                    Phamatech, Inc.

# STATEMENT OF WORK (SOW)
### *(Orginal SOW – Refer to Exhibit 10)*

**A.1    Schedule of Supplies/Services**

Pricing Base Year and Option Years – See FedBid Reverse Auction results

**A.2    Description of Supplies/Services**

|  | | **Requirements Met and / or concur** | |
|---|---|---|---|
|  | | Yes | No |
| *I.* | ***Cup Design Requirements:*** | | |
| a. | Fully integrated, without a separate testing device. (Sample enclosed) | _x_ | ___ |
| b. | Must test for multiple drugs. | _x_ | ___ |
| c. | No other manipulation, pouring, tipping, turning, tilting, inserting and turning a key, test card, pipette, dropper or dipper required. | _x_ | ___ |
| d. | Cup must be able to of detecting 6 drugs simultaneously | _x_ | ___ |
| e. | BOP requires 6 panel cup as outlined in Section III | _x_ | ___ |
| f. | BOP reserves right to change screens at no add'l cost | _x_ | ___ |
| g. | Cup must be of clear plastic with a screw top lid | _x_ | ___ |
| h. | Cup will not leak during air/ground shipping | _x_ | ___ |
| i. | Cup's mouth 2 ¼" diameter and at least 3" high | _x_ | ___ |
| j. | Cup must have minimum fill line/mark at least 30ml Clearly displayed on the outside of the cup | _x_ | ___ |
| k. | Cup must have temperature label installed horizontally at the most bottom  portion of the cup which provides color coded indication for temperatures ranging from 90F/32C to 100F/38C in 1 or 2 degree increments | _x_ | ___ |
| l. | The test panel results must covered by a label | _x_ | ___ |
| m. | The test results must appear within five minutes and remain stable up to a minimum of 30 minutes | _x_ | ___ |
| n. | Cup must be FDA approved for commercial distribution with an active 510K notification document; ***(Refer to Exhibit 1 – 510K)*** | _x_ | ___ |
| o. | Contractor will provide the following samples: | | |
|  | i.. Shipping bag | _x_ | ___ |
|  | ii. Shipping container that will hold 2 specimen cups ***(Refer to Exhibit 1a – Inside binder's back pocket)*** | _x_ | ___ |
|  | iii.  Chain of custody | _x_ | ___ |

| | Requirements Met and / or concur | |
|---|:---:|:---:|
| | Yes | No |

## II.    Supplies/Report Forms:

a.    Each sterile on-site cup will be provided in a seal bag
with lot number, expiration date, drugs.cut-off levels _____x_____ _____

b.    Cup must have a desiccant that maintains relative
humidity per manufacturers' specifications _____x_____ _____

c.    Instructions for use must of the on-site cups on the outside
of the sealed bag _____x_____ _____

d.    Product must have a minimum shelf life of 12 months
from date of delivery _____x_____ _____

e.    Contractor to provide clear sealable shipping bags and
sturdy cardboard shipping containers for shipping positive
results for lab confirmation _____x_____ _____
**(Refer to Exhibits 1a & 1b, inside binder's back pocket)**

f.    Contractor will provide for each cup, a single donor
a preprinted chain of custody with specimen ID not to
exceed 10 characters, a self adhesive peel off label with
matching specimen ID number (long enough to seal the
lid of the cup). **(Refer to Exhibit 2 – Chain of Custody)** _____x_____ _____

g.    Label must have  line to enter collection time, date and
inmate's initials, and two additional smaller self adhesive
peel off labels with matching specimen ID _____x_____ _____

h.    The supplied chain of custody form will consist of two (2)
self carbonized parts (original and copy) _____x_____ _____

i.    The inmate's identity must be blocked out on the copy
(Inmate's name, register number, certification/signature) _____x_____ _____

j.    Urine collection procedures must be printed on the custody
form per BOP's Attachment A **(Refer to Exhibit 2)** _____x_____ _____

## III.    Test Panels, Sensitivity, and Accuracy:

a.    The 6 panel drug cup must be capable of detecting the
following drugs simultaneously at the listed cut off levels: _____x_____ _____

| | |
|---|---|
| THC | 50 ng/ml |
| OPIATES | 300 ng/ml |
| AMPHETAMINES | 1000 ng/ml |
| METHAMPHETAMINES | 1000 ng/ml |
| COCAINE | 300 ng/ml |
| BARBITUATES | 300 ng/ml |

<u>**Requirements Met
and / or Concur**</u>

Yes    No

### III.    *Test Panels, Sensitivity, and Accuracy (continued):*

b.  The contractor must also have, as an available option,
an adulteration  strip                                                    _X_    ____

c   To prevent leaching, each drug test (one drug per strip) must
be in its own individual test strip chamber/channel and have
its own test control and test result lines.                               _X_    ____

c.  Each test strip chamber/channel must have a control line
indicator to determine that the test has functioned properly             _X_    ____

d.  The contractor must provide a list of drugs that will not be
detected and will not produce a positive result for the category
of drugs specified above-lists to be provided with quote;                _X_    ____
    **(Refer to Exhibit 3 – Drug Cross Reaction)**

e.  The on site test strips must have an accuracy rate of at least
95% as compared to GC/MS results and documentation must be
presented with proposal;                                                 _X_    ____
    *(Refer to Exhibit 4 – Accuracy Specifications)*

f.  The accuracy rate must not change due collection site elevation/
altitude or humidity levels                                              _X_    ____

g.  The contractor product must have participated in a well regarded
third party study for accuracy and contractor will provide results
with proposal; *(Refer to Exhibit 5 – Third Party Study)*                _X_    ____


### IV.    *Support*

a.  The Contractor must provide 24 hours/day, seven days/week
technical assistance at no additional cost;                              _X_    ____
    **(Refer to Exhibit 6 – Client Support)**

b.  The product being offered must not be sold over the counter
or over the internet                                                     _X_    ____

c.  The contractor must provide subject matter expert testimony
upon request from the BOP Contracting Officer;                           _X_    ____
    **(Refer to Exhibit 7 – Expert Witness Credentials)**


### V.    *Comparison Testing:*

Nothing required from the contractor under this category

**Bureau of Prisons Solicitation**
**Solicitation Number: RFQ-NAS-0021-2207**

<div align="right">

**Page 4**
**Phamatech, Inc.**

</div>

<div align="right">

**Requirements Met**
**and / or concur**
Yes     No

</div>

### VI.    Training

a.  The contractor shall be able to provide on-site training
    Certification to the COTR and the six Regional Office
    Urine Surveillance Program Coordinators                          _X_     ____

b.  The vendor may also provide a training CD or video to each
    Institution, which may suffice for the training                 _X_     ____

### VII.    Billing

a.  Costs of all supplies to include on-site cups, lids, shipping
    containers, identification labels, and chain of custody forms
    to be included in the cost of the on-site cup                   _X_     ____

b.  Contractor must assign/provide each collection site with an
    exclusive identification (account) number                       _X_     ____

c.  The account numbers must be preprinted on the Chain of
    Custody                                                         _X_     ____

d.  Billing for supplies will be directed to the specific billing
    address provided for each collection site                      _X_     ____

e.  The BOP will be reimbursed for the costs of defective product  _X_     ____

### VIII.   Contract Award

a.  The contractor must ship requested supplies and offer full support
    services to each collection site within 30 days of official notification
    of award FOB destination                                       _X_     ____

b.  The contractor must replenish supplies and forms within 14 calendar
    days of verbal notification request                            _X_     ____

**Bureau of Prisons Solicitation**
**Solicitation Number: RFQ-NAS-0021-2207**

<div align="right">

Page 5
**Phamatech, Inc.**

</div>

<div align="right">

**Requirements Met**
**and / or Concur**
Yes    No

</div>

### IX.    *Quality Control/Manufacturing Practices:*

a.  The manufacturer of the on-site cup must be an International
Organization for Standardization (ISO) certified and
Documentation of such to be provided with proposal;
*(Refer to Exhibit 8 – ISO Certificate)*                    _x_    ____

### X.    *Technology Statement*

a.  Should new on-site cup technology become available during
the contract period, the contractor will provide those cups
to BOP for evaluation/consideration                         _x_    ____

b.  If new technology results in discontinued use of contracted
product, then the new acceptable technology will be provided
to BOP at no additional cost                                _x_    ____

### A.3    EVALUATION CRITERIA

*Technical*

a.  The technical portion of the quote will be evaluated on a Go/No-Go
Basis for compliance as predicated on the Statement of Work      _x_    ____

b.  The quote should address each and every specification          _x_    ____

*Past Performance*

a.  Each quoter shall submit past performance information for three
recent and relevant contracts for the same or similar items ;
*(Refer to Exhibit 9 – Past Performance – Submitted using*
*BOP's Attachment A form)*                                  _x_    ____

b.  Quoter should address any instances of past performance problems
in referenced contracts and explain how these problems were
resolved *(Refer to Exhibit 9)*                            _x_    ____

**Bureau of Prisons Solicitation**
**Solicitation Number: RFQ-NAS-0021-2207**

**Page 6**
**Phamatech, Inc.**

**Requirements Met**
**and / or Concur**
Yes    No

### A. 3   EVALUATION CRITERIA (continued)

*Price*

a.  The quoter's price will be a factor in the award decision        _x_    ____

*Evaluation and Award*

a.  The quoter's initial quote should contain the quoter's best
    term from a technical and price standpoint.  However, the
    Government reserves the right to conduct discussions if later
    determined by the Contracting Officer        _x_    ____

### A. 4   PROJECT COORDINATION

a.  The Government will appoint Nancy Trudel as the Contracting
    Officer's Technical Representative (COTR) for this project      _x_    ____
b.  The COTR does not have authority to alter the Contracting
    Officer's obligations under this contract       _x_    ____
c.  If as a result of technical questions it is desirable to alter/
    change the contractual obligations or requirement, the
    contracting officer shall issue such changes in writing under
    signature        _x_    ____

### A. 5   CONTRACTING AND ADMINISTRATIVE AUTHORITY

a.  The Contracting Officer is the only person authorized to approve
    Changes or modify any of the requirements under this task order
    contract        _x_    ____
b.  In the event that the Contractor effects any change at the direction
    of any person other than the Contracting Officer, the change will
    be considered to have been without  authority nullifying any
    changes        _x_    ____

**Bureau of Prisons Solicitation**
**Solicitation Number: RFQ-NAS-0021-220⁷**

Page  7
Phamatech, Inc.

<u>**Requirements Met**</u>
<u>**and / or Concur**</u>
<u>Yes    No</u>

### A. 5  CONTRACTING AND ADMINISTRATIVE AUTHORITY (cont'd)

c.  Contractual problems, of any nature, that may arise during the
performance of this contract must be handled in accordance with
the specific public laws and regulations (FAR).  Only the
Contracting Officer is authorized to solve such problems                    _X_    ____

### A. 6  INSPECTION AND ACCEPTANCE

a.  The contractor shall only deliver items or services that conform
To the requirements of this task order contract                             _X_    ____
b.  The COTR reserves the right to inspect and test the items
tendered by the contractor                                                   _X_    ____
c.  If any item/service is found unacceptable or not meeting the
intent of this requirement, the Government may require re-
performance  with no price increase                                         _X_    ____

### A. 7  PAYMENT AND INVOICING

a.  The Contractor will propose firm fixed unit prices based on
the GSA FSS contract for this requirement                                    _X_    ____
b.  All invoices shall be prepared in accordance with FAR clause
52.212-4(g) and invoiced only for completed tasks after
delivery and acceptance by the BOP                                          _X_    ____
c.  Payments will be made by Electronic Funds Transfer and in
accordance with the Prompt Payment Act.  The contactor shall
be registered in the CCR Database with current information                   _X_    ____

### A.8  CONTRACT CLAUSES

**52.252-2 CLAUSES INCORPORATED**
**BY REFERENCE (FEB 1998)**                                                  _X_    ____

Bureau of Prisons Solicitation
Solicitation Number: RFQ-NAS-0021-2207

Page  8
Phamatech, Inc.

**Requirements Met
and / or Concur**

Yes    No

### A.8   CONTRACT CLAUSES (cont'd)

### 52.216-18  ORDERING (OCT 1995)

a.  Any supplies and services under this contract shall be
    ordered by issuance of delivery or task orders    _x_    ____
b.  All delivery or task orders are subject to the terms and
    conditions of this contract, in the event of a conflict, the
    contract shall control    _x_    ____
c.   If mailed, a delivery order or task is considered "issued"
    When the Government deposits the order in the mail.    _x_    ____
d.  Orders may be issued orally, by facsimile, or by electronic
    commerce methods if authorized by the Schedule    _x_    ____

### 52.216-19  ORDERING LIMITATIONS (OCT 1995)

a.  Minimum order – If less $100 Government is not required
    required to purchase nor the contractor obligated    _x_    ____
b.  Maximum order -  The contractor is not obligated to honor
    1. Any single item greater $100,000    _x_    ____
    2. Any order for a combination of items greater than $250,000    _x_    ____
    3. A series of order from the same ordering office  within 30 days
        that together exceed (b) (1) or (2) above    _x_    ____
c.  If this is a requirement  contract  (i.e., includes the Requirements
    Clause of subsection 52.216-21 of the FAR, the Government is
    not required to order a part of any one requirement that exceeds the
    maximum-order limitations in paragraph (b) of this section    _x_    ____
d.  Notwithstanding paragraphs (b) and (c) of this section, the
    Contractor shall honor any order exceeding the maximum order
    Limitations in paragraph (b), unless that order (or orders) is returned
    to the ordering office within 15 days after issuance, with written
    Contractors intent not to ship    _x_    ____
e.  Upon receiving this notice the Government may order from
    supplies/services from another source    _x_    ____

**Requirements Met**
**and / or Concur**
Yes    No

### 52.216-21     REQUIREMENTS (OCT 1995)

a.  This is a requirements contract and the quantities specified are
estimates only and not purchased by this contract. If Government's
requirement does not result in orders as estimated this does not
constitute a basis of equitable price adjustment                        _X_    ___
b.  Delivery or performance shall be made only as authorized per the
ordering clause. The Government may issue orders requiring
delivery to multiple locations                                          _X_    ___
c.  The Government shall order from the contractor all the supplies
or services as specified in the Schedule                               _X_    ___
d.  The Government is not required to purchase from Contractor in
excess of any limit on total orders under this contract                _X_    ___
e.  If the Government urgently required delivery of any quantity of an
item before the earliest date specified under the contract, and it the
Contractor will not accept an order providing accelerated delivery,
the Government may order such request from another source              _X_    ___
f.  Any order issued during the effective period of this contract and
not completed within that period shall be completed by Contractor
within the time specified in the order.  The contract shall govern
the Contractor's and Government's rights and obligations with
respect to that order to the same extent as stipulated by the
contract; provided that the Contractor shall not be required to
perform  under this contract after contract expiration                 _X_    ___

### 52.217-8     OPTION TO EXTEND SERVICE (NOV 1999)

a.  The Government may require continued performance of any services
within the limits and the rates specified in the contract. The option
provision may be exercised more than once, not exceed 6 months per
written notice from the Contracting Officer                            _X_    ___

**Requirements Met
and / or Concur**
Yes    No

**52.217-9    OPTION TO EXTEND THE TERM
OF THE CONTRACT (MAR 2000)**

a.  The Government may extend the term of this contract with 45
    day written notice.  This notice does not commit the Government
    to an extension                                                                   _X_    ___
b.  If the Government exercise this option, the extended contract
    shall be considered to include this option clause                   _X_    ___
c.  The total duration of this contract, including any options under
    this clause shall not exceed five years                                  _X_    ___

**52.232-19    AVAILABILITY OF FUNDS FOR THE
THE NEXT FISCAL YEAR (APR 1984)**

a.  The Government obligation for performance beyond September
    30 is contingent upon the availability of appropriated funds.  No
    Government legal liability for any payment beyond September
    30 until funds are available to the Contracting Officer             _X_    ___

**CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE
(COTR) (JAR 2852.201-70) (JAN 1985)**

a.  Nancy Trudel is the designated COTR as stipulated under this
    the contract                                                                       _X_    ___
b.  The COTR is responsible for all administrative duties as stipulated
    under the contract                                                              _X_    ___
c.  The COTR does not have authority to alter the contractor's
    obligation under the contract, and/or modify any of the terms,
    conditions, specifications, or cost of the agreement.  If as a result
    of technical discussions it is desirable to alter/change the contractual
    obligations or the Scope of Work, the Contracting Officer shall issue
    such changes                                                                     _X_    ___

## PROTESTS FILED DIRECTLY WITH THE DEPARTMENT OF JUSTICE (JAR 2852.233-70) (JAN 1988)

*We, at Phamatech, Inc., concur with the Government's entire Protest procedures as stipulated under this section.*

### A.9  SOLICITATION PROVISIONS

**The following provisions are incorporated into this solicitation/ Contract by full text as follows:**

**52.233-2      SERVICE OF PROTEST (AUG 1996)**

*We, at Phamatech, Inc., concur with the Government's Service of Protest procedures as stipulated under this section.*



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
2098 Gaither Road
Rockville MD 20850

**MAY 2 6 2000**

Mr. Carl A. Mongiovi
Vice President
Phamatech
9265 Activity Road, #112-113
San Diego, California 92126

Re:    K001397
       Trade Name: QuickScreen™ Pro Drug Cup (Model 9195X)
       Regulatory Class: II
       Product Code: DKZ, LDJ, LCM, LAF, DIO, DJG, DJR, DIS, JXM
       Dated: April 26, 2000
       Received: May 3, 2000

Dear Mr. Mongiovi:

We have reviewed your Section 510(k) notification of intent to market the device referenced above and we have determined the device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act). You may, therefore, market the device, subject to the general controls provisions of the Act. The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II (Special Controls) or class III (Premarket Approval), it may be subject to such additional controls. Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 895. A substantially equivalent determination assumes compliance with the Current Good Manufacturing Practice requirements, as set forth in the Quality System Regulation (QS) for Medical Devices: General regulation (21 CFR Part 820) and that, through periodic QS inspections, the Food and Drug Administration (FDA) will verify such assumptions. Failure to comply with the GMP regulation may result in regulatory action. In addition, FDA may publish further announcements concerning your device in the Federal Register. Please note: this response to your premarket notification submission does not affect any obligation you might have under sections 531 through 542 of the Act for devices under the Electronic Product Radiation Control provisions, or other Federal laws or regulations.

Page 2

This letter will allow you to begin marketing your device as described in your 510(k) premarket notification. The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801 and additionally 809.10 for in vitro diagnostic devices), please contact the Office of Compliance at (301) 594-4588. Additionally, for questions on the promotion and advertising of your device, please contact the Office of Compliance at (301) 594-4639. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR 807.97). Other general information on your responsibilities under the Act may be obtained from the Division of Small Manufacturers Assistance at its toll-free number (800) 638-2041 or (301) 443-6597 or at its internet address "http://www.fda.gov/cdrh/dsma/dsmamain.html".

Sincerely yours,

Steven I. Gutman, M.D., M.B.A.
Director
Division of Clinical Laboratory Devices
Office of Device Evaluation
Center for Devices and Radiological Health

Enclosure

# INDICATIONS FOR USE

Applicant: Phamatech

510 (k) Number (if known) __K 001397__

Device Name: _QuickScreen Pro Drug Cup (Model 9195X)_

Indications for Use:

An in vitro diagnostic test for the qualitative identification of amphetamine, cocaine, methamphetamine, opiates, PCP, benzodiazepines, barbiturates, methadone and THC in urine. Measurements obtained by this device are used in the diagnosis and treatment of drug abuse. It is intended for professional use only.

(Division Sign-Off)
Division of Clinical Laboratory Devices
510(k) Number __K001397__

PLEASE DO NOT WRITE BELOW THIS LINE

Concurrence of the CDRH Office of Device Evaluation (ODE)

Division Sign-off
Division of Clinical Laboratory Devices
510 (k) Number

Prescription Use: __✓__    OR    Over the Counter:_____
Per 21 CFR 801.109

Product Detail

   

Tutorial | Customer Assistance | Wr

**Advantage!**

New search:                                          in All Categories

 Product Detail                                    ? Help on this page

| | | Contractor: |
|---|---|---|
| Product: | **6 DRUG CUP** | **PHAMATECH INC** |
| NSN/Mfr Part #: | 9600X QUICKSCREEN CUP | 10151 BARNES CANYON RD., SAN DIEGO, CA 92121 |
| Mfr: | PHAMATECH, INC. | http://www.phamatech.com Phone: 8586355840 |
| Desc: | 9600X QuickScreen Cup - any 6 drug combination that will include, 6 drug screens, with or without results covered window, bio bag, chain of custody, transport boxes, etc. | GS-07F-5785P - Small Business Contract end date: May 31, 2009 |

Qty:  [ADD to Cart]

**Instructions:** To view another contractors description, click on the Contractor name.

| | |
|---|---|
| Contractor | ● **PHAMATECH INC** |
| Delivery | 5 days delivered ARO |
| Unit Price | (b)(4) |
| Unit | EA |
| Manufacturer | PHAMATECH, INC. |
| Mfr.Part Number | 9600X QUICKSCREEN CUP |
| Min. per Order | $100.00 |
| Max. per Order | $200,000.00 |
| Stock Status | Direct Delivery |
| F.O.B. | Origin-CONUS,AK,PR,HI |
| Warranty | STANDARD WARRANTY |
| Country of origin | UNITED STATES OF AMERICA |
| Product web page | ❥ visit site |

## Federal Bureau of Prisons Chain of Custody Form

SPECIMEN ID NO.: B O P 0 0 0 0 0 0 0 0 0 1

**STEP 1: TO BE COMPLETED BY STAFF**

A. Institution Name, Address and Account No.

B.                                                                          Inmate's Register No.: _____

(PRINT) Inmate's Name (Last, First, MI)

C.  Time Requested: _____    Time Provided: _____    Date Collected: __Mo.__ __Day__ __Year__    Drug Cup Results: ☐ Negative ☐ Positive

D. Test Reason:   ☐ Random   ☐ Prior Use   ☐ Suspect   ☐ Disruptive Group   ☐ Saturation   ☐ Community   ☐ Other

**STEP 2: INMATE CERTIFICATION**

I have provided this specimen for the purpose of a drug screen. I acknowledge that the container was sealed with the tamper-proof seal in my presence and that the specimen number provided on this form and on the label affixed to the specimen container are the same.

**X.**

INMATE'S SIGNATURE

**X.**

Witness Signature (If Inmate refuse or unable to sign)                      PRINT (Witness Name)

**STEP 3: STAFF CERTIFICATION**

I certify that the specimen given to me by the inmate identified on this form was collected, labeled, and sealed in accordance with BOP Requirements

X.

Signature of Staff                                              (PRINT) Staff Name (Last, First, MI)

**STEP 4: TO BE COMPLETED BY STAFF**

A. Request Confirmation For:

☐ MET   ☐ THC   ☐ OPI   ☐ AMP   ☐ COC   ☐ BAR

B. Request Screening and Confirmation for:

☐ BZD   ☐ PCP   ☐ MTD   ☐ STEROIDS   ☐ OTHER

C.  Date Shipped: _____    Airbill Number: _____    Staff Initials: _____

| TO BE COMPLETED BY LABORATORY: | Specimen Bottle seal intact |
|---|---|
| **X.** _____ Received by Signature | ☐ YES |
| (PRINT) Received by Name (Last, First, MI)   __Mo.__ __Day__ __Year__ Date Received | ☐ NO, Enter Remarks |

_____ / _____ / _____
DATE    INMATE'S INITIALS    COLLECTION TIME

_____ / _____ / _____
DATE    INMATE'S INITIALS    COLLECTION TIME

LABEL AREA PART 1 ONLY

COPY 1-BUREAU OF PRISONS

BOP0000000001                                        BOP0000000001

# Federal Bureau of Prisons Chain of Custody Form

SPECIMEN ID NO.: _____

**STEP 1: TO BE COMPLETED BY STAFF**

A. Institution Name, Address and Account No.


B.                                                      Inmate's Register No.: _____

C. Time Requested: _____ Time Provided: _____ Date Collected: __|__|__  Drug Cup Results: ☐ Negative ☐ Positive
          24 hour clock/Military Time   24 hour clock/Military Time    Mo. Day Year

D. Test Reason: ☐ Random ☐ Prior Use ☐ Suspect ☐ Disruptive Group ☐ Saturation ☐ Community ☐ Other

**STEP 2: INMATE CERTIFICATION**

I have provided this specimen for the purpose of a drug screen. I acknowledge that the container was sealed with the tamper-proof seal in my presence and that the specimen number provided on this form and on the label affixed to the specimen container are the same.

**X.**

**INMATE'S SIGNATURE**

**X.**

Witness Signature (If Inmate refuse or unable to sign) | PRINT (Witness Name)

**STEP 3: STAFF CERTIFICATION**

I certify that the specimen given to me by the inmate identified on this form was collected, labeled, and sealed in accordance with BOP Requirements

**X.**
                 Signature of Staff                          (PRINT) Staff Name (Last, First, MI)

**STEP 4: TO BE COMPLETED BY STAFF**

A. Request Confirmation For:
☐ MET    ☐ THC    ☐ OPI    ☐ AMP    ☐ COC    ☐ BAR

B. Request Screening and Confirmation For:
☐ BZD    ☐ PCP    ☐ MTD    ☐ STEROIDS    ☐ OTHER

C. Date Shipped: _____ Airbill Number: _____ Staff Initials: _____

**TO BE COMPLETED BY LABORATORY:**

**X.**
          Received by Signature

(PRINT) Received by Name (Last, First, MI)     Date Received: __|__|__
                                       Mo. Day Year

Specimen Bottle seal intact
☐ YES
☐ NO, Enter Remarks

COPY 2

FACE 2:  YELLOW REPRESENTS DESENSITIZED ...



## EXHIBIT 2 – CHAIN OF CUSTODY (CC) - PROTOTYPE

The proposed CC is a rough draft of a two part form. This prototype is just waiting for BOP's revisions and can be produced in less than two weeks.

We have included one of Phamatech's current five page CC form, used for confirming the Quickscreen Devices, for BOP's review of the type of work that Phamatech is capable of producing.

Federal Bureau of Prisons... 159742.pdf   1/18/70   7:03:24 AM

# Federal Bureau of Prisons Chain of Custody Form



SPECIMEN ID NO.: 0 0 0 0 0 0 0 0 0 1

## STEP 1: TO BE COMPLETED BY COLLECTOR

A. Institution Name, Address and Account No.

B.. Collection Site Name, Address, and Account No.

C. Inmate Register No. _____  Time Of Collection Requested: _____  Time Provided: _____

D. Reason for Test: ☐ Random  ☐ Prior Use  ☐ Suspect  ☐ Disruptive Group  ☐ Saturation  ☐ Community  ☐ Other

E.. Inmate Identification Verified By ☐  Photo I.D. ☐  Other  Inmate Date of Birth: _____
Month    Date    Year

## STEP 2: TO BE COMPLETED BY COLLECTOR AND DONOR

I authorize the collection of the specimen for the purpose of a drug screen. I acknowledge that the container(s) was/were seal with Tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen Container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its agents

(PRINT) INMATE'S NAME (LAST,FIRST,MID)   SIGNATURE OF DONOR   INITIAL   MONTH   DAY   YEAR

Witness Signature (If Inmate refuses or unable to sign)   PRINT (Witness Name)   DATE:

## STEP 3: TO BE COMPLETED BY COLLECTOR

Read Specimen temperature within 4 minutes. Is the temperature   Specimen Collection:
Between 90 and 100 F? ☐ Yes  ☐ No, enter remarks in Step 4 below    ☐ Single  ☐ None Provided  ☐ Observed
Between 32 and 38 C ? ☐ Yes  ☐ No, enter remarks in Step 4 below    (Enter Remarks Below)   (Enter Remarks Below)

REMARKS:

## STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR- Collector affixes bottle seal(s). Collector dates Seal(s)

Donor initials seal(s), if applicable to collection device.

Collector: Record lot Number _____ and the Expiration Date _____ found on the foil pouch of the test device
Year    Month

Collector: Record Results    Negative Results    CHECK BOXES BELOW FOR EACH PRESUMPTIVE POSITIVE RESULT
A. For Confirmation Requested

☐ MET500   ☐ THC   ☐ OPI300   ☐ AMP   ☐ COC   ☐ BAR 300

B. For Screen and Confirmation Requested:
☐ BZD   ☐ PCP   ☐ STEROIDS   ☐ MTD   ☐ OTHER

## STEP 5: CHAIN OF CUSTODY-INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted, in accordance with applicable requirements.

X _____

Signature of Collector

(PRINT) Collector Name (Last, First, MI)    ___/___/___ (Mm/Dd/Yr.)

SPECIMEN BOTTLE (S) RELEASED TO:

Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB:

Signature of Accessioner

(PRINT) Accessioner's Name (First, MI, Last)

Primary specimen Bottle seal in tact
☐ YES
☐ NO, Enter Remarks Below

SPECIMEN BOTTLE(S) RELEASED TO:

___/___ DATE   DONOR'S INITIALS

COPY 1- LABORATORY

0000000001

0000000001

Federal Bureau of Prr@158763.pdf   1/18/70   7:08:36 AM

# Federal Bureau of Prisons Chain of Custody Form



SPECIMEN ID NO.: 0 0 0 0 0 0 0 0 1

## STEP 1: TO BE COMPLETED BY COLLECTOR

A. Institution Name, Address and Account No.

B.. Collection Site Name, Address, and Account No.

Time Of Collection Requested:                    Time Provided:

D. Reason for Test: ☐ Random  ☐ Prior Use  ☐ Suspect  ☐ Disruptive Group  ☐ Saturation  ☐ Community  ☐ Other

E.. Inmate Identification Verified By ☐ Photo I.D.  ☐ Other     Inmate Date of Birth: _____
                                                                        Month     Date     Year

## STEP 2: TO BE COMPLETED BY COLLECTOR AND DONOR

I authorize the collection of the specimen for the purpose of a drug screen. I acknowledge that the container(s) was/were sealed with Tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen Container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its agents

Witness Signature (If Inmate refuses or unable to sign)      PRINT (Witness Name)          DATE:

## STEP 3: TO BE COMPLETED BY COLLECTOR

Read Specimen temperature within 4 minutes. Is the temperature    Specimen Collection:
Between 90 and 100 F? ☐ Yes  ☐ No, enter remarks in Step 4 below    ☐ Single  ☐ None Provided  ☐ Observed
Between 32 and 38 C ? ☐ Yes  ☐ No, enter remarks in Step 4 below              (Enter Remarks Below)  (Enter Remarks Below)

REMARKS:

## STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR- Collector affixes bottle seal(s). Collector dates Seal(s)

Donor initials seal(s), if applicable to collection device.
Collector: Record lot Number _____ and the Expiration Date _____ found on the foil pouch of the test device
                                                          Year    Month

Collector: Record Results    Negative Results    CHECK BOXES BELOW FOR EACH PRESUMPTIVE POSITIVE RESULT
A. For Confirmation Requested

☐ MET500   ☐ THC   ☐ OPI300   ☐ AMP   ☐ COC   ☐ BAR 300

B. For Screen and Confirmation Requested:
☐ BZD   ☐ PCP   ☐ STEROIDS   ☐ MTD   ☐ OTHER

## STEP 5: CHAIN OF CUSTODY-INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted, in accordance with applicable requirements.

X _____
    Signature of Collector

_____          ___/___/___
(PRINT) Collector Name (Last, First, MI)    (Mo/Da/Yr)

SPECIMEN BOTTLE (S) RELEASED TO:

Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB:                                          SPECIMEN BOTTLE(S) RELEASED TO:

_____
    Signature of Accessioner

Primary specimen
Bottle seal in tact

☐ YES

☐ NO, Enter Remarks Below

_____
(PRINT) Accessioner's Name (First, MI, Last)

**COPY 2 BUREAU OF PRISIONS**



QuickScreen™ Chain of Custody Form



**PHAMATECH, INC.**
10151 Barnes Canyon Road, San Diego, CA 92121
**TOLL-FREE: 1-877-635-5840**



0000005603

SPECIMEN ID NO. **0000005603**   LAB ACCESSION NO _____

**STEP 1: TO BE COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

Employer Name, Address and I.D. No.                                    B. MRO Name, Address, Phone and Fax No.

C. Donor SSN or Employee I.D. No.

D. Reason for Test: ☐ Pre-Employment  ☐ Random  ☐ Reasonable Suspicion/Cause  ☐ Post Accident  ☐ Periodic  ☐ Other _____

E. Collection Site Address:

Collector Phone No. ( )     -
Collector Fax No. ( )     -

F. Donor Identification Verified By:  ☐ Photo I.D.   ☐ Employer Representative

**STEP 2: TO BE COMPLETED BY COLLECTOR AND DONOR**                          MONTH   DAY   YEAR

G. Daytime Phone No. ( ) ___ - ___   Evening Phone No. ( ) ___ - ___   Date of Birth ___ / ___ / ___

I authorize the collection of this specimen for the purpose of a drug screen. I acknowledge that the specimen container(s) was/were sealed with a tamperproof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its designated agents.

(PRINT) DONOR'S NAME (LAST, FIRST, MID)        SIGNATURE OF DONOR            MONTH   DAY   YEAR

**STEP 3: TO BE COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature
between 90° and 100°F? ☐ Yes ☐ No, enter remarks in Step 4 below

Specimen Collection:
☐ Single  ☐ Split  ☐ None Provided (Enter Remarks Below)  ☐ Observed (Enter Remarks Below)

REMARKS:

**STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR** - Collector affixes bottle seal(s). Collector dates seal(s). Donor initials seal(s), if applicable to collection device.

Collector: Record Lot Number _____ and the Expiration Date ___ year - ___ month found on the foil pouch of the Quickscreen product used for this test.

Collector: Record Results  ☐ Negative Result   CHECK BOXES BELOW FOR EACH PRESUMPTIVE POSITIVE RESULT

| | | | | |
|---|---|---|---|---|
| ☐ MET500 | ☐ THC | ☐ OPI300 | ☐ BAR | ☐ Other |
| ☐ MET1000 | ☐ COC | ☐ OPI2000 | ☐ BZD | ☐ Other |
| ☐ AMP | ☐ PCP | ☐ OXY | ☐ MTD | ☐ Other |

**STEP 5: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted, in accordance with applicable requirements.

X _____
Signature of Collector        Time of Collection  AM PM

SPECIMEN BOTTLE(S) RELEASED TO:

_____
(PRINT) Collector's Name (First, MI, Last)    (Mo/Day/Yr)

Name of Delivery Service Transferring Specimen to Lab

**RECEIVED AT LAB:**

X _____
Signature of Accessioner

_____
(PRINT) Accessioner's Name (First, MI, Last)    (Mo/Day/Yr)

Primary Specimen
Bottle Seal Intact

☐ Yes
☐ No, Enter Remark Below

SPECIMEN BOTTLE(S) RELEASED TO:

Bottle A

0000005603

Bottle B (SPLIT)

0000005603

DATE

DATE

QuickScreen  Chain of Custody Form

# PHAMATECH, INC.
10151 Barnes Canyon Road, San Diego, CA 92121
**TOLL-FREE: 1-877-635-5840**

SPECIMEN ID NO  000000SS03                    LAB ACCESSION NO

**STEP 1: TO BE COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

Employer Name, Address and I.D. No.                    B. MRO Name, Address, Phone and Fax No.

C. Donor SSN or Employee I.D. No.

D. Reason for Test: ☐ Pre-Employment ☐ Random ☐ Reasonable Suspicion/Cause ☐ Post Accident ☐ Periodic ☐ Other _____

E. Collection Site Address:
Collector Phone No. (     )     -
Collector Fax No. (     )     -

F. Donor Identification Verified By: ☐ Photo I.D. ☐ Employer Representative

**STEP 2: TO BE COMPLETED BY COLLECTOR AND DONOR**                    MONTH   DAY   YEAR

G. Daytime Phone No. (_____) _____ - _____   Evening Phone No. (_____) _____ - _____   Date of Birth _____

I authorize the collection of this specimen for the purpose of a drug screen. I acknowledge that the specimen container(s) was/were sealed with tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its designated agents.

(PRINT) DONOR'S NAME (LAST, FIRST, MID)          SIGNATURE OF DONOR          INITIAL    MONTH   DAY   YEAR

**STEP 3: TO BE COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature between 90° and 100°F? ☐ Yes ☐ No, enter remarks in Step 4 below

Specimen Collection:
☐ Single ☐ Split ☐ None Provided (Enter Remarks Below) ☐ Observed (Enter remarks below)

**STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR** - Collector affixes bottle seal(s). Collector dates seal(s). Donor initials seal(s), if applicable to collection _____

Collector: _____ Lot Number _____ and the Expiration Date _____ found on the foil pouch of the Quickscreen product used for this test.                    year        month

Collector: Record Results  ☐ Negative Result    CHECK BOXES BELOW FOR EACH PRESUMPTIVE POSITIVE RESULT

☐ MET500      ☐ THC      ☐ OPI300      ☐ BAR      ☐ Other
☐ MET1000     ☐ COC      ☐ OPI2000     ☐ BZD      ☐ Other
☐ AMP         ☐ PCP      ☐ OXY         ☐ MTD      ☐ Other

**STEP 5: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted, in accordance with applicable requirements.

X _____                    _____ ☐ AM ☐ PM     SPECIMEN BOTTLE(S) RELEASED TO:
Signature of Collector          Time of Collection

(PRINT) Collector's Name (First, MI, Last)    (Mo/Day/Yr)          Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB:                    Primary Specimen Bottle Seal Intact    SPECIMEN BOTTLE(S) RELEASED TO:

X _____                    ☐ Yes
Signature of Accessioner                    ☐ No, Enter Remark Below

(PRINT) Accessioner's Name (First, MI, Last)   (Mo/Day/Yr)



QuickScreen Chain of Custody Form

# PHAMATECH, INC.
10151 Barnes Canyon Road, San Diego, CA 92121
**TOLL-FREE: 1-877-635-5840**

SPECIMEN ID NO. 000005603    LAB ACCESSION NO.

**STEP 1: TO BE COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address and I.D. No.    B. MRO Name, Address, Phone and Fax No.

C. Donor SSN or Employee I.D. No.

D. Reason for Test: ☐ Pre-Employment ☐ Random ☐ Reasonable Suspicion/Cause ☐ Post Accident ☐ Periodic ☐ Other

E. Collection Site Address:

Collector Phone No. ( ) -

Collector Fax No. ( ) -

F. Donor Identification Verified By: ☐ Photo I.D. ☐ Employer Representative

**STEP 2: TO BE COMPLETED BY COLLECTOR AND DONOR**

MONTH    DAY    YEAR

G. Daytime Phone No. ( ) - Evening Phone No. ( ) - Date of Birth

I authorize the collection of this specimen for the purpose of a drug screen, I acknowledge that the specimen container(s) was/were sealed with a tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its designated agents.

(PRINT) DONOR'S NAME (LAST, FIRST, MID)    SIGNATURE OF DONOR    INITIAL    MONTH    DAY    YEAR

**STEP 3: TO BE COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature between 90° and 100°F? ☐ Yes ☐ No, enter remarks in Step 4 below

Specimen Collection: ☐ Single ☐ Split ☐ None Provided (Enter Remarks Below) ☐ Observed (Enter Remarks Below)

REMARKS:

**STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR** - Collector affixes bottle seal(s). Collector dates seal(s). Donor initials seal(s), if applicable to collection device.

Collector: Record Lot Number _____ and the Expiration Date _____ found on the foil pouch of the Quickscreen product used for this test.    year    month

Collector: Record Results ☐ Negative Result    CHECK BOXES BELOW FOR EACH PRESUMPTIVE POSITIVE RESULT

| | | | | |
|---|---|---|---|---|
| ☐ MET500 | ☐ THC | ☐ OPI300 | ☐ BAR | ☐ Other |
| ☐ MET1000 | ☐ COC | ☐ OPI2000 | ☐ BZD | ☐ Other |
| ☐ AMP | ☐ PCP | ☐ OXY | ☐ MTD | ☐ Other |

**STEP 5: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted, in accordance with applicable requirements.

X _____    : ☐ AM ☐ PM
Signature of Collector    Time of Collection

SPECIMEN BOTTLE(S) RELEASED TO:

(PRINT) Collector's Name (First, MI, Last)    Date (Month/Day/Year)    Name of Delivery Service (Standard) Specimen I.D. No.

RECEIVED AT LAB:

X _____
Signature of Accessioner

(PRINT) Accessioner's Name (First, MI, Last)    Date (Month/Day/Year)

Primary Specimen Bottle Seal Intact

☐ Yes
☐ No, Enter Remark Below

SPECIMEN BOTTLE(S) RELEASED TO:

QuickScreen™ Chain of Custody Form



# PHAMATECH, INC.
10151 Barnes Canyon Road, San Diego, CA 92121
**TOLL-FREE: 1-877-635-5840**

SPECIMEN ID NO. 000005603    LAB ACCESSION NO

**STEP 1: TO BE COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address and I.D. No.                    B. MRO Name, Address, Phone and Fax No.

C. Donor SSN or Employee I.D. No.

D. Reason for Test: ☐ Pre-Employment ☐ Random ☐ Reasonable Suspicion/Cause ☐ Post Accident ☐ Periodic ☐ Other

E. Collection Site Address:

Collector Phone No. (        )        -

Collector Fax No. (        )        -

F. Donor Identification Verified By:    ☐ Photo I.D.    ☐ Employer Representative

**STEP 2: TO BE COMPLETED BY COLLECTOR AND DONOR**                    MONTH    DAY    YEAR

G. Daytime Phone No. (        )        -    Evening Phone No. (        )        -    Date of Birth _____

I authorize the collection of this specimen for the purpose of a drug screen. I acknowledge that the specimen container(s) is/are sealed with tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its designated agents.

(PRINT) DONOR'S NAME (LAST, FIRST, MID)    SIGNATURE OF DONOR    INITIAL    MONTH  DAY  YEAR

**STEP 3: TO BE COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature between 90° and 100°F? ☐ Yes ☐ No, enter remarks in Step 4 below

Specimen Collection: ☐ Single ☐ Split ☐ None Provided (Enter Remarks Below) ☐ Observed (Enter Remarks Below)

REMARKS

(COMPLETED BY COLLECTOR AND DONOR - Collector affixes bottle seal(s). Collector dates seal(s). Donor initials seal(s), if applicable to collector)

Control Lot Number _____ and the Expiration Date _____ found on the foil pouch of the Quickscreen product used for
this test.                                                         year    month

Collector: Record Results  ☐ Negative Result    CHECK BOXES BELOW FOR EACH PRESUMPTIVE POSITIVE RESULT

☐ MET500        ☐ THC        ☐ OPI300        ☐ BAR        ☐ Other
☐ MET1000       ☐ COC        ☐ OPI2000       ☐ BZD        ☐ Other
☐ AMP           ☐ PCP        ☐ OXY           ☐ MTD        ☐ Other

**STEP 5: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted, in accordance with applicable requirements.

X _____                    .        ☐ AM    SPECIMEN BOTTLE(S) RELEASED TO:
Signature of Collector                    Time of Collection    ☐ PM

(PRINT) Collector's Name (First, MI, Last)    Mo/Day/Yr    Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB:                                Primary Specimen    SPECIMEN BOTTLE(S) RELEASED TO:
X _____                    Bottle Seal Intact
Signature of Accessioner                       ☐ Yes
(PRINT) Accessioner's Name (First, MI, Last)   Mo/Day/Yr   ☐ No, Enter Remark Below



QuickScreen, Chain of Custody Form

# PHAMATECH, INC.
10151 Barnes Canyon Road, San Diego, CA 92121
**TOLL-FREE: 1-877-635-5840**

SPECIMEN ID NO. 0000001603    LAB ACCESSION NO.

**STEP 1: TO BE COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address and I.D. No.

B. MRO Name, Address, Phone and Fax No.

C. Donor SSN or Employee I.D. No.

D. Reason for Test: ☐ Pre-Employment  ☐ Random  ☐ Reasonable Suspicion/Cause  ☐ Post Accident  ☐ Periodic  ☐ Other

E. Collection Site Address:

Collector Phone No. (    )    -

Collector Fax No. (    )    -

F. Donor Identification Verified By:  ☐ Photo I.D.  ☐ Employer Representative

**STEP 2: TO BE COMPLETED BY COLLECTOR AND DONOR**

G. Daytime Phone No. (    )    -    Evening Phone No. (    )    -    Date of Birth    MONTH / DAY / YEAR

I authorize the collection of this specimen for the purpose of a drug screen. I acknowledge that the specimen container(s) was/were sealed with tamperproof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its designated agents.

(PRINT) DONOR'S NAME (LAST, FIRST, MID)    SIGNATURE OF DONOR    INITIAL    MONTH / DAY / YEAR

**STEP 3: TO BE COMPLETED BY COLLECTOR**

| Read specimen temperature within 4 minutes. Is temperature between 90° and 100°F? ☐ Yes ☐ No, enter remarks in Step 4 below | Specimen Collection: ☐ Single ☐ Split ☐ None Provided (Enter Remarks Below) | ☐ Observed (Enter Remarks Below) |

REMARKS:

**STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR** - Director initials bottle seal(s), Collector dates seal(s), Donor initials seal(s), if applicable to collection device.

Collection Record Lot Number _____ and the Expiration Date _____ found on the foil pouch of the Quickscreen product used for this test.    year    month

Collector Record Results  ☐ Negative Result    CHECK BOXES BELOW FOR EACH PRESUMPTIVE POSITIVE RESULT

☐ MET500  ☐ THC  ☐ OPI300  ☐ BAR  ☐ Other
☐ MET1000  ☐ COC  ☐ OPI2000  ☐ BZD  ☐ Other
☐ AMP  ☐ PCP  ☐ OXY  ☐ MTD  ☐ Other

**STEP 5: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the delivery service noted, in accordance with applicable requirements.

X _____    . _____ AM PM    SPECIMEN BOTTLE(S) RELEASED TO:
Signature of Collector    Time of Collection

(PRINT) Collector's Name (First, MI, Last)    Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB:

X _____    Primary Specimen Bottle Seal Intact    SPECIMEN BOTTLE(S) RELEASED TO:
Signature of Accessioner
☐ Yes
(PRINT) Accessioner's Name (First, MI, Last)    _____    ☐ No, Enter Remark Below

Bureau of Prisons Solicitation
Solicitation Number: RFQ-NAS-0021-2207

Phamatech, Inc.

## Exhibit 3 – Drug Cross Reaction Chart

*Included under this exhibit are:*

1. <u>List of Cross Reactive Substances</u> that meets or exceeds BOP's drug screen list
2. <u>List of Non-Interfering Substances</u> that meets or exceeds BOP's drug screen list

### List of Non- Interfering Substances

The following compounds were spiked into normal human urine and tested for interference with the QuickScreen™ Cup Multi Drug Screening Test. Except as noted, no interference was observed when the compound was tested to 100 μg/mL.

Acetaminophen • Acetoacetic Acid • Acetone • Acetylsalicylic Acid (Aspirin) • Albumin • Alphenal • Amantadine • (+)-Amethopterin • Amikacin • dl-Aminoglutethimide • Aminopyrine • Amitriptyline • Amoxicillin • Ampicillin • Apomorphine • (−)-Arterenol • l-Ascorbic Acid (Vitamin C) • Aspartame • d-Aspartic Acid • dl-Aspartic Acid • l-Aspartic Acid • Atropine • Barbituric Acid • Benzoic Acid • Benzphetamine • Benztropine Methane Sulfonate • Bilirubin • Bromocriptine Mesylate • (+)-Brompheniramine • Caffeine • Cannabidiol • Cannabinol • Carbamazepine • Cephalexin • Chloramphenicol • Chloroquine • (−)-Chlorpheniramine • (±)-Chlorpheniramine • Chlorpromazine • Chlorpropamide • Chlorprothixene • Cimetidine • Clemastine • Clomipramine • Clonidine • (−)-Cotinine • Creatinine • Cyclizine • Cyclobenzaprine • Cyclosporin A • Cyproheptadine • Desipramine • Dextromethorphan • Diflunisal • Digoxin • 4-Dimethylaminoantipyrine • Diphenhydramine • Diphenoxylate • 5,5-Diphenylhydantoin • Disopyramide • Doxepin • Doxylamine • (−)-ψ-Ephedrine • (−)-Ephedrine • (±)-Epinephrine • (−)-Epinephrine • Erythromycin • Estriol • Estrone-3-Sulfate • Ethanol • Ethosuximide • Ethyl-p-Aminobenzoate • Ethylenediaminetetraacetic Acid • 2-Ethyl-5-Methyl-3,3-Diphenylpyrroline (EMDP) • Fenoprofen • Fentanyl[D] • Furosemide • Gentamicin • Gentisic Acid • Glucose • dl-Glutethimide • Griseofulvin • Guaiacol Glyceryl Ester • Hexobarbital • Human Hemoglobin • Hydrochlorothiazide • dl-β-Hydroxybutyric Acid • o-Hydroxyhippuric Acid • 5-Hydroxyindole-3-Acetic Acid • 5-Hydroxyindole-2-Carboxylic Acid • Hydroxyzine • Ibuprofen • Imipramine • Indole-3-Acetic Acid • Indole-3-Butyric Acid • Indomethacin • (+)-Isoproterenol • (−)-Isoproterenol • Isoxsuprine • Kanamycin • Ketamine • Ketoprofen • Labetalol • Levorphanol • Lidocaine • Lithium Carbonate • Lysergic Acid Diethylamide (LSD)[E] • Melanin • Meperidine • Meprobamate • Mescaline • dl-Metanephrine • Methaqualone • (S)-6-Methoxy-α-Methyl-2-Naphthaleneacetic Acid • 2-Methyl-3-(3,4-Dihydroxyphenyl)-dl-Alanine • 2-Methyl-3-(3,4-Dihydroxyphenyl)-l-Alanine • Methylphenidate • Methyprylon • (±)-Metoprolol • Nafcillin • Naloxone • Naltrexone • Naphazoline • α-Naphthaleneacetic Acid • β-Naphthaleneacetic Acid • Naproxen • Netilmicin • Niacinamide • Nialamide • Nicotinic Acid • Nifedipine • Nomifensine • Norcodeine • Nordoxepin[D] • Norethindrone • Normorphine[D] • Nortriptyline • Noscapine • Orphenadrine • Oxalic Acid • Oxycodone • Oxymetazoline • Papaverine • Penicillin G • Pentazocine • Phenelzine • Pheniramine • Phenothiazine • Phentermine • Phenylacetone • l-Phenylalanine • Phenylbutazone • trans-2-Phenylcyclopropylamine • l-Phenylephrine • (±)-Phenylpropanolamine • Piroxicam • Prazosin Chloride • Prednisolone • Primidone • Procainamide • Prochlorperazine • Promazine • Promethazine • (+)-Propoxyphene • 2-Propylpentanoic Acid • Protriptyline • Quinidine • Quinine • Ranitidine • Riboflavin • Salicylic Acid • (−)-Scopolamine • Sodium Chloride • Sulindac • Terbutaline • Tetracycline • Tetraethylthiuram Disulfide (Antabuse) • Tetrahydrozoline • Thebaine • Theophylline • Thioridazine • cis-Thiothixene • Tobramycin • Triamterene • Trifluoperazine • Trifluopromazine • dl-Trihexyphenidyl • Trimethobenzamide • Trimethoprim • Trimipramine • Triprolidine • Urea • Uric Acid • Vancomycin • (±)-Verapamil • Zomepirac

[D] No interference was observed when the compound was tested to 10 μg/mL.
[E] No interference was observed when the compound was tested to 2.5 μg/mL.

Non-inclusive list of possible cross-reacting substances as related to quickscreen tests for MET, AMP, THC, COC, OPI. (Please keep confidential)

| TYPE OF DRUG | QuickScreen | Category | Lab | NOTES |
|---|---|---|---|---|
| Adderal | YES | AMP | YES | Amphetamine, ADD medication. (Dextroamphetamine) |
| Afrin | YES | - | NO | Decongestion and pain... if enough in urine will screen positive. |
| Albuterol (has Phentermine) | YES | MET | NO | For asthma... reversible obstructive airway disease. May cause reaction MET panel |
| Aleve | NO | - | NO | Pain medication... aches and pains. |
| Allegra | NO | - | | Antihistamine, Seasonal allergic rhinitis. |
| Ambien | NO | - | | Insomnia. |
| Amoxicillin | NO | - | | Antibiotic |
| Baclofen | maybe | met, amp | | Muscle possible react with meth or amp. Antispastic |
| Benadryl | maybe | - | YES | Compositions? |
| Benzphetamine | YES | - | | Dietary Anorectic suppressant |
| Buspar | YES | - | | Anxiety Disorder |
| Carnoral | maybe | met, amp | maybe | Depression, may also show positive screen for PCP. |
| Carisoprodol (Soma) | NO | - | | Acute, painful musculoskeletal conditions. |
| Catapres (Clonidine) | NO | - | | ADD. Recent UGN Narcotic withdrawal. High Blood Pressure. Cramps. Migranes. |
| Celexa | NO | - | | Osteoarthritis and rheumatoid Arthritis - Adults |
| Celebrex | NO | - | | Anti depression |
| Citrate of Magnesia | NO | - | | Laxative |
| Citrin D | no | - | | Cold and Flu |
| Citrin D | no | - | | Pain Medication |
| Clonazepam | no | - | | Mania - Bipolar Disorder |
| Clonidine (Catapres) | no | - | | Hypertension |
| Cozar (Losartan) | no | - | | Blood pressure, ADD. Antihypertensive. |
| Darvocet (Propoxyphene) | no | - | | Seasonal Allergic rhinitis |
| Darvon (Propoxyphene) | no | - | | Anti Histamine |
| Daypro | no | - | | Pain Medication |
| Demerol | no | - | | |
| Depakote (Divalproex Sodium) | YES | - | | Narcolepsy, Obesity, ADD. |
| Desoxyn | YES | AMP | YES | Amphetamine, Narcolepsy, ADD. |
| Desyrel | YES | OPI | NO | Massive amount. In cough and cold medicine. |
| Dexedrine | YES | AMP | YES | Amphetamine. Narcolepsy. ADD with hyperactivity. |
| Dextromethorphan | YES | OPI | NO | |
| Dextrostat | YES | AMP | YES | Propoxyphene, Antiarrythmics, spasms. Refer to Dr.'s Office. |
| Diazepam (Valium) | no | - | NO | Prescription Diet pill. |
| Didrex | YES | MET | | Exogenous Obesity. |
| Diethylpropion | YES | - | | Narcotic analgesic. Hydrogenated ketone of morphine. |
| Dilaudid (Hydromorphone) | YES | OPI | YES | Mania - Bipolar Disorder |
| Divalproex Sodium (Depakote) | NO | - | | Manic-Depressive, Psychoneurosis, depression, anxiety. |
| Doxepine | NO | - | | Lab will confirm MDMA, MDA. |
| Ecstasy (MDMA, MDA) | YES | MET, AMP | YES | Depression. May also show positive screen for PCP. |
| Effexor | NO | - | NO | Depression. |
| Elavil | NO | - | MAYBE | Depression. |
| Entex LA | MAYBE | - | NO | Allergy... sinusitis, bronchitis, pharyngitis. |
| Ephedrine | MAYBE | MET | NO | Allergy... MASSIVE dose may give METH positive result. |
| Erythromycine | NO | - | | Antibiotic |
| Flexoral | NO | - | NO | ... painful muscoskeletal condition. |
| Flonase | NO | - | NO | Allergic rhinitis. |

Non-inclusive list of possible cross-reading substance … (Please keep confidential)

| Drug | Screen | Code | Confirm | Notes |
|---|---|---|---|---|
| GHB | NO | - | NO | Defer to their Doctor |
| Golden Seal Root | NO | - | NO | Medicinal Tea, Tonic, Laxative, Detergent, Antiseptic. |
| Guaifenex AC | NO | - | NO | Codeine, Expectorant in cough syrup. |
| Guaifenesin | NO | - | NO | Expectorant, OTC comprising Guanfic… |
| Halcion (Triazolam) | NO | - | NO | Benzodiazepine, Antianalgesic. |
| Halofantrin AC | YES | OPI | YES | May positive positive … Total … |
| Hydrochlorthiazide (HCTZ) | NO | - | NO | Blood Pressure, diuretic. |
| Hydrocodone (Vicodin) | YES | OPI | YES | Pain Medication |
| Hydromorphone (Dilaudid) | YES | OPI | YES | Pain Medication, multi-unsaturated ketone of morphine. |
| Hydroxyzine | NO | - | NO | Reduces … Sedative Antihistamine. |
| Imipramine | NO | - | NO | Reduces … Manic Depressive, antidepressant it will react. |
| Immodian AD | NO | - | NO | Diarrhea |
| Ionamin (Phentermine) | YES | AMP | NO | Tergizmine, Obesity |
| Isoproterenol (Isuprel or Norisodrine) | YES | MET | NO | Possible both screen - negative GCMS. Acute / Chronic Asthma. Bronchospasm. |
| Ketamine, Special K | NO | - | NO | … |
| Lecithin | NO | - | NO | Pain Disorders, Low blood, choline level |
| Levalbuterol | NO | - | NO | Acute bronchial exacerbation of chronic bronchitis. Mild moderate, severe infections. |
| Levo-Dromoran (Dromoran, Levo Dromoran) | YES | OPI | NO | Pre Op. medication, Moderate to severe pain. Opioid analgesic. Negative GC/MS. |
| Lithium | NO | - | NO | Bi Polar, Manic Depressive. |
| Lomotil | NO | - | NO | Diarrhea |
| Loracet (Hydrocodone) | YES | OPI | YES | Hydrocodone, Pain Medication. |
| Lortab (Hydrocodone) | YES | OPI | YES | Hydrocodone, Pain Medication. |
| Losartan (Cozar) | NO | - | NO | Hypertension |
| LSD | NO | - | NO | Hypertension |
| MDMA, MDA (Ecstasy) | YES | MET | YES | Follow Lab Procedure, $100.00. |
| Metabolize | NO | - | NO | Lab will confirm Ritalin, MFA. |
| Methadone | YES | MET | NO | Diet Aids |
| Methotrexate | NO | - | NO | Maintenance of Narcotic Addiction, Narcotic Detoxification. |
| Methylphenate | NO | - | NO | |
| Methyldopa (Aldoclor) | YES | AMP | YES | Blood Pressure. |
| Metoclopramide (Reglan) | YES | COC | NO | POSSIBLE cocaine positive, negative GC/MS. Symptomatic gastroesophageal reflux. |
| Mirtazapine (Remeron) | NO | - | NO | Depression |
| Nalbuphine (Nubain) | YES | OPI | YES | Pain Medication, Pre / Post Op. |
| Naloxone (Narcan) | YES | OPI | NO | POSSIBLE Opiates, negative GC/MS. Narcotic Depression. |
| Naltrexone (Revia) | YES | OPI | NO | POSSIBLE Opiates, negative GC/MS. Blocade of Alcoholic Dependence. |
| Naproxen | NO | - | - | |
| Nasonex | NO | - | - | |
| Nefazodone (Serzone X) | NO | - | - | Depression |
| Neopelymycin | NO | - | - | Over-The-Counter |
| Neurontin | NO | - | - | Antiepileptic / seizure, mood disorder. |
| Novacaine | NO | - | - | Dental |
| Nyquil | NO | - | - | Cold Medicine |
| Oxycodone (Percodan / Percocet) | YES | OPI | NO | Massive amount will screen prelim positive. Pain Medication. |
| Oxycontin | YES | OPI | NO | Narcotic analgesic. |
| Pavil | NO | - | - | Anti-Anxiety, Depression. |
| Penacillin | NO | - | - | Antibiotic |
| Pepto Bismol | NO | - | - | Diarrhea |

Non-Inclusive list of possible cross-reacting substances as related to QuickScreen tests for THC, AMP, THC, COC, OPI. (Please keep confidential.)

| Drug | QuickScreen | Type | Positive | Type of Drug |
|---|---|---|---|---|
| Percocet / Percodan (Oxycodone) | YES | OPI | NO | Pain Medication. |
| Phenergan | NO | AMP | NO | Allergic rhinitis |
| Phentermine | YES | AMP | - | screen prelim positive. |
| Primidine Mist | NO | - | - | |
| Propoxyphene (Darvocet, Darvon) | NO | - | - | |
| Quinidine | NO | - | - | |
| Darvocet X (Zantac) | YES | - | NO | |
| Redux | YES | - | NO | |
| Prempro | NO | - | - | Depression |
| Prempro (Mirtazapine) | NO | - | - | Vitamin |
| Restoril (Temazepam) | NO | - | - | Short Term Sleep Medication |
| Rohypnol | NO | - | - | Short Term Sleep Medication |
| Robitussin | NO | - | - | Upper Respiratory Tract |
| Serzone D | NO | - | - | |
| Serzone D | NO | - | - | |
| Serequel | NO | - | - | |
| Serzone X (Nefazodone) | NO | - | - | |
| Soma (Carisoprodol) | NO | - | - | |
| Special K / Ketamine | NO | - | - | |
| Sudafed | NO | - | - | Sinus |
| Sudafed | NO | - | - | |
| Sustar | Unknown | - | - | |
| Sustiva-Efavirenz | YES | THC | NO | Aids drug -- will cause "FALSE" THC positive screen. |
| Talwin | NO | - | - | Moderate Pain Medication. |
| Temazepam | NO | - | - | Short Term Sleep Medication |
| Temazepam (Restoril) | NO | - | - | |
| Tenuate Dospan | NO | - | - | |
| Tramadol (Ultram) | NO | - | - | Pain Medication |
| Tramadol | NO | - | - | Anti-Depressant and Anxiety, Pain |
| Trazodone | NO | - | - | Pain Medication |
| Ultram | NO | - | - | |
| Valium (Diazepam) | NO | - | - | Anxiety, tension, spasms. Refer to Dr.'s Office. |
| Viagra | NO | - | - | Impotence |
| Vicodin (Hydrocodone) | YES | OPI | YES | Pain Medication |
| Vioxx | NO | - | - | Arthritis Medication |
| Vistaril | NO | - | - | Anxiety, tension, psychoneurosis |
| Wellbutrin | NO | - | - | Depression |
| Xanax | NO | - | - | Anti-Anxiety |
| Xenical | NO | - | - | Weight Loss |
| Yellow Jackets | NO | - | - | Barbiturate, depressant |
| Zantac (Ranitidine) | YES | MET/PCP | NO | Prescription Doses Only |
| Zithromax | NO | - | - | Pneumonia, Mild to moderate infection. |
| Zocor | NO | - | - | Vascular Disease, Lipid Altering Agent. |
| Zoloft | NO | - | - | Anti-Anxiety, Depression. |
| Zyprexa | NO | - | - | Anti-Psychotic, Psychotic Disorders. |
| Zyrtec | NO | - | - | Allergic Rhinitis |

Notes: "QuickScreen" column:    YES = the "Type of Drug" can cause a screen positive result.

**Non-inclusive list of possible cross-reacting substances as related to QuickScreen tests for MET, AMP, THC, COC, OPI. (Please keep confidential)**

NO = the "Type of Drug" will not cause a screen positive result.

"**Drug**" column:
Refers to the drug category, or strip on the QuickScreen device where the result will appear.

"**LAB**" column:
Refers to the subsequent result of GC/MS confirmation on the sample.

This chart does *not* include the following categories: Barbiturates, Benzodiazepines, PCP, or Methadone

<u>List of Cross-Reactive Substances</u>

The following compounds were spiked into normal human urine and tested for cross-reactivity with the QuickScreen™ Cup Multi Drug Screening Test. The results (in µg/mL) are expressed as that amount of compound capable of giving a result equivalent to the target drug at its cutoff concentration. Except as noted, a blank space indicates that no cross-reactivity was observed to 100 µg/mL.

| Compound | BAR | BZD | MTD | AMP | MET | COC | THC | OPI | PCP |
|---|---|---|---|---|---|---|---|---|---|
| Amobarbital | 0.15 | | | | | | | | |
| Aprobarbital | 0.05 | | | | | | | | |
| Barbital • Butabarbital • Pentobarbital | 0.025 | | | | | | | | |
| Butalbital | 0.3 | | | | | | | | |
| Butethal | 0.075 | | | | | | | | |
| 5,5-Diallylbarbituric Acid | 0.1 | | | | | | | | |
| Phenobarbital • Secobarbital | 0.3 | | | | | | | | |
| (±)-Thiopental | 9.5 | | | | | | | | |
| Alprazolam[A] • Clonazepam | | 0.5 | | | | | | | |
| Bromazepam | | 0.6 | | | | | | | |
| Chlordiazepoxide | | 0.3 | | | | | | | |
| Desmethyldiazepam | | 0.25 | | | | | | | |
| Diazepam • Flunitrazepam • Lormetazepam | | 0.4 | | | | | | | |
| Flurazepam • Medazepam • Prazepam | | 1.0 | | | | | | | |
| (±)-Lorazepam • Triazolam[B] | | 0.5 | | | | | | | |
| Nitrazepam • Oxazepam | | 0.2 | | | | | | | |
| Temazepam | | 0.25 | | | | | | | |
| (−)-α-Acetylmethadol (LAAM) | | | 1 | | | | | | |
| (−)-α-Methadol | | | 0.8 | | | | | | |
| (±)-Methadone | | | 0.3 | | | | | | |
| d-Amphetamine | | | | 1 | 20 | | | | |
| dl-Amphetamine | | | | 10 | 50 | | | | |
| l-Amphetamine • (R)-(+)-α-Phenylethylamine | | | | 100 | 100 | | | | |
| 3-Hydroxytyramine • (±)-α-Methylethylamine | | | | 10 | | | | | |
| ...enethylamine | | | | 100 | 10 | | | | |
| ...3,4-Methylenedioxyamphetamine | | | | 4.5 | 100 | | | | |
| ...Phenylethylamine | | | | 10 | | | | | |
| ...ramine | | | | 12.5 | 62.5 | | | | |
| ...-Acetylprocainamide • (+)-...Ephedrine | | | | | 100 | | | | |
| (−)-Deoxyephedrine | | | | | 1 | | | | |
| (+)-Ephedrine • (±)-Ephedrine • Fenfluramine | | | | | 100 | | | | |
| (±)-Isoproterenol | | | | | 1.5 | | | | |
| (+)-Methamphetamine | | | | | 0.5 | | | | |
| (±)-3,4-Methylenedioxymethamphetamine | | | | | 3.5 | | | | |
| Nylidrin | | | | | 5 | | | | |
| Benzoylecgonine • Cocaine | | | | | | 0.3 | | | |
| Metoclopramide | | | | | | 25 | | | |
| Procaine • Pyrilamine | | | | | | 100 | | | |
| 11-Hydroxy-$\Delta^9$-THC[C] | | | | | | | 1 | | |
| 11-Nor-$\Delta^8$-THC-9-Carboxylic Acid[C] | | | | | | | 0.1 | | |
| 11-Nor-$\Delta^9$-THC-9-Carboxylic Acid[C] | | | | | | | 0.05 | | |
| $\Delta^8$-Tetrahydrocannabinol | | | | | | | 100 | | |
| $\Delta^9$-Tetrahydrocannabinol | | | | | | | 0.05 | | |
| 6-Acetylmorphine • Hydromorphone | | | | | | | | 10 | |
| Codeine | | | | | | | | 1 | |
| Ethylmorphine[B] • Morphine • Nalorphine | | | | | | | | 2 | |
| Heroin[B] • Hydrocodone | | | | | | | | 2.5 | |
| Morphine-3-β-D-Glucuronide | | | | | | | | 5 | |
| EDDP (Primary Methadone Metabolite) | | | | | | | | | 25 |
| Phencyclidine | | | | | | | | | 0.025 |

[A] A blank space indicates that no cross-reactivity was observed when the compound was tested at 25 µg/mL.
[B] A blank space indicates that no cross-reactivity was observed when the compound was tested at 10 µg/mL.
[C] A blank space indicates that no cross-reactivity was observed when the compound was tested at 5 µg/mL.

**Nemko** Certification

www.nemko.com

# C E R T I F I C A T E

We hereby certify that

## Phamatech Inc.

complies with the Quality Management System requirements specified in

### ISO 13485:2003

and Nemko Certification´s general provisions for certification

The certificate covers the following activities:

Design and Manufacture of Medical
and Non-Medical In-Vitro-Diagnostic Devices

Oslo, 2005-05-26

Claus Breyholtz
Technical Manager
Nemko Certification AS

Expires: 2008-05-26
First time issued: 2005-05-26
Certificate no: 908025



# FEDERAL BUREAU OF PRISONS
# ORIGINAL STATEMENT OF WORK

## A.1    SCHEDULE OF SUPPLIES/SERVICES

The Federal Bureau of Prisons (BOP) intends to make a single award, requirements type task order contract with firm fixed unit prices based on a General Services Administration (GSA) Federal Supply Schedule (FSS) contract for the acquisition of On-Site Urine Test Cups. All requirements for the On-Site Urine Test Cups shall be provided in accordance with the Contractor's GSA FSS and the attached Statement of Work. The pricing schedule for the one year base period and the four (4) one year option periods, if exercised, are below. Delivery or performance shall be made only as authorized by individual delivery orders issued by BOP institutions.

The BOP intends to conduct an online competitive reverse auction for the pricing component of this Request for Quotes. The reverse auction is to be facilitated by the third-party reverse auction provider, FedBid, Inc. FedBid has developed an online, anonymous, browser based application to conduct the reverse auction. A quoter may submit a series of pricing quotes, which descend in price during the specified period of time for the aforementioned reverse auction. The BOP is taking this action in an effort to improve both vendor access and awareness of requests and the agency's ability to gather multiple, completed, real-time quotes. All responsible quoters that respond to this Request for Quotes MUST submit the pricing portion of their quote using the online exchange located at www.FedBid.com. There is no cost to register, review procurement data, or make a quote on www.FedBid.com. Quoters that are not currently registered to use www.FedBid.com should proceed to www.FedBid.com to complete their free registration. Quoters that require special considerations or assistance may contact the FedBid Helpdesk at 877-9FEDBID (877-933-3243) or vial email at clientservices@fedbid.com. Quoters may not artificially manipulate the price of a transaction on www.FedBid.com by any means. It is unacceptable to place bad faith quotes, to use decoys in the www.FedBid.com process or to collude with the intent or effect of hampering the competitive www.FedBid.com process. Should quoters require additional clarification, contact Chris Harvel at chris.harvel@gsa.gov or FedBid at 877-9FEDBID (877-933-3243) or clientservices@fedbid.com.. The fee for FedBid is to be calculated into the price of the on-site test cups of the base year only.

Use of FedBid: Buyers and Sellers agree to conduct this transaction through FedBid in compliance with the FedBid Terms of Use. Buyers and Sellers understand that FedBid ranks all quotes by price; however, pursuant to applicable acquisition regulations and/or departmental guidelines, Buyers may use criteria other than price to evaluate quotes. Accordingly, please note that, unless otherwise specified herein below, to the extend required by applicable regulations and/or guidelines, award will be made to the responsible Seller whose quote conforming to the Request for Quotes will be most advantageous to the Buyer on the basis of price, technical capability, and past performance.

## BASE YEAR: Date of Award through 12 months

On-Site Urine Test Cups
Expert Witness                          200,000   EA
                                             20   HRS

## OPTION YEAR ONE: 13 months through 24 months

On-Site Urine Test Cups
Expert Witness                          205,000   EA
                                             20   HRS

## OPTION YEAR TWO: 25 months through 36 months

On-Site Urine Test Cups
                                        210,000   EA

Expert Witness

20 HRS

## OPTION YEAR THREE: 37 months through 48 months

On-Site Urine Test Cups

Expert Witness                                    215,000  EA

20  HRS

## OPTION YEAR FOUR: 49 months through 60 months

On-Site Urine Test Cups

Expert Witness                                    220,000  EA

20  HRS

Quoters are advised that the above quantities are estimates only, and do not represent fixed requirements and in no way are to be construed as actual requirements, nor constitute a BOP usage guarantee, nor as a guarantee of revenue to the Contractor. The Government shall not be responsible for fluctuation in the quantity of deliverables required. Payment shall be made for actual quantities delivered. All requirements for on-site urine testing cups shall be made to the awardee.

Failure to comply with the instructions provided in the Request for Quotes may result in a quote being determined as non-responsive.

Pursuant to Federal Acquisition Regulation (FAR) 17.203(b), quoters are reminded that the evaluation of quotes shall be inclusive of options. Pursuant to FAR clause 52.217-8, "Option to Extend Services", the Government has the unilateral right under this task order contract to extend services up to six (6) months total, provided the Contractor has been given written notice, not later than fifteen (15) days prior to contract expiration, of the Government's intent to do so. The Government may exercise this option any time after notification of intent, but prior to contract expiration.

In accordance with FAR 52.217-9, "Option to Extend the Term of the Contract", the Government may exercise the term of the contract by the first day of the ensuing option period, provided that the Government has given the Contractor the required 45 day preliminary written notice of its intent to exercise such option period.

The Contractor's performance under this task order contract shall be monitored by the Contracting Officer's Technical Representative (COTR) listed in the solicitation.

The Contractor shall commence performance of this contract no later than 30 days from the date of award.

Funds for this requirement shall be obligated by issuance of individual task orders, not by award of the task order contract itself. All BOP Contracting Officers are authorized to place orders against this delivery order contract. Deliverables under this task order contract may be required, but not limited to, the approximately 112 institutions which are currently located throughout the continuous United States, Hawaii, and Puerto Rico.

## A.2    DESCRIPTION OF SUPPLIES/SERVICES

The contractor is to provide on-site urinalysis specimen test cups to the Federal Bureau of Prisons (BOP)

for detecting drugs of abuse which meet the following specifications and other conditions:

I.    Cup Design:

The test cup must be integrated to allow for collection and testing of urine for multiple drugs simultaneously, without a separate testing device. Once the specimen is collected and the lid is installed on the cup, no other manipulation of the urine is required such as pouring, tipping, tilting, turning, inserting and turning a key, inserting a test card, pipette, dropper, or dipper. The on-site test cup must have the capability of detecting six different drugs at the same time. The BOP requires a 6-panel cup with the designated drug test strips outlined in Section III. However, the BOP COTR reserves the right to change and specify the type of drugs/test strips and cut-off levels that will be integrated into the on-site cup based on institution inmate drug abuse history and regional trends. This change would be at no cost to the Government.

The cup must be constructed of clear plastic with a screw top lid that will not leak during air/ground shipping. The cup's mouth at the lid must measure at least 2 1/4" in diameter and the cup shall stand at least 3" high.

The cup must have a minimum fill line/mark (at least 30ml) clearly displayed on the outside of the cup to ensure sufficient specimens are collected.

The cup must have a temperature label installed horizontally at the most bottom portion of the cup which provides color coded indication for temperatures ranging from 90□F/32□C to 100□F/38□C in 1□ or 2□ increments.

The test panel results should be covered by a label or other pull strip in order to conceal the results from the inmates at time of testing. The test results must appear within five minutes and then remain stable and be accurately read up to a minimum of 30 minutes after the specimen is provided in the cup.

The contractor must demonstrate that the on-site cup is approved by the Food and Drug Administration for commercial distribution with an active 510-(K)- notification document.

The contractor will provide a sample of the on-site cups, as well as a sample shipping bag, shipping container and chain of custody form with their proposal for the BOP technical review.

II.  Supplies/Report Forms:

Each sterile on-site cup will be provided in a sealed bag with lot number, an expiration date, the drugs/cut-off levels that the on-site cup tests for, desiccant that maintains relative humidity inside the sealed bag within the manufacturer's recommended specifications, and instructions for use of the on-site cups on outside of the bag. The product must have a minimum shelf life of 12 months from the date of delivery.

The contractor will also provide clear sealable shipping bags and sturdy cardboard shipping containers for institutions to use when mailing/shipping the positive on-site cups to the lab for confirmation (approximately 2% of all cups).

The contractor will provide for each cup, a single donor Chain of Custody form that has a preprinted specimen identification number not to exceed 10 characters, a self-adhesive peel-off

label with matching specimen identification number (long enough to be used to seal the lid of the cup) that has a line to enter collection time, date and inmate's initials, and two additional smaller self-adhesive peel-off labels with matching specimen identification number (to be used for the log book or other recording purposes).

The contractor supplied Chain of Custody forms will consist of two (2) self-carbonized parts (an original and one copy). BOP staff will complete the forms in full for cups producing positive results, record the necessary specimen identification information, retain the original, and send the copy to the confirmation lab, along with the specimen.

* For security reasons and in order to protect the inmate's identity, the blocks for Inmate's Name, Register Number, and Inmate Certification (Signature) must not carbon through from the original to the copy (they must be blocked out on the copy).

The contractor supplied Chain of Custody forms will provide space to document, at a minimum and subject to change by the BOP as it deems appropriate, the following information:

URINE COLLECTION PROCEDURES (Pre-Printed) (collection    procedures will be
   provided by the BOP - **see ATTACHMENT A**)
COLLECTION SITE NAME, ADDRESS, AND INSTITUTION CODE (Pre-Printed)
   (all information will be provided by the BOP)
SPECIFIC ACCOUNT NUMBER FOR COLLECTION SITE (Pre-Printed)
SPECIMEN NUMBER (Pre-Printed)
CONFIRMATION ONLY TESTS REQUESTED (Pre-Printed)
   □ Cannabinoids (THC)  □ Opiates  □ Amphetamine
   □ Methamphetamine  □ Cocaine  □ Barbiturates
SCREEN AND CONFIRMATION TESTS REQUESTED (Pre-Printed)
   □ Methadone  □ Benzodiazepines  □ Steroids
   □ PCP   □ <u>Other:</u>
TEST REASON (Pre-Printed) (Collector to check one)
   □ Random  □ Prior Use  □ Suspect
   □ Disruptive Group  □ Saturation  □ Community
INMATE'S NAME AND REGISTER NUMBER (Original only)
DATE COLLECTED (mm/dd/yy)
TIME REQUESTED (24 hour clock - "Military Time")
TIME PROVIDED (24 hour clock - "Military Time")
COLLECTOR'S (Staff's) CERTIFICATION/SIGNATURE
INMATE'S CERTIFICATION/SIGNATURE (Original Only)
WITNESS (Staff) SIGNATURE (donor refuses/cannot sign)

III.    Test Panels, Sensitivity, and Accuracy:

The BOP anticipates the requirement for an estimated 200,000 6-panel test cups for each performance period of the contract capable of detecting the following drugs simultaneously at the listed cut-off levels:

THC - 50 ng/ml

Opiates - 300 ng/ml

Amphetamines - 1,000 ng/ml

Methamphetamines - 1,000 ng/ml
Cocaine - 300 ng/ml
Barbiturates - 300 ng/ml

The contractor must also have, as an available option, an adulteration strip in addition to the 6-panel drug strips.

To prevent reagent leaching, each drug test (one drug per strip) must be in its own individual test strip chamber/channel and have its own test control and test result lines. Each test strip chamber/channel must have a control line indicator to determine that the test has functioned properly. The BOP will not be charged for cups that fail to produce a procedural control valid test indication.

The contractor must ensure that the COTR, Correctional Services Administrator in Central Office, and each institution Chief, Correctional Services are provided with an up-to-date list of cross-reacting drugs that will be detected by the on-site cup. The contractor must also provide a list of drugs that will not be detected and will not produce a positive result for the category of drugs specified above. These lists shall be provided with the quote and at the beginning of each performance period throughout the life of the contract.

The on-site cup test strips must have an accuracy rate of at least 95% as compared to GS/MS results and documentation must be provided with the proposal to verify that independent tests have been conducted to obtain those accuracy rates. The accuracy rate must not change due to collection site elevation/altitude or humidity levels, for example at Denver, Colorado, and Yazoo, Mississippi. The contractor's product must have participated in a well regarded and rigorous third party study for accuracy and the contractor will provide with the proposal documentation of such results to the BOP.

IV. Support:

The contractor must be able to provide 24 hours/day, seven days/week technical assistance at no additional cost.

For security purposes and to maintain the integrity of the testing program, the product being offered must not be sold over the counter or over the internet.

The contractor will provide subject matter expert testimony upon request from the BOP Contracting Officer to address issues such as testing methodologies, testing results, testing cut-off levels, accuracy of on-site cups, and other issues. The BOP anticipates the requirement for an estimated 20 hours of expert testimony per year. The offer must include the cost of this service as a separate line item. Reimbursement of travel expenses authorized in providing expert witness testimony will be in accordance with Federal Travel Regulations. Any travel must have the prior approval of the COTR and BOP Contracting Officer.

V. Comparison Testing:

The BOP will, on occasion, conduct comparison testing using other alternative testing matrixes (saliva, hair, sweat, lab EMIT screening, etc) to compare the results of the on-site test cup results with the results of the other matrixes.

## VI.   Training:

The contractor shall be able to provide on-site training and certification to the COTR and the six Regional Office Urine Surveillance Program Coordinators who in-turn will train other field staff. The training will be conducted at the Central Office, Washington, D.C. and/or at the BOP Management and Speciality Training Center (MSTC) in Denver, Colorado. The training may also be accomplished through video teleconferencing between Central Office and all other sites, but that decision will be made by the COTR in coordination with the institutions and Correctional Services Branch, Central Office. The vendor shall also provide a training CD or video to each institution, Regional Office, and Central Office, which may suffice for the training requirement. Reimbursement of travel expenses authorized in providing the training at BOP sites will be in accordance with Federal Travel Regulations. Any travel must have the prior approval of the COTR and BOP Contracting Officer.

## VII.  Billing:

Costs for all supplies to include on-site cups, lids, shipping containers, identification labels, and Chain of Custody forms are to be included in the cost per on-site cup price.

The contractor must assign/provide each collection site with an exclusive identification (account)number to identify each  site from other locations.  Those respective account numbers will be pre-printed on the Chain of Custody forms provided to the respective institutions.  The account number should include the institution's 3-letter identification code as a prefix to the account number.  For example, the contractor would assign an account number to FPC Alderson as ALD  (institution code) and XXXX (contractor assigned number) or ALDXXXX.  Another example would be FCC Coleman (medium) as COMXXXX.  The BOP COTR will provide to the contractor, upon contract award, the 3-letter identification code for each collection site.

There are approximately 125 collection sites throughout the United States, Hawaii, and Puerto Rico, with the possibility of other locations to be added over the life of the contract.  Some institutions have more than one collection site.  The contractor must provide each collection site, an exclusive identification (account) number to identify each site from other locations.

Billing for supplies used will be directed to the specific    billing address provided for each collection site.  Billing will be monthly.  Approximately 50% of the billing sites will be for multiple collection sites.

A list of BOP facilities can be obtained at ≤www.bop.gov≥ by clicking on BOP Directory. Institutions will be added or deleted by the BOP Contracting Officer.  As new institutions are activated, the COTR will notify the BOP Contracting Officer who will advise the contractor in writing.  Within 14 days of notification, the contractor will establish the account, and provide all the necessary supplies and forms.

The BOP will be reimbursed for the costs of on-site cups and any other costs associated with malfunctioning cups.  Each BOP collection site will notify the contractor quarterly the number of malfunctioning cups.  For example, cups that the control lines do not appear, cups that leak during shipping, etc.

## VIII. Contract Award

The contractor must ship requested supplies and offer full support services to the individual testing sites within 30 calendar days of official notification of the contract award. Expenses for shipping supplies will be born by the contractor.

Upon award of contract, a three month supply (approximately 450 6-panel cups, Chain of Custody forms and associated seals/labels, and shipping cartons) will be provided to each testing location/collection site. After initial delivery of supplies and forms, it will be the responsibility of the collection site to advise the contractor when additional supplies and forms are required. The contractor must be able to replenish supplies and forms within 14 calendar days of verbal notification/request.

IX. Quality Control/Manufacturing Practices:

The manufacturer of the on-site cup must be an International Organization for Standardization (ISO) 9001:2000 certified company and documentation of such must be provided with the proposal.

X.     Technology Statement:

Should new on-site cup technology become available during the contract period, the contractor will make those cups available to the BOP for test and evaluation to determine consideration for possible future use. If the new technology results in discontinued use of the on-site cup provided under this contract, the new technology on-site test cup will be provided to the BOP under this contract at no additional cost.

## A.3     EVALUATION CRITERIA

The Government will award a task order contract based on the GSA FSS contract resulting from this solicitation based on best value, to the responsible quoter whose quote conforming to the solicitation, will be most advantageous to the Government, price and other factors considered. The following factors shall be used to evaluate quotes:

Technical
Past Performance
Price

Technical merit shall be on a Go/No-Go basis in response to the specifications stated in the Statement of Work of the solicitation.

Price and Past Performance shall be considered in order of preference after the quote is accepted technically. In this process, price and past performance are equal.

## Technical

The technical portion of the quote will be evaluated on a Go/No-Go basis for compliance with the requirements and specifications stated in the Statement of Work of the solicitation. The quote should address each and every specification.

## Past Performance

Each quoter will be evaluated on its performance under existing and prior contracts for the same or similar supplies/services. Performance information will be used for both responsibility determinations and as an evaluation factor against which the quoter's relative rankings will be compared to assure the best value to the Government. The factors will be evaluated based upon the following:

1. Quality of Service
2. Timeliness of Performance
3. Cost Control
4. Business Relations
5. Customer Satisfaction

**Each quoter shall submit past performance information for three recent and relevant contracts for the same or similar items.** Information provided by quoters regarding past performance shall include contract numbers, firm or company names, points of contact with telephone numbers and any other relevant information that will assist with the evaluation process.

Quoters shall address any instances of past performance problems in referenced contracts and explain how these problems were resolved. Failure by the quoter to satisfactorily explain past performance problems will have an adverse affect on the past performance evaluation.

The past performance questionnaire, included as Attachment B, shall be used to collect the past performance information. It is the quoter's responsibility to provide the questionnaire to the contractors to complete and return to the quoter for submittal along with their quote.

## Price

The quoter's price will be a factor in the award decision. However, the Government reserves the right to make an award, based on best value to the Government (considering technical and past performance ), to a quoter having other than the lowest price quotation.

## Evaluation and Award

The quoter's initial quote should contain the quoter's best terms from a technical and price standpoint. However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary.

## A.4    PROJECT COORDINATION

The Government will appoint Nancy Trudel as the Contracting Officer's Technical Representative (COTR) for this project. The COTR is responsible for providing direction to the Contractor which clarifies the contract effort, fills in details or otherwise serves to accomplish the contractual scope of work, evaluates performance.

The COTR does not have the authority to alter the Contractor's obligations under the contract action, direct changes that fall within the Changes clause, and/or modify any of the expressed terms, conditions, specifications, or cost of this agreement. If as a result of technical discussions it is desirable to alter/change the contractual obligations or requirement, the contracting officer

shall issue such changes in writing under signature.

## A.5    CONTRACTING AND ADMINISTRATIVE AUTHORITY

The Contracting Officer is the only person authorized to approve changes or modify any of the requirements under this task order contract, and notwithstanding any provisions contained elsewhere in this contract, the said authority remains solely with the Contracting Officer. In the event the Contractor effects any such change at the direction of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustments will be made in the contract price, delivery schedule, terms or conditions to cover any increased costs incurred as a result.

The Contractor shall submit requests for modifications of this task order contract to the Contracting Officer, with a copy of the request to the COTR.

Contractual problems, of any nature, that may arise during the performance of this contract must be handled in conformance with the specific public laws and regulations (e.g. Federal Acquisition Regulation). Only the Contracting Officer is authorized to resolve such problems. Requests for information on matters related to this task order, such as explanations of terms and conditions, or contractual interpretations, shall be submitted to the Contracting Officer.

## A.6    INSPECTION AND ACCEPTANCE

The contractor shall only deliver items or services that conform to the requirements of this task order contract. The COTR reserves the right to inspect or test the items tendered by the Contractor. If any item/service is found to be unacceptable or not meeting the intent of this requirement, the Government may require re-performance of the nonconforming item/service at no increase in contract price.

## A.7    PAYMENT AND INVOICING

The Bureau of Prisons will award a single, requirements type task order contract with firm-fixed unit prices based on a GSA FSS contract for this requirement. The Contractor will propose firm-fixed prices for each of the required items. All invoices shall be prepared in accordance with FAR clause 52.212-4(g). The Contractor shall invoice the Government only for completed tasks after delivery and acceptance by the BOP of the final deliverables.

Payments will be made by Electronic Funds Transfer and in accordance with the Prompt Payment Act. The contractor shall be registered in the Central Contractor Registration Database and must keep all information updated. Invoices shall be sent to the "payment will be made by" address on the applicable order.

## A.8    CONTRACT CLAUSES

## 52.252-2 CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

www.acqnet.gov/far

I.    FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES
      NUMBER        DATE          TITLE

         52.212-4        SEP 2005       CONTRACT TERMS AND CONDITIONS -
COMMERCIAL ITEMS
         52.232-18       APR 1984       AVAILABILITY OF FUNDS
         52.232-33       OCT 2003       PAYMENT BY ELECTRONIC FUNDS TRANSFER -
CENTRAL CONTRACTOR REGISTRATION

The following clauses are incorporated into this solicitation/contract by full text as follows:

## 52.216-18 ORDERING (OCT 1995)

(a)    Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from the first day of the effective contract period through the last day of the effective contract.

(b)    All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the  contract shall control.

(c)    If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail.  Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

[End of Clause]

## 52.216-19 ORDER LIMITATIONS (OCT 1995)

(a)    *Minimum Order*. When the Government requires supplies or services covered by this contract in a n amount of less than $100.00, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

(b)    *Maximum order*. The Contractor is not obligated to honor
      (1) Any order for a single item in excess of $100,000.00;
      (2) Any order for a combination of items in excess of $250,000.00;
      (3) A series of orders from the same ordering office within 30 days that together call for quantities exceeding the limitation in subparagraph (b)(1) or (2) of this section.

(c)    If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.

(d)    Notwithstanding paragraphs (b) and © of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office with 15 days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reason. Upon receiving this notice, the Government may

acquire the supplies or services from another source.
[End of Clause]

## 52.216-21 REQUIREMENTS (OCT 1995)

(a)    This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirement do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

(b)    Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. Subject to any limitations in the Order Limitations clause or elsewhere in this contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause. The Government may issue orders requiring delivery to multiple destination or performance at multiple locations.

(c)    Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

(d)    The Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract.

(e)    If the Government urgently required delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if the Contractor will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source.

(f)    Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the contractor shall not be required to make any deliveries under this contract after expiration of the applicable contract period.
[End of Clause]

## 52.217-8 OPTION TO EXTEND SERVICES (NOV 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor prior to the expiration of the current contract period.
[End of Clause]

## 52.217-9 OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000)

(a)    The Government may extend the term of this contract by written notice to the Contractor prior to the expiration of the current contract period; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least <u>45</u> days before

the contract expires. The preliminary notice does not commit the Government to an extension.

(b)   If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c)   The total duration of this contract, including the exercise of any options under this clause, shall not exceed <u>five years</u>.

[End of Clause]


## 52.232-19 AVAILABILITY OF FUNDS FOR THE NEXT FISCAL YEAR (APR 1984)

Funds are not presently available for performance under this contract beyond September 30. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond September 30 until funds are made available to the Contracting Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

[End of Clause]


## CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR) (JAR 2852.201-70) (JAN 1985)

(a)   <u>Nancy Trudel</u> of the <u>Correctional Services Branch, Correctional Program Division, Federal Bureau of Prisons, 320 First Street, N. W., Washington, DC 20534,</u> is hereby designated to act as Contracting Officer's Technical Representative (COTR) under this contract.

(b)   The COTR is responsible, as applicable, for: receiving all deliverables, inspecting and accepting the supplies or services provided hereunder in accordance with the terms and conditions of this contract; providing direction to the contractor which clarifies the contract effort, fills in details or otherwise serves to accomplish the contractual Scope of Work; evaluating performance; and certifying all invoices/vouchers for acceptance of the supplies or services furnished for payment.

(c)   The COTR does not have the authority to alter the contractor's obligations under the contract, and/or modify any of the expressed terms, conditions, specifications, or cost of the agreement. If as a result of technical discussions it is desirable to alter/change contractual obligations or the Scope of Work, the Contracting Officer shall issue such changes.

[End of Clause]


## PROTESTS FILED DIRECTLY WITH THE DEPARTMENT OF JUSTICE (JAR 2852.233-70)(JAN 1998)

(a)   The following definitions apply in this provision:

(1)   "Agency Protest Official" means the official, other than the contracting officer, designated to review and decide procurement protests filed with a contracting activity of the Department of Justice.

(2)   "Deciding Official" means the person chosen by the protestor to decide the

agency protest; it may be either the Contracting Officer or the Agency Protest Official.

(3)    "Interested Party" means an actual or prospective offeror whose direct economic interest would be affected by the award or prospective offeror whose direct economic interest would be affected by the award of a contract or by the failure to award a contract.

(b)    A protest filed directly with the Department of Justice must:

(1)    Indicate that it is a protest to the agency.

(2)    Be filed with the Contracting Officer.

(3)    State whether the protestor chooses to have the Contrating Officer or the Agency Protest Official decide the protest. If the protest is silent on this matter, the Contracting Officer will decide the protest.

(4)    Indicate whether the protestor prefers to make an oral or written presentation of arguments in support of the protest to the deciding official.

(5)    Include the information required by FAR 33.103(d)(2):

(i)    Name, address, facsimile number and telephone number of the protestor.

(ii)    Solicitation or contract number.

(iii)    Detailed statement of the legal and factual grounds for the protest, to include a description of resulting prejudice to the protestor.

(iv)    Copies of relevant documents.

(v)    Request for ruling by the agency.

(vi)    Statement as to the form of relief requested.

(vii)    All information establishing that the protestor is an interested party for the purpose of filing a protest.

(viii)    All information establishing the timeliness of the protest.

(c)    An interested party filing a protest with the Department of Justice has the choice of requesting either that the Contracting Officer or the Agency Protest Official decide the protest.

(d)    The decision by the Agency Protest Official is an alternative to a decision by the Contracting Officer. The Agency Protest Official will not consider appeals from the Contracting Officer's decision on an agency protest.

(e)    The deciding official must conduct a scheduling conference with the protestor within five (5) days after the protest is filed. The scheduling conference will establish deadlines for oral or written arguments in support of the agnecy protest and for agency officials to present information in response to the protest issues. The deciding official may hear oral arguments in support of the agency protest at the same time as the scheduling conference, depending on availability of the necessary parties.

(f)    Oral conferences may take place either by telephone or in person. Other parties may attend at the discretion of the deciding official.

(g)    The protestor has only one opportunity to support or explain the substance of its protest. Department of Justice procedures do not provide for any discovery. The deciding official may request additional information from either the agency or the protestor. The deciding official will resolve the protest through informal presentations or meetings to the maximum extent practicable.

(h)    An interested party may represent itself or be represented by legal counsel. The Department of Justice will not reimburse the protestor for any legal fees related to the agency protest.

(i)    The Department of Justice will stay award or suspend contract performance in accordance with FAR 33.103(f). The stay or suspension, unless over-ridden, remains in effect until the protest is decided, dismissed, or withdrawn.

(j)    The deciding official will make a best effort to issue a decision on the protest within twenty (20) days after the filing date. The decision may be oral or written.

(k)    The Department of Justice may dismiss or stay proceeding on an agency protest if a protest on the same or similar basis is filed with a protest forum outside the Department of Justice.

[END OF ADDENDUM TO FAR 52.212-4]

**A.9    SOLICITATION PROVISIONS**

The following provisions are incorporated into this solicitation/contract by full text as follows:

**52.233-2 SERVICE OF PROTEST (AUG 1996)**

(a)    Protests, as defined in Section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the General Accounting Office (GAO), shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from:

Federal Bureau of Prisons
320 First Street, N. W., Room 5006
Washington, DC  20534
Attention: Darlene Ely, Procurement Executive

(b)    The copy of any protest shall be received in the office deignated above within one day of filing a protest with the GAO.
[End of Provision]





REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO EXPOSE ADHESIVE   REMOVE TO I

**BOP Solicitation Number:**
**RFQ-NAS-0021-002**
**Exhibit 1b**
**Clear Sealable Bio Bag**

TEAR AT SCORE TO OPEN

GSA #: GS07F5786P
PHAMATECH, INC.
10151 Barnes Canyon Road
San Diego, CA 92121



1) Insert Specimen in Longer Pouch.

2) Pull Off Liner, Press to Close.

3) Insert Requisition Into Outside Pocket.

4) Tuck Top of Requisition Under Flap.

*LABTITE* ®
COVERED BY PATENT #6,012,844

**KEEP SEALED UNTIL READY FOR USE**
*TO BE OPENED BY AUTHORIZED AGENT ONLY*
*PHAMATECH QuickScreen OneStep OnSite Test Cup*

**Package contents -** 1 self contained urinalysis drug test cup with 6 test strips for the simultaneous detection of the following drugs of abuse with drug concentration cut off levels of:

| DRUG SCREEN | | CUT OFF LEVEL |
|---|---|---|
| Cannabinoids | (THC) | 50 ng/ml |
| Cocaine | (COC) | 300 ng/ml |
| Opiates | (OPI) | 300 ng/ml |
| Amphetamines | (AMP) | 1000 ng/ml |
| Methamphetamines | (MET) | 1000 ng/ml |
| Barbituates | (BAR) | 300 ng/ml |

**DIRECTIONS FOR USE:**

Collect the urine sample to the minimum line indicated on the outside of the cup. Read the temperature immediately. It must read between 90 to 100 F. The indicator will turn completely red (approximately 5 minutes); pull the tab to

**INTERPRETATION OF RESULTS:**

C= Control Line  **T** = Test line  **Two lines** = *Negative*  **One line** = *Presumptive Positive*
*(A more specific chemical method, preferably GC/MS, should be used to confirm a presumptive positive result).*

**Model #:** *9600X-9187Z*    **Lot Number:** *A70133*    **Expiration Date: 2008-09**

**FEDERAL BUREAU OF PRISONS
ACQUISITIONS BRANCH
NATIONAL ACQUISITIONS SECTION**
320 First St., N.W., Room 5006
Washington, DC 20534

Solicitation #: RFQ-NAS-0021-2007

Due Date/Local Time: 01-29-2007 12:00 P.M.

Contracting Officer: Jan R. Johns

## <u>SAMPLE</u>

Vendor Contact: Phamatech Inc.
John Polanco – 888-635-5840 Ext. 244



Innovators of Rapid In-Vitro Diagnostics



**BOP SOLICITATION NUMBER:**
**RFQ-NAS-0021-2207**

**Exhibit 1a**
Shipping container for 2 specimen cups

GSA #: GS07F5786P
PHAMATECH, INC.
10151 Barnes Canyon Road
San Diego, CA 92121

Federal Bureau
of Prisons

Urine Specimens



**PHAMATECH, INC.**

*A world leader in the manufacture of FDA cleared and CLIA waived on-site drug screening devices*

**John Toma**
*Government Contract Specialist*

10151 Barnes Canyon Rd.
San Diego, CA 92121-2725
TOLL FREE (888) 635-5840 ext.248
FAX (858) 635-5843

CELL (619) 884-1281
TEL (858) 643-5555 Ext. 248
E-mail toma@phamatech.com
www.phamatech.com

GSA Contract #: GS07F5786P

---

**PHAMATECH, INC.**

*A world leader in the manufacture of FDA cleared and CLIA waived on-site drug screening devices*

**John Polanco**
*Government Contracts Manager*

10151 Barnes Canyon Rd.
San Diego, CA 92121-2725
TOLL FREE (888) 635-5840 ext.244
FAX (858) 635-5843

CELL (619) 665-6977
TEL (858) 643-5555 Ext. 244
E-mail john@phamatech.com
www.phamatech.com

GSA Contract #: GS07F5786P



PHAMATECH

10151 Barnes Canyon Road
San Diego, CA 92121 USA
TOLL FREE (888) 635-5840
FAX (858) 635-5843
TEL (858) 643-5555
www.phamatech.com

# Memorandum

Date:      February 1, 2007

Reply to:   John Polanco

To:        Ms. Jan R. Johns

Subject:    Drug Screen Cup Samples – RFQ-NAS-0021-2007

*CMAS- 4.04840015A     GSA- GS07F5786P     MMCAP-4.34680     TXMAS- 4.84080*

Dear Ms. Johns:

Pursuant to your request enclosed please find the drug screen samples.

**Please keep in mind that we are a FDA approved manufacturer and have the
capability to produce drug screen devices to match the Bureau of Prisons needs.**

**You may reach me anytime on my cell:  619-665-6977.**

Regards,

John Polanco
**Government Contracts Manager**



10151 Barnes Canyon Road
San Diego, CA 92121 USA
TOLL FREE (888) 635-5840
FAX (858) 635-5843
TEL (858) 643-5555
www.phamatech.com

**PHAMATECH**

February 16, 2007

**VIA: Fax and Overnight**

Jan R. Johns
Contracting Officer
Federal Bureau of Prisons
Acquisitions Management Section
320 First Street, N.W. Room 5006
Washington D.C.  20534

RE:  Clarification to Quote RFQ-NAS-0021-2007 – On Site Urine Test Cups

Dear Ms. Johns:

The following represents our responses for clarifications per your letter dated February 15, 2007.

*1. Yes, the desiccant will be placed in the sealed bag and not in the cup.  Since we are the manufacturers of the device, we can place it wherever the BOP department sees fit.*

*2. Yes, that's correct.  The ID#, Date and Donor Initials will not appear on the cup.  The identification label on the cup is an option that may assist in identifying donors at a later time if necessary.*

*3. Yes, that's correct all the information on the peel-off security label will be provided as indicated, if that's what the BOP department desires.  Or we can custom make any peel off label to fit the needs of the BOP department.*

*4. The result ready indicator will turn fully red within five minutes and the result expired indicator will turn completely red after 30 minutes, per BOP bid specifications.  Please note that all test results will be ready within 2 minutes, however, we recommend that end users wait until the result ready indicator turns completely red to confirm any preliminary presumptive positives.*

*5. The chain of custody form submitted with the BOP bid was strictly a prototype.  We can easily change who will get the original copy of the Chain of Custody.  If the BOP department desires the original copy, then the BOP Department will appear at the bottom of the original copy. (see attached revised copy).*

*6. Client support means in person, via telephone, Internet, CD training, etc.  The BOP department will have the capability to page or call someone 24 hours a day 7 days a week.  Additionally, the BOP department will have full access to our chief toxicologist and our laboratory manager.  Phamatech will have at least two full time employees to strictly handle the BOP department's needs.*

*7. Training CDs will be provided to each institution, Regional Offices and Central Office.  We will send a CD that is currently in use for a similar product that can be tailor made to fit the BOP department's needs.  A sample CD will be in your office by 19/Feb/07 at 10:30 am.*



PHAMATECH                          February 16, 2007
                                            Page Two

8. *The BOP department will have two options regarding adulteration strips.*

**Option A:**

(b)(4)

(b)(4)

**Option B:**

(b)(4)

(b)(4)

I hope I have addressed all your clarifications and if you have any additional questions you may call me at 888-635-5840, extension 244 or my cell, 619-665-6977.

Regards,

John Polanco
Government Contracts Manager

# Federal Bureau of Prisons Chain of Custody Form



SPECIMEN ID NO: 0 0 0 0 0 0 0 0 0 1

C000000001

## STEP 1: TO BE COMPLETED BY COLLECTOR

A. Institution Name, Address and Account No.                    B. Collection Site Name, Address, and Account No.

C. Inmate Register No: _____    Time Of Collection Requested: _____    Time Provided: _____
(24 hour clock/Military time)                (24 hour clock/Military time)

D. Reason for Test: ☐ Random  ☐ Prior Use  ☐ Suspect  ☐ Disruptive Group  ☐ Saturation  ☐ Community  ☐ Other

E. Inmate Identification Verified By ☐ Photo I.D.  ☐ Other    Inmate Date of Birth: _____  _____  _____
                                                                Month   Date   Year

## STEP 2: TO BE COMPLETED BY COLLECTOR AND DONOR

I authorize the collection of the specimen for the purpose of a drug screen. I acknowledge that the container(s) was/were seal with Tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen Container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its agents

(PRINT) INMATE'S NAME (LAST,FIRST,MID)    SIGNATURE OF DONOR   INITIAL    MONTH    DAY    YEAR

Witness Signature (If Inmate refuses or unable to sign)    PRINT (Witness Name)    DATE:

## STEP 3: TO BE COMPLETED BY COLLECTOR

Read Specimen temperature within 4 minutes. Is the temperature          Specimen Collection:
Between 90 and 100 F? ☐ Yes ☐ No, enter remarks in Step 4 below    ☐ Single   ☐ None Provided   ☐ Observed
Between 32 and 38 C ? ☐ Yes ☐ No, enter remarks in Step 4 below              (Enter Remarks below)  (Enter Remarks below)

REMARKS:

## STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR- Collector affixes bottle seal(s). Collector dates Seal(s)

Donor initials seal(s), if applicable to collection device.
Collector: Record lot Number _____ and the Expiration Date _____  _____ found on the foil pouch of the test device
                                                                        Year    Month

Collector: Record Results    Negative Results    CHECK BOXES BELOW FOR EACH PRESUMPTIVE POSITIVE RESULT
A. For Confirmation Requested

☐ MET500    ☐ THC    ☐ OPI300    ☐ AMP    ☐ COC    ☐ BAR 300

B. For Screen and Confirmation Requested:
☐ BZD    ☐ PCP    ☐ STEROIDS    ☐ MTD    ☐ OTHER

## STEP 5: CHAIN OF CUSTODY-INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted, in accordance with applicable requirements.
X _____
   Signature of Collector

_____    ___/___/___       SPECIMEN BOTTLE (S) RELEASED TO:
(PRINT) Collector Name (Last, First, MI)   (Mm/Dd/Yy.)    Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB:                            Primary specimen       SPECIMEN BOTTLE(S) RELEASED TO:
                                           Bottle seal in tact
_____                  ☐ YES
   Signature of Accessioner
                                           ☐ NO, Enter Remarks Below
(PRINT) Accessioner's Name (First, MI, Last)

A    ___/___/___
     DATE    DONORS INITIALS

0000000001          0000000001

Federal Bureau of Prisons Chain of Custody Form 

SPECIMEN ID NO.: _ _ _ _ _ _ _ _ _ _

**STEP 1: TO BE COMPLETED BY COLLECTOR**

A. Institution Name, Address and Account No.                    B. Collection Site Name, Address, and Account No.

C. Inmate Register No. _____    Time Of Collection Requested: _____    Time Provided: _____

D. Reason for Test: ☐ Random  ☐ Prior Use  ☐ Suspect  ☐ Disruptive Group  ☐ Saturation  ☐ Community  ☐ Other

E. Inmate Identification Verified By: ☐ Photo I.D.  ☐ Other    Inmate Date of Birth: _____
                                                          Month      Date      Year

**STEP 2: TO BE COMPLETED BY COLLECTOR AND DONOR**

I authorize the collection of the specimen for the purpose of a drug screen. I acknowledge that the container(s) was/were seal with tamper-proof seal(s) in my presence and that the information provided on this form and on the label(s) affixed to the specimen Container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its agents

(PRINT) INMATE'S NAME (LAST, FIRST, MID)    SIGNATURE of DONOR    INITIAL    MONTH    DAY    YEAR

Witness Signature (If Inmate refuses or unable to sign)    PRINT (Witness Name)    DATE:

**STEP 3: TO BE COMPLETED BY COLLECTOR**

Read Specimen temperature within 4 minutes. Is the temperature    Specimen Collection:
between 90 and 100 F?  ☐ Yes  ☐ No, enter remarks in Step 4 below    ☐ Single    ☐ None Provided    ☐ Observed
between 32 and 38 C ?  ☐ Yes  ☐ No, enter remarks in Step 4 below              (Enter Remarks Below)  (Enter Remarks Below)

REMARKS:

**STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR**- Collector affixes bottle seal(s). Collector dates Seal(s)
Donor initials seal(s), if applicable to collection device.
Collector: Record lot Number _____ and the Expiration Date _____ found on the foil pouch of the test device
                                                                      Year    Month
Collector: Record Results    Negative Results    CHECK BOXES BELOW FOR EACH PRESUMPTIVE POSITIVE RESULT
A. For Confirmation Requested

☐ MET500    ☐ THC    ☐ OPI300    ☐ AMP    ☐ COC    ☐ BAR 300

B. For Screen and Confirmation Requested:
☐ BZD    ☐ PCP    ☐ STEROIDS    ☐ MTD    ☐ OTHER

**STEP 5: CHAIN OF CUSTODY INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted, in accordance with applicable requirements.
X _____
   Signature of Collector                                    SPECIMEN BOTTLE (S) RELEASED TO:

_____              ___/___/___                   Name of Delivery Service Transferring Specimen to Lab
(PRINT) Collector Name (Last, First, MI)    (Mm/Dd/Yr.)

RECEIVED AT LAB:                              Primary specimen        SPECIMEN BOTTLE(S) RELEASED TO:
                                             bottle seal in tact
_____                              ☐ YES
   Signature of Accessioner
                                             ☐ NO, Enter Remarks Below
_____
(PRINT) Accessioner's Name (First, MI, Last)

COPY 2 LABORATORY

02/28/2007  11:44   3017841004        FCI CUMBERLAND                    PAGE  02

## Regional Administrative Remedy Appeal
### Part B - Response

Date Filed: January 23, 2006

Remedy ID No. 401720-R1

You appeal the DHO decision of December 5, 2005, for Use of Cocaine (Code 112). You state you did not commit the prohibited act. You claim the sanctions are too harsh. You request the incident report be expunged.

The DHO found you committed the prohibited act based on the greater weight of the evidence which was the chain of custody form and your initials indicating the specimen was yours and was sealed in your presence. The DHO considered your denial of the charge. The DHO also relied on the written confirmation received from Toxicology Laboratories showing that your urine specimen tested positive for cocaine. Institution staff verified that you were not prescribed medication which would cause you to test positive for morphine/opiates. We find the DHO accurately and adequately explained to you in Section V of the DHO report the specific evidence relied on to find you committed the prohibited act, and we find no need to elaborate further.

The sanctions imposed were appropriate and available to the DHO for a prohibited act in the Greatest severity category.

We find the required disciplinary procedures were substantially followed, the evidence supports the DHO's finding, and the sanctions were appropriate for the offense.

Your appeal is denied. If you are dissatisfied with this response, you may appeal to the General Counsel, Federal Bureau of Prisons, 320 First Street, N.W., Washington, D.C. 20534. Your appeal must be received in the General Counsel's Office within 30 days from the date of this response.

MAR 2 9 2006
_____
Date

_____
K. M. White
Regional Director
Mid-Atlantic Regional Office

02/26/2006 11:23    3017841224    UNIT A    PAGE 03/17
01/26/2006 11:23    3017841224    FCI CUMBERLAND    PAGE 01

REQUEST FOR DOCUMENTS - ADMINISTRATIVE REMEDY


DATE: JANUARY 26, 2006

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      MID-ATLANTIC REGIONAL OFFICE

TO  : ADMINISTRATIVE REMEDY COORDINATOR
      CUMBERLAND FCI


OUR OFFICE RECEIVED THE BELOW INDICATED REGIONAL APPEAL.
PLEASE SEND US COPIES OF THE DOCUMENTS INDICATED BELOW, WHICH
WE NEED IN ORDER TO RESPOND.  PLEASE NOTIFY US PROMPTLY IF YOU
CANNOT HAVE THIS MATERIAL TO US BY MON, JANUARY 30, 2006


REMEDY ID : 401720-R1          REGIONAL APPEAL
INMATE    : ANTHONY D RAY, 04077-000
INMATE LOC: CUMBERLAND FCI UNT: UNIT A QTR: A01-128U
SUBJECT 1 : DHO APPEAL - COMBINED (PROCEDURES, EVIDENCE & SANCTIONS)
SUBJECT 2 :
INC RPT NO: 1403543
DOCUMENT  : DHO PACKET                    12-05-2005
REMARKS   : SEND TO NANCY TRUDEL, DHA, MARO

## DISCIPLINE HEARING OFFICER REPORT
## U.S. DEPARTMENT OF JUSTICE



**BP-S305.052 MAY 94**
**FEDERAL BUREAU OF PRISONS**

| INSTITUTION | FCI CUMBERLAND | | INCIDENT REPORT NUMBER | | 1403543 |
|---|---|---|---|---|---|
| INMATE NAME | RAY, ANTHONY D | REG NO | 04077-000 | UNIT | A 1 |
| DATE OF INCIDENT | 11-09-2005 | DATE OF INCIDENT REPORT | | | 11-18-2005 |
| OFFENSE CODE(S) | 112 | | | | |
| SUMMARY OF CHARGES | Use of Any Narcotics, Marijuana, Drug or Related Paraphernalia Not Prescribed For the Individual by the Medical Staff | | | | |

### I.  NOTICE OF CHARGE(S)

A. Advanced written notice of charge (copy of Incident Report) was given to inmate on
(date)  11-18-2005      at (time)  1020    (by staff member)  K. Bageant

B. The DHO Hearing was held on (date)    12-05-2005    at (time)    1350

C. The inmate was advised of his/her rights before the DHO by (staff member):

S. Golub                        on (date)    11-23-2005        and a copy

of the advisement of rights form is attached.

### II.  STAFF REPRESENTATIVE

| A. Inmate waived right to staff representative. | Yes: | -- | No: | X |
|---|---|---|---|---|

B. Inmate requested staff representative and   J. Courtney            appeared.

C. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result
that:  N/A

| D. Staff representative | N/A | was appointed. |
|---|---|---|

E. Staff representative statement:

Mr. J. Courtney, Correctional Counselor, appeared at the hearing with inmate RAY and each acknowledged they were ready to proceed with the hearing. Mr. Courtney stated that he discussed this incident with inmate RAY and was ready to assist him as necessary. Mr. Courtney described RAY as a ideal inmate and that he does not cause any problems in the unit or for the unit team.  At the conclusion of the hearing Mr. Courtney  stated that RAY had received a fair hearing and that appropriate sanctions were imposed.

### III.  PRESENTATION OF EVIDENCE

| A. Inmate | admits | - | denies | - | the charge(s). |
|---|---|---|---|---|---|

B. Summary of inmate statement:

RAY acknowledged receiving a copy of the incident report and stated he understood his rights before the DHO. RAY verified his signature on the Chain of Custody for Drug Analysis form for specimen number B01652926. RAY denied using drugs not prescribed for him by medical staff.  RAY stated he was treated by the dentist and received anesthetic during a dental procedure. RAY then stated he provided the urine specimen a couple of days after the dental procedure. According to RAY, on the day of graduation from Vo-Tech, he was called to the Lieutenant's office and was wrongly charged with having used drugs. RAY denied using any illegal drugs.

C. Witness(es):

**DISCIPLINE HEARING OFFICER REPORT**
**U.S. DEPARTMENT OF JUSTICE**



BP-S305.052 MAY 94
**FEDERAL BUREAU OF PRISONS**

| 1. The inmate requested witness(es). | Yes: | | - | No: | | X |
|---|---|---|---|---|---|---|

2. The following persons were called as witnesses at this hearing and appeared. (Include each witnesses' name, title, reg number and statement as appropriate.)

N/A

3. The following persons requested were not called for the reason(s) given.

N/A

| 4. Unavailable witnesses were requested to submit written | Yes | - | No | - | N/A | X |
|---|---|---|---|---|---|---|

D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following documents:

1. Chain of Custody for Drug Analysis, dated 11-09-2005, for Specimen Number B01652926 signed by inmate Anthony RAY.

2. Laboratory Report, dated 11-17-2005 for Specimen Number B01652926 from National Toxicology Laboratories, showing a positive test for Cocaine.

3. A memorandum signed by Registered Nurse L. Dudeck, dated 11-18-2005 indicating that a review of RAY's medical record finds no medication prescribed for RAY that would cause a positive test for Cocaine.

4. A memorandum from LCDR R. Byrd, Chief Pharmacist, stating he reviewed the metabolism and chemical structures of a dental anesthetic given to RAY and found no comparison between them and cocaine metabolites that would cause a false positive urine test result.

E. Confidential information was used by DHO in support of his findings, but was not revealed to the inmate. The confidential information was documented in a separate report. The confidential information has been (confidential informants have been) determined to be reliable because:

N/A

**IV. FINDINGS OF THE DHO**

| X | A. The act was committed as charged. |
|---|---|
| - | B. The following act was committed: |
| - | C. No prohibited act was committed: Expunge according to Inmate Discipline PS. |

**V. SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.)**

Based on the greater weight of the evidence the DHO finds that on 11-09-2005, inmate RAY provided a urine sample that subsequently tested positive for the presence of Cocaine, without this substance being prescribed for him by medical staff. To reach this finding the DHO relies on the National Toxicology Laboratories report, dated 11-17-2005, showing a positive result for Cocaine for Specimen No. B01652926; the Chain of Custody for Drug Analysis for Specimen No. B01652926, dated 11-09-2005, signed by inmate RAY, Anthony; and, the Registered Nurse's memorandum, dated 11-18-2005, saying that RAY was not prescribed any medication that would result in a positive test for Cocaine. The DHO also relies on the reporting officer's statements contained in the Incident Report as follows:

On November 18,2005, at approximately 7:15 a.m., a fax mail Laboratory Report was received at the FCI Cumberland SIS office from National Toxicology Laboratories. INC.. Bakersfield, CA., indicating urine specimen

**DISCIPLINE HEARING OFFICER REPORT**
**U.S. DEPARTMENT OF JUSTICE**



BP-S305.052 MAY 94
**FEDERAL BUREAU OF PRISONS**

number BO1652926, tested positive for cocaine (Benzoylecgonine). Inmate RAY, Anthony D., #04077-000, provided specimen number BO1652926, on November 9, 2005, at 6:08 a.m. The institution Health Services department was contacted and advised staff did not prescribe inmate Ray any medication that would cause a positive urine test result for cocaine. Based on this information I conclude that inmate Ray used narcotics, drugs or related paraphernalia not prescribed for him by medical staff.

Additionally, the DHO relies on RAY's statement confirming the specimen control number and verification of his signature on the chain of custody form to find he used narcotics, marijuana, drugs or related paraphernalia not prescribed by medical staff. The DHO considered RAY's allegation this was a false positive test result from anesthetic given to him during a dental procedure. However, the DHO gives greater weight to the Chief Pharmacist's memorandum stating the chemical structure of the anesthetic would not cause a false positive test result to find RAY used narcotics, marijuana, drugs or related paraphernalia not prescribed by medical staff.

---

**VI. SANCTION OR ACTION TAKEN**

20 days Disciplinary Segregation
20 days DS suspended
Forfeit 60 days Statutory Good Time
365 days loss of Social Visiting Restriction, followed by
365 days Social Visiting restricted to either non-contact visits or only immediate family members.

---

**VII. REASON FOR SANCTION OR ACTION TAKEN**

Using narcotics, marijuana, drugs or related paraphernalia not prescribed by medical staff will not be permitted. Actions like this threaten the security and orderly running of the institution. These actions also endanger the safety and quality of life of both inmates and staff.

The DHO imposes the sanctions listed above to convey the seriousness and inappropriateness of your actions. The DHO selected these sanctions to deter you and others from exhibiting similar acts of misbehavior in the future.

---

**VIII. APPEAL RIGHTS:** The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

| | Yes | | X | No | | – |
|---|---|---|---|---|---|---|

---

**IX. DISCIPLINE HEARING OFFICER**

| Printed Name of DHO | Signature of DHO | Date |
|---|---|---|
| J. Howard Losiewicz | | 12-15-2005 |
| Report delivered to inmate by: | DATE | TIME |

(This form may be replicated in WP)

Replaces BP-304(52) of JAN 88

BP-S288.052 INCIDENT REPORT CDFRM
May 1994
U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

| 1. Name of Institution: FCI Cumberland | | # 1405543 |
|---|---|---|

### PART I - INCIDENT REPORT

| 2. Name of Inmate<br>RAY, Anthony D. | 3. Register Number<br>04077-000 | 4. Date of Incident<br>November 9, 2005 | 5. Time<br>6:08 AM |
|---|---|---|---|
| 6. Place of Incident<br>Unit A-1 | 7. Assignment<br>F CCS AM | 8. Unit<br>A-1 | |
| 9. Incident: Use of any narcotics, or related paraphernalia not prescribed for the individual by the medical staff. | | 10. Code 112 | |

11. Description of Incident (Date: 11-18-05 Time: 7:15 AM Staff became aware of incident)

On November 18, 2005, at approximately 7:15 a.m., a fax mail Laboratory Report was received at the FCI Cumberland SIS office from National Toxicology Laboratories, INC., Bakersfield, CA., indicating urine specimen number B01652926, tested positive for cocaine (Benzoylecgonine). Inmate RAY, Anthony D., #04077-000, provided specimen number B01652926, on November 9, 2005, at 6:08 a.m. The institution Health Services department was contacted and advised staff did not prescribe inmate Ray any medication that would cause a positive urine test result for cocaine. Based on this information I conclude that inmate Ray used narcotics, drugs or related paraphernalia not prescribed for him by medical staff.

| 12. Signature of Reporting Employee<br>D. Dereiner | Date and Time<br>11-18-2005/8:30 AM | 13. Name and Title (printed)<br>D. Deremer/ SIS Technician |
|---|---|---|
| 14. Incident Report Delivered to above inmate by: | 15. Date Incident Report delivered<br>11.18.05 | 16. Time Incident Report Delivered<br>10:20 Am |

### PART II - COMMITTEE ACTION

17. Comments of Inmate to Committee Regarding Above Incident  *I dont know nothin about none of that staff. I went to see the Dentist they shot me up in the mouth with some new medicine. I never used drugs in my life.*

| 18. A. It is the finding of the Committee that you:<br>_____ Committed the following prohibited act.<br><br>_____ Did not commit a prohibited act. | B. __✓__ The Committee is referring the charge(s) to the DHO for further hearing<br>C. _____ The Committee advised the inmate of its findings and    of the right to file an appeal within 15 calendar days. |
|---|---|

19. Committee Decision is based on the following information:  *The UDC is referring the incident report to the DHO based on the seriousness of the offense. Additionally sanctions are not available at UDC level.*

20. Committee Action and/or recommendation if referred to DHO (contingent upon DHO finding inmate committed prohibited act)  *If guilty, UDC recommends 30 days DS, 41 days loss of GCT.*

21. Date and Time of Action  *11/23/5  9:35Am*  (The UDC Chairman's signature next to his name certifies who sat on the UDC and that the completed report accurately reflects the UDC proceedings.)

| T. Giart / G.... | J. Golub / S. Golub | |
|---|---|---|
| Chairman (typed name/signature) | Member (typed name) | Member (typed name) |

Record Copy - Central File Record; Copy - DHO; Copy - Inmate after UDC Action; Copy - Inmate within 24 hours of Part I preparation
(This form may be replicated via WP)

Replaces BP-288(52) of Jan. 88

## PART III - INVESTIGATION:

22.   Date and Time Investigation Began:   __11-18-2005 /10:20 A.M.__

23.   Inmate advised of right to remain silent: You are advised of your right to remain silent at all stages of the disciplinary process but are informed that your silence may be used to draw an adverse inference against you at any stage of the institutional disciplinary process. You are also informed that your silence alone may not be used to support a finding that you have committed a prohibited act.

The inmate was advised of the above right by __K. Bageant__ at (date/time) __11-16-2005 /10:20 P.M.__

24.   Inmate Statement and Attitude:

Inmate Ray #04077-000 was advised of his rights and given a copy of this report.
Inmate stated that he understood his rights.

Inmate Stated: **I don't know anything about this. Inmate Ray #04077-000 declined to make any further statement during this investigation.**

Inmate displayed a ~~Good~~ attitude during this investigation.

25. Other facts about the incident, statements of those persons present at scene, disposition of evidence, etc.

Inmate requested no witnesses at this time.

Other evidence has been presented. **Attached documentation from National Toxicology Laboratories and Supporting Memorandum.**

.26. Investigator's comments and conclusions: **Based on the information contained within the body of this report, I find this report to be true and correct as written.**

27. Action Taken:
Inmate Ray #04077-000 was placed in Special Housing on 11-18-2005.This report is being referred to the UDC pending further action.

Date and time investigation completed   **11-18-2005 /10:25 P.M.**

Printed Name/Signature of Investigator __K. Bageant__ / _____   __Act. Lieutenant__
                                                                      Title




**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Federal Correctional Institution*
*Cumberland, Maryland 21502*

Date: November 18, 2005

Reply To
Attn Of: D. Deremer
SIS Technician

Subject: Request for Medical Prescription Information
**RAY, Anthony D. #04077-000**

To: Health Services Department

The above referenced inmate provided a urine sample on November 9, 2005, at 6:08 a.m., for testing according to the Federal Bureau of Prisons policy on Urine Surveillance. The National Toxicology Laboratories INC., Bakersfield, CA, advises this specimen (#B01652926), tested positive for **cocaine (Benzoylecgonine)**. Before proceeding with disciplinary action it is necessary to determine if any medication prescribed for this inmate justifies the positive test result. Please review the subject's medical records and indicate below if Health Services staff prescribed any medication that would justify the positive test result.

Thank you in advance, for promptly completing the requested information and returning this memorandum to my attention.

---

As requested above, I, reviewed the above referenced inmate's medical record and find:

___✓___: The inmate was not prescribed any medication that would test positive for the above stated drug.

_____: The inmate was prescribed the medication(s) listed below that would cause a positive urine test result for the above stated drug.
Please list below the prescribed medication(s) justifying the positive test result.

L. Dudek RN                RN                11-18-05
Printed Name & Signature          Title          Date
Reviewing and Certifying
Inmate's Medication History



# National Toxicology Laboratories INC

1100 California Ave.    Bakersfield, California 93304

## Chain of Custody for Drug Analysis

## FEDERAL BUREAU OF PRISONS



| Specimen Number | B01652926 |
|---|---|

| Results Name and Address | CUM | Account No. | 01007 |
|---|---|---|---|
| FCI Cumberland 14601 Burbridge Rd. SE Cumberland, MD 21502 | INSTITUTION CODE | Special Tests Requested | |

**INSTITUTION SECURITY LEVEL:**  MINIMUM 01 ☐   LOW 02 ☐   MEDIUM 03 ☑   HIGH 04 ☐   ADMINISTRATIVE 05 ☐   COMMUNITY 06 ☐

## URINE COLLECTION PROCEDURES

1. To the extent possible, urine samples should be collected in one or two centralized areas of the institution, e.g. Lieutenants' office or R & D, by staff who are thoroughly familiar with the procedures specified below.
2. Inmates shall be thoroughly searched to detect any device designed to provide a urine substitute or possible contaminant and will thoroughly wash their hands prior to providing the sample. Prior to collecting the sample, a staff member shall complete all blocks of the Chain of Custody form **except** for Time Provided and Collector and Inmate Certification.
3. When the inmate reports for testing, staff shall make a positive picture identification of the inmate; shall collect a specimen from the inmate under direct observation; shall complete time provided information; shall ensure that the specimen bottle is tightly capped; and shall affix a label containing the specimen number to the Urine Surveillance Log. Ordinarily, to be submitted for testing, bottles should be full.
4. The inmate shall verify that the specimen numbers (i.e. barcode numbers) on the Chain of Custody form, on the peel-off barcode, and on the numbered label to be affixed to the Urine Surveillance Log are identical.
5. After verification, the collector shall affix the barcode and security seals to the specimen bottle. The inmate shall be asked to initial the security seal and to read and sign the Inmate Certification Statement.
6. The staff member collecting the specimen shall read and sign the Collector Certification Statement. If the inmate refuses to sign the Inmate Certification or initial the security seal, a second staff member shall also sign the Collector Certification and shall initial the security seal.
7. After samples are collected, they shall be maintained under direct staff observation until moved to a locked area where they may be stored until shipping. This area shall be designated by the Urine Surveillance Program Coordinator and should be one which is accessible to a very limited number of staff and to no inmates.
8. All samples shall be sent to National Toxicology Laboratories no later than the first work day after they are collected.
9. When a positive result is received, an incident report shall be written unless medical staff indicates the positive result is due to authorized medication. A photocopy of both the laboratory report and the Chain of Custody form (retained at the institution) containing the inmate's name, registration number and specimen number shall be attached to the incident report and made part of the disciplinary record.

## STAFF COMPLETES

**TEST REASON SELECT ONE ONLY**    RANDOM 07 ☑   PRIOR USE 08 ☐   SUSPECT 09 ☐   DISRUPTIVE GROUP 10 ☐   COMMUNITY 11 ☐   SATURATION 12 ☐

**INMATE NAME (Last, First, I.)**  RAY  Anthony  (A1-120 / CCS Am)    **REGISTER #:** 04077-000

**DATE COLLECTED:** 11-9-05    **TIME REQUESTED:** 6:08 AM/PM    **TIME PROVIDED:** 6:08 AM/PM

**Collector Certification:** I certify that the specimen identified on this form is the specimen presented to me by the inmate providing the certification below, that it bears the same identification number as set forth above, and that it has been collected, labeled and sealed in accordance with the collection procedures provided above.

Staff Member Collecting Specimen (Last, First, I.):  SEIBEL  Chris B

Staff Member's (Collector's) Signature  [signature]

## INMATE COMPLETES

**Inmate Certification:** I certify that the specimen accompanying this form is my own and that I provided it to the collector. Further, I certify that the specimen was sealed in my presence and that the information on this form and label is correct.

Second Witness Signature (To be completed by second staff member if inmate declines to sign.)    Inmate's (Donor's) Signature  [signature]

**APPLY ▶ BARCODE VERTICALLY ON VIAL.**

**DO NOT PLACE SECURITY SEAL OVER HINGE OR LATCH**





B01652926

 

BP-S294.052    **NOTICE OF DISCIPLINE HEARING BEFORE THE (DHO)**    CDFRM
MAY 94

**U.S. DEPARTMENT OF JUSTICE**                        **FEDERAL BUREAU OF PRISONS**

<table>
<tr><td colspan="2">FCI Cumberland<br>_____<br>Institution<br><u>November 23, 2005</u><br>Date</td></tr>
</table>

| TO: RAY, Anthony | Reg. No.: 04077-000 |
|---|---|

ALLEGED VIOLATION(S):
Use of Any Narcotics, or Related Paraphernalia Not Prescribed for the Individual by the Medical Staff

| DATE OF OFFENSE: 11/09/2005 | Code No.: 112 |
|---|---|

You are being referred to the DHO for the above charge(s).

The hearing will be held on: <u>Next Available</u> at <u>FCI Cumberland</u> (A.M./P.M.) at the following location:

Next available docket

You are entitled to have a full-time staff member represent you at the hearing.  Please indicate below whether you desire to have a staff representative, and if so, his or her name.

I (do) __✓__ (do not) ____ wish to have a staff representative.

If so, the staff representative's name is: __J. Courtney, A-1 Counselor__

You will also have the right to call witnesses at the hearing and to present documentary evidence in your behalf; provided, calling your witnesses will not jeopardize institutional safety.  Names of witnesses you wish to call should be listed below.  Briefly state to what each proposed witness would be able to testify.

I (do) ____ (do not) __✓__ wish to have witnesses.

| NAME: | Can Testify to: |
|---|---|
|  |  |
| NAME: | Can Testify to: |
|  |  |
| NAME: | Can Testify to: |
|  |  |

The Discipline Hearing Officer will call those witnesses (Staff or Inmate) who are reasonably available, and who are determined by the DHO to have information relevant to the charge(s).  Repetitive witnesses and repetitive character references need not be called.  Unavailable witnesses may be asked to submit written statements.

If additional space is needed, use the reverse side of this form.  Date, sign, and return this form to the DHO.

| DATE: 11-23-05 | SIGNATURE: |
|---|---|

Notice of hearing before DHO given inmate 11-23-05/9:41AM by ____
                                        Date/Time

S. Golub /S. Golub
Staff Printed Name/Signature

(This form may be replicated via WP)                    Replaces BP-294(52) of JAN 88

From:        Russell L. Byrd
To:          Deremer, James D.
Date:        11/21/2006 11:20:23 AM
Subject:     Articaine

My review of the metabolism and chemical structures of articaine (Septocaine®) and its metabolites revealed that neither it nor any of its metabolites are structurally similar to cocaine or any of its metabolites. Therefore, there should not be any false positives for cocaine metabolites from articaine or its metabolites.

LCDR Russell Byrd, USPHS
Chief Pharmacist
FCI Cumberland
14601 Burbridge Rd SE
Cumberland, MD 20152
rbyrd@bop.gov
301-784-1000 ext-2093/2012
Fax: 301-784-1033



**U.S. Department of Justice**
Federal Bureau of Prisons

# Change
# Notice

**DIRECTIVE AFFECTED:** 6060.08
**CHANGE NOTICE NUMBER:** 1
**DATE:** 3/8/2001

1.  **PURPOSE AND SCOPE.** To revise PS 6060.08, Urine Surveillance and Narcotic Identification to remove the requirement for staff to administer the Random selection list in a sequential order.

2.  **SUMMARY OF CHANGES.** The revised policy will allow staff to skip an inmate on the Random list who is not readily available, i.e., on a medical trip, in the visiting room, etc., and continue with testing from the list. The inmate who was bypassed can then be tested when it is more convenient for staff and the inmate is available.

Additionally, an extension of the Random list will serve to supply additional inmate names for testing to replace inmates who are not readily available for testing. For example, if five percent of the population must be tested, a list containing seven percent should be produced. Inmates will then be sequentially chosen from the remaining names on the Random list to replace those unavailable for testing.

3.  **TABLE OF CHANGES**

    **Remove**                          **Insert**

    Pages 7 and 8                       Pages 7 and 8

4.  **ACTION.** File this Change Notice in front of PS 6060.08, Urine Surveillance and Narcotic Identification.


                              /s/
                              Kathleen Hawk Sawyer
                              Director



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program
# Statement

OPI:     CPD
**NUMBER:**  6060.08
**DATE:**    11/24/99
**SUBJECT:** Urine Surveillance and
         Narcotic Identification

1.  [<u>PURPOSE AND SCOPE</u> §550.30.  **The Warden must establish programs of urine testing for drug use, to monitor specific groups or individual inmates who are considered as high risk for drug use, such as those involved in community activities, those with a history of drug use, and those inmates specifically suspected of drug use.**

**Testing is to be performed as frequently as the Warden determines on at least 50 percent of inmates who are involved in community activities.  In addition, staff shall randomly sample each institution's inmate population during each month to test for drug use.]**

Information on urine surveillance of inmates at Community Corrections Centers and other community-based programs is in the Community Corrections Manual.

This Program Statement also requires that each institution maintain a supply of Narcotic Identification Kits to determine whether unknown substances are narcotics, or other controlled substances.

2.  **SUMMARY OF CHANGES.**  This revision changes:

- The Random urine **testing requirement for High Level Security from seven percent to ten percent** and **Minimum Level Security institutions from five percent to three percent.**

**[Bracketed Bold - Rules]**
Regular Type - Implementing Information
- The Random selection process from a **"selection without replacement"** to **"selection with replacement"** of the inmate's name.

- Additionally, an inmate's name will no longer be removed from the Disruptive Group Testing Category when their name also appears on the Random Selection Category.

3.  **PROGRAM OBJECTIVES.  The expected results of this program are:**

  a.  Illegal use of drugs by inmates will be deterred.

  b.  Inmates will live in a safe and orderly environment.

  c.  The public will be protected from undue risk from inmates in
community activities.

4.  **DIRECTIVES AFFECTED**

  a.  Directive Rescinded

    PS 6060.07        Urine Surveillance and Narcotic Identification
                      (1/29/99)

  b.  Directives Referenced

    PS 1380.05 Special Investigative Supervisors Manual (8/1/95)
    PS 1627.01        Commercial Drivers Testing for Use of Controlled
                      Substances/Alcohol (11/29/96)
    PS 5270.07        Inmate Discipline and Special Housing Units
                      (12/29/87)
    PS 5360.07        Religious Beliefs and Practices (8/29/97)
    PS 5500.09        Correctional Services Manual (10/27/97)
    PS 7300.09        Community Corrections Manual (1/12/98)

  c.  Rules cited in this Program Statement are contained in 28 CFR
550.30-32.

5.  **STANDARDS REFERENCED**

  a.  American Correctional Association 3rd Edition Standards for
Adult Correctional Institutions:  3-4344-1

  b.  American Correctional Association 3rd Edition Standards for
Adult Local Detention Facilities:  3-ALDF-4E-19-2

  c.  American Correctional Association 2nd edition Standards for
Administration of Correctional Agencies:  None

  d.  American Correctional Association Standards for Adult
Correctional Boot Camp Programs:  1-ABC-4E-22

6.  **PRETRIAL/HOLDOVER PROCEDURES.  Procedures required in this Program
Statement apply to pretrial and holdover inmates.**

7.  **RESPONSIBILITIES.  Ordinarily, the Warden designates the Captain
as the Urine Surveillance Program Coordinator.**

PS 6060.08
11/24/99
Page 3

●    Operational responsibility may be further delegated no lower than Lieutenant.

Only staff (not inmates) may execute the duties of this program (such as urine collection, recording, mailing, and processing of results).

8.  SURVEILLANCE CATEGORIES.  Urine surveillance is to be applied to inmates in the following categories:

a.  Random.  Five percent of each institution's total inmate population must be tested randomly monthly, however, exactly three percent are to be tested randomly in all Minimum Security Level institutions and ten percent in all U.S. Penitentiaries, with the exception of:

●    ADX-FLO-MAX, Florence, Colorado and
●    U.S. Penitentiary Marion, Illinois, which is to follow the five percent random testing monthly (see Section 10.c.(1)).

Inclusion in another urine surveillance category will not interfere with inclusion in the random sample.  The Random selection process is modified from "selection without replacement" to "selection with replacement."  This removes the inmate assurance that once tested in a given month that there is no possibility of being tested until the following month.

b.  Community Activities.  At least 50 percent of inmates involved in community activities are to be tested, including all inmates with a history of drug use.

For the purposes of this Program Statement, inmates assigned to Military Base details are not considered to be involved in community activities.

c.  Disruptive Groups.  Every confirmed disruptive group member will be tested each month.

d.  Suspected.  Inmates who have been identified through intelligence gathering, i.e., telephone monitoring, involvement in an incident resulting in physical violence towards another person.  This testing will occur over an extended period of time (e.g., three consecutive months).

e.  Saturation.  A method for targeting a large group of inmates for testing.

f.  Prior Act.  Inmates found by the DHO to have committed the following prohibited acts will be tested monthly for the following 24 months (see Section 8.):

- Refusing to Provide a Urine Sample, Code 110;
- Introduction of Drugs or Drug Paraphernalia, Code 111;
- Use of Drugs or Related Paraphernalia, Code 112; or
- Possession of Drugs or Related Paraphernalia, Code 113.

9.  [<u>PROCEDURES</u>  §550.31

   a.  Staff of the same sex as the inmate tested shall directly
supervise the giving of the urine sample.  If an inmate is unwilling
to provide a urine sample within two hours of a request for it, staff
must file an incident report.  No waiting period or extra time need be
allowed for an inmate who directly and specifically refuses to provide
a urine sample.  To eliminate the possibility of diluted or
adulterated samples, staff shall keep the inmate under direct visual
supervision during this two-hour period, or until a complete sample is
furnished.  To assist the inmate in giving the sample, staff shall
offer the inmate eight ounces of water at the beginning of the
two-hour time period.  An inmate is presumed to be unwilling if the
inmate fails to provide a urine sample within the allotted time
period.  An inmate may rebut this presumption during the disciplinary
process.]

   Ordinarily, an inmate is expected to provide a urine sample within
two hours of the request, but the Captain (or Lieutenant) may extend
the time if warranted by specific situations (for example, the inmate
has a documented medical or psychological problem, is dehydrated,
etc.).

   Staff may consider supervising indirectly an inmate who claims to be
willing but unable to provide a urine sample under direct
visual supervision.  For example, this might be accomplished by
allowing the inmate to provide the sample in a secure, dry room after
a thorough search has been made of both the inmate and the room.

   A urine sample is considered to be approximately a full specimen
bottle.  Refer to Standard Procedures for Collecting Urine
Surveillance Samples (Attachment A).

   [b.  Institution staff shall determine whether a justifiable reason
exists, (e.g., use of prescribed medication) for any positive urine
test result.  If the inmate's urine test shows a positive test result
for the presence of drugs which cannot be justified, staff shall file
an incident report.]

   In addition to checking whether the inmate's positive urinalysis
result may be justified by prescribed medication, staff must ensure
that the minimum waiting period for successive positive results is
taken into account, as guided by the Detection Periods for Selected
Drugs (Attachment B).

- Those time periods are estimates of the maximum time urine would test positive for a particular drug.  For example, ordinarily, at least 30 days would have to elapse between urine collections before disciplinary action could be taken for a second positive THC result; however, urine could be collected from that inmate within those 30 days, and an incident report could be based on positive results for a drug other than THC.

Incident reports pertaining to positive urine tests will be forwarded to the Unit Discipline Committee, in accordance with the Program Statement on Inmate Discipline and Special Housing Units.

An inmate who has been found to have committed any of the following prohibited acts will be tested monthly for the following 24 months:

- Refusing to Provide a Urine Sample, Code 110;
- Introduction of Drugs or Drug Paraphernalia, Code 111;
- Use of Drugs or Related Paraphernalia, Code 112; or
- Possession of Drugs or Related Paraphernalia, 113.

After being tested for a period of 24 consecutive months and no further discipline actions taken for drug related offenses, the inmate will be removed from the Prior Act List; however, acts of misconduct (Codes 110, 111, 112, or 113) while on the Prior Act List requires continuance on the Prior Act List for an additional 24 months from the date of the new discipline action.

c.  Urine Sample Screening and Confirmation.  Urinalysis will be performed exclusively by a Central Office-approved laboratory.

The urinalysis contractor will detect and identify at least the following drugs and/or metabolites by basic screen at the minimal levels stated in the contract:

- Morphine (total, free, or glucuronide)
- Methadone (& metabolite)
- Codeine
- Other Opiates
- Barbiturates (including but not limited to Amobarbital, Phenobarbital, Pentobarbital, Butabarbital, Hexobarbital, Secobarbital)
- Amphetamines (including, but not limited to, d-amphetamine and methamphetamine)
- Cocaine (free)
- Cocaine metabolite (benzoylecgonine)
- Phencyclidine (PCP)
- THC

An initial positive test is confirmed by a second test before it is reported to the institution.

A positive written report from the contractor for any of the above drugs indicates that the particular drug has been identified by an initial screening test and then confirmed by a different laboratory procedure.

If a contractor detects and identifies other drugs or substances during the initial screening, the contractor will identify and report them.  The institution may then decide whether to request confirmation.

- ● Retesting at the inmate's request is not permitted.

10. GENERATING RANDOM URINE SURVEILLANCE LISTS

a.  On the first work day of each month a list of randomly selected inmate names will be produced through the SENTRY Random Population Selection Transaction.  This list is non-alphabetical and will be used for the selection of inmates.

A second list in alphabetical order will also be produced to determine the location of the selected inmates.  This second list is to facilitate use of the random list and may not be used to select inmates for urine surveillance.

PS 6060.08
11/24/99
Page 7

PS 6060.08
CN-1 3/8/2001
Page 7

Many institutions have both operating methods and data recording instruments for the urine testing programs.  For this reason the only part of the computerized list which may be used is the random list of names.  The other data elements are printed for staff convenience and may be used or ignored according to the procedural requirements of the local program.

*       b.  The Urine Surveillance Program Coordinator is responsible for list security and secure storage of the lists until it is  delivered to the person responsible for urine testing. Ordinarily, the list of inmate names will be issued to staff for collection at the beginning of the shift.  Ordinarily is defined as in Article 18, section U of the Master Agreement.                                                       *

The Urine Surveillance Program Coordinator will assure that sufficient copies of the list are printed to accommodate the local program requirements.  Random lists cannot be replicated by SENTRY if they are lost or destroyed.

c.  Procedures for collecting samples from the random group shall be developed locally in accordance with the following requirements:

*       (1)  The random list will be used sequentially beginning with the first name.  The notification and collection, however, may occur in any order.  Inmates do not have to provide the sample in the order that they were notified.  Names of inmates no longer at the institution will be skipped and not counted. Inmates not readily available, e.g., on a medical trip, in the visiting room, may also be skipped.
                                 *

Exactly five percent (rounded) of the listed population count will be ordered to produce samples.  The number of samples taken plus the refusals must equal five percent of the count listed on the printout.  With exception, exactly three percent (rounded) will be tested randomly in all Minimum Security Level institutions and ten percent (rounded) of the listed inmate population in all U.S. Penitentiaries will be ordered to produce samples, except for ADX-FLO-MAX, Florence, Colorado and the U.S. Penitentiary Marion, Illinois, which will follow the five percent random testing monthly.

*       An extension of the Random list will serve to supply additional inmate names for testing to replace the inmates who are not readily available for testing.  For example, if five percent of the population must be tested, a list containing seven percent should be produced.   *

PS 6060.08
CN-1 3/8/2001
Page 8

\*      Inmates will then be sequentially chosen from the remaining names on the Random list to replace those unavailable for testing in order to continue testing from the list.  Any unavailable inmate who is bypassed should be tested when it is more convenient for staff and the inmate is available.                                           \*

     (2)  Fairness and randomness are necessary in using the list.  No listed inmate may be excused if he or she is available to provide a urine sample.  If even one inmate is excused, the selection process is no longer random.

     (3)  While the random list is to be produced on a regularly scheduled basis, it is not necessary to actually collect the samples in that same calendar month.  For example, a list produced one month might be used through the 15th of the following month.

     (4)  Sample collection will not follow any pattern that inmates could predict.  Samples will be taken at different hours (early morning, noon, late evening).  Collection will be spread evenly over seven days a week during the course of a month whenever practicable.

11.  NARCOTIC IDENTIFICATION KITS.  Each Captain will ensure the institution maintains a supply of Narcotic Identification Kits (purchased through the Federal Supply Schedule) to determine the identity of unknown substances.

All lieutenants will be proficient in using the Narcotic Identification Kit and ordinarily are responsible for testing unknown substances.

While identification of such substances may be useful for various security purposes, it is often particularly important in the investigation of incident reports and may be important in referring incidents to the Federal Bureau of Investigation.

12.  FEDERAL HIGHWAY ADMINISTRATION (FHWA) TESTING.  Inmates assigned to drive a vehicle requiring a commercial driver's license are also subject to alcohol testing under FHWA guidelines.

Refer to the Correctional Services Manual and Special Investigative Supervisors Manual for further information.


                              /s/
                              Kathleen Hawk Sawyer
                              Director

STANDARD PROCEDURES FOR COLLECTING URINE SURVEILLANCE SAMPLES

1.     To the extent possible, urine samples should be collected in one or two centralized areas of the institution, ( e.g., lieutenants' office or R & D), by staff who are thoroughly familiar with the procedures specified below.

2.     Inmates will be thoroughly searched to detect any device designed to provide a urine substitute or possible contaminant and will thoroughly wash their hands prior to providing the sample.

3.     When the inmate reports for testing staff will:

●     make a positive picture identification of the inmate;
●     collect the sample from the inmate;
●     assign the sample a urine sample identification number;
●     label the urine bottle with that number and the date and;
●     record the number next to the inmate's name on the lab slip.

4.     Bottles will be kept under direct staff observation and control at all times, both before and after the inmate furnishes the urine sample.

5.     Ordinarily, to be submitted for testing, bottles will be full (i.e., 60cc or 2 oz).  Once a sufficient sample is provided, staff must ensure that the urine sample identification number on the bottle corresponds to the number assigned to that inmate on the lab slip.  Staff must then sign the laboratory form certifying that the specimen identified on the laboratory form is the specimen presented to staff by the inmate providing the certification on the form, bears the same identification number as the specimen, and has been labeled and sealed according to the collection procedures stipulated above.

6.     The inmate will then certify by signing the laboratory form that the specimen provided to the collection officer was provided by the inmate, sealed in the inmate's presence, and the information on the form and label is correct.  If the inmate refuses, a second staff member must make this verification and sign the form.

PS 6060.08
11/24/99
Attachment A, Page 2

7.   After samples are collected they will be maintained under direct
     staff observation until moved to a locked area where they will be
     stored until mailing.   This area should be designated by the
     Urine Surveillance Program Coordinator and will be accessible to
     a very limited number of staff. Under no circumstances will
     inmates have access to this area.

8.   All samples will be mailed to the testing laboratory no later
     than 72 hours after collection, (excluding holidays).

9.   When a positive result is received, and an incident report
     written, a photocopy of both the slip returned by the lab and the
     slip listing the inmate's name and urine sample identification
     number (retained at the institution) will be attached to the
     incident report and made a part of the disciplinary record.

PS 6060.08
11/24/99
Attachment B, Page 1

### DETECTION PERIODS FOR SELECTED DRUGS

The time periods below are estimates of the maximum lengths of time, after last use, that a person's urine would be positive for a particular drug.  These periods also represent the minimum waiting periods between samples on which successive disciplinary actions for the same drug ordinarily may be based.  For example, ordinarily at least 30 days must elapse between urine collection dates before disciplinary action may be taken for a second THC positive.  The inmate could, however, be retested within this 30-day period and disciplinary action could be based on positive results for drugs other than THC.

| | |
|---|---|
| 3 days | Amphetamines |
| | Methamphetamine |
| | Cocaine |
| | Cocaine Metabolite |
| 5 days | Methadone |
| | Methadone Metabolite |
| 6 days | Morphine |
| | Codeine |
| | Opiates |
| | Meperidine (Demerol) |
| | Pentazocine (Talwin) |
| | Propoxyphene (Darvon) |
| 11 days | Barbiturates |
| | Phencyclidine (PCP) |
| 14 days | Phenobarbital |
| 30 days | THC |



NATIONAL TOXICOLOGY LABORATORIES, INC.                    Laboratory Report
1100 CALIFORNIA AVE. BAKERSFIELD, CA 93304
========================================================================
INSTITUTION # 01007
SEND TO:                              SPECIMEN ID: B01652926
Captain/Correctional Program          DATE COLLECTED: 11/09/2005
FCI Cumberland                        TEST REASON: Random
14601 Burbridge Rd.                   SECURITY LEVEL: Medium
Cumberland, MD  21502                 LAB ACCESSION #: 051107913
                                      DATE RECEIVED: 11/16/2005
                                      DATE REPORTED: 11/17/2005
========================================================================
                            TEST RESULTS*
Drug                      Results
========================================================================
Cocaine (Benzoylecgonine)   POSITIVE

                   <ALL OTHER DRUGS NOT DETECTED*>




     I Certify that the specimen identified by this accession number is the
same specimen that bears the specimen identification above, that the specimen
has been examined upon receipt, handled and analyzed in accordance with
applicable requirements, and that these results are for that specimen.

Results Certified by:                                 Date: 11/17/2005
========================================================================
*The sample was tested for the following drugs:
                  TEST METHODS AND DETECTION LEVELS

| Drug or Drug Class | Initial Test | | Confirmatory Test | |
|---|---|---|---|---|
| | Method | Cutoff | Method | Cutoff |
| Amphetamines | EIA | 1000 ng/ml | GC/MS | 300 ng/ml |
| Barbiturates | EIA | 300 ng/ml | GC/MS | 500 ng/ml |
| Benzodiazepines | EIA | 200 ng/ml | GC/MS | 200 ng/ml |
| Cannabinoid | EIA | 50 ng/ml | GC/MS | 15 ng/ml |
| Cocaine Metabolite | EIA | 300 ng/ml | GC/MS | 300 ng/ml |
| Methadone | EIA | 300 ng/ml | GC/MS | 300 ng/ml |
| Opiates | EIA | 300 | | |
| Codeine | EIA | | GC/MS | 500 ng/ml |
| Morphine | EIA | | GC/MS | 200 ng/ml |
| Hydromorphone | EIA | | GC/MS | 100 ng/ml |
| Phencyclidine | EIA | 25 ng/ml | GC/MS | 25 ng/ml |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ANTHONY D. RAY,                      )
                                     )
            Plaintiff,               )
                                     )
    v.                               )        Civil Action No.  06-1673 (RWR)
                                     )
BUREAU OF PRISONS,                   )
                                     )
            Defendant.               )
_____ )

**ORDER**

UPON CONSIDERATION OF the Federal Defendant's Motion for Summary Judgment,

Memorandum of Points and Authorities, supporting Exhibits, and the entire record in this case, it

is, hereby,

**ORDERED** that Federal Defendant's Motion for Summary Judgment, is **GRANTED**

and it is

**FURTHER ORDERED** that the Plaintiff's Complaint is dismissed.

**SO ORDERED**.


October ___, 2007.                   _____
                                     RICHARD W. ROBERTS
                                     UNITED STATES DISTRICT JUDGE