**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| **ANTHONY D. RAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.  06-1673 (RWR)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BUREAU OF PRISONS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S REPLY BRIEF

Defendant, Bureau of Prisons ("BOP"), respectfully submits this reply to plaintiff's opposition to Defendant's Motion for Summary Judgment, filed on December 6, 2007 (Docket Entry No. 18) in this case brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended.[1]  Plaintiff, who is incarcerated and proceeding pro se, did not file a written opposition; rather plaintiff filed a Statement of Disputed/Unresolved Factual Issues Precluding Entry of Summary Judgment in Defendant's Favor, and a Declaration in Opposition to Defendant's Motion for Summary Judgment.  Plaintiff's statement of disputed facts and declaration fail to comport with the requirements of Local Rule 7(h).  See Defendant's  Reply to Plaintiff's Statement of Disputed Facts at 1-3.

Although plaintiff's statement simply identifies six alleged legal disputes with defendant, plaintiff's declaration raises only one disputed fact, i.e., that the BOP's disclosure of documents

---

[1]  Undersigned counsel entered an appearance in this case on December 12, 2007, for the purpose of filing a reply brief, and sought an initial extension of time to review the file (Docket Entry No. 20).  Upon further review of the file, undersigned counsel sought two additional extensions so that the BOP could conduct a second search for responsive documents (Docket Entry Nos. 21 and 22).

relating to BOP's contract Pharmatech, Inc. ("Pharmatech") were non-responsive to his FOIA request because the company that analyzed his random urine sample was the National Toxicology Laboratories, Inc. ("NTL") (Pl's Decl., ¶ 15).[2]   Defendant concedes this error and has since conducted a second search and disclosed to plaintiff responsive non-exempt documents relating to NTL (Defendant's Amended Statement of Material Facts Not in Genuine Dispute ("SFNGD"), ¶¶ 19-20).[3]   The second search and supplemental disclosures are described in the attached (Supplemental) Declaration of Wilson Moorer (at ¶¶ 12-13).[4]

As it now appears to be undisputed that the BOP has conducted an adequate search in response to plaintiff's FOIA request, has disclosed all responsive non-exempt records (including its supplemental disclosure of the NTL contract documents), and no records have been improperly

_____

[2]  Plaintiff does not otherwise challenge the reasonableness of BOP's search for responsive documents maintained by BOP's Administration Division, Procurement Executive Office, or contained in plaintiff's Inmate Central File (Moorer Decl., ¶¶ 6, 7).  Nor does plaintiff challenge the assertion of any FOIA exemptions by defendant.  Rather, plaintiff merely speculates that the 252 pages of documents in BOP's Pharmatech that were deemed to be non-responsive to his FOIA request may contain information otherwise responsive to his request for information that his positive drug test was actually a false positive (Pl's Decl., ¶ 17).  This speculation is belied by the fact (which plaintiff correctly points out) that his urine specimen was analyzed by NTL, not Pharmatech, which was not involved in the analysis of his urine specimen (see id., ¶ 15).  Hence, any Pharmatech documents are clearly non-responsive to plaintiff's FOIA request.  The remainder of plaintiff's declaration complains about the delay in BOP's response to his FOIA request, but does not otherwise challenge any of the assertions in defendant's statement of material facts not in genuine dispute.

[3]  Because BOP is filing a supplemental declaration, we have no opposition to plaintiff filing a response limited to the supplemental search for NTL documents and resulting supplemental disclosures.  Defendant, however, does object to plaintiff raising any issues that could have been raised in his initial opposition.

[4]  The supplemental declaration restates the numbered paragraphs in same order as the paragraphs contained in Moorer's original declaration, which was filed as part of defendant's motion for summary judgment.  The supplemental declaration also contains the two additional paragraphs noted above that describe the supplemental search for NTL contract documents and the disclosure of the documents to plaintiff (Moorer Decl., ¶¶ 12-13).

withheld from plaintiff, this Court should grant defendant's motion for summary judgment and enter judgment in favor of the BOP.

## **BACKGROUND**

Plaintiff, who is serving a life sentence on a murder conviction, filed an Amended Complaint (Docket Entry No. 13), on October 3, 2007, seeking the release of certain records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended, related to plaintiff's positive drug test on November 9, 2005.[5]  Plaintiff requested, among other things, information about NTL, the company used by BOP to analyze the random urine sample submitted by plaintiff.  The BOP concedes that plaintiff correctly points out that it had erroneously released documents relating to Pharmatech, Inc., the "company that currently contracts with BOP to perform the laboratory tests on random urine sampling collected from BOP inmates," rather than NTL , the company that performed the tests on plaintiff's sample submitted in November 2005.  See (Supplemental) Declaration of Wilson J. Moorer, ¶ 6, 12, and Ex. D).[6]

Upon learning of the error in its initial disclosure, the BOP FOIA Office contacted the Administration Division, Procurement Executive Office, and obtained a copy of the contract between the BOP and NTL, JN00c-024 (SGNFD, ¶ 19; Moorer Decl., ¶ 12).  The BOP located 63 pages of documents in response to plaintiff's request for a copy of the contract between BOP and

---

[5]  Plaintiff's original complaint was filed on September 29, 2006 (Docket Entry No. 1), but the re-issued summons was not served on the Bureau of Prisons until July 25, 2007 (Docket Entry No. 8).  Plaintiff's Amended Complaint is substantially the same as the original complaint.

[6]  The BOP responded to the remainder of plaintiff's request by providing 24 pages of documents relating to this drug test that were contained in plaintiff's Inmate Central File (SFNGD, ¶ 17).  Plaintiff does not challenge this search or the assertion of FOIA exemptions 6 and 7(C).

NTL (SGNFD, ¶ 19; Moorer Decl., ¶ 12, Ex. D). BOP disclosed 58 pages in their entirety, and 5

pages were disclosed in redacted form pursuant to 5 U.S.C. §§ 552(b)(2), (b)(4) ((SGNFD, ¶¶ 19-20;

Moorer Decl., ¶¶ 12-13, and Ex. D and E).[7] BOP mailed the documents to plaintiff by letter dated

February 13, 2008 ((SGNFD, ¶ 19; Moorer Decl., ¶ 12, and Ex. D).

## ARGUMENT

This Court has jurisdiction in a FOIA action, such as this, only when an agency has

improperly withheld agency records. 5 U.S.C. § 552(a)(4)(B). "[I]t is well established that under

the FOIA, 'once the records are produced the substance of the controversy disappears and becomes

moot, since disclosure which the suit seeks has already been made.'" Trueblood v. U.S. Dep't of

Treasury, 943 F. Supp. 64, 67 (D.D.C. 1996) (quoting Crooker v. U.S. State Dep't, 628 F.2d 9, 10

(D.C. Cir. 1980)); see also Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982). Furthermore,

summary judgment is appropriate where the pleadings, together with the declaration, demonstrate

that there is no genuine issue of material fact in dispute and that the moving party is entitled to

judgment as a matter of law. Fed. R Civ. P. 56(c); Weisberg v. U.S. Dep't of Justice, 627 F.2d 365,

368 (D.C. Cir. 1980). The agency may carry its burden by relying on the declaration of a

government official because courts normally accord a presumption of expertise in FOIA as long as

the declaration is sufficiently clear and detailed and submitted in good faith. See, e.g., Oglesby v.

U.S. Department of Army, 920 F.2d 57, 68 (D.C. Cir. 1990); Hayden v. National Security Agency,

608 F.2d 1381, 1387 (D.C. Cir. 1979). A court may therefore award summary judgment in a FOIA

case solely on the basis of information provided by the department or agency affidavits or

---

[7] Defendant also applied FOIA Exemptions 2 and 4 to information contained in the
Pharmatech documents (Moorer Decl., ¶¶ 9-10).

declarations.  See Hayden, 608 F.2d at 1387.

Here, summary judgment should be entered in favor of the BOP because plaintiff cannot meet  his burden of "contradicting the assertions"in Defendant's Amended Statement of Material Issues as to Which There Is No Genuine Dispute. See Neal v. Kelly, 963 F.2d 453, 456-57 (D.C. Cir. 1992), LCvR 7(h) and Fed. R. Civ. P. 56(e).  Mere conclusory allegations are not enough to survive a motion for summary judgment.  Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993); Rowland v. Riley, 5 F. Supp.2d 1, 3 (D.D.C. 1998); Benn v. Unisys Corp., 176 F.R.D. 2 (D.D.C. 1997).  The FOIA confers jurisdiction upon the District Court to provide relief to a plaintiff only where requested documents have been "improperly withheld" by an agency. 5 U.S.C. § 552(a)(4)(B).  The courts have interpreted this section of the statute to mean that jurisdiction only exists upon a showing by the plaintiff that the defendant (1) improperly (2) withheld (3) agency records.  See Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 150 (1980).

"The plaintiff must show that the agency 'contravened all three components of this obligation' in order for jurisdiction to be valid." Kuffel v. U.S. Bureau of Prisons, 882 F. Supp. 1116, 1120 (D.D.C. 1995) (citing Kissinger, 445 U.S. at 151.)  Absent such a showing, FOIA confers no "judicial authority to devise remedies and enjoin agencies." With the supplemental disclosure of the NTL documents, defendant has proved that it conducted an adequate search and that it was responsive to plaintiff's FOIA request.

**I.      Since Defendant Has Released All Responsive Non-Exempt Records**
**        Defendant Is Entitled To Judgment As A Matter of Law**

The only disputed issue raised by plaintiff in his opposition papers relates to erroneous disclosure of Pharmatech contract documents, rather than the requested NTL contract documents, in BOP's initial disclosure letter; plaintiff does not challenge the reasonableness of defendant's search for the remaining records he requests or the exemptions asserted by BOP (see Pl's Statement of Disputed Facts, ¶¶ 1-2).  BOP concedes its error and has corrected it by conducting a second search and making a supplemental disclosure of NTL documents.  Defendant is therefore entitled to summary judgment because the BOP has conducted an adequate search in response to plaintiff's FOIA request, has disclosed all responsive non-exempt records (including its supplemental disclosure of the NTL contract documents), and no records have been improperly withheld from plaintiff.

Plaintiff's remaining disputed issues relate to his complaint about the alleged improper "delay" in BOP's response to his FOIA requests and (those of other unnamed inmates) (Pl's Statement of Disputed Facts, ¶¶ 3-5).  However, plaintiff appears to misunderstand the purpose of the FOIA, and the remedies available under the Act.  Namely, the primary purpose of a FOIA lawsuit is to gain access to, and obtain copies of, agency records.  Once the responsive records have been provided, there is no additional relief that can be obtained.  This is true even if the records were released after the federal complaint was filed, as in this case.  See Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987) ("[H]owever fitful or delayed the release of information . . . if we are convinced that [the agency has] belatedly released all non-exempt material, we have no further judicial function to perform under the FOIA.") (quoting Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982)); see also Webb v. Dep't of Health and Human Services, 696 F.2d 101, 107-08 (D.C. Cir.

6

1982) ("Granting full access to the requested documents . . . terminates a FOIA action . . . ."). In short, defendant's purported delay in providing the responsive information to Plaintiff does not warrant any judicial relief because it is undisputed that plaintiff ultimately received all of the information to which he legally is entitled under the FOIA.

### A.    The BOP Conducted an Adequate Search

In responding to a FOIA request, an agency must conduct a reasonable search for responsive records. Oglesby, 920 F.2d 57, 68 (D.C. Cir. 1990); Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1352 (D.C. Cir. 1983). This "reasonableness" standard focuses on the method of the search, not its results, so that a search is not unreasonable simply because it fails to produce responsive information. Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health and Human Services, 844 F. Supp. 770, 777 n.4 (D.D.C. 1993). An agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located. Oglesby, 920 F.2d at 68. Consistent with the reasonableness standard, the adequacy of the search is "dependent upon the circumstances of the case." Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990). The fundamental question is not "whether there might exist any other documents responsive to the request, but rather whether the search for those documents was adequate." Steinberg v. Dept. of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).

Even when a requested document indisputably exists or once existed, summary judgment will not be defeated by an unsuccessful search for the document so long as the search was diligent and reasonable. Nation Magazine, Washington Bureau v. U.S. Customs Service, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995). Additionally, the mere fact that a document once existed does not mean that

it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it.  Maynard v. CIA, 986 F.2d 547, 564 (1st Cir. 1993).

The burden rests with the agency to establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  Oglesby, 920 F.2d at 68; see SafeCard Services v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991).  "An agency may prove the reasonableness of its search through affidavits of responsible agency officials so long as the affidavits are relatively detailed, non-conclusory and submitted in good faith."  Miller v. U.S. Dep't of State, 779 F.2d 1378, 1383 (8th Cir. 1985); Goland v. Central Intelligence Agency, 607 F.2d 339, 352 (D.C. Cir. 1978), cert. denied, 445 U.S. 927 (1980).  Although the agency has the burden of proof on the adequacy of its search, the "affidavits submitted by an agency are 'accorded a presumption of good faith,'" Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir.), cert. denied, 513 U.S. 823 (1994) (quoting SafeCard Services, 926 F.2d at 1200).  Thus, once the agency has met its burden regarding adequacy of its search, the burden shifts to the requester to rebut the evidence by a showing of bad faith on the part of the agency.  Miller, 779 F.2d at 1383.  A requester may not rebut agency affidavits with purely speculative allegations.  See Carney, 19 F.3d at 813; SafeCard Services, 926 F.2d at 1200; Maynard v. CIA, 986 F.2d 547, 559-560 (1st Cir. 1993). .

The (Supplemental) Declaration of Wilson Moorer describes the reasonable and adequate supplemental search conducted by the BOP FOIA office for the BOP documents relating to the contract between the BOP and NTL.  Specifically, the BOP FOIA Office conducted a second search for documents relating to the contract between the BOP and NTL by making a request to BOP's Administrative Division, Procurement Executive Office in Washington, D.C., and obtained 63 pages

of documents relating to the NTL contract, JN00c-024 (SFNGD, ¶ 19; Moorer Decl., ¶ 12, and Ex. D). Thus, defendant met the reasonableness standard in conducting its search and is therefore entitled to summary judgment. Plaintiff's speculative and conclusory allegations to the contrary are insufficient to rebut this evidence of the adequacy of BOP's search.

### B.        BOP Properly Applied FOIA Exemptions 2 and 4

The (Supplemental) Declaration of Wilson Moorer further explains that The BOP FOIA Office disclosed 58 pages of the NTL contract documents to plaintiff in their entirety, and 5 pages were disclosed in redacted form pursuant to 5 U.S.C. §§ 552(b)(2), (b)(4) (SFNGD, ¶¶ 19-20; Moorer Decl., ¶¶ 12-13, and Ex. D and E). The NTL contract documents were mailed to plaintiff by letter dated February 13, 2008 (SFNGD, ¶ 19; Moorer Decl., ¶ 12, and Ex. D).

Mr. Moorer further explains that the BOP applied the exemptions to the NTL documents in the following manner:

(a)     Exemption (b)(2) was used to exempt from mandatory disclosure records relating solely to the internal personnel rules and practices of an agency. If the information were to be released, an inmate would be aware of the financial/bank routing number used by NTL to receive payment from the BOP for the service that was provided (SFNGD, ¶ 20; Moorer Decl., ¶ 13, and Ex. D and E).

(b)    Exemption (b)(4) was used to exempt from disclosure records that would disclose trade secrets and commercial or financial information obtained from a person that is privileged or confidential, including information voluntarily submitted (SFNGD, ¶ 20; Moorer Decl., ¶ 13, and Ex. D and E). The information that was redacted pursuant to Exemption (b)(4), pertains to the unit price of NTL material used for urine specimen testing and the method by which NTL calculated the

unit price for its urine specimen testing were redacted from the document because if released the information would reveal specific prices used by NTL in obtaining the contract (id.).  If the unit pricing were to be released it could cause substantial harm to NTL's competitive position because other competitive bidders would discover the method by which NTL calculated their unit pricing (id.).

Because no non-exempt responsive records have been improperly withheld from plaintiff, summary judgment should be entered in favor of BOP.

### 1.    <u>BOP Properly Applied Exemption 2</u>

Exemption 2 under FOIA exempts from mandatory disclosure records that are "related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  Not long after FOIA was passed, the Supreme Court declared that Exemption 2 was intended to relieve agencies of the burden of assembling and providing access to any "matter in which the public could not reasonably be expected to have an interest" and matters of public interest "where disclosure may risk circumvention of agency regulation."  <u>Dep't of Air Force v. Rose</u>, 425 U.S. 352, 369-70 (1976). Subsequently, courts have approved two general categories of withholdings under Exemption 2: (1) internal matters of a relatively trivial nature (sometimes referred to as "low-2"); and (2) more substantial internal matters for which disclosure would risk circumvention of a legal requirement (sometimes called "high-2").  <u>Schiller v. NLRB</u>, 964 F.2d 1205, 1207 (D.C. Cir. 1992); <u>see</u> <u>Crooker v. ATF</u>, 670 F.2d 1051 (D.C. Cir. 1981) (en banc) (setting forth a two part test for high-2 material). Thus, the types of documents and/or information withheld under this exemption may relate to internal matters of a relatively trivial nature, such as internal personnel rules and practices which could consist of employee identification codes, computer login codes, policies regarding the use of

parking facilities and break rooms, employee leave policies and dress codes or internal matters of a more substantial nature, the disclosure of which would risk circumvention of a legal requirement, such as operating rules, guidelines and manuals of procedures for examiners or adjudicators.

Disclosure of investigation case names or information about law enforcement operation handling has been held to be protected under the "high 2" exemption and computer codes, internal file numbers, and internal operation information have been held to be protected under the "low 2" exemption. See Key v. Dep't of Homeland Security, 510 F.Supp.2d 121, 127-28 (D.D.C. 2007) (citation omitted).

Here, BOP properly withheld the financial/bank routing number used by NTL to receive payment from the BOP for the service that was provided under Exemption 2 because this information relates to a purely internal agency matter. Disclosure of routine internal administrative information such as the financial/bank routing number would not result in any benefit to the public at large and there is no legitimate public interest to be served in the disclosure of these numbers to an inmate challenging his positive drug test. Accordingly, this internal number has been exempted from disclosure pursuant to Exemption (b)(2)-1

## 2.    **BOP Properly Applied Exemption 4**

Exemption 4 provides that the FOIA does not apply to "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Exemption 4 protects as confidential "any financial or commercial information whose disclosure would be likely either (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974). The

11

D.C. Circuit declared in National Parks that the term "confidential" should be read to protect governmental interests as well as private ones, according to the following two-part test:

> To summarize, commercial or financial matter is "confidential" for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.

Nat'l Parks, 498 F.2d at 770.  Further, the D.C. Circuit has held that records are commercial so long as the submitter has a "commercial interest" in them.  Pub. Citizen Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1288 (D.C. Cir. 1983).

In this case, the BOP applied Exemption (b)(4) to redact the unit price of NTL material used for urine specimen testing and the method by which NTL calculated the unit price for its urine specimen testing.  Because this information is clearly confidential business information, the BOP properly redacted this information.  As Mr. Moorer explained in his declaration, if this information were released it would reveal specific prices used by NTL in obtaining the contract (SFNGD, ¶ 20; Moorer Decl., ¶ 13).  The release of  the unit pricing could cause substantial harm to NTL's competitive position because other competitive bidders would discover the method by which NTL calculated their unit pricing (id.).  It is the law of this circuit that line-item or unit prices come within the protection provided by Exemption 4.  See, e.g., McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1192 (D.C. Cir. 2004) ("reverse-FOIA" case); McDonnell Douglas Corp. v. NASA, 180 F.3d 303, 307 (D.C. Cir. 1999) ("under present law, whatever may be the desirable policy course, [McDonnell Douglas] has every right to insist that its line item prices be withheld as confidential").  Accordingly, the release of this information would "impair the government's ability to obtain necessary information in the future" or "cause substantial harm to the competitive position

of the person from whom the information was obtained." <u>Canadian Commercial Corp. v. Dep't of the Air Force</u>, No. 06-5310, slip op. at 4 (D.C. Cir. Jan. 29, 2008) (In "reverse-FOIA" case, the Court of Appeals cited its previous decisions in <u>McDonnell Douglas v. U.S. Dep't of the Air Force</u> and <u>McDonnell Douglas Corp. v. NASA</u> and found once again that line-item pricing information in a government contract is subject to Exemption 4 of the FOIA).

## C.    <u>BOP Disclosed All Reasonably Segregable Information</u>

The Court of Appeals for the District of Columbia Circuit has held that a District Court considering a FOIA action has "an affirmative duty to consider the segregability issue <u>sua sponte</u>." <u>Trans-Pacific Policing Agreement v. United States Customs Service</u>, 177 F.3d 1022, 1028 (D.C. Cir. 1999). The FOIA requires that if a record contains information that is exempt from disclosure, any "reasonably segregable" information must be disclosed after deletion of the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions." 5 U.S.C. § 552(b); <u>Mead Data Cent., Inc. v. United States Dept. of the Air Force</u>, 566 F.2d 242, 260 (D.C. Cir. 1977).

In order to demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" rather than "conclusory statements." <u>Mead Data</u>, 566 F.2d at 261. The agency is not, however, required "to provide such a detailed justification" that the exempt material would effectively be disclosed. <u>Id.</u> All that is required is that the government show "with 'reasonable specificity'" why a document cannot be further segregated. <u>Armstrong v. Executive Office of the President</u>, 97 F.3d 575, 578-79 (D.C. Cir. 1996). Moreover, the agency is not required to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content."

Mead Data, 566 F.2d at 261, n.55.

Here, as clearly expressed in Mr. Moorer's declaration, BOP evaluated each document, and each page contained in each document, for segregability (see Moorer Decl. ¶¶ 10, 11, 13). All information withheld was exempt from disclosure pursuant to a FOIA exemption. Id. No reasonably segregable non-exempt portions were withheld from Plaintiff. Plaintiff was provided with all information which did not reveal information protected by statute and which, if disclosed, would not violate the personal privacy or commercial interests of third parties. Id.

## II.    Plaintiff Is Not Entitled To Litigation Costs

Plaintiff also requests that the Court award him the costs of bringing this lawsuit (Pl's Statement of Disputed Facts, ¶ 6). As an initial matter, plaintiff correctly does not ask for attorney's fees because he is representing himself in this lawsuit. Section 552(a)(4)(E) of the FOIA provides that a court "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." In Benavides v. Bureau of Prisons, 993 F.3d 257, 259 (D.C. Cir. 1993), the Court of Appeals reversed its earlier position set forth in Cox v. United States Dept. of Justice, 601 F.2d 1 (D.C. Cir. 1979), and held that pro se litigants are not entitled to attorney fees under section 552(a)(4)(E). See also Trueblood v. Internal Revenue Service, 943 F.Supp. 64, 69 (D.D.C. 1996). Accordingly, there is no legal basis to award Plaintiff -- who is pro se -- attorney fees.

In any event, Plaintiff is entitled to neither attorney fees or litigation costs because he has not "substantially prevailed" within the meaning of the statute. In Oil, Chemical And Atomic Workers Int'l Union v. Department of Energy, 288 F.3d 452 (D.C. Cir. 2002), the Court of Appeals held that the Supreme Court's recent opinion in Buckhannon Board & Care Home, Inc. v. West

<u>Virginia Department of Health and Human Resources</u>, 121 S.Ct. 1835 (2001) – rejecting the "catalyst" theory for determining whether a party has "prevailed" for purposes of fee-shifting statutes -- applies in FOIA context.  Specifically, the Court of Appeals held that "in order for plaintiffs in FOIA actions to become eligible for an award of attorney's fees, they must have 'been awarded some relief by [a] court,' either in a judgment on the merits or in a court-ordered consent decree."  <u>See</u> <u>Oil, Chemical And Atomic Workers</u>, at 456-57.[8]

Here, plaintiff has not been awarded any court-ordered relief, either by a judgment on the merits or by a consent decree.  On the contrary, all of the non-exempt records responsive to plaintiff's request voluntarily were released by defendant.  Accordingly, defendant respectfully submits that plaintiff is entitled to no litigation costs in this case.

<b><u>CONCLUSION</u></b>

For the reasons set forth above, as well as in Defendant's Motion for Summary Judgment, the Court should grant defendant's motion and enter summary judgment in favor of the Bureau of Prisons.

---

[8] Although this sentence does not mention costs, the Court of Appeals makes it clear elsewhere in its opinion that its holding applies to both fees and costs.  <u>See</u>, <u>e.g.</u>, <u>id</u>. at 454, 457; <u>see</u> <u>also</u> 5 U.S.C. § 552(a)(4)(E) (the same standard – "substantially prevailed" –  applies to both fees and costs).

Case 1:06-cv-01673-RWR     Document 23     Filed 03/17/2008     Page 16 of 28

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____
JOHN G. INTERRANTE
PA Bar # 61373
Assistant United States Attorney
Civil Division, Room E-4806
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7220
(202) 514-8780 (fax)
John.Interrante@usdoj.gov


Of Counsel:

Wanda Hunt, Esq.
Federal Bureau of Prisons
Washington, D.C.

16

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ANTHONY D. RAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  06-1673 (RWR) |
| | ) | |
| BUREAU OF PRISONS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S AMENDED STATEMENT OF MATERIAL**
**FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Defendant respectfully submits the following amended statement of material facts as to which there is no genuine issue in this action brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended.

**I.  Introduction**

This amended statement of undisputed facts is being submitted based on a second search of BOP records that resulted in a supplemental disclosure of responsive non-exempt information. Specifically, paragraphs 19 and  20 have been added to this amended statement to describe the second search conducted by the Bureau of Prisons ("BOP") for documents relating to the National Toxicology Laboratories, Inc. ("NTL"), and BOP's assertion of FOIA Exemptions (b)(2) and (b)(4) in connection with the disclosure of responsive information.  BOP previously asserted Exemptions 2 and 4 in connection with the release of documents of Pharmatech, Inc. ("Pharamatech"), a different laboratory.  All citations in this amended statement are to the (Supplemental) Declaration of Wilson

1

J. Moorer ("Moorer Decl."), which is attached to Defendant's Reply Brief.[1]  Paragraphs 1-18 of this

amended statement of facts are substantially the same as paragraphs 1-18 of original statement of

facts, which was filed as part of Defendant's Motion for Summary Judgment.[2]   Paragraph 21 has

been added to the amended statement of facts based on  statements in the original and supplemental

Moorer declarations relating to non-segregability of withheld information.

## II.  Amended Statement of Undisputed Facts

1.      Plaintiff Anthony D. Ray,  Register Number 04077-000, is an inmate at the Federal

Correctional Institution at Cumberland, Maryland ("FCI Cumberland") (see Am. Compl., Caption

and ¶ 3).

2.      Plaintiff is serving a life sentence on a conviction for first degree murder while

armed, in violation of D.C. Code §§ 22-2401 and 22-3202 (1989), and associated firearms offenses,

and is eligible for parole in 2015 (see Moorer Decl. ¶ 3).

---

[1]  Paragraphs 1 through 11 of the supplemental Moorer Declaration contain the same assertions of fact as paragraphs 1 through 11 of the original Moorer Declaration, which was submitted as part of defendant's moving papers.  The supplemental declaration also contains two additional paragraphs (¶¶ 12 and 13), which describe the supplemental search and disclosure of NTL documents.

[2]  Paragraphs 1-15 and 18 of defendant's amended statement of facts contain the same assertions of fact as the same numbered paragraphs in the original statement of facts, except for a few minor edits, e.g., references to the original complaint have been changed to the amended complaint.  Paragraph 16 of the amended statement of facts contains a more detailed description of the search and location of the 325 pages of Pharmatech records found in the BOP contract file, which BOP now concedes were non-responsive in their entirety.  Similarly, paragraph 17 of the amended statement of facts contains a more detailed description of the search and location of the 24 pages of documents relating to the analysis of plaintiff's urine specimen and his appeal of the positive result based on the unsubstantiated allegation that the use of prescribed medication (articaine) resulted in a false positive result.  Although paragraphs 16 and 17 contain more detailed descriptions of the assertions of fact therein, the descriptions are based on information contained in the original Moorer declaration, as well as language contained in original BOP disclosure letter, dated October 1, 2007 (Moorer Decl., ¶ 8, and Ex. B).

3.      On November 9, 2005, Plaintiff submitted a urine sample, Specimen Number B01652926, for drug analysis as part of the BOP's random Urine Surveillance and Narcotic Identification program (Moorer Decl., ¶ 3).

4.      Specimen Number B01652926 subsequently tested positive for cocaine (Moorer Decl., ¶ 3).

5.      Plaintiff mailed a letter dated January 13, 2006, containing a request made pursuant to the FOIA and the Privacy Act ("FOIA Request") to BOP, by delivering it to prison authorities with first-class postage prepaid and addressed to: Office of General Counsel, Federal Bureau of Prisons, Central Office, 320 First Street, N.W., Washington, D.C. 20001 (Moorer, Decl., ¶ 4, and Ex. A).

6.      Plaintiff's FOIA request sought "a copy of all records created by the Bureau of Prisons (BOP) in regards to the National Toxicology Laboratories, Inc. (NTL) urine specimen #BOI652926; a copy of the contract between the BOP and NTL; a copy of any Operations Memoranda or policies regarding urine analysis; and the names of NTL personnel who conducted the urine test" (Moorer Decl., ¶ 4, Ex. A and B).

7.      The BOP did not respond to Plaintiff's January 13, 2006, letter within twenty work days (Am. Compl., ¶¶ 7, 10).

8.      Plaintiff's FOIA request was erroneously forwarded to the BOP's Mid-Atlantic Regional Office ("MARO") for processing (see Moorer Decl., ¶ 5).

9.      The BOP's FOIA database shows the request was received by the MARO, and was logged in and assigned FOIA Request Number 2006-02881 (Moorer Decl., ¶ 5).

10.     The MARO reviewed FOIA Request Number 2006-02881 and determined the request

should be answered by the BOP's FOIA Office, Washington, D.C. (Moorer Decl., ¶ 5).

11.    The MARO returned FOIA Request Number 2006-02881 to the BOP's FOIA Office in Washington, D.C. for further processing (Moorer Decl., ¶ 5).

12.    BOP is unable to determine whether FOIA Request Number 2006-02881, that was forwarded by MARO, was received by BOP's Washington, D.C. office ("D.C. BOP office") (Moorer Decl., ¶ 5).

13.    On April 29, 2006, Plaintiff mailed to the U.S. Department of Justice, Office of Information and Privacy ("OIP"), a letter appealing the BOP's failure to respond to Plaintiff's request for disclosure of records (Am. Compl., ¶ 8).

14.    On July 25, 2007, the BOP was served with a summons and complaint (see Docket Entry No. 8).

15.    After the D.C. BOP office became aware of the FOIA request, it reopened Plaintiff's FOIA Request (Moorer Decl., ¶¶ 5, 6).

16.    The D.C. BOP office sent a request to the BOP's Administration Division, Procurement Executive Office, located in Washington, D.C., to determine if a contract existed between BOP and NTL (Moorer Decl., ¶ 6). The Procurement Executive Office is the central office for maintaining all national contracts (id.). The Procurement Executive Office conducted a search of all national contract files to determine which file, if any was responsive to plaintiff's FOIA request (id.). The Procurement Office retrieved and reviewed approximately 325 pages of information comprising the Pharmatech, Inc. ("Pharmatech") contract (id.). Pharmatech is the company that currently contracts with the BOP to perform the laboratory tests on random urine sampling collected from BOP inmates (id.). A review of the contract revealed 73 pages of

information that were responsive to Plaintiff's FOIA request (id.). The remaining 252 pages of the contract file were not responsive to Plaintiff's FOIA request and consisted of independent consumer studies and questionnaires filled out by private individuals concerning Pharmatech's Test Kits (id.).

17.    By letter dated October 1, 2007, the BOP responded to FOIA Request Number 2006-02881, and informed plaintiff that it had identified 97 pages of documents containing information found to be responsive to his request (Moorer Decl., ¶ 8, Ex. B). The ninety-seven pages comprised the 73 pages of documents relating to the contract between BOP and NTL (Pharmatech documents), and 24 pages of documents responsive to the remainder of his request for a copy of all records created by the BOP regarding the NTL urine specimen #BOI652926, a copy of any Operations Memoranda or policies regarding urine analysis, and the names of NTL personnel who conducted the urine test (id., ¶¶ 6-8). The latter 24 pages of documents were retrieved from plaintiff's Inmate Central File, which was determined to contain any and all information responsive to plaintiff's request for information relating to the analysis of his urine specimen, which yielded a positive result for cocaine, and included documents relating to his appeal of the positive results based on plaintiff's unsubstantiated allegation that he was taking prescribed medication (articaine) that resulted in a false positive result (id., ¶ 7, and Ex. C).[3] Although there may be other locations containing this information, those files would only duplicate information found in plaintiff's Inmate Central File (id.)

18.    Of the ninety-seven pages that were released to Plaintiff, ninety-two pages of documents were released in their entirety; four pages were released with redactions, pursuant to 5

---

[3]  The Moorer declaration describes a 12-page document entitled Program Statement 6060.08, Urine Surveillance and Narcotic Identification. The 24 pages of responsive documents, including the program statement, are attached to the Moorer Declaration as Ex. C.

U.S.C. §§ 552(b)(2), (b)(4) (Pharmatech documents); and one page was released in a redacted form, pursuant to 5 U.S.C. §§ 552(b)(6) and (b)(7)(C) (documents relating to analysis of plaintiff's urine specimen) (Moorer Decl., ¶¶ 8-10, and Ex. B).

19.    On December 6, 2007, plaintiff filed a Declaration in Opposition to Defendant's Motion for Summary Judgement in which he alleged that this office had provided the incorrect contract.  The BOP FOIA Office contacted the Administration Division, Procurement Executive Office, and subsequently received a copy of the contract between the BOP and NTL, JN00c-024 (Moorer Decl., ¶ 12).  The BOP FOIA Office obtained 63 pages of documents in response to plaintiff's request for a copy of the contract between BOP and NTL (id., and Ex. D).  BOP disclosed 58 pages in their entirety, and 5 pages were disclosed in redacted form pursuant to 5 U.S.C. §§ 552(b)(2), (b)(4) (id., ¶¶ 12-13, and Ex. D and E).  The NTL contract documents were mailed to plaintiff by letter dated February 13, 2008 (id., ¶ 12, and Ex. D).

20.    The BOP applied the exemptions to the NTL documents in the following manner:

(a)    Exemption (b)(2) was used to exempt from mandatory disclosure records relating solely to the internal personnel rules and practices of an agency.  If the information were to be released, an inmate would be aware of the financial/bank routing number used by NTL to receive payment from the BOP for the service that was provided (Moorer Decl., ¶ 13, and Ex. D and E).

(b)    Exemption (b)(4) was used to exempt from disclosure records that would disclose trade secrets and commercial or financial information obtained from a person that is privileged or confidential, including information voluntarily submitted ((Moorer Decl., ¶ 13, and Ex. D and E). The information that was redacted pursuant to Exemption (b)(4), pertains to the unit price of NTL material used for urine specimen testing and the method by which NTL calculated the unit price for

6

its urine specimen testing were redacted from the document because if released the information

would reveal specific prices used by NTL in obtaining the contract (id.).  If the unit pricing were to

be released it could cause substantial harm to NTL's competitive position because other competitive

bidders would discover the method by which NTL calculated their unit pricing (id.).

21.    No reasonably segregable non-exempt portions of responsive documents were

withheld from plaintiff (see Moorer Decl., ¶ 11).

Respectfully submitted,


                                    /s/
                            JEFFREY A. TAYLOR, D.C. Bar # 498610
                            United States Attorney


                                    /s/
                            RUDOLPH CONTRERAS, D.C. Bar # 434122
                            Assistant United States Attorney


                                    /s/
                            JOHN G. INTERRANTE
                            PA Bar # 61373
                            Assistant United States Attorney
                            Civil Division, Room E-4806
                            555 4th Street, N.W.
                            Washington, D.C. 20530
                            (202) 514-7220
                            (202) 514-8780 (fax)
                            John.Interrante@usdoj.gov


Of Counsel:

Wanda Hunt, Esq.
Federal Bureau of Prisons
Washington, D.C.

7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| **ANTHONY D. RAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.  06-1673 (RWR)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BUREAU OF PRISONS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S REPLY TO PLAINTIFF'S STATEMENT OF DISPUTED FACTS

Defendant, Bureau of Prisons ("BOP"), respectfully submits this response to Plaintiff's Statement of Disputed/Unresolved Factual Issues Precluding Entry of Summary Judgment in Defendant's Favor (Docket Entry No. 18)  in this case brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended.

## I.  Introduction

Plaintiff's statement of disputed facts fails to comport with the requirements of Local Rule 7(h), and instead simply identifies six alleged legal disputes with Defendant.  To the contrary, Local Rule 7(h) requires that an opposition to a summary judgment motion be accompanied by "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  The opposing statement of genuine issues must respond directly to the factual statements asserted in the motion for summary judgment.  As stated in the rule:

> In determining a motion for summary judgment, the court may
> assume that facts identified by the moving party in its statement of
> material facts are admitted, unless such a fact is controverted in the

statement of genuine issues filed in opposition to the motion (LCvR 7(h)).

See also LCvR 56.1.

## II.    Plaintiff Has Conceded Many of the Facts Asserted in Defendant's Statement of Material Facts Not in Genuine Dispute

Plaintiff's statement of disputed facts makes no response whatsoever to any of the specific facts presented in Defendant's Statement of Material Facts Not in Genuine Dispute ("SFNGD"). Having failed to address these facts, he must be deemed to have conceded them under LCvR 7(h). See Twist v. Meese, 854 F.2d 1421 (D.C. Cir. 1988); Heasley v. D.C. General Hosp., 180 F. Supp. 2d 158, 163 (D.D.C. 2002); Trawick v. Hantman, 151 F. Supp. 2d 54, 58-59 (D.D.C. 2001).

In addition to his statement of disputed facts, plaintiff also submitted a Declaration in Opposition to Defendant's Motion for Summary Judgment. However, this document also fails to comply with the requirements of Local Rule 7(h). Nonetheless, the declaration raised the issue of the erroneous disclosure of Pharmatech, Inc. ("Pharmatech") contract documents instead of the requested National Toxicology Laboratories, Inc. ("NTL") contract documents (Pl's Decl., ¶ 15). As discussed below, Defendant acknowledges this error and has corrected it by conducting a second search and making a supplemental disclosure to plaintiff.

The remainder of plaintiff's declaration is speculative and conclusory. For example, plaintiff speculates that the 252 pages of the documents in BOP's Pharmatech that were deemed to be non-responsive to his FOIA request may contain information otherwise responsive to his request for information that his positive drug test was actually a false positive (id., ¶ 17). This speculation is belied by the fact (which plaintiff correctly pointed out) that his urine specimen was analyzed by NTL, not Pharmatech. The remainder of plaintiff's declaration complains about the delay in BOP's response to his FOIA request, but does not otherwise challenge any of the assertions in defendant's

2

statement of material facts not in genuine dispute.

Defendant acknowledges that it erroneously disclosed contract documents relating to Pharmatech, the company that currently analyzes urine samples for the BOP, rather than documents relating to the contract between the BOP and the NTL, which conducted the analysis of plaintiff's urine specimen submitted on November 9, 2005, and the subject of plaintiff's FOIA request. BOP concedes this error and has since conducted a second search and disclosed to plaintiff responsive non-exempt documents relating to NTL. The second search and supplemental disclosures are described in the (Supplemental) Declaration of Wilson J. Moorer, which is attached to our Reply Brief. Defendant is also filing an Amended Statement of Material Facts As to Which There is No Genuine Dispute, which is substantially the same as Defendant's original statement, except that it includes two additional paragraphs about the supplemental search and some additional revisions (and one additional paragraph), as described therein.

## III. With BOP's Supplemental Disclosure of NTL Documents, Plaintiff Fails to State Any Material Facts Not in Genuine Dispute

The Moorer Declaration explains that the BOP has conducted a reasonable search of its records in response to plaintiff's FOIA request, has disclosed responsive non-exempt records (including its supplemental disclosure of the NTL contract documents), and no records have been improperly withheld from plaintiff. Plaintiff fails to challenge these assertions in his statement of disputed facts. Moreover, his claim that he may challenge an alleged BOP "practice and custom of ignoring, or delaying response to, prisoner requests for access to records under FOIA" fails to state a claim for relief under FOIA. See 5 U.S.C. § 552(a)(4)(B) (a federal court "has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant"). Accordingly, this action should therefore be

dismissed or summary judgment granted in favor of the BOP.

Respectfully submitted,

    /s/
_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

    /s/
_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

    /s/
_____
JOHN G. INTERRANTE
PA Bar # 61373
Assistant United States Attorney
Civil Division, Room E-4806
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7220
(202) 514-8780 (fax)
John.Interrante@usdoj.gov

Of Counsel:

Wanda Hunt, Esq.
Federal Bureau of Prisons
Washington, D.C.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 17th day of March, 2008, I caused a copy of the foregoing reply brief

to be served upon plaintiff by U.S. Mail, first class postage prepaid, addressed to:


**ANTHONY D. RAY**
R# 04077-000
Cumberland F.C.I.
P.O.B. 1000
14601 Burbridge Road, SE
Cumberland, Maryland  21501-1000


                                            /s/                                                                
                                         John G. Interrante
                                         Assistant United States Attorney

17

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANTHONY D. RAY,             )
                               )
            Plaintiff,        )
                               )
                               )
           v.               )   Civil Action No.: 06-1673 (RWR)
                               )
BUREAU OF PRISONS       )
                               )
            Defendant.     )

## DECLARATION OF WILSON J. MOORER

I, Wilson J. Moorer, do hereby declare and state the following:

1.  I am currently a Paralegal Specialist at the Federal Bureau of Prisons, Office of General Counsel, Freedom of Information Act Section, Washington, D.C. I have been employed in this position since April 2003; however, I have been employed with the Bureau of Prisons since July of 1988. My duties include assisting the Chief, Freedom of Information Act/Privacy Act Section and Freedom of Information Administrator in the review and possible release of information requested from the Bureau of Prisons via the Freedom of Information Act.

2.  The Freedom of Information Act, commonly referred to as FOIA, is a statute governing the release of government records. In general, FOIA provides that any person has a right, enforceable in court, to obtain access to federal agency records, except to the extent that such records (or portions of them) are protected from public disclosure by one of nine exemptions or by one of three (3) special law enforcement record exclusions.

1

3.  The Plaintiff, Anthony D. Ray, Register Number 04077-000 is currently serving a life

sentence for murder while armed, possession of a firearm, and carrying a deadly weapon, in

violation of Title 22 Section 2401, 3204(B), 3204 of the District of Columbia Criminal Law code,

and is eligible for parole in 2015.  On November 9, 2005, Plaintiff submitted a urine sample,

Specimen Number B01652926, for drug analysis as part of the BOP's random Urine Surveillance

and Narcotic Identification program.  Specimen Number B01652926 subsequently tested positive

for cocaine.

4.  The Plaintiff filed a complaint alleging the Bureau of Prisons (BOP) failed to respond

to his FOIA request in which he requested the following information: a copy of all records created

by the Bureau of Prisons(BOP) in regards to the National Toxicology Laboratories, Inc.(NTL)

urine specimen #B01652926; a copy of the contract between the BOP and NTL; a copy of any

Operations Memoranda or policies regarding urine analysis; and the names of NTL personnel who

conducted the urine test.   See Letter from Anthony D. Ray, to the Federal Bureau of Prisons

dated January 13, 2006, a true and correct copy of which is attached here to as Exhibit A.

5.  At the time Mr. Ray's FOIA request was initially received at the BOP's FOIA Office,

Washington, D.C., a processing error occurred which caused the Plaintiff's FOIA request to be

forwarded to the BOP's Mid-Atlantic Regional Office (MARO)  for processing.  The BOP's

FOIA Data Base shows the request was received by the MARO, logged in and assigned FOIA

Request Number 2006-02881.  The MARO reviewed the request and determined the request

should be answered by the BOP's FOIA Office, Washington, D.C.  The MARO returned the

request to the BOP's FOIA Office, Washington, D.C. for further processing; however, it cannot

be determined if the request was ever received by the Washington, D.C. office. The Washington, D.C. office became aware of the FOIA request when the Plaintiff filed this civil action.

6. After careful review of the complaint and consultation with its counsel (Special Assistant United States Attorney Sherease Pratt), the BOP reopened FOIA Request Number 2006-02881. To locate the contract that was requested in Plaintiff's FOIA Request, a request was submitted to the BOP's Administration Division, Procurement Executive Office, Washington, D.C. to determine if a contract existed between the BOP and NTL. The Procurement Executive Office is the central office for maintaining all national contracts. The Procurement Office conducted a search of all national contracts files to determine which file, if any, was responsive to Plaintiff's FOIA Request. The Procurement Office search found a file containing 325 pages of information comprising the Phamatech, Inc. contract. Phamatech, Inc. is the company that currently contracts with the BOP to perform the laboratory tests on random urine sampling collected from BOP inmates. A review of the contract revealed 73 pages of information were responsive to Plaintiff's FOIA Request. The 252 pages of the contract that were not responsive to Plaintiff's FOIA Request consisted of independent consumer studies and questionnaires filled out by private individuals concerning Phamatech's Test Kits. The non-responsive pages were information obtained by Phamatech, Inc. that was not essential to the basic request of the Plaintiff which was a copy of the Phamatech, Inc. contract. The Procurement Office searched all files and areas likely to contain responsive records/documents/materials were searched with respect to Plaintiff's FOIA Request.

3

7. To locate the remaining documents that were requested in Plaintiff's FOIA Request, a request was submitted to the BOP's MARO Legal Department. The Legal Department caused a search to be made of all the files and areas likely to contain responsive records, documents, or materials concerning this section of Plaintiff's FOIA Request. It was determined the Plaintiff's Inmate Central File contained any/all information responsive to the FOIA Request. The Inmate Central File contains information related to the inmate's daily incarceration in the BOP. This is the main file for any/all information regarding an inmate. Although there may be other locations that may have information regarding an inmate, these files would only contain duplicate information that is originally found in the Inmate Central File. The search revealed 12 pages of information that were responsive to the request. The BOP's index of policies/program statements were searched to locate any/all policies regarding urine testing. The index of policies/program statements contains/lists all current BOP policies governing the incarceration of BOP inmates. The search revealed a 12 page document entitled Program Statement 6060.08, Urine Surveillance and Narcotic Identification. Because an Inmate Central File contains any/all information related to an inmates's incarceration, all files and areas reasonably likely to have contained responsive records regarding this section of Plaintiff's FOIA Request were searched.

8. BOP responded to FOIA Request Number 2006–02881 on October 1, 2007, stating 97 pages of information were found to be responsive to his request. The responsive documents were released in the following manner: 92 pages of documents were released in their entirety, 4 pages were released with redactions pursuant to 5 U.S.C. §552(b)(2), (b)(4), and one page was released with redactions pursuant to 5 U.S.C. §552(b)(6) and (b)(7)(C). See Letter from Federal Bureau

4

of Prisons to Anthony Ray, dated October 1, 2007, a true and correct copy of which is attached here to as Exhibit B.

9. Exemption (b)(2) exempts from mandatory disclosure records relating solely to the internal personnel rules and practices of an agency the disclosure of which would risk circumvention of a legal requirement. Exemption (b)(4) exempts from disclosure records that would disclose trade secrets and commercial or financial information obtained from a person that is privileged or confidential, including information voluntarily submitted. Exemption (b)(6) exempts personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. Exemption (b)(7)(C) provide for the withholding of records or information compiled for law enforcement purposes which could reasonably be expected to constitute an unwarranted invasion of personal privacy. A true and correct copy of the documents released in their entirety and the documents released in redacted form are attached here to as Exhibit C.

10. The exemptions were applied in the following manner:

Exemption (b)(2) was used to exempt from mandatory disclosure records relating solely to the internal personnel rules and practices of an agency. If the information were to be released, an inmate would be aware of the direct telephone number extensions of Phamatech, Inc. employees and personal cellular telephone numbers of Phamatech, Inc. employees.

Exemption (b)(4) was used to exempt from disclosure records that would disclose trade secrets and commercial or financial information obtained from a person that is privileged or confidential, including information voluntarily submitted. The information that was redacted

5

pursuant to Exemption (b)(4), pertains to the tax identification number which was redacted from the document because it disclosed information that is used to file for certain tax exemptions or credits that are only allowed for individuals who are making a legal deduction. The financial numbering system of Phamatech, Inc. was redacted from the document because it disclosed the routing number used by Phamatech, Inc. to receive payment from the BOP for the service being provided. The unit price of Phamatech, Inc. material used for urine specimen testing and the method by which Phamatech, Inc. calculates the unit price for its urine specimen testing were redacted from the document because if released the information would reveal specific prices used by Phamatech, Inc. to determine the amount they believe could be charged to assist them in obtaining the contract. If awarded the contract, as they were, the release of this information would give others a competitive advantage when the contract is announced for renewal. If the unit pricing were to be released it could cause substantial harm to Phamatech, Inc. competitive position because other competitive bidders would discover the method by which Phamatech, Inc. calculated their unit pricing.

Exemption (b)(6) and (b)(7)(C) were both used to redact a certain document because the document contained information regarding an individual the disclosure of which would constitute an unwarranted invasion of personal privacy. The document in question contained the name of the laboratory employee who certified the results of the urine specimen.

11. As described above, no reasonably segregable non-exempt portions were withheld from Plaintiff. Accordingly, all redacted information was exempt from disclosure pursuant to a FOIA exemption or was not reasonably segregable because it was so intertwined with protected

6

material that segregation was not possible or its release would have revealed the underlying protected material. All documents which relate to plaintiff's requests were processed to achieve maximum disclosure consistent with the provisions of the FOIA.

12. On December 6, 2007, plaintiff filed a Declaration in Opposition to Defendant's Motion for Summary Judgement in which he alleged that this office had provided the incorrect contract. The BOP FOIA Office contacted the Administration Division, Procurement Executive Office, and subsequently received a copy of the contract between the BOP and National Toxicology Labs. The National Toxicology Labs contract, JN00c-024, was mailed to plaintiff on February 13, 2008. See Letter from Federal Bureau of Prisons to Anthony Ray, dated February 13, 2008, a true and correct copy of which is attached here to as Exhibit D.

13. The exemptions were applied in the following manner: Exemption (b)(2) was used to exempt from mandatory disclosure records relating solely to the internal personnel rules and practices of an agency. If the information were to be released, an inmate would be aware of the financial/bank routing number used by National Toxicology Labs to receive payment from the BOP for the service that was provided.

Exemption (b)(4) was used to exempt from disclosure records that would disclose trade secrets and commercial or financial information obtained from a person that is privileged or confidential, including information voluntarily submitted. The information that was redacted pursuant to Exemption (b)(4), pertains to the unit price of National Toxicology Labs material used for urine specimen testing and the method by which National Toxicology Labs calculated the unit price for its urine specimen testing were redacted from the document because if released the

7

information would reveal specific prices used by National Toxicology Labs in obtaining the contract. If the unit pricing were to be released it could cause substantial harm to National Toxicology Labs competitive position because other competitive bidders would discover the method by which National Toxicology Labs calculated their unit pricing. A true and correct copy of the documents released in their entirety and the documents released in redacted form are attached here to as Exhibit E.

I declare under the penalty of perjury, pursuant to Title 28 U.S.C. § 1746, the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this *25* day of February 2008, at Washington, D.C.

Wilson J. Moorer
Paralegal Specialist
Federal Bureau of Prisons
Washington, D.C.

8

**EXHIBIT A**

02/26/2007 10:28 FAX  2025141003          DOJ-01F                    ☑004/008

Date: January 13, 2006

OFFICE OF THE GENERAL COUNSEL

FEDERAL BUREAU OF PRISONS

CENTRAL OFFICE

320 FIRST STREET, N.W.

WASHINGTON, D.C. 20001

RE:  FREEDOM OF INFORMATION AND PRIVACY ACT REQUEST
     PURSUANT TO TITLE 5 U.S.C. §552, §552(a) (FOIA/PA)

Dear    Sir/Madam            :

Please consider this a Formal Request under the FOIA/PA. Your immediate and strict
compliance with this request is fully expected, pursuant to Section 552(a)(6)(A)(i).

Because there is an exceptional need and urgency for the information sought, I
expect a response to this request within the twenty (20) working day period provided
under the law. The requested information, when disclosed, will relieve the requestor
of Constitutional deprivations. Therefore, the requestor asks that this FOIA/PA
request be given priority and expeditious consideration.

In order to help determine my status, and to assess fees, you should know that I
am a Federal Inmate, and herein certify that I am a pauper within the meaning of
28 U.S.C. §1915, and I am unable to pay for search and copy fees. I request a
waiver of fees for this request. Disclosure of the requested information to me is
in the public interest, as it is likely to contribute significantly to the
clarification of Constitutional and/or legal issues. The information requested is
for personal use and will not be used for any commercial purposes.

The information and documents I am requesting are outlined herein as follows:

Copies of all records created by the BOP and/or the National Toxicology Laboratories,
Inc. (NTL), regarding urine specimen # BOI652926, including chain-of-custody records,
relevant portions of any ledgers kept by respective custodians, laboratory results/
reports, etc.   I also request copies of the contract between the BOP and NTL under
which specimen # BOI65926 was tested, and copies of any Operations Memoranda or
other documents which set forth procedure, protocol, standards or guidelines estab-
lished to ensure the reliability and accuracy of urine analysis.  Finally, I request
disclosure of the identities of NTL personnel involved in the analysis of (see attched)

I am also attaching an information and data sheet to assist you in locating the
requested materials in compliance with 28 C.F.R. Section 16.41.

This request is to include all local records, as well as records stored or filed
at the Central Office of the Agency from which the request is made.

Sincerely yours,

Anthony Ray

:ATTACHMENTS

02.18/2007 10 27 FAX  2025141009        DOJ-OIP                              005/008

FOIA/PA REQUEST, p. 2 of 2
1/13/06

specimen BOI65926, the number and type of tests conducted on said specimen, whether
the entire specimen was consumed in testing, and the disposition of both the tested
and any untested portions of the specimen.

If you determine that any portion of the specimen remains  in the custody or
control of either the BOP or NTL, I hereby request that such remaining portions
of the specimen be preserved as evidence material to  resolution of judicial
proceedings.

My final request is for copies of documents and/or disclosure of information
referred to in disciplinary proceedings based on Incident Report # 1403543.
See attached DHO Report, p. 2 at D., 1. thru 4.  More specifically, as
regards D.,4., I request a copy of the "memorandum" submitted to the DHO
by LCDR R. Byrd, as well as copies of any publications and/or the source
and substance of any unpublished information "reviewed" by R. Byrd which
led him to conclude that the "metabolism and chemical structure of a dental
anesthetic given to [me near time of submission of urine sample showed]
no comparison...[to] cocaine metabolites that would cause a false positive
urine test result."

**EXHIBIT B**



**U.S. Department of Justice**

Federal Bureau of Prisons

OCT   1 2007

_____

*Washington, DC 20534*

Anthony Ray                          For Further Inquiry Contact:
Register Number 04077-000            Federal Bureau of Prisons
Federal Correctional Institution     320 First Street. N.W.
P.O. Box 1000                        Room 841, HOLC Building
Cumberland, Maryland 21501-1000      Washington, D.C. 20534
                                     Attn: FOIA/Privacy Act Office


RE:  Request for Information, FOIA Request No. 2006-02881

Dear Mr. Ray:

     This is in response to your Freedom of Information Act
request for a copy of all records created by the Bureau of
Prisons(BOP) in regards to the National Toxicology Laboratories,
Inc.(NTL) urine specimen #BOI652926; a copy of the contract
between the BOP and NTL; a copy of any Operations Memoranda or
policies regarding urine analysis; and the names of NTL personnel
who conducted the urine test.

     We have located 73 pages of documents in response to your
request for a copy of the contract between the BOP and NTL.  You
are being provided 69 pages in their entirety; however, portions
of the remaining 4 pages are being redacted pursuant to 5 U.S.C.
§552(b)(2) and (b)(4).

     Exemption (b)(2) exempts from mandatory disclosure records
relating solely to the internal personnel rules and practices of
an agency the disclosure of which would risk circumvention of a
legal requirement.

     Exemption (b)(4) exempts from disclosure records that would
disclose trade secrets and commercial or financial information
obtained from a person that is privileged or confidential,
including information voluntarily submitted.

     In reference to your request for a copy of all records
created by the Bureau of Prisons(BOP) in regards to the National
Toxicology Laboratories, Inc.(NTL) urine specimen #BOI652926; a
copy of any Operations Memoranda or policies regarding urine
analysis; and the names of NTL personnel who conducted the urine
test, a total of 24 pages of documents were located in response
to your request.

Page 2
Anthony Ray
FOIA Request Number 2006-02881

You are being provided 23 pages in their entirety; however, a portion of the remaining one page is being redacted pursuant to 5 U.S.C. §552(b)(6) and (b)(7)(C).

Exemption (b)(6) exempts personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

Exemption (b)(7)(C) provide for the withholding of records or information compiled for law enforcement purposes which could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Pursuant to 28 C.F.R. § 16.9, if you are dissatisfied with this response, you may appeal to the Attorney General by filing a written appeal within sixty (60) days of the date of this letter. The appeal should be addressed to the **Office of Information and Privacy, U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001.**  Both the envelope and appeal letter should be marked **"Freedom of Information Act Appeal."**

I trust this has been responsive to your request.  If you have any questions or concerns please contact Wilson J. Moorer, Paralegal.

Sincerely,

Wilson J. Moorer, Paralegal
Wanda M. Hunt
Chief, FOIA/PA Section

Enclosure: 97 pages

cc: File

**EXHIBIT C**

**(Excluding Pharmatech, Inc. Documents, attached as Exhibit C, Part I, to Defendant's Motion for Summary Judgment, Docket Entry No. 14)**

## Regional Administrative Remedy Appeal
### Part B - Response

**Date Filed: January 23, 2006**

**Remedy ID No. 401720-R1**

You appeal the DHO decision of December 5, 2005, for Use of Cocaine (Code 112). You state you did not commit the prohibited act. You claim the sanctions are too harsh. You request the incident report be expunged.

The DHO found you committed the prohibited act based on the greater weight of the evidence which was the chain of custody form and your initials indicating the specimen was yours and was sealed in your presence. The DHO considered your denial of the charge. The DHO also relied on the written confirmation received from Toxicology Laboratories showing that your urine specimen tested positive for cocaine. Institution staff verified that you were not prescribed medication which would cause you to test positive for morphine/opiates. We find the DHO accurately and adequately explained to you in Section V of the DHO report the specific evidence relied on to find you committed the prohibited act, and we find no need to elaborate further.

The sanctions imposed were appropriate and available to the DHO for a prohibited act in the Greatest severity category.

We find the required disciplinary procedures were substantially followed, the evidence supports the DHO's finding, and the sanctions were appropriate for the offense.

Your appeal is denied. If you are dissatisfied with this response, you may appeal to the General Counsel, Federal Bureau of Prisons, 320 First Street, N.W., Washington, D.C. 20534. Your appeal must be received in the General Counsel's Office within 30 days from the date of this response.

MAR 2 2 2006
_____
Date

_____
K. M. White
Regional Director
Mid-Atlantic Regional Office

02/26/2007  12:43    3017841012                    A UNIT                          PAGE   03/17

01/26/2006  11:29    3017841284                    FCI CUMBERLAND                  PAGE   01


REQUEST FOR DOCUMENTS - ADMINISTRATIVE REMEDY


DATE: JANUARY 26, 2006

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      MID-ATLANTIC REGIONAL OFFICE

TO  : ADMINISTRATIVE REMEDY COORDINATOR
      CUMBERLAND FCI


OUR OFFICE RECEIVED THE BELOW INDICATED REGIONAL APPEAL.
PLEASE SEND US COPIES OF THE DOCUMENTS INDICATED BELOW, WHICH
WE NEED IN ORDER TO RESPOND.  PLEASE NOTIFY US PROMPTLY IF YOU
CANNOT HAVE THIS MATERIAL TO US BY MON, JANUARY 30, 2006


REMEDY ID : 401720-R1          REGIONAL APPEAL
INMATE    : ANTHONY D RAY, 04077-000
INMATE LOC: CUMBERLAND FCI UNT: UNIT A QTR: A01-128U
SUBJECT 1 : DHO APPEAL - COMBINED (PROCEDURES, EVIDENCE & SANCTIONS)
SUBJECT 2 :
INC RPT NO: 1402543
DOCUMENT  : DHO PACKET                      12-05-2005
REMARKS   : SEND TO NANCY TRUDEL, DHA, MARO

02/28/2007  12:43    3017841012                    A UNIT                              PAGE  04/17

DISCIPLINE HEARING OFFICER REPORT
U.S. DEPARTMENT OF JUSTICE



BP-S305.052 MAY 94
FEDERAL BUREAU OF PRISONS

| INSTITUTION | FCI CUMBERLAND | INCIDENT REPORT NUMBER | | 1403543 |
|---|---|---|---|---|
| INMATE NAME | RAY, ANTHONY D | REG NO  04077-030 | UNIT | A 1 |
| DATE OF INCIDENT | 11-09-2005 | DATE OF INCIDENT REPORT | | 11-18-2005 |
| OFFENSE CODE(S) | 112 | | | |
| SUMMARY OF CHARGES | | Use of Any Narcotics, Marijuana, Drug or Related Paraphernalia Not Prescribed For the Individual by the Medical Staff | | |

### I.   NOTICE OF CHARGE(S)

A. Advanced written notice of charge (copy of Incident Report) was given to inmate on

(date)  11-18-2005       at (time)  1020      (by staff member)  K. Bageant

B. The DHO Hearing was held on (date)       12-05-2005      at (time)      1350

C. The inmate was advised of his/her rights before the DHO by (staff member):

S. Golub                              on (date)      11-23-2005          and a copy

of the advisement of rights form is attached.

### II.   STAFF REPRESENTATIVE

| A. Inmate waived right to staff representative. | Yes: | – | No: | X |
|---|---|---|---|---|

B. Inmate requested staff representative and  J. Courtney        appeared.

C. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that:  N/A

| D. Staff representative | N/A | was appointed. |
|---|---|---|

E. Staff representative statement:

Mr. J. Courtney, Correctional Counselor, appeared at the hearing with inmate RAY and each acknowledged they were ready to proceed with the hearing. Mr. Courtney stated that he discussed this incident with inmate RAY and was ready to assist him as necessary. Mr. Courtney described RAY as a ideal inmate and that he does not cause any problems in the unit or for the unit team. At the conclusion of the hearing Mr. Courtney  stated that RAY had received a fair hearing and that appropriate sanctions were imposed.

### III.   PRESENTATION OF EVIDENCE

| A. Inmate    admits | – | denies | – | the charge(s). |
|---|---|---|---|---|

B. Summary of inmate statement:

RAY acknowledged receiving a copy of the incident report and stated he understood his rights before the DHO. RAY verified his signature on the Chain of Custody for Drug Analysis form for specimen number B01652926. RAY denied using drugs not prescribed for him by medical staff. RAY stated he was treated by the dentist and received anesthetic during a dental procedure. RAY then stated he provided the urine specimen a couple of days after the dental procedure. According to RAY, on the day of graduation from Vo-Tech, he was called to the Lieutenant's office and was wrongly charged with having used drugs. RAY denied using any illegal drugs.

C. Witness(es):

Page 1 of 3

DISCIPLINE HEARING OFFICER REPORT
U.S. DEPARTMENT OF JUSTICE



BP-S305.052 MAY 94
FEDERAL BUREAU OF PRISONS

| 1. The inmate requested witness(es). | Yes: | – | No: | X |
|---|---|---|---|---|

2. The following persons were called as witnesses at this hearing and appeared. (Include each witnesses' name, title, reg number and statement as appropriate.)

N/A

3. The following persons requested were not called for the reason(s) given.

N/A

| 4. Unavailable witnesses were requested to submit written | Yes | – | No | – | N/A | X |
|---|---|---|---|---|---|---|

D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following documents:

1. Chain of Custody for Drug Analysis, dated 11-09-2005, for Specimen Number B01652926 signed by inmate Anthony RAY.

2. Laboratory Report, dated 11-17-2005 for Specimen Number B01652926 from National Toxicology Laboratories, showing a positive test for Cocaine.

3. A memorandum signed by Registered Nurse L. Dudeck, dated 11-18-2005 indicating that a review of RAY's medical record finds no medication prescribed for RAY that would cause a positive test for Cocaine.

4. A memorandum from LCDR R. Byrd, Chief Pharmacist, stating he reviewed the metabolism and chemical structures of a dental anesthetic given to RAY and found no comparison between them and cocaine metabolites that would cause a false positive urine test result.

E. Confidential information was used by DHO in support of his findings, but was not revealed to the inmate. The confidential information was documented in a separate report. The confidential information has been (confidential informants have been) determined to be reliable because:

N/A

**IV. FINDINGS OF THE DHO**

| X | A. The act was committed as charged. |
|---|---|
| – | B. The following act was committed: |  ↩ |
| – | C. No prohibited act was committed: Expunge according to Inmate Discipline PS. |

**V. SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.)**

Based on the greater weight of the evidence the DHO finds that on 11-09-2005, inmate RAY provided a urine sample that subsequently tested positive for the presence of Cocaine, without this substance being prescribed for him by medical staff. To reach this finding the DHO relies on the National Toxicology Laboratories report, dated 11-17-2005, showing a positive result for Cocaine for Specimen No. B01652926; the Chain of Custody for Drug Analysis for Specimen No. B01652926, dated 11-09-2005, signed by inmate RAY, Anthony; and, the Registered Nurse's memorandum, dated 11-18-2005, saying that RAY was not prescribed any medication that would result in a positive test for Cocaine. The DHO also relies on the reporting officer's statements contained in the Incident Report as follows:

On November 18, 2005, at approximately 7:15 a.m., a fax mail Laboratory Report was received at the FCI Cumberland SIS office from National Toxicology Laboratories, INC., Bakersfield, CA., indicating urine specimen

02/28/2007  12:43    3017841012                    A UNIT                              PAGE  06/17

**DISCIPLINE HEARING OFFICER REPORT** 
**U.S. DEPARTMENT OF JUSTICE**

BP-S305.052 MAY 94
**FEDERAL BUREAU OF PRISONS**

---

number B01652926, tested positive for cocaine (Benzoylecgonine). Inmate RAY, Anthony D., #04077-000, provided specimen number B01652926, on November 9, 2005, at 6:08 a.m. The institution Health Services department was contacted and advised staff did not prescribe inmate Ray any medication that would cause a positive urine test result for cocaine. Based on this information I conclude that inmate Ray used narcotics, drugs or related paraphernalia not prescribed for him by medical staff.

Additionally, the DHO relies on RAY's statement confirming the specimen control number and verification of his signature on the chain of custody form to find he used narcotics, marijuana, drugs or related paraphernalia not prescribed by medical staff. The DHO considered RAY's allegation this was a false positive test result from anesthetic given to him during a dental procedure. However, the DHO gives greater weight to the Chief Pharmacist's memorandum stating the chemical structure of the anesthetic would not cause a false positive test result to find RAY used narcotics, marijuana, drugs or related paraphernalia not prescribed by medical staff.

---

**VI. SANCTION OR ACTION TAKEN**

20 days Disciplinary Segregation
20 days DS suspended
Forfeit 60 days Statutory Good Time
365 days loss of Social Visiting Restriction, followed by
365 days Social Visiting restricted to either non-contact visits or only immediate family members.

---

**VII. REASON FOR SANCTION OR ACTION TAKEN**

Using narcotics, marijuana, drugs or related paraphernalia not prescribed by medical staff will not be permitted. Actions like this threaten the security and orderly running of the institution. These actions also endanger the safety and quality of life of both inmates and staff.

The DHO imposes the sanctions listed above to convey the seriousness and inappropriateness of your actions. The DHO selected these sanctions to deter you and others from exhibiting similar acts of misbehavior in the future.

---

**VIII. APPEAL RIGHTS:** The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

| | Yes | | X | No | | - | |
|---|---|---|---|---|---|---|---|

**IX. DISCIPLINE HEARING OFFICER**

| Printed Name of DHO | Signature of DHO | Date |
|---|---|---|
| J. Howard Losiewicz | | 12-15-2005 |
| Report delivered to inmate by: | DATE | TIME |

(This form may be replicated in WP)                                                Replaces BP-304.52) of JAN 88

Page 3 of  3

02/28/2007  12:43   3017841012              A UNIT                          PAGE  07/17

BP-S288.052 INCIDENT REPORT CDFRM
May 1994
U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

| 1. Name of Institution: FCI Cumberland | | | # 1403543 |
|---|---|---|---|

### PART I - INCIDENT REPORT

| 2. Name of Inmate RAY, Anthony D. | 3. Register Number 04077-000 | 4. Date of Incident November 9, 2005 | 5. Time 6:08 AM |
|---|---|---|---|
| 6. Place of Incident Unit A-1 | 7. Assignment F CCS AM | 8. Unit A-1 | |

| 9. Incident: Use of any narcotics, or related paraphernalia not prescribed for the individual by the medical staff. | 10. Code 112 |
|---|---|

11. Description of Incident (Date: 11-18-05 Time: 7:15 AM Staff became aware of incident)

On November 18, 2005, at approximately 7:15 a.m., a fax mail Laboratory Report was received at the FCI Cumberland SIS office from National Toxicology Laboratories, INC., Bakersfield, CA., indicating urine specimen number B01652926, tested positive for cocaine (Benzoylecgonine). Inmate RAY, Anthony D., #04077-000, provided specimen number B01652926, on November 9, 2005, at 6:08 a.m. The institution Health Services department was contacted and advised staff did not prescribe inmate Ray any medication that would cause a positive urine test result for cocaine. Based on this information I conclude that inmate Ray used narcotics, drugs or related paraphernalia not prescribed for him by medical staff.

| 12. Signature of Reporting Employee | Date and Time 11-18-2005/8:30 AM | 13. Name and Title (printed) D. Deremer/ SIS Technician |
|---|---|---|
| 14. Incident Report Delivered to above inmate by: | 15. Date Incident Report delivered 11.18.05 | 16. Time Incident Report Delivered 10:20 Am |

### PART II - COMMITTEE ACTION

17. Comments of Inmate to Committee Regarding Above Incident  I dont know nothin about none of that staff. I went to see the Dentist they shot me up in the mouth with some new medicine. I never used drugs in my life.

| 18 A. It is the finding of the Committee that you: ___ Committed the following prohibited act: ___ Did not commit a prohibited act. | B. ✓ The Committee is referring the charge(s) to the DHO for further hearing C. ___ The Committee advised the inmate of its findings and of the right to file an appeal within 15 calendar days. |
|---|---|

19. Committee Decision is based on the following information:  The UDC is referring the incident report to the DHO based on the seriousness of the offense. Additionally sanctions are not available at UDC level.

20. Committee Action and/or recommendation if referred to DHO (contingent upon DHO finding inmate committed prohibited act).  If guilty, UDC recommends 30 days DS, 41 days loss of GCT.

21. Date and Time of Action  11/23/5  9:35 Am  (The UDC Chairman's signature next to his name certifies who sat on the UDC and that the completed report accurately reflects the UDC proceedings.)

T. Biark /Bluett                    J. Galub /S. Galul  _____
Chairman (typed name/signature)     Member (typed name)      Member (typed name)

Record Copy - Central File Record. Copy - DHO; Copy - Inmate after UDC Action; Copy - Inmate within 24 hours of Part I preparation
(This form may be replicated via WP)

Replaces BP-288(52) of Jan. 88

02/28/2007  12:43    3017041012                    A UNIT                              PAGE  08/17

PART III - INVESTIGATION:

22.     Date and Time Investigation Began:    11-18-2005 /10:20 A.M.

23.     Inmate advised of right to remain silent: You are advised of your right to remain silent at all stages of the
        disciplinary process but are informed that your silence may be used to draw an adverse inference against
        you at any stage of the institutional disciplinary process. You are also informed that your silence alone may
        not be used to support a finding that you have committed a prohibited act.

        The inmate was advised of the above right by  K. Bageant    at (date/time) 11-16-2005 /10:20 P.M.

24. Inmate Statement and Attitude:

Inmate Ray #04077-000 was advised of his rights and given a copy of this report.
Inmate stated that he understood his rights.

Inmate Stated: **I don't know anything about this. Inmate Ray #04077-000 declined to make any further
statement during this investigation.**

Inmate  displayed a Good attitude during this investigation.

25. Other facts about the incident, statements of those persons present at scene, disposition of evidence, etc.

Inmate requested no witnesses at this time.

Other evidence has been presented.  **Attached documentation from National Toxicology Laboratories and
Supporting Memorandum.**

.26. Investigator's comments and conclusions:  **Based on the information contained within the body of this
report, I find this report to be true and correct as written.**

27. Action Taken:
Inmate Ray #04077-000 was placed in Special Housing on 11-18-2005. This report is being referred to the UDC
pending further action.

Date and time investigation completed    **11-18-2005 /10:25 P.M.**

Printed Name/Signature of Investigator  **K. Bageant /**                      Act   Lieutenant
                                                                                         Title

 

**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Federal Correctional Institution*
*Cumberland, Maryland 21502*

| | |
|---|---|
| Date: | November 18, 2005 |
| Reply To Attn Of: | D. Deremer<br>SIS Technician |
| Subject: | Request for Medical Prescription Information<br>**RAY, Anthony D. #04077-000** |
| To: | Health Services Department |

The above referenced inmate provided a urine sample on November 9, 2005, at 6:08 a.m., for testing according to the Federal Bureau of Prisons policy on Urine Surveillance. The National Toxicology Laboratories INC., Bakersfield, CA, advises this specimen (#B01652926), tested positive for **cocaine (Benzoylecgonine).** Before proceeding with disciplinary action it is necessary to determine if any medication prescribed for this inmate justifies the positive test result. Please review the subject's medical records and indicate below if Health Services staff prescribed any medication that would justify the positive test result.

Thank you in advance, for promptly completing the requested information and returning this memorandum to my attention.

---

As requested above, I, reviewed the above referenced inmate's medical record and find:

_____✓_____:  The inmate was not prescribed any medication that would test positive for the above stated drug.

_____:  The inmate was prescribed the medication(s) listed below that would cause a positive urine test result for the above stated drug.
Please list below the prescribed medication(s) justifying the positive test result.

| L. Dudek RN, *[signature]* | RN | 11-18-05 |
|---|---|---|
| Printed Name & Signature | Title | Date |
| Reviewing and Certifying | | |
| Inmate's Medication History | | |

02/28/2007  12:43    3017041012                    A UNIT                                    PAGE  11/17

  

**National Toxicology Laboratories** INC

1100 California Ave.    Bakersfield, California 93304

## Chain of Custody for Drug Analysis



**FEDERAL BUREAU OF PRISONS**

| Results Name and Address | CUM | Specimen Number    B01852926 |
|---|---|---|
| FCI Cumberland<br>14601 Burbridge Rd. SE<br>Cumberland, MD  21502 | INSTITUTION CODE | Account No.    91007 |
| | | Special Tests Requested |

INSTITUTION SECURITY LEVEL:

MINIMUM 01 ☐    LOW 02 ☐    MEDIUM 03 ☑    HIGH 04 ☐    ADMINISTRATIVE 05 ☐    COMMUNITY 06 ☐

**URINE COLLECTION PROCEDURES**

1. To the extent possible, urine samples should be collected in one or two centralized areas of the institution, e.g. Lieutenants' office or R & D, by staff who are thoroughly familiar with the procedures specified below.
2. Inmates shall be thoroughly searched to detect any device designed to provide a urine substitute or possible contaminant and will thoroughly wash their hands prior to providing the sample. Prior to collecting the sample, a staff member shall complete all blocks of the Chain of Custody form except for Time Provided and Collector and Inmate Certification.
3. When the inmate reports for testing, staff shall make a positive picture identification of the inmate; shall collect a specimen from the inmate under direct observation; shall complete time provided information; shall ensure that the specimen bottle is tightly capped; and shall affix a label containing the specimen number to the Urine Surveillance Log. Ordinarily, to be submitted for testing, bottles should be full.
4. The inmate shall verify that the specimen numbers (i.e. barcode numbers) on the Chain of Custody form, on the peel-off barcode, and on the numbered label to be affixed to the Urine Surveillance Log are identical.
5. After verification, the collector shall affix the barcode and security seals to the specimen bottle. The inmate shall be asked to initial the security seal and to read and sign the Inmate Certification Statement.
6. The staff member collecting the specimen shall read and sign the Collector Certification Statement. If the inmate refuses to sign the Inmate Certification or initial the security seal, a second staff member shall also sign the Collector Certification and shall initial the security seal.
7. After samples are collected, they shall be maintained under direct staff observation until moved to a locked area where they may be stored until shipping. This area shall be designated by the Urine Surveillance Program Coordinator and should be one which is accessible to a very limited number of staff and to no inmates.
8. All samples shall be sent to National Toxicology Laboratories no later than the first work day after they are collected.
9. When a positive result is received, an incident report shall be written unless medical staff indicates the positive result is due to authorized medication. A photocopy of both the laboratory report and the Chain of Custody form (retained at the institution) containing the inmate's name, registration number and specimen number shall be attached to the incident report and made part of the disciplinary record.

**STAFF COMPLETES**

TEST REASON SELECT ONE ONLY    RANDOM 07 ☑    PRIOR USE 08 ☐    SUSPECT 09 ☐    DISRUPTIVE GROUP 10 ☐    COMMUNITY 11 ☐    SATURATION 12 ☐

| INMATE NAME (Last, First, I.):    RAY Anthony  CA1-120 / CCS Am | REGISTER #    04077-000 |
|---|---|
| DATE COLLECTED:   11-9-05    TIME REQUESTED:   6:08  PM | TIME PROVIDED:   6:08  PM |

Collector Certification: I certify that the specimen identified on this form is the specimen presented to me by the inmate providing the certification below, that it bears the same identification number as set forth above, and that it has been collected, labeled and sealed in accordance with the collection procedures provided above.

Seibel  Chris  B
Staff Member Collecting Specimen (Last, First, I.):                    Staff Member's (Collector) Signature

Inmate Certification: I certify that the specimen accompanying this form is my own and that I provided it to the collector. Further, I certify that the specimen was sealed in my presence and that the information on this form and label is correct.

Second Witness Signature (To be completed by second staff member if inmate declines to sign.)                    Inmate's (Donor) Signature

**APPLY ▶ BARCODE VERTICALLY ON VIAL.**



SECURITY SEAL

**DO NOT PLACE SECURITY SEAL OVER HINGE OR LATCH**



B01652926

02/28/2007  12:43    3017841012                    A UNIT                        PAGE  14/17



BP-S294.052  NOTICE OF DISCIPLINE HEARING BEFORE THE (DHO)  CDFRM
MAY 94
U.S. DEPARTMENT OF JUSTICE                        FEDERAL BUREAU OF PRISONS

                                                    FCI Cumberland
                                                    _____
                                                        Institution
                                                    November 23, 2005
                                                    _____
                                                            Date

TO: RAY, Anthony                          | Reg. No.: 04077-000

ALLEGED VIOLATION(S):
Use of Any Narcotics, or Related Paraphernalia Not Prescribed for the Individual by the Medical Staff

DATE OF OFFENSE: 11/09/2005               | Code No.: 112

You are being referred to the DHO for the above charge(s).

The hearing will be held on:  Next Available  at  FCI Cumberland (A.M./P.M.) at the following location:

Next available docket

You are entitled to have a full-time staff member represent you at the hearing.  Please indicate below
whether you desire to have a staff representative, and if so, his or her name.

I (do) __✓__ (do not)____ wish to have a staff representative.

If so, the staff representative's name is:  J. Courtney , A-1 counselor

You will also have the right to call witnesses at the hearing and to present documentary evidence in your
behalf; provided, calling your witnesses will not jeopardize institutional safety.  Names of witnesses you
wish to call should be listed below.  Briefly state to what each proposed witness would be able to testify.

I (do) ____ (do not) __✓__ wish to have witnesses.

| NAME:                        | Can Testify to:              |
|------------------------------|------------------------------|
|                              |                              |
| NAME:                        | Can Testify to:              |
|                              |                              |
| NAME:                        | Can Testify to:              |
|                              |                              |

The Discipline Hearing Officer will call those witnesses (Staff or inmate) who are reasonably available,
and who are determined by the DHO to have information relevant to the charge(s).  Repetitive witnesses and
repetitive character references need not be called.  Unavailable witnesses may be asked to submit written
statements.

If additional space is needed, use the reverse side of this form.  Date, sign, and return this form to the
DHO.

| DATE: 11-23-05 | SIGNATURE: |

Notice of hearing before DHO given inmate  11-23-05/9:41am by           S. Golub /S. Golub
                                          Date/Time                    Staff Printed Name/Signature

(This form may be replicated via WP)                        Replaces BP-294(52) of JAN 88

From:       Russell L. Byrd
To:         Deremer, James D.
Date:       11/21/2005 11:20:23 AM
Subject:    Articaine

My review of the metabolism and chemical structures of articaine (Septocaine®) and its metabolites revealed that neither it nor any of its metabolites are structurally similar to cocaine or any of its metabolites. Therefore, there should not be any false positives for cocaine metabolites from articaine or its metabolites.

LCDR Russell Byrd, USPHS
Chief Pharmacist
FCI Cumberland
14601 Burbridge Rd SE
Cumberland, MD 20152
rbyrd@bop.gov
301-784-1000 ext-2093/2012
Fax: 301-784-1033



**U.S. Department of Justice**
Federal Bureau of Prisons

# Change
# Notice

**DIRECTIVE AFFECTED:** 6060.08
**CHANGE NOTICE NUMBER:** 1
**DATE:** 3/8/2001

1. **PURPOSE AND SCOPE.** To revise PS 6060.08, Urine Surveillance and Narcotic Identification to remove the requirement for staff to administer the Random selection list in a sequential order.

2. **SUMMARY OF CHANGES.** The revised policy will allow staff to skip an inmate on the Random list who is not readily available, i.e., on a medical trip, in the visiting room, etc., and continue with testing from the list. The inmate who was bypassed can then be tested when it is more convenient for staff and the inmate is available.

Additionally, an extension of the Random list will serve to supply additional inmate names for testing to replace inmates who are not readily available for testing. For example, if five percent of the population must be tested, a list containing seven percent should be produced. Inmates will then be sequentially chosen from the remaining names on the Random list to replace those unavailable for testing.

3. **TABLE OF CHANGES**

| Remove | Insert |
|---|---|
| Pages 7 and 8 | Pages 7 and 8 |

4. **ACTION.** File this Change Notice in front of PS 6060.08, Urine Surveillance and Narcotic Identification.

/s/
Kathleen Hawk Sawyer
Director



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program
# Statement

OPI:     CPD
**NUMBER:**  6060.08
**DATE:**    11/24/99
**SUBJECT:** Urine Surveillance and
               Narcotic Identification

1.  [<u>PURPOSE AND SCOPE</u> §550.30. **The Warden must establish programs of
urine testing for drug use, to monitor specific groups or individual
inmates who are considered as high risk for drug use, such as those
involved in community activities, those with a history of drug use,
and those inmates specifically suspected of drug use.**

**Testing is to be performed as frequently as the Warden determines on
at least 50 percent of inmates who are involved in community
activities. In addition, staff shall randomly sample each
institution's inmate population during each month to test for drug
use.]**

Information on urine surveillance of inmates at Community Corrections
Centers and other community-based programs is in the Community
Corrections Manual.

This Program Statement also requires that each institution maintain a
supply of Narcotic Identification Kits to determine whether unknown
substances are narcotics, or other controlled substances.

2.  **SUMMARY OF CHANGES.**  This revision changes:

- The Random urine **testing requirement for High Level Security
from seven percent to ten percent** and **Minimum Level Security
institutions from five percent to three percent.**

**[Bracketed Bold - Rules]**
Regular Type - Implementing Information
- The Random selection process from a **"selection without
replacement"** to **"selection with replacement"** of the inmate's
name.

- **Additionally, an inmate's name will no longer be removed
from the Disruptive Group Testing Category when their name
also appears on the Random Selection Category.**

PS 6060.08
11/24/99
Page 2

3.  **PROGRAM OBJECTIVES.**  The expected results of this program are:

a.  Illegal use of drugs by inmates will be deterred.

b.  Inmates will live in a safe and orderly environment.

c.  The public will be protected from undue risk from inmates in community activities.

4.  **DIRECTIVES AFFECTED**

a.  Directive Rescinded

PS 6060.07      Urine Surveillance and Narcotic Identification (1/29/99)

b.  Directives Referenced

PS 1380.05 Special Investigative Supervisors Manual (8/1/95)
PS 1627.01      Commercial Drivers Testing for Use of Controlled Substances/Alcohol (11/29/96)
PS 5270.07      Inmate Discipline and Special Housing Units (12/29/87)
PS 5360.07      Religious Beliefs and Practices (8/29/97)
PS 5500.09      Correctional Services Manual (10/27/97)
PS 7300.09      Community Corrections Manual (1/12/98)

c.  Rules cited in this Program Statement are contained in 28 CFR 550.30-32.

5.  **STANDARDS REFERENCED**

a.  American Correctional Association 3rd Edition Standards for Adult Correctional Institutions:  3-4344-1

b.  American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities:  3-ALDF-4E-19-2

c.  American Correctional Association 2nd edition Standards for Administration of Correctional Agencies:  None

d.  American Correctional Association Standards for Adult Correctional Boot Camp Programs:  1-ABC-4E-22

6.  **PRETRIAL/HOLDOVER PROCEDURES.**  Procedures required in this Program Statement apply to pretrial and holdover inmates.

7.  **RESPONSIBILITIES.**  Ordinarily, the Warden designates the Captain as the Urine Surveillance Program Coordinator.

PS 6060.08
11/24/99
Page 3

- Operational responsibility may be further delegated no lower than Lieutenant.

Only staff (not inmates) may execute the duties of this program (such as urine collection, recording, mailing, and processing of results).

8.  SURVEILLANCE CATEGORIES.  Urine surveillance is to be applied to inmates in the following categories:

a.  Random.  Five percent of each institution's total inmate population must be tested randomly monthly, however, exactly three percent are to be tested randomly in all Minimum Security Level institutions and ten percent in all U.S. Penitentiaries, with the exception of:

- ADX-FLO-MAX, Florence, Colorado and
- U.S. Penitentiary Marion, Illinois, which is to follow the five percent random testing monthly (see Section 10.c.(1)).

Inclusion in another urine surveillance category will not interfere with inclusion in the random sample.  The Random selection process is modified from "selection without replacement" to "selection with replacement."  This removes the inmate assurance that once tested in a given month that there is no possibility of being tested until the following month.

b.  Community Activities.  At least 50 percent of inmates involved in community activities are to be tested, including all inmates with a history of drug use.

For the purposes of this Program Statement, inmates assigned to Military Base details are not considered to be involved in community activities.

c.  Disruptive Groups.  Every confirmed disruptive group member will be tested each month.

d.  Suspected.  Inmates who have been identified through intelligence gathering, i.e., telephone monitoring, involvement in an incident resulting in physical violence towards another person.  This testing will occur over an extended period of time (e.g., three consecutive months).

e.  Saturation.  A method for targeting a large group of inmates for testing.

f.  Prior Act.  Inmates found by the DHO to have committed the following prohibited acts will be tested monthly for the following 24 months (see Section 8.):

- Refusing to Provide a Urine Sample, Code 110;
- Introduction of Drugs or Drug Paraphernalia, Code 111;
- Use of Drugs or Related Paraphernalia, Code 112; or
- Possession of Drugs or Related Paraphernalia, Code 113.

9.  [PROCEDURES  §550.31

   a.  Staff of the same sex as the inmate tested shall directly
supervise the giving of the urine sample.  If an inmate is unwilling
to provide a urine sample within two hours of a request for it, staff
must file an incident report.  No waiting period or extra time need be
allowed for an inmate who directly and specifically refuses to provide
a urine sample.  To eliminate the possibility of diluted or
adulterated samples, staff shall keep the inmate under direct visual
supervision during this two-hour period, or until a complete sample is
furnished.  To assist the inmate in giving the sample, staff shall
offer the inmate eight ounces of water at the beginning of the
two-hour time period.  An inmate is presumed to be unwilling if the
inmate fails to provide a urine sample within the allotted time
period.  An inmate may rebut this presumption during the disciplinary
process.]

   Ordinarily, an inmate is expected to provide a urine sample within
two hours of the request, but the Captain (or Lieutenant) may extend
the time if warranted by specific situations (for example, the inmate
has a documented medical or psychological problem, is dehydrated,
etc.).

   Staff may consider supervising indirectly an inmate who claims to be
willing but unable to provide a urine sample under direct
visual supervision.  For example, this might be accomplished by
allowing the inmate to provide the sample in a secure, dry room after
a thorough search has been made of both the inmate and the room.

   A urine sample is considered to be approximately a full specimen
bottle.  Refer to Standard Procedures for Collecting Urine
Surveillance Samples (Attachment A).

   [b.  Institution staff shall determine whether a justifiable reason
exists, (e.g., use of prescribed medication) for any positive urine
test result.  If the inmate's urine test shows a positive test result
for the presence of drugs which cannot be justified, staff shall file
an incident report.]

   In addition to checking whether the inmate's positive urinalysis
result may be justified by prescribed medication, staff must ensure
that the minimum waiting period for successive positive results is
taken into account, as guided by the Detection Periods for Selected
Drugs (Attachment B).

PS 6060.08
11/24/99
Page 5

- Those time periods are estimates of the maximum time urine would test positive for a particular drug.  For example, ordinarily, at least 30 days would have to elapse between urine collections before disciplinary action could be taken for a second positive THC result; however, urine could be collected from that inmate within those 30 days, and an incident report could be based on positive results for a drug other than THC.

Incident reports pertaining to positive urine tests will be forwarded to the Unit Discipline Committee, in accordance with the Program Statement on Inmate Discipline and Special Housing Units.

An inmate who has been found to have committed any of the following prohibited acts will be tested monthly for the following 24 months:

- Refusing to Provide a Urine Sample, Code 110;
- Introduction of Drugs or Drug Paraphernalia, Code 111;
- Use of Drugs or Related Paraphernalia, Code 112; or
- Possession of Drugs or Related Paraphernalia, 113.

After being tested for a period of 24 consecutive months and no further discipline actions taken for drug related offenses, the inmate will be removed from the Prior Act List; however, acts of misconduct (Codes 110, 111, 112, or 113) while on the Prior Act List requires continuance on the Prior Act List for an additional 24 months from the date of the new discipline action.

c.  Urine Sample Screening and Confirmation.  Urinalysis will be performed exclusively by a Central Office-approved laboratory.

The urinalysis contractor will detect and identify at least the following drugs and/or metabolites by basic screen at the minimal levels stated in the contract:

- Morphine (total, free, or glucuronide)
- Methadone (& metabolite)
- Codeine
- Other Opiates
- Barbiturates (including but not limited to Amobarbital, Phenobarbital, Pentobarbital, Butabarbital, Hexobarbital, Secobarbital)
- Amphetamines (including, but not limited to, d-amphetamine and methamphetamine)
- Cocaine (free)
- Cocaine metabolite (benzoylecgonine)
- Phencyclidine (PCP)
- THC

An initial positive test is confirmed by a second test before it is reported to the institution.

A positive written report from the contractor for any of the above drugs indicates that the particular drug has been identified by an initial screening test and then confirmed by a different laboratory procedure.

If a contractor detects and identifies other drugs or substances during the initial screening, the contractor will identify and report them. The institution may then decide whether to request confirmation.

- Retesting at the inmate's request is not permitted.

10. GENERATING RANDOM URINE SURVEILLANCE LISTS

a. On the first work day of each month a list of randomly selected inmate names will be produced through the SENTRY Random Population Selection Transaction. This list is non-alphabetical and will be used for the selection of inmates.

A second list in alphabetical order will also be produced to determine the location of the selected inmates. This second list is to facilitate use of the random list and may not be used to select inmates for urine surveillance.

PS 6060.08
11/24/99
Page 7

PS 6060.08
CN-1 3/8/2001
Page 7

Many institutions have both operating methods and data recording instruments for the urine testing programs. For this reason the only part of the computerized list which may be used is the random list of names. The other data elements are printed for staff convenience and may be used or ignored according to the procedural requirements of the local program.

*     b. The Urine Surveillance Program Coordinator is responsible for list security and secure storage of the lists until it is delivered to the person responsible for urine testing. Ordinarily, the list of inmate names will be issued to staff for collection at the beginning of the shift. Ordinarily is defined as in Article 18, section U of the Master Agreement.     *

The Urine Surveillance Program Coordinator will assure that sufficient copies of the list are printed to accommodate the local program requirements. Random lists cannot be replicated by SENTRY if they are lost or destroyed.

    c. Procedures for collecting samples from the random group shall be developed locally in accordance with the following requirements:

*     (1) The random list will be used sequentially beginning with the first name. The notification and collection, however, may occur in any order. Inmates do not have to provide the sample in the order that they were notified. Names of inmates no longer at the institution will be skipped and not counted. Inmates not readily available, e.g., on a medical trip, in the visiting room, may also be skipped.
    *

Exactly five percent (rounded) of the listed population count will be ordered to produce samples. The number of samples taken plus the refusals must equal five percent of the count listed on the printout. With exception, exactly three percent (rounded) will be tested randomly in all Minimum Security Level institutions and ten percent (rounded) of the listed inmate population in all U.S. Penitentiaries will be ordered to produce samples, except for ADX-FLO-MAX, Florence, Colorado and the U.S. Penitentiary Marion, Illinois, which will follow the five percent random testing monthly.

*     An extension of the Random list will serve to supply additional inmate names for testing to replace the inmates who are not readily available for testing. For example, if five percent of the population must be tested, a list containing seven percent should be produced.     *

\*        Inmates will then be sequentially chosen from the remaining names on the Random list to replace those unavailable for testing in order to continue testing from the list.  Any unavailable inmate who is bypassed should be tested when it is more convenient for staff and the inmate is available.                                            \*

        (2)  Fairness and randomness are necessary in using the list.  No listed inmate may be excused if he or she is available to provide a urine sample.  If even one inmate is excused, the selection process is no longer random.

        (3)  While the random list is to be produced on a regularly scheduled basis, it is not necessary to actually collect the samples in that same calendar month.  For example, a list produced one month might be used through the 15th of the following month.

        (4)  Sample collection will not follow any pattern that inmates could predict.  Samples will be taken at different hours (early morning, noon, late evening).  Collection will be spread evenly over seven days a week during the course of a month whenever practicable.

11.  NARCOTIC IDENTIFICATION KITS.  Each Captain will ensure the institution maintains a supply of Narcotic Identification Kits (purchased through the Federal Supply Schedule) to determine the identity of unknown substances.

All lieutenants will be proficient in using the Narcotic Identification Kit and ordinarily are responsible for testing unknown substances.

While identification of such substances may be useful for various security purposes, it is often particularly important in the investigation of incident reports and may be important in referring incidents to the Federal Bureau of Investigation.

12.  FEDERAL HIGHWAY ADMINISTRATION (FHWA) TESTING.  Inmates assigned to drive a vehicle requiring a commercial driver's license are also subject to alcohol testing under FHWA guidelines.

Refer to the Correctional Services Manual and Special Investigative Supervisors Manual for further information.


                                /s/
                                Kathleen Hawk Sawyer
                                Director

STANDARD PROCEDURES FOR COLLECTING URINE SURVEILLANCE SAMPLES

1.  To the extent possible, urine samples should be collected in one or two centralized areas of the institution, ( e.g., lieutenants' office or R & D), by staff who are thoroughly familiar with the procedures specified below.

2.  Inmates will be thoroughly searched to detect any device designed to provide a urine substitute or possible contaminant and will thoroughly wash their hands prior to providing the sample.

3.  When the inmate reports for testing staff will:

    ● make a positive picture identification of the inmate;
    ● collect the sample from the inmate;
    ● assign the sample a urine sample identification number;
    ● label the urine bottle with that number and the date and;
    ● record the number next to the inmate's name on the lab slip.

4.  Bottles will be kept under direct staff observation and control at all times, both before and after the inmate furnishes the urine sample.

5.  Ordinarily, to be submitted for testing, bottles will be full (i.e., 60cc or 2 oz).  Once a sufficient sample is provided, staff must ensure that the urine sample identification number on the bottle corresponds to the number assigned to that inmate on the lab slip.  Staff must then sign the laboratory form certifying that the specimen identified on the laboratory form is the specimen presented to staff by the inmate providing the certification on the form, bears the same identification number as the specimen, and has been labeled and sealed according to the collection procedures stipulated above.

6.  The inmate will then certify by signing the laboratory form that the specimen provided to the collection officer was provided by the inmate, sealed in the inmate's presence, and the information on the form and label is correct.  If the inmate refuses, a second staff member must make this verification and sign the form.

PS 6060.08
11/24/99
Attachment A, Page 2

7.   After samples are collected they will be maintained under direct
     staff observation until moved to a locked area where they will be
     stored until mailing.  This area should be designated by the
     Urine Surveillance Program Coordinator and will be accessible to
     a very limited number of staff. Under no circumstances will
     inmates have access to this area.

8.   All samples will be mailed to the testing laboratory no later
     than 72 hours after collection, (excluding holidays).

9.   When a positive result is received, and an incident report
     written, a photocopy of both the slip returned by the lab and the
     slip listing the inmate's name and urine sample identification
     number (retained at the institution) will be attached to the
     incident report and made a part of the disciplinary record.

PS 6060.08
11/24/99
Attachment B, Page 1

DETECTION PERIODS FOR SELECTED DRUGS

The time periods below are estimates of the maximum lengths of time, after last use, that a person's urine would be positive for a particular drug.  These periods also represent the minimum waiting periods between samples on which successive disciplinary actions for the same drug ordinarily may be based.  For example, ordinarily at least 30 days must elapse between urine collection dates before disciplinary action may be taken for a second THC positive.  The inmate could, however, be retested within this 30-day period and disciplinary action could be based on positive results for drugs other than THC.

| | |
|---|---|
| 3 days | Amphetamines |
| | Methamphetamine |
| | Cocaine |
| | Cocaine Metabolite |
| 5 days | Methadone |
| | Methadone Metabolite |
| 6 days | Morphine |
| | Codeine |
| | Opiates |
| | Meperidine (Demerol) |
| | Pentazocine (Talwin) |
| | Propoxyphene (Darvon) |
| 11 days | Barbiturates |
| | Phencyclidine (PCP) |
| 14 days | Phenobarbital |
| 30 days | THC |

02/28/2007  12:43   3017841012              A UNIT                      PAGE  09/17

NATIONAL TOXICOLOGY LABORATORIES, INC.              Laboratory Report
1100 CALIFORNIA AVE. BAKERSFIELD, CA 93304
=================================================================================
INSTITUTION # 01007
SEND TO:                              SPECIMEN ID: B01652926
Captain/Correctional Program          DATE COLLECTED: 11/09/2005
FCI Cumberland                        TEST REASON: Random
14601 Burbridge Rd.                   SECURITY LEVEL: Medium
Cumberland, MD  21502                 LAB ACCESSION #: 051107913
                                      DATE RECEIVED: 11/16/2005
                                      DATE REPORTED: 11/17/2005
=================================================================================
                            TEST RESULTS*
Drug                          Results
=================================================================================
Cocaine (Benzoylecgonine)    POSITIVE

                    <ALL OTHER DRUGS NOT DETECTED*>




      I Certify that the specimen identified by this accession number is the
same specimen that bears the specimen identification above, that the specimen
has been examined upon receipt, handled and analyzed in accordance with
applicable requirements, and that these results are for that specimen.

Results Certified by:                      (b)(b)(b)(6)          Date: 11/17/2005

=================================================================================
*The sample was tested for the following drugs:
                    TEST METHODS AND DETECTION LEVELS
Drug or                  Initial Test              Confirmatory Test
Drug Class          Method       Cutoff         Method        Cutoff
=================================================================================
Amphetamines        EIA          1000  ng/ml     GC/MS         300 ng/ml
Barbiturates        EIA           300  ng/ml     GC/MS         500 ng/ml
Benzodiazepines     EIA           200  ng/ml     GC/MS         200 ng/ml
Cannabinoid         EIA            50  ng/ml     GC/MS          15 ng/ml
Cocaine Metabolite  EIA           300  ng/ml     GC/MS         300 ng/ml
Methadone           EIA           300  ng/ml     GC/MS         300 ng/ml
Opiates             EIA           300
 Codeine            EIA                           GC/MS         500 ng/ml
 Morphine           EIA                           GC/MS         200 ng/ml
 Hydromorphone      EIA                           GC/MS         100 ng/ml
Phencyclidine       EIA            25  ng/ml      GC/MS          25 ng/ml
=================================================================================

**<u>EXHIBIT D</u>**



**U.S. Department of Justice**

Federal Bureau of Prisons

FEB 1 3 2008

_Washington, DC 20534_

Anthony Ray
Register Number 04077-000
Federal Correctional Institution
P.O. Box 1000
Cumberland, Maryland 21501-1000

For Further Inquiry Contact:
Federal Bureau of Prisons
320 First Street. N.W.
Room 841, HOLC Building
Washington, D.C. 20534
Attn: FOIA/Privacy Act Office

RE:  Request for Information, FOIA Request No. 2006-02881

Dear Mr. Ray:

This is in further response to the above Freedom of
Information Act request and current civil action for a copy of
the contract between the Bureau of Prisons (BOP) and National
Toxicology Laboratories, Inc.(NTL).

We have located 63 pages of documents in response to your
request for a copy of the contract between the BOP and NTL.  You
are being provided 58 pages in their entirety; however, portions
of the remaining 5 pages are being redacted pursuant to 5 U.S.C.
§552(b)(2) and (b)(4).

Exemption (b)(2) exempts from mandatory disclosure records
relating solely to the internal personnel rules and practices of
an agency the disclosure of which would risk circumvention of a
legal requirement.

Exemption (b)(4) exempts from disclosure records that would
disclose trade secrets and commercial or financial information
obtained from a person that is privileged or confidential,
including information voluntarily submitted.

Pursuant to 28 C.F.R. § 16.9, if you are dissatisfied with
this response, you may appeal to the Attorney General by filing a
written appeal within sixty (60) days of the date of this letter.
The appeal should be addressed to the **Office of Information and
Privacy, U.S. Department of Justice, 1425 New York Ave., NW,
Suite 11050, Washington, D.C. 20530-0001.**

Page 2
Anthony Ray
FOIA Request Number 2006-02881


Both the envelope and appeal letter should be marked "**Freedom of Information Act Appeal.**"

I trust this has been responsive to your request. If you have any questions or concerns please contact Wilson J. Moorer, Paralegal.

Sincerely,

Wilson J. Moorer, Paralegal
Wanda M. Hunt
Chief, FOIA/PA Section


Enclosure: 63 pages

cc: File

**EXHIBIT E**

| OMB No.: 1103-0018 |
| Expiration Date: 02/29/2004 |

| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS OFFEROR TO COMPLETE BLOCKS 12,17,23,24, & 30 | 1. REQUISITION NUMBER NCP-3031 | | PAGE 1 | OF PAGES 102 |

| 2. CONTRACT NO. JN00c-024 | 3. AWARD/EFF DATE 09-27-2003 | 4. ORDER NUMBER | 5. SOLICITATION NUMBER RFP-NCP-010-02 | 6. SOLICITATION ISSUE DATE 02/10/2003 |

| 7. FOR SOLICITATION INFORMATION CALL: | a. NAME Joseph J. Rofrano | b. TELEPHONE NUMBER (No collect calls) 202-307-0985 | 8. OFFER DUE DATE/ LOCAL TIME 02/25/2003 2:00PM |

| 9. ISSUED BY   CODE | 10. THIS ACQUISITION IS | 11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED | 12. DISCOUNT TERMS |

9. ISSUED BY CODE

Federal Bureau of Prisons
National Contracts and Policy
320 First Street, N.W., Room 5006

Washington                          DC 20534

10. THIS ACQUISITION IS
[ ] UNRESTRICTED
[X] SET ASIDE  100  % FOR
[X] SMALL BUSINESS
[ ] HUBZONE SMALL BUSINESS
[ ] 8(A)
NAICS: 621511
SIZE STANDARD: $11.5 MILLION

11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED
[X] SEE SCHEDULE

12. DISCOUNT TERMS
N/A

13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)
13b. RATING

14. METHOD OF SOLICITATION
[ ] RFQ    [ ] IFB    [X] RFP

| 15. DELIVER TO   CODE | DELIVERY DATE | 16. ADMINISTERED BY   CODE |

15. DELIVER TO CODE

Federal Bureau of Prisions
VARIOUS INSTITUTIONS
Room 5006
Washington, DC. 20534

16. ADMINISTERED BY CODE

Acquistions Branch
National Contracts and Policy
320 First Street, N.W., Room 5006

Washington                          DC 20534

17a. CONTRACTOR/ OFFEROR   CODE   FACILITY CODE

National Toxicology Labs., Inc.
1100 California Ave.
Bakersfield,CA  93304

PHONE: 661-322-4250   FAX: 661-322-4322

18a. PAYMENT WILL BE MADE BY   CODE

Federal Bureau of Prisions
VARIOUS INSTITUTIONS

[ ] 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER.

18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED. [X] SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | See page 2 for schedule of supplies/services | | | | |

25. ACCOUNTING AND APPROPRIATION DATA
(b)(2)Low

26. TOTAL AWARD AMOUNT (For Govt Use Only)
$713,910.00 Estimated Base Year

[X] 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED.
ADDENDA   [X] ARE   [ ] ARE NOT ATTACHED.
[ ] 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED
ADDENDA   [ ] ARE   [ ] ARE NOT ATTACHED.

[ ] 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN _____ COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN.

[ ] 29. AWARD OF CONTRACT: REF. _____ OFFER DATED _____. YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

30A. SIGNATURE OF OFFEROR/CONTRACTOR
*Thomas Sneath*

30b. NAME AND TITLE OF SIGNER (TYPE OR PRINT)
Thomas Sneath
President

30c. DATE SIGNED
2/19/03

31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER)

31b. NAME OF CONTRACTING OFFICER (TYPE OR PRINT)
Joseph J. Rofrano

31c. DATE SIGNED
9/26/03

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 4/2002)
Prescribed by GSA - FAR (48 CFR) 53.212



**■ FreeMarkets.**

**Cost Breakdown**
*Federal Bureau of Prisons*
CBE 9037  Inmate Urinalysis Testing
**Update 1**

| Offeror Name |
|---|
| Version 1.0 |

## Lot 1 - Inmate Drug Testing

| Line Item | Part Description | Quantity | Unit of Measure | Unit Price ($/UOM)* | Extended Price ($/UOM)* |
|---|---|---|---|---|---|
| **OPTION PERIOD Base Year (date of award through 12 months)** | | | | | |
| 0001 | Primary Test Panel | (b)(4) | EA | (b)(4) | $ 669,300.00 |
| 0002 | Special Test Panel | | EA | | $ 45,600.00 |
| 0003 | Individual Special Test-Steroid | | EA | | $ 6,600.00 |
| 0004 | Individual Special Test-LSD | | EA | | $ 450.00 |
| 0005 | Individual Special Test-Fentanyl | | EA | | $ 450.00 |
| 0006 | Subject Matter Expert Testimony | | HR | | $ 980.00 |
| 0007 | Other Methodology | | EA | | $ 530.00 |
| **OPTION Year One (13 months through 24 months)** | | | | | |
| 0008 | Primary Test Panel | (b)(4) | EA | (b)(4) | $ 707,880.00 |
| 0009 | Special Test Panel | | EA | | $ 49,800.00 |
| 0010 | Individual Special Test-Steroid | | EA | | $ 7,600.00 |
| 0011 | Individual Special Test-LSD | | EA | | $ 500.00 |
| 0012 | Individual Special Test-Fentanyl | | EA | | $ 500.00 |
| 0013 | Other Methodology | | EA | | $ 560.00 |
| 0014 | Subject Matter Expert Testimony | | HR | | $ 1,000.00 |
| **OPTION Year Two (25 months through 36 months)** | | | | | |
| 0015 | Primary Test Panel | (b)(4) | EA | (b)(4) | $ 756,460.00 |
| 0016 | Special Test Panel | | EA | | $ 51,500.00 |
| 0017 | Individual Special Test-Steroid | | EA | | $ 8,000.00 |
| 0018 | Individual Special Test-LSD | | EA | | $ 550.00 |
| 0019 | Individual Special Test-Fentanyl | | EA | | $ 550.00 |
| 0020 | Other Methodology | | EA | | $ 590.00 |
| 0021 | Subject Matter Expert Testimony | | HR | | $ 1,000.00 |

**Total Lot Price ** | $ 2,300,400.00 |

* All pricing must be submitted in U.S. Dollars (USD)
** Total Lot Price submitted via Cost Breakdown must exactly match offeror's lowest bid submitted in the online market, CBE 9037

 

SECTION: A

**CONTRACT CLAUSES**

**A.1  52.204-4 PRINTED OR COPIED DOUBLE-SIDED ON RECYCLED PAPER (AUG 2000)**

(a)  <u>Definitions</u>. As used in this clause—
"Postconsumer material" means a material or finished product that has served its intended use and has been discarded for disposal or recovery, having completed its life as a consumer item. Postconsumer material is a part of the broader category of "recovered material." For paper and paper products, postconsumer material means "postconsumer fiber" defined by the U.S. Environmental Protection Agency (EPA) as--

   (1)  Paper, paperboard, and fibrous materials from retail stores, office buildings, homes, and so forth, after they have passed through their end-usage as a consumer item, including: used corrugated boxes; old newspapers; old magazines; mixed waste paper; tabulating cards; and used cordage; or

   (2)  All paper, paperboard, and fibrous materials that enter and are collected from municipal solid waste; but not

   (3)  Fiber derived from printers' over-runs, converters' scrap, and over-issue publications.

"Printed or copied double-sided" means printing or reproducing a document so that information is on both sides of a sheet of paper.

"Recovered material", for paper and paper products, is defined by EPA in its Comprehensive Procurement Guideline as "recovered fiber" and means the following materials:

   (1)  Postconsumer fiber; and

   (2)  Manufacturing wastes such as–

      (i)  Dry paper and paperboard waste generated after completion of the papermaking process (that is, those manufacturing operations up to and including the cutting and trimming of the paper machine reel into smaller rolls or rough sheets) including: envelope cuttings, bindery trimmings, and other paper and paperboard waste resulting from printing, cutting, forming, and other converting operations; bag, box, and carton manufacturing wastes; and butt rolls, mill wrappers, and rejected unused stock; and

      (ii)  Repulped finished paper and paperboard from obsolete inventories of paper and paperboard manufacturers, merchants, wholesalers, dealers, printers, converters, or others.

(b)  In accordance with Section 101 of Executive Order 13101 of September 14, 1998, Greening the Government through Waste Prevention, Recycling, and Federal Acquisition, the Contractor is encouraged to submit paper documents, such as offers, letters, or reports, that are printed or copied double-sided on recycled paper that meet minimum content standards specified in Section 505 of Executive Order 13101, when not using electronic commerce methods to submit information or data to the Government.

 

(c)  If the Contractor cannot purchase high-speed copier paper, offset paper, forms bond, computer printout paper, carbonless paper, file folders, white wove envelopes, writing and office paper, book paper, cotton fiber paper, and cover stock meeting the 30 percent postconsumer material standard for use in submitting paper documents to the Government, it should use paper containing no less than 20 percent postconsumer material. This lesser standard should be used only when paper meeting the 30 percent postconsumer material standard is not obtainable at a reasonable price or does not meet reasonable performance standards.

[End of Clause]

## A.2  52.252-2  CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

www.acqnet.gov

I.  FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

NUMBER          DATE          TITLE

## A.3  52.212-4 CONTRACT TERMS AND CONDITIONS--COMMERCIAL ITEMS (FEB 2002)

(a)  Inspection/Acceptance.  The Contractor shall only tender for acceptance those items that conform to the requirements of this contract.  The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance.  The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. The Government must exercise its post-acceptance rights--

(1)  Within a reasonable time after the defect was discovered or should have been discovered; and

(2)  Before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

(b)  Assignment. The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. 3727).  However, when a third party makes payment (e.g., use of the Governmentwide commercial purchase card), the Contractor may not assign its rights to receive payment under this contract.

(c)  Changes. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

 

(d) Disputes. This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613). Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(e) Definitions. The clause at FAR 52.202-1, Definitions, is incorporated herein by reference.

(f) Excusable delays. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

(g) Invoice. (1) The Contractor shall submit an original invoice and three copies (or electronic invoice, if authorized) to the address designated in the contract to receive invoices. An invoice must include—

    (i)    Name and address of the Contractor;

    (ii)   Invoice date and number;

    (iii)  Contract number, contract line item number and, if applicable, the order number;

    (iv)  Description, quantity, unit of measure, unit price and extended price of the items delivered;

    (v)   Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;

    (vi)  Terms of any discount for prompt payment offered;

    (vii)  Name and address of official to whom payment is to be sent;

    (viii) Name, title, and phone number of person to notify in event of defective invoice; and

    (ix)  Taxpayer Identification Number (TIN). The Contractor shall include its TIN on the invoice only if required elsewhere in this contract.

    (x)   Electronic funds transfer (EFT) banking information.

       (A) The Contractor shall include EFT banking information on the invoice only if required elsewhere in this contract.

       (B) If EFT banking information is not required to be on the invoice, in order for the invoice to be a proper invoice, the Contractor shall have submitted correct EFT banking information in accordance with the applicable solicitation provision, contract clause (e.g., 52.232-33, Payment by Electronic Funds Transfer—Central Contractor Registration, or 52.232-34, Payment by Electronic Funds Transfer—Other Than Central Contractor Registration), or applicable agency procedures.

 

        (C) EFT banking information is not required if the Government waived the requirement to pay by EFT.

    (2) Invoices will be handled in accordance with the Prompt Payment Act (31 U.S.C. 3903) and Office of Management and Budget (OMB) prompt payment regulations at 5 CFR part 1315.

(h) Patent indemnity. The Contractor shall indemnify the Government and its officers, employees and agents against liability, including costs, for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark or copyright, arising out of the performance of this contract, provided the Contractor is reasonably notified of such claims and proceedings.

(i) Payment. Payment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in this contract. The Government will make payment in accordance with the Prompt Payment Act (31 U.S.C. 3903) and OMB prompt payment regulations at 5 CFR part 1315. In connection with any discount offered for early payment, time shall be computed from the date of the invoice. For the purpose of computing the discount earned, payment shall be considered to have been made on the date which appears on the payment check or the specified payment date if electronic funds transfer payment is made.

(j) Risk of loss. Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the Contractor until, and shall pass to the Government upon:

    (1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or

    (2) Delivery of the supplies to the Government at the destination specified in the contract, if transportation is f.o.b. destination.

(k) Taxes. The contract price includes all applicable Federal, State, and local taxes and duties.

(l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(m) Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

 

(n) Title. Unless specified elsewhere in this contract, title to items furnished under this contract shall pass to the Government upon acceptance, regardless of when or where the Government takes physical possession.

(o) Warranty. The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract.

(p) Limitation of liability. Except as otherwise provided by an express warranty, the Contractor will not be liable to the Government for consequential damages resulting from any defect or deficiencies in accepted items.

(q) Other compliances. The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract.

(r) Compliance with laws unique to Government contracts. The Contractor agrees to comply with 31 U.S.C. 1352 relating to limitations on the use of appropriated funds to influence certain Federal contracts; 18 U.S.C. 431 relating to officials not to benefit; 40 U.S.C 327, et seq., Contract Work Hours and Safety Standards Act; 41 U.S.C. 51-58, Anti-Kickback Act of 1986; 41 U.S.C. 265 and 10 U.S.C. 2409 relating to whistleblower protections; 49 U.S.C 40118, Fly American; and 41 U.S.C. 423 relating to procurement integrity.

(s) Order of precedence. Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order:

    (1) The schedule of supplies/services.

    (2) The Assignments, Disputes, Payments, Invoice, Other Compliances, and Compliance with Laws. Unique to Government Contracts paragraphs of this clause.

    (3) The clause at 52.212-5.

    (4) Addenda to this solicitation or contract, including any license agreements for computer software.

    (5) Solicitation provisions if this is a solicitation.

    (6) Other paragraphs of this clause.

    (7) The Standard Form 1449.

    (8) Other documents, exhibits, and attachments.

    (9) The specification.

[End of Clause]

## A.4  52.212-5  CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS--COMMERCIAL ITEMS (MAY 2002)

(a) The Contractor shall comply with the following FAR clauses, which are incorporated in this contract by reference, to implement provisions of law or executive orders applicable to acquisitions of commercial items:

    (1) 52.222-3, Convict Labor (E.O. 11755).

    (2) 52.233-3, Protest after Award (31 U.S.C. 3553).



SECTION: A

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items or components:

__ (1) 52.203-6, Restrictions on Subcontractor Sales to the Government, with Alternate I (41 U.S.C. 253g and 10 U.S.C. 2402).

__ (2) 52.219-3, Notice of Total HUBZone Small Business Set-Aside (Jan 1999).

__ (3) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (Jan 1999) (if the offeror elects to waive the preference, it shall so indicate in its offer).

__ (4) (i)    52.219-5, Very Small Business Set-Aside (Pub. L. 103-403, section 304, Small Business Reauthorization and Amendments Act of 1994).

__       (ii) Alternate I to 52.219-5

__       (iii) Alternate II to 52.219-5

__ (5) 52.219-8, Utilization of Small Business Concerns (15 U.S.C. 637 (d)(2) and (3)).

__ (6) 52.219-9, Small Business Subcontracting Plan (15 U.S.C. 637 (d)(4)).

__ (7) 52.219-14, Limitations on Subcontracting (15 U.S.C. 637(a)(14)).

__ (8) (i)    52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323) (if the offeror elects to waive the adjustment, it shall so indicate in its offer).

__       (ii) Alternate I of 52.219-23.

__ (9) 52.219-25, Small Disadvantaged Business Participation Program--Disadvantaged Status and Reporting (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

__ (10) 52.219-26, Small Disadvantaged Business Participation Program--Incentive Subcontracting (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

XX (11) 52.222-21, Prohibition of Segregated Facilities (Feb 1999).

XX (12) 52.222-26, Equal Opportunity (E.O. 11246).

XX (13) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (38 U.S.C. 4212).

XX (14) 52.222-36, Affirmative Action for Workers with Disabilities (29 U.S.C. 793).

__ (15) 52.222-37, Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (38 U.S.C. 4212).

__ (16) 52.222-19, Child Labor--Cooperation with Authorities and Remedies (E.O. 13126).

__ (17) (i)    52.223-9, Estimate of Percentage of Recovered Material Content for EPA-Designated Products (42 U.S.C. 6962(c)(3)(A)(ii)).

__       (ii) Alternate I of 52.223-9 (42 U.S.C. 6962(i)(2)(C)).

__ (18) 52.225-1, Buy American Act--Supplies (41 U.S.C. 10a-10d).

__ (19) (i)    52.225-3, Buy American Act--North American Free Trade Agreement--Israeli Trade Act (41 U.S.C. 10a-10d, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note).

__       (ii) Alternate I of 52.225-3.



        \_    (iii) Alternate II of 52.225-3.

    \_   (20) 52.225-5, Trade Agreements (19 U.S.C. 2501, et seq., 19 U.S.C. 3301 note).

    XX (21) 52.225-13, Restriction on Certain Foreign Purchases (E.O. 12722, 12724, 13059, 13067, 13121, and 13129).

    \_   (22) 52.225-15, Sanctioned European Union Country End Products (E.O. 12849).

    \_   (23) 52.225-16, Sanctioned European Union Country Services (E.O. 12849).

    \_   (24) 52.232-33, Payment by Electronic Funds Transfer-- Central Contractor Registration (31 U.S.C. 3332).

    XX (25) 52.232-34, Payment by Electronic Funds Transfer-- Other than Central Contractor Registration (31 U.S.C. 3332).

    \_   (26) 52.232-36, Payment by Third Party (31 U.S.C. 3332).

    \_   (27) 52.239-1, Privacy or Security Safeguards (5 U.S.C. 552a).

    \_   (28) (i)  52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (46 U.S.C. 1241).

    \_   (ii) Alternate I of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, which the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or executive orders applicable to acquisitions of commercial items or components:

    \_   (1) 52.222-41, Service Contract Act of 1965, As Amended (41 U.S.C. 351, et seq.).

    \_   (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

    \_   (3) 52.222-43, Fair Labor Standards Act and Service Contract Act--Price Adjustment (Multiple Year and Option Contracts) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

    \_   (4) 52.222-44, Fair Labor Standards Act and Service Contract Act--Price Adjustment (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

    \_   (5) 52.222-47, SCA Minimum Wages and Fringe Benefits Applicable to Successor Contract Pursuant to Predecessor Contractor Collective Bargaining Agreement (CBA) (41 U.S.C. 351, et seq.).

(d) Comptroller General Examination of Record. The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records--Negotiation.

    (1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

    (2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final

 

termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c) or (d) of this clause, the Contractor is not required to include any FAR clause, other than those listed below (and as may be required by an addenda to this paragraph to establish the reasonableness of prices under Part 15), in a subcontract for commercial items or commercial components--

(1) 52.222-26, Equal Opportunity (E.O. 11246);

(2) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (38 U.S.C. 4212);

(3) 52.222-36, Affirmative Action for Workers with Disabilities (29 U.S.C. 793);

(4) 52.247-64, Preference for Privately-Owned U.S.-Flag Commercial Vessels (46 U.S.C. 1241) (flow down not required for subcontracts awarded beginning May 1, 1996); and

(5) 52.222-41, Service Contract Act of 1965, As Amended (41 U.S.C. 351, et seq.).

[End of Clause]


**A.5  52.216-18 ORDERING (OCT 1995)**

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from from the first day of the effective contract period through the last day of the effective contract period.

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

(c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

[End of Clause]


**A.6  52.216-19 ORDER LIMITATIONS (OCT 1995)**

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than $100.00, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

(b) Maximum order. The Contractor is not obligated to honor--

 

    (1) Any order for a single item in excess of $100,000.00;

    (2) Any order for a combination of items in excess of $250,000.00; or

    (3) A series of orders from the same ordering office within 30 days that together call for quantities exceeding the limitation in subparagraph (b)(1) or (2) of this section.

(c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.

(d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within 15 days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.

[End of Clause]

## A.7  52.216-21 REQUIREMENTS (OCT 1995)

(a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. Subject to any limitations in the Order Limitations clause or elsewhere in this contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

(d) The Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract.

(e) If the Government urgently requires delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if the Contractor will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source.



(f) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after after the expiration of the applicable contract period..

[End of Clause]

## A.8  52.217-8 OPTION TO EXTEND SERVICES (NOV 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within 60 days.

[End of Clause]

## A.9  CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR) (JAR 2852.201-70) (JAN 1985)

(a) John Richardson of Correctional Services Branch, 541, 320 First St, N.W., Washington, D. C., 202-514-5855, is hereby designated to act as Contracting Officer's Technical Representative (COTR) under this contract.

(b) The COTR is responsible, as applicable, for: receiving all deliverables, inspecting and accepting the supplies or services provided hereunder in accordance with the terms and conditions of this contract; providing direction to the contractor which clarifies the contract effort, fills in details or otherwise serves to accomplish the contractual Scope of Work; evaluating performance; and certifying all invoices/vouchers for acceptance of the supplies or services furnished for payment.

(c) The COTR does not have the authority to alter the contractor's obligations under the contract, and/or modify any of the expressed terms, conditions, specifications, or cost of the agreement. If as a result of technical discussions it is desirable to alter/change contractual obligations or the Scope of Work, the Contracting Officer shall issue such changes.

[End of Clause]

## A.10 52.222-37 EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS, VETERANS OF THE VIETNAM ERA, AND OTHER ELIGIBLE VETERANS (DEC 2001)

(a) Unless the Contractor is a State or local government agency, the Contractor shall report at least annually, as required by the Secretary of Labor, on—

    (1) The number of special disabled veterans, the number of veterans of the Vietnam era, and other eligible veterans in the workforce of the Contractor by job category and hiring location; and

 

    (2) The total number of new employees hired during the period covered by the report, and of the total, the number of special disabled veterans, the number of veterans of the Vietnam era, and the number of other eligible veterans; and

    (3) The maximum number and the minimum number of employees of the Contractor during the period covered by the report.

(b) The Contractor shall report the above items by completing the Form VETS-100, entitled "Federal Contractor Veterans' Employment Report (VETS-100 Report)."

(c) The Contractor shall submit VETS-100 Reports no later than September 30 of each year beginning September 30, 1988.

(d) The employment activity report required by paragraph (a)(2) of this clause shall reflect total hires during the most recent 12-month period as of the ending date selected for the employment profile report required by paragraph (a)(1) of this clause. Contractors may select an ending date--

    (1) As of the end of any pay period between July 1 and August 31 of the year the report is due; or

    (2) As of December 31, if the Contractor has prior written approval from the Equal Employment Opportunity Commission to do so for purposes of submitting the Employer Information Report EEO-1 (Standard Form 100).

(e) The Contractor shall base the count of veterans reported according to paragraph (a) of this clause on voluntary disclosure. Each Contractor subject to the reporting requirements at 38 U.S.C. 4212 shall invite all special disabled veterans, veterans of the Vietnam era, and other eligible veterans who wish to benefit under the affirmative action program at 38 U.S.C. 4212 to identify themselves to the Contractor. The invitation shall state that--

    (1) The information is voluntarily provided;

    (2) The information will be kept confidential;

    (3) Disclosure or refusal to provide the information will not subject the applicant or employee to any adverse treatment; and

    (4) The information will be used only in accordance with the regulations promulgated under 38 U.S.C. 4212.

(f) The Contractor shall insert the terms of this clause in all subcontracts or purchase orders of $25,000 or more unless exempted by rules, regulations, or orders of the Secretary of Labor.

[End of Clause]


A.11 52.219-14 LIMITATIONS ON SUBCONTRACTING (DEC 1996)

(a) This clause does not apply to the unrestricted portion of a partial set-aside.

(b) By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for--



(1) Services (except construction). At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern.

(2) Supplies (other than procurement from a nonmanufacturer of such supplies). The concern shall perform work for at least 50 percent of the cost of manufacturing the supplies, not including the cost of materials.

(3) General construction. The concern will perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees.

(4) Construction by special trade contractors. The concern will perform at least 25 percent of the cost of the contract, not including the cost of materials, with its own employees.

[End of Clause]


## A.12 52.219-8 UTILIZATION OF SMALL BUSINESS CONCERNS (OCT 2000)

(a) It is the policy of the United States that small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns shall have the maximum practicable opportunity to participate in performing contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems. It is further the policy of the United States that its prime contractors establish procedures to ensure the timely payment of amounts due pursuant to the terms of their subcontracts with small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women- owned small business concerns.

(b) The Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest · extent consistent with efficient contract performance. The Contractor further agrees to cooperate in any studies or surveys as may be conducted by the United States Small Business Administration or the awarding agency of the United States as may be necessary to determine the extent of the Contractor's compliance with this clause.

(c) Definitions. As used in this contract–

"HUBZone small business concern" means a small business concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration.

"Service-disabled veteran-owned small business concern"--

(1) Means a small business concern–

(i) Not less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and

(ii) The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran.



(2) Service-disabled veteran means a veteran, as defined in 38 U.S.C. 101(2), with a disability that is service-connected, as defined in 38 U.S.C. 101(16).

"Small business concern" means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto.

"Small disadvantaged business concern" means a small business concern that represents, as part of its offer that—

(1) It has received certification as a small disadvantaged business concern consistent with 13 CFR part 124, subpart B;

(2) No material change in disadvantaged ownership and control has occurred since its certification;

(3) Where the concern is owned by one or more individuals, the net worth of each individual upon whom the certification is based does not exceed $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); and

(4) It is identified, on the date of its representation, as a certified small disadvantaged business in the database maintained by the Small Business Administration (PRO-Net).

"Veteran-owned small business concern" means a small business concern--

(1) Not less than 51 percent of which is owned by one or more veterans (as defined at 38 U.S.C. 101(2)) or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and

(2) The management and daily business operations of which are controlled by one or more veterans.

"Women-owned    small business concern" means a small business concern--

(1) That is at least 51 percent owned by one or more women, or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(2) Whose management and daily business operations are controlled by one or more women.

(d) Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as a small business concern, a veteran-owned small business concern, a service-disabled veteran-owned small business concern, a HUBZone small business concern, a small disadvantaged business concern, or a women-owned small business concern.

[End of Clause]


A.13 52.219-6  NOTICE OF TOTAL SMALL BUSINESS SET-ASIDE (JUL 1996)

(a) Definition.

"Small business concern," as used in this clause, means a concern, including its affiliates, that is



independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

(b) <u>General</u>. (1) Offers are solicited only from small business concerns. Offers received from concerns that are not small business concerns shall be considered nonresponsive and will be rejected.

(2) Any award resulting from this solicitation will be made to a small business concern.

(c) <u>Agreement</u>. A small business concern submitting an offer in its own name agrees to furnish, in performing the contract, only end items manufactured or produced by small business concerns in the United States. The term "United States" includes its territories and possessions, the Commonwealth of Puerto Rico, the Trust Territory of the Pacific Islands, and the District of Columbia. If this procurement is processed under simplified acquisition procedures and the total amount of this contract does not exceed $25,000, a small business concern may furnish the product of any domestic firm. This paragraph does not apply in connection with construction or service contracts.

[End of Clause]


A.14 52.217-9  OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000)

(a) The Government may extend the term of this contract by written notice to the Contractor within the first day; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

[End of Clause]


A.15 52.232-19  AVAILABILITY OF FUNDS FOR THE NEXT FISCAL YEAR (APR 1984)

Funds are not presently available for performance under this contract beyond FY03. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond FY03, until funds are made available to the Contracting Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

[End of Clause]



SECTION: A

**A.16 52.224-1  PRIVACY ACT NOTIFICATION (APR 1984)**

The Contractor will be required to design, develop, or operate a system of records on individuals, to accomplish an agency function subject to the Privacy Act of 1974, Public Law 93-579, December 31, 1974 (5 U.S.C. 552a) and applicable agency regulations.  Violation of the Act may involve the imposition of criminal penalties.

[End of Clause]

**A.17 52.224-2  PRIVACY ACT (APR 1984)**

(a) The Contractor agrees to--

    (1) Comply with the Privacy Act of 1974 (the Act) and the agency rules and regulations issued under the Act in the design, development, or operation of any system of records on individuals to accomplish an agency function when the contract specifically identifies--

        (i)  The systems of records; and

        (ii)  The design, development, or operation work that the contractor is to perform;

    (2) Include the Privacy Act notification contained in this contract in every solicitation and resulting subcontract and in every subcontract awarded without a solicitation, when the work statement in the proposed subcontract requires the redesign, development, or operation of a system of records on individuals that is subject to the Act; and

    (3) Include this clause, including this subparagraph (3), in all subcontracts awarded under this contract which requires the design, development, or operation of such a system of records.

(b) In the event of violations of the Act, a civil action may be brought against the agency involved when the violation concerns the design, development, or operation of a system of records on individuals to accomplish an agency function, and criminal penalties may be imposed upon the officers or employees of the agency when the violation concerns the operation of a system of records on individuals to accomplish an agency function.  For purposes of the Act, when the contract is for the operation of a system of records on individuals to accomplish an agency function, the Contractor and any employee of the Contractor is considered to be an employee of the agency.

(c) (1) "Operation of a system of records," as used in this clause, means performance of any of the activities associated with maintaining the system of records, including the collection, use, and dissemination of records.

    (2) "Record," as used in this clause, means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and that contains the person's name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a fingerprint or voiceprint or a photograph.



(3) "System of records on individuals," as used in this clause, means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

[End of Clause]

### A.18 52.222-49  SERVICE CONTRACT ACT - PLACE OF PERFORMANCE UNKNOWN (MAY 1989)

(a) This contract is subject to the Service Contract Act, and the place of performance was unknown when the solicitation was issued.  In addition to places or areas identified in wage determinations, if any, attached to the solicitation, wage determinations have also been requested for the following:

nationwide

_____
_____
_____
_____

The Contracting Officer will request wage determinations for additional places or areas of performance if asked to do so in writing by Feb 20, 2003, 2:00 PM eastern standard time.

(b) Offerors who intend to perform in a place or area of performance for which a wage determination has not been attached or requested may nevertheless submit bids or proposals.  However, a wage determination shall be requested and incorporated in the resultant contract retroactive to the date of contract award, and there shall be no adjustment in the contract price.

[End of Clause]



| REGISTER OF WAGE DETERMINATIONS UNDER<br>THE SERVICE CONTRACT ACT<br>By direction of the Secretary of Labor | U.S. DEPARTMENT OF LABOR<br>EMPLOYMENT STANDARDS ADMINISTRATION<br>WAGE AND HOUR DIVISION<br>WASHINGTON, D.C. 20210 |
|---|---|
| William W.Gross        Division of Wage<br>Director                Determinations | Wage Determination No.: 1994-2043<br>Revision No.: 21<br>Date of Last Revision: 06/17/2003 |

State: California

Area: California County of Kern

_National toxic_

\*\*Fringe Benefits Required Follow the Occupational Listing\*\*

| OCCUPATION CODE - TITLE | MINIMUM WAGE RATE |
|---|---|
| **01000 - Administrative Support and Clerical Occupations** | |
| 01011 - Accounting Clerk I | 11 .32 |
| 01012 - Accounting Clerk II | 12 .35 |
| 01013 - Accounting Clerk III | 13 .86 |
| 01014 - Accounting Clerk IV | 17 .62 |
| 01030 - Court Reporter | 17 .04 |
| 01050 - Dispatcher, Motor Vehicle | 14 .52 |
| 01060 - Document Preparation Clerk | 13 .14 |
| 01070 - Messenger (Courier) | 10 .04 |
| 01090 - Duplicating Machine Operator | 13 .14 |
| 01110 - Film/Tape Librarian | 11 .50 |
| 01115 - General Clerk I | 8 .99 |
| 01116 - General Clerk II | 10 .11 |
| 01117 - General Clerk III | 14 .75 |
| 01118 - General Clerk IV | 16 .57 |
| 01120 - Housing Referral Assistant | 15 .93 |
| 01131 - Key Entry Operator I | 11 .13 |
| 01132 - Key Entry Operator II | 13 .63 |
| 01191 - Order Clerk I | 11 .78 |
| 01192 - Order Clerk II | 12 .28 |
| 01261 - Personnel Assistant (Employment) I | 10 .84 |
| 01262 - Personnel Assistant (Employment) II | 12 .17 |
| 01263 - Personnel Assistant (Employment) III | 15 .04 |
| 01264 - Personnel Assistant (Employment) IV | 15 .55 |
| 01270 - Production Control Clerk | 15 .16 |
| 01290 - Rental Clerk | 12 .27 |

| | |
|---|---|
| 01300 - Scheduler, Maintenance | 12 .46 |
| 01311 - Secretary I | 12 .46 |
| 01312 - Secretary II | 15 .28 |
| 01313 - Secretary III | 15 .93 |
| 01314 - Secretary IV | 19 .60 |
| 01315 - Secretary V | 21 .76 |
| 01320 - Service Order Dispatcher | 14 .64 |
| 01341 - Stenographer I | 11 .91 |
| 01342 - Stenographer II | 13 .80 |
| 01400 - Supply Technician | 19 .60 |
| 01420 - Survey Worker (Interviewer) | 14 .23 |
| 01460 - Switchboard Operator-Receptionist | 9 .74 |
| 01510 - Test Examiner | 15 .28 |
| 01520 - Test Proctor | 15 .28 |
| 01531 - Travel Clerk I | 9 .47 |
| 01532 - Travel Clerk II | 9 .97 |
| 01533 - Travel Clerk III | 10 .80 |
| 01611 - Word Processor I | 12 .22 |
| 01612 - Word Processor II | 15 .16 |
| 01613 - Word Processor III | 17 .03 |

**03000 – Automatic Data Processing Occupations**

| | |
|---|---|
| 03010 - Computer Data Librarian | 12 .88 |
| 03041 - Computer Operator I | 12 .80 |
| 03042 - Computer Operator II | 14 .81 |
| 03043 - Computer Operator III | 17 .87 |
| 03044 - Computer Operator IV | 20 .00 |
| 03045 - Computer Operator V | 22 .16 |
| 03071 - Computer Programmer I (1) | 15 .63 |
| 03072 - Computer Programmer II (1) | 18 .99 |
| 03073 - Computer Programmer III (1) | 21 .74 |
| 03074 - Computer Programmer IV (1) | 26 .28 |
| 03101 - Computer Systems Analyst I (1) | 16 .36 |
| 03102 - Computer Systems Analyst II (1) | 23 .69 |
| 03103 - Computer Systems Analyst III (1) | 25 .85 |
| 03160 - Peripheral Equipment Operator | 14 .67 |

**05000 – Automotive Service Occupations**

| | |
|---|---|
| 05005 - Automotive Body Repairer, Fiberglass | 17 .23 |
| 05010 - Automotive Glass Installer | 15 .90 |
| 05040 - Automotive Worker | 15 .90 |
| 05070 - Electrician, Automotive | 16 .55 |
| 05100 - Mobile Equipment Servicer | 14 .36 |

Wage Determination: 1994-2043_21

| | |
|---|---|
| 05130 - Motor Equipment Metal Mechanic | 17.23 |
| 05160 - Motor Equipment Metal Worker | 15.90 |
| 05190 - Motor Vehicle Mechanic | 17.23 |
| 05220 - Motor Vehicle Mechanic Helper | 13.30 |
| 05250 - Motor Vehicle Upholstery Worker | 15.42 |
| 05280 - Motor Vehicle Wrecker | 15.90 |
| 05310 - Painter, Automotive | 16.54 |
| 05340 - Radiator Repair Specialist | 15.90 |
| 05370 - Tire Repairer | 13.87 |
| 05400 - Transmission Repair Specialist | 17.23 |

**07000 - Food Preparation and Service Occupations**

| | |
|---|---|
| (not set) - Food Service Worker | 9.15 |
| 07010 - Baker | 12.41 |
| 07041 - Cook I | 11.20 |
| 07042 - Cook II | 12.41 |
| 07070 - Dishwasher | 9.15 |
| 07130 - Meat Cutter | 13.45 |
| 07250 - Waiter/Waitress | 8.77 |

**09000 - Furniture Maintenance and Repair Occupations**

| | |
|---|---|
| 09010 - Electrostatic Spray Painter | 16.54 |
| 09040 - Furniture Handler | 12.87 |
| 09070 - Furniture Refinisher | 16.54 |
| 09100 - Furniture Refinisher Helper | 13.30 |
| 09110 - Furniture Repairer, Minor | 15.21 |
| 09130 - Upholsterer | 16.54 |

**11030 - General Services and Support Occupations**

| | |
|---|---|
| 11030 - Cleaner, Vehicles | 7.96 |
| 11060 - Elevator Operator | 10.42 |
| 11090 - Gardener | 9.74 |
| 11121 - House Keeping Aid I | 7.96 |
| 11122 - House Keeping Aid II | 9.82 |
| 11150 - Janitor | 9.64 |
| 11210 - Laborer, Grounds Maintenance | 9.33 |
| 11240 - Maid or Houseman | 7.14 |
| 11270 - Pest Controller | 12.14 |
| 11300 - Refuse Collector | 11.93 |
| 11330 - Tractor Operator | 11.06 |
| 11360 - Window Cleaner | 10.63 |

**12000 - Health Occupations**

| | |
|---|---|
| 12020 - Dental Assistant | 13 .05 |
| 12040 - Emergency Medical Technician (EMT)/Paramedic/Ambulance Driver | 12 .63 |
| 12071 - Licensed Practical Nurse I | 12 .63 |
| 12072 - Licensed Practical Nurse II | 14 .19 |
| 12073 - Licensed Practical Nurse III | 15 .88 |
| 12100 - Medical Assistant | 10 .39 |
| 12130 - Medical Laboratory Technician | 12 .59 |
| 12160 - Medical Record Clerk | 10 .89 |
| 12190 - Medical Record Technician | 13 .12 |
| 12221 - Nursing Assistant I | 7 .48 |
| 12222 - Nursing Assistant II | 8 .40 |
| 12223 - Nursing Assistant III | 9 .16 |
| 12224 - Nursing Assistant IV | 10 .30 |
| 12250 - Pharmacy Technician | 13 .37 |
| 12280 - Phlebotomist | 14 .19 |
| 12311 - Registered Nurse I | 17 .51 |
| 12312 - Registered Nurse II | 21 .44 |
| 12313 - Registered Nurse II, Specialist | 21 .44 |
| 12314 - Registered Nurse III | 25 .93 |
| 12315 - Registered Nurse III, Anesthetist | 25 .93 |
| 12316 - Registered Nurse IV | 30 .83 |

**13000 - Information and Arts Occupations**

| | |
|---|---|
| 13002 - Audiovisual Librarian | 20 .01 |
| 13011 - Exhibits Specialist I | 17 .88 |
| 13012 - Exhibits Specialist II | 21 .28 |
| 13013 - Exhibits Specialist III | 26 .31 |
| 13041 - Illustrator I | 15 .55 |
| 13042 - Illustrator II | 18 .55 |
| 13043 - Illustrator III | 22 .87 |
| 13047 - Librarian | 20 .64 |
| 13050 - Library Technician | 12 .33 |
| 13071 - Photographer I | 12 .90 |
| 13072 - Photographer II | 15 .38 |
| 13073 - Photographer III | 18 .66 |
| 13074 - Photographer IV | 22 .83 |
| 13075 - Photographer V | 28 .08 |

**15000 - Laundry, Dry Cleaning, Pressing and Related Occupations**

| | |
|---|---|
| 15010 - Assembler | 7 .87 |
| 15030 - Counter Attendant | 7 .87 |
| 15040 - Dry Cleaner | 8 .31 |

| | |
|---|---|
| 15070 - Finisher, Flatwork, Machine | 7.87 |
| 15090 - Presser, Hand | 7.87 |
| 15100 - Presser, Machine, Drycleaning | 7.87 |
| 15130 - Presser, Machine, Shirts | 7.87 |
| 15160 - Presser, Machine, Wearing Apparel, Laundry | 7.87 |
| 15190 - Sewing Machine Operator | 9.18 |
| 15220 - Tailor | 9.73 |
| 15250 - Washer, Machine | 8.33 |

**19000 - Machine Tool Operation and Repair Occupations**

| | |
|---|---|
| 19010 - Machine-Tool Operator (Toolroom) | 18.03 |
| 19040 - Tool and Die Maker | 24.06 |

**21000 - Material Handling and Packing Occupations**

| | |
|---|---|
| 21010 - Fuel Distribution System Operator | 16.69 |
| 21020 - Material Coordinator | 13.96 |
| 21030 - Material Expediter | 13.96 |
| 21040 - Material Handling Laborer | 10.38 |
| 21050 - Order Filler | 12.17 |
| 21071 - Forklift Operator | 11.77 |
| 21080 - Production Line Worker (Food Processing) | 12.32 |
| 21100 - Shipping/Receiving Clerk | 12.47 |
| 21130 - Shipping Packer | 12.47 |
| 21140 - Store Worker I | 9.38 |
| 21150 - Stock Clerk (Shelf Stocker; Store Worker II) | 11.70 |
| 21210 - Tools and Parts Attendant | 12.30 |
| 21400 - Warehouse Specialist | 12.30 |

**23000 - Mechanics and Maintenance and Repair Occupations**

| | |
|---|---|
| 23010 - Aircraft Mechanic | 20.02 |
| 23040 - Aircraft Mechanic Helper | 15.73 |
| 23050 - Aircraft Quality Control Inspector | 21.22 |
| 23060 - Aircraft Servicer | 18.00 |
| 23070 - Aircraft Worker | 18.80 |
| 23100 - Appliance Mechanic | 16.54 |
| 23120 - Bicycle Repairer | 13.87 |
| 23125 - Cable Splicer | 19.82 |
| 23130 - Carpenter, Maintenance | 17.72 |
| 23140 - Carpet Layer | 15.90 |
| 23160 - Electrician, Maintenance | 20.15 |
| 23181 - Electronics Technician, Maintenance I | 17.97 |
| 23182 - Electronics Technician, Maintenance II | 19.88 |
| 23183 - Electronics Technician, Maintenance III | 21.45 |

| | |
|---|---|
| 23260 - Fabric Worker | 16 .01 |
| 23290 - Fire Alarm System Mechanic | 19 .04 |
| 23310 - Fire Extinguisher Repairer | 15 .00 |
| 23340 - Fuel Distribution System Mechanic | 19 .81 |
| 23370 - General Maintenance Worker | 17 .02 |
| 23400 - Heating, Refrigeration and Air Conditioning Mechanic | 19 .04 |
| 23430 - Heavy Equipment Mechanic | 18 .95 |
| 23440 - Heavy Equipment Operator | 22 .11 |
| 23460 - Instrument Mechanic | 19 .29 |
| 23470 - Laborer | 11 .28 |
| 23500 - Locksmith | 16 .54 |
| 23530 - Machinery Maintenance Mechanic | 20 .33 |
| 23550 - Machinist, Maintenance | 18 .42 |
| 23580 - Maintenance Trades Helper | 13 .30 |
| 23640 - Millwright | 18 .70 |
| 23700 - Office Appliance Repairer | 18 .03 |
| 23740 - Painter, Aircraft | 16 .54 |
| 23760 - Painter, Maintenance | 16 .54 |
| 23790 - Pipefitter, Maintenance | 17 .23 |
| 23800 - Plumber, Maintenance | 16 .54 |
| 23820 - Pneudraulic Systems Mechanic | 19 .04 |
| 23850 - Rigger | 22 .39 |
| 23870 - Scale Mechanic | 17 .02 |
| 23890 - Sheet-Metal Worker, Maintenance | 17 .23 |
| 23910 - Small Engine Mechanic | 15 .90 |
| 23930 - Telecommunication Mechanic I | 21 .77 |
| 23931 - Telecommunication Mechanic II | 23 .71 |
| 23950 - Telephone Lineman | 21 .77 |
| 23960 - Welder, Combination, Maintenance | 17 .23 |
| 23965 - Well Driller | 19 .04 |
| 23970 - Woodcraft Worker | 19 .04 |
| 23980 - Woodworker | 15 .44 |

**24000 - Personal Needs Occupations**

| | |
|---|---|
| 24570 - Child Care Attendant | 8 .76 |
| 24580 - Child Care Center Clerk | 13 .61 |
| 24600 - Chore Aid | 8 .04 |
| 24630 - Homemaker | 14 .56 |

**25000 - Plant and System Operation Occupations**

| | |
|---|---|
| 25010 - Boiler Tender | 19 .81 |
| 25040 - Sewage Plant Operator | 20 .07 |
| 25070 - Stationary Engineer | 23 .75 |

| | |
|---|---|
| 25190 - Ventilation Equipment Tender | 13 .99 |
| 25210 - Water Treatment Plant Operator | 20 .07 |

**27000 - Protective Service Occupations**

| | |
|---|---|
| (not set) - Police Officer | 25 .52 |
| 27004 - Alarm Monitor | 12 .80 |
| 27006 - Corrections Officer | 22 .51 |
| 27010 - Court Security Officer | 24 .02 |
| 27040 - Detention Officer | 24 .02 |
| 27070 - Firefighter | 24 .02 |
| 27101 - Guard I | 9 .80 |
| 27102 - Guard II | 10 .70 |

**28000 - Stevedoring/Longshoremen Occupations**

| | |
|---|---|
| 28010 - Blocker and Bracer | 16 .62 |
| 28020 - Hatch Tender | 16 .62 |
| 28030 - Line Handler | 16 .62 |
| 28040 - Stevedore I | 14 .08 |
| 28050 - Stevedore II | 17 .61 |

**29000 - Technical Occupations**

| | |
|---|---|
| 21150 - Graphic Artist | 13 .19 |
| 29010 - Air Traffic Control Specialist, Center (2) | 28 .21 |
| 29011 - Air Traffic Control Specialist, Station (2) | 19 .46 |
| 29012 - Air Traffic Control Specialist, Terminal (2) | 21 .43 |
| 29023 - Archeological Technician I | 14 .85 |
| 29024 - Archeological Technician II | 16 .61 |
| 29025 - Archeological Technician III | 20 .56 |
| 29030 - Cartographic Technician | 26 .30 |
| 29035 - Computer Based Training (CBT) Specialist/ Instructor | 16 .36 |
| 29040 - Civil Engineering Technician | 21 .90 |
| 29061 - Drafter I | 14 .51 |
| 29062 - Drafter II | 17 .30 |
| 29063 - Drafter III | 24 .04 |
| 29064 - Drafter IV | 24 .84 |
| 29081 - Engineering Technician I | 11 .33 |
| 29082 - Engineering Technician II | 13 .52 |
| 29083 - Engineering Technician III | 18 .79 |
| 29084 - Engineering Technician IV | 19 .89 |
| 29085 - Engineering Technician V | 28 .14 |
| 29086 - Engineering Technician VI | 29 .43 |
| 29090 - Environmental Technician | 16 .63 |
| 29100 - Flight Simulator/Instructor (Pilot) | 23 .69 |

| | |
|---|---|
| 29160 - Instructor | 16 .36 |
| 29210 - Laboratory Technician | 15 .59 |
| 29240 - Mathematical Technician | 19 .88 |
| 29361 - Paralegal/Legal Assistant I | 15 .00 |
| 29362 - Paralegal/Legal Assistant II | 19 .07 |
| 29363 - Paralegal/Legal Assistant III | 23 .33 |
| 29364 - Paralegal/Legal Assistant IV | 28 .21 |
| 29390 - Photooptics Technician | 21 .82 |
| 29480 - Technical Writer | 25 .67 |
| 29491 - Unexploded Ordnance (UXO) Technician I | 17 .93 |
| 29492 - Unexploded Ordnance (UXO) Technician II | 21 .70 |
| 29493 - Unexploded Ordnance (UXO) Technician III | 26 .01 |
| 29494 - Unexploded (UXO) Safety Escort | 17 .93 |
| 29495 - Unexploded (UXO) Sweep Personnel | 17 .93 |
| 29620 - Weather Observer, Senior (3) | 17 .22 |
| 29621 - Weather Observer, Combined Upper Air and Surface Programs (3) | 15 .49 |
| 29622 - Weather Observer, Upper Air (3) | 15 .49 |

**31000 - Transportation/ Mobile Equipment Operation Occupations**

| | |
|---|---|
| 31030 - Bus Driver | 13 .77 |
| 31260 - Parking and Lot Attendant | 6 .73 |
| 31290 - Shuttle Bus Driver | 11 .20 |
| 31300 - Taxi Driver | 10 .48 |
| 31361 - Truckdriver, Light Truck | 11 .20 |
| 31362 - Truckdriver, Medium Truck | 14 .81 |
| 31363 - Truckdriver, Heavy Truck | 15 .07 |
| 31364 - Truckdriver, Tractor-Trailer | 15 .07 |

**99000 - Miscellaneous Occupations**

| | |
|---|---|
| 99020 - Animal Caretaker | 9 .15 |
| 99030 - Cashier | 8 .17 |
| 99041 - Carnival Equipment Operator | 13 .24 |
| 99042 - Carnival Equipment Repairer | 14 .27 |
| 99043 - Carnival Worker | 8 .73 |
| 99050 - Desk Clerk | 8 .44 |
| 99095 - Embalmer | 17 .93 |
| 99300 - Lifeguard | 9 .42 |
| 99310 - Mortician | 17 .93 |
| 99350 - Park Attendant (Aide) | 11 .84 |
| 99400 - Photofinishing Worker (Photo Lab Tech., Darkroom Tech) | 9 .42 |
| 99500 - Recreation Specialist | 12 .32 |
| 99510 - Recycling Worker | 15 .58 |

| | |
|---|---|
| 99610 - Sales Clerk | 9 .10 |
| 99620 - School Crossing Guard (Crosswalk Attendant) | 8 .09 |
| 99630 - Sport Official | 9 .42 |
| 99658 - Survey Party Chief (Chief of Party) | 14 .51 |
| 99659 - Surveying Technician (Instr. Person/Surveyor Asst./Instr.) | 13 .19 |
| 99660 - Surveying Aide | 9 .63 |
| 99690 - Swimming Pool Operator | 12 .72 |
| 99720 - Vending Machine Attendant | 10 .95 |
| 99730 - Vending Machine Repairer | 13 .72 |
| 99740 - Vending Machine Repairer Helper | 11 .80 |

ALL OCCUPATIONS LISTED ABOVE RECEIVE THE FOLLOWING BENEFITS:

HEALTH & WELFARE:          (b)(4)

VACATION: 2 weeks paid vacation after 1 year of service with a contractor or successor; 3 weeks after 5 years, and 4 weeks after 15 years. Length of service includes the whole span of continuous service with the present contractor or successor, wherever employed, and with the predecessor contractors in the performance of similar work at the same Federal facility. (Reg. 29 CFR 4.173)

HOLIDAYS: A minimum of ten paid holidays per year: New Year's Day, Martin Luther King Jr.'s Birthday, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, and Christmas Day. (A contractor may substitute for any of the named holidays another day off with pay in accordance with a plan communicated to the employees involved.) (See 29 CFR 4.174)

THE OCCUPATIONS WHICH HAVE PARENTHESES AFTER THEM RECEIVE THE FOLLOWING BENEFITS (as numbered):

1) Does not apply to employees employed in a bona fide executive, administrative, or professional capacity as defined and delineated in 29 CFR 541. (See CFR 4.156)

2) APPLICABLE TO AIR TRAFFIC CONTROLLERS ONLY - NIGHT DIFFERENTIAL: An employee is entitled to pay for all work performed between the hours of 6:00 P.M. and 6:00 A.M. at the rate of basic pay plus a night pay differential amounting to 10 percent of the rate of basic pay.

3) WEATHER OBSERVERS - NIGHT PAY & SUNDAY PAY: If you work at night as part of a regular tour of duty, you will earn a night differential and receive an additional 10% of basic pay for any hours worked between 6pm and 6am. If you are a full-time employed (40 hours a week) and Sunday is part of your regularly scheduled workweek, you are paid at your rate of basic pay plus a Sunday premium of 25% of your basic rate for each hour of Sunday work which is not overtime (i.e. occasional work on Sunday outside the normal tour of duty is considered overtime work).

HAZARDOUS PAY DIFFERENTIAL: An 8 percent differential is applicable to employees employed in a position that represents a high degree of hazard when working with or in close proximity to ordinance, explosives, and incendiary materials. This includes work such as screening, blending, dying, mixing, and pressing of sensitive ordance, explosives, and pyrotechnic compositions such as lead azide, black powder and photoflash powder. All dry-house activities involving propellants or explosives. Demilitarization, modification, renovation, demolition, and maintenance operations on sensitive ordnance, explosives and incendiary materials. All operations involving regrading and cleaning of artillery ranges.

A 4 percent differential is applicable to employees employed in a position that represents a low degree of hazard when working with, or in close proximity to ordance, (or employees possibly adjacent to) explosives and incendiary materials which involves potential injury such as laceration of hands, face, or arms of the employee engaged in the operation,

 
irritation of the skin, minor burns and the like; minimal damage to immediate or adjacent work area or equipment being used. All operations involving, unloading, storage, and hauling of ordance, explosive, and incendiary ordnance material other than small arms ammunition. These differentials are only applicable to work that has been specifically designated by the agency for ordance, explosives, and incendiary material differential pay.


** UNIFORM ALLOWANCE **

If employees are required to wear uniforms in the performance of this contract (either by the terms of the Government contract, by the employer, by the state or local law, etc.), the cost of furnishing such uniforms and maintaining (by laundering or dry cleaning) such uniforms is an expense that may not be borne by an employee where such cost reduces the hourly rate below that required by the wage determination. The Department of Labor will accept payment in accordance with the following standards as compliance:

The contractor or subcontractor is required to furnish all employees with an adequate number of uniforms without cost or to reimburse employees for the actual cost of the uniforms. In addition, where uniform cleaning and maintenance is made the responsibility of the employee, all contractors and subcontractors subject to this wage determination shall (in the absence of a bona fide collective bargaining agreement providing for a different amount, or the furnishing of contrary affirmative proof as to the actual cost), reimburse all employees for such cleaning and maintenance at a rate of $3.35 per week (or $.67 cents per day). However, in those instances where the uniforms furnished are made of "wash and wear" materials, may be routinely washed and dried with other personal garments, and do not require any special treatment such as dry cleaning, daily washing, or commercial laundering in order to meet the cleanliness or appearance standards set by the terms of the Government contract, by the contractor, by law, or by the nature of the work, there is no requirement that employees be reimbursed for uniform maintenance costs.


** NOTES APPLYING TO THIS WAGE DETERMINATION **

Source of Occupational Title and Descriptions:

The duties of employees under job titles listed are those described in the "Service Contract Act Directory of Occupations," Fourth Edition, January 1993, as amended by the Third Supplement, dated March 1997, unless otherwise indicated. This publication may be obtained from the Superintendent of Documents, at 202-783-3238, or by writing to the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402. Copies of specific job descriptions may also be obtained from the appropriate contracting officer.

REQUEST FOR AUTHORIZATION OF ADDITIONAL CLASSIFICATION AND WAGE RATE {Standard Form 1444 (SF 1444)}

Conformance Process:

The contracting officer shall require that any class of service employee which is not listed herein and which is to be employed under the contract (i.e., the work to be performed is not performed by any classification listed in the wage determination), be classified by the contractor so as to provide a reasonable relationship (i.e., appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination. Such conformed classes of employees shall be paid the monetary wages and furnished the fringe benefits as are determined. Such conforming process shall be initiated by the contractor prior to the performance of contract work by such unlisted class(es) of employees. The conformed classification, wage rate, and/or fringe benefits shall be retroactive to the commencement date of the contract. {See Section 4.6 (C)(vi)} When multiple wage determinations are included in a contract, a separate SF 1444 should be prepared for each wage determination to which a class(es) is to be conformed.

The process for preparing a conformance request is as follows:

1) When preparing the bid, the contractor identifies the need for a conformed occupation(s) and computes a proposed rate (s).

2) After contract award, the contractor prepares a written report listing in order proposed classification title(s), a Federal grade equivalency (FGE) for each proposed classification(s), job description(s), and rationale for proposed wage rate(s), including information regarding the agreement or disagreement of the authorized representative of the employees



involved, or where there is no authorized representative, the employees themselves. This report should be submitted to the contracting officer no later than 30 days after such unlisted class(es) of employees performs any contract work.

3) The contracting officer reviews the proposed action and promptly submits a report of the action, together with the agency's recommendations and pertinent information including the position of the contractor and the employees, to the Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, for review. (See section 4.6 (b)(2) of Regulations 29 CFR Part 4).

4) Within 30 days of receipt, the Wage and Hour Division approves, modifies, or disapproves the action via transmittal to the agency contracting officer, or notifies the contracting officer that additional time will be required to process the request.

5) The contracting officer transmits the Wage and Hour decision to the contractor.

6) The contractor informs the affected employees.

Information required by the Regulations must be submitted on SF 1444 or bond paper.

When preparing a conformance request, the "Service Contract Act Directory of Occupations" (the Directory) should be used to compare job definitions to insure that duties requested are not performed by a classification already listed in the wage determination. Remember, it is not the job title, but the required tasks that determine whether a class is included in an established wage determination. Conformances may not be used to artificially split, combine, or subdivide classifications listed in the wage determination.

17366005.1

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1. CONTRACT ID CODE | | PAGE OF | PAGES |
|---|---|---|---|---|
| | | | 1 | 1 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFF. DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 0010 | 08/20/2003 | NCP-3031 | 72M |

| 6. ISSUED BY | CODE | | 7. ADMINISTERED BY (If other than Item 6) | CODE | |
|---|---|---|---|---|---|
| Federal Bureau of Prisons | | | Acquisions Branch | | |
| National Contracts and Policy | | | National Contracts and Policy | | |
| 320  First Street, N.W., Room 5006 | | | 320  First Street, N.W., Room 5006 | | |
| Washington | DC  20534 | | Washington | DC  20534 | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and Zip Code) | | | 9A. AMENDMENT OF SOLICITATION NO. | |
|---|---|---|---|---|
| National Toxicology Labs, Inc.<br>1100 California Ave.<br>Bakersfield, CA  93304 | | X | RFP-NCP-010-02 | |
| | | | 9B. DATED (SEE ITEM 11) | 02/10/2003 |
| | | | 10A. MODIFICATION OF CONTRACT/ORDER NO. | |
| | | | / | |
| CODE | FACILITY CODE | | 10B. DATED (SEE ITEM 13) | |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [ ] is extended, [ ] is not extended.  Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____1_____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers.  FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER.  If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS,**
**IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| | |
|---|---|
| A. | THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| B. | THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES  (Such as changes in paying office, appropriation date, etc. )  SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). |
| C. | THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| D. | OTHER (Specify type of modification and authority) |

E. IMPORTANT:  Contractor [ ] is not [ ] is required to sign this document and return _____ copies to issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

This amendment is to delete line item number 0031. Individual Special
Test-Steroid from the revised Schedule of Supplies and Services which was issued
through Amendment 0009 on August 8, 2003.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|---|
| Thomas  Sheath  ,  President | | | Joseph J. Rofrano | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | | 16C. DATE SIGNED |
| (Signature of person authorized to sign) | 8/21/03 | BY<br>(Signature of Contracting Officer) | | |

| | |
|---|---|
| NSN 7540-01-152-8070 | STANDARD FORM 30 (REV. 10-83) |
| PREVIOUS EDITION UNUSABLE | Prescribed by GSA FAR  (48 CFR)  53.243 |

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1. CONTRACT ID CODE | | PAGE OF | PAGES |
|---|---|---|---|---|
| | | | 1 | 7 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFF. DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 0009 | 08/06/2003 | NCP-3031 | 72M |

| 6. ISSUED BY                     CODE | 7. ADMINISTERED BY (If other than Item 6)          CODE | |
|---|---|---|
| Federal Bureau of Prisons<br>National Contracts and Policy<br>320 First Street, N.W., Room 5006<br><br>Washington                DC  20534 | Acquisitions Branch<br>National Contracts and Policy<br>320 First Street, N.W., Room 5006<br><br>Washington                      DC  20534 | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and Zip Code) | | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| National Toxicology Labs., Inc.<br>1100 California Ave.<br>Kern County<br>Bakersfield, CA  93304 | X | RFP-NCP-010-02 |
| | | 9B. DATED (SEE ITEM 11)          02/10/2003 |
| | | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
| | | / |
| CODE | FACILITY CODE | 10B. DATED (SEE ITEM 13) |

| 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS |
|---|

[X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [X] is extended, [ ] is not extended. Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning ___1___ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

| 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS,<br>IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14. | |
|---|---|
| A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (Such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). | |
| C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | |
| D. OTHER (Specify type of modification and authority) | |
| E. IMPORTANT: Contractor [ ] is not [ ] is required to sign this document and return ____ copies to issuing office. | |

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

This amendment is to correct references to certain areas of the Statement of Work, add FAR clauses that are incorporated by reference, provide and correct the fill in information for other FAR clauses and change the date for the Competitive Bidding Event (CBE). See pages 2-6 for details.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|
| Thomas Sneath          President | Joseph J. Rofrano | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA |
| _(signature)_ | 8/18/03 | BY |
| (Signature of person authorized to sign) | | (Signature of Contracting Officer) |
| | | 16C. DATE SIGNED |

NSN 7540-01-152-8070<br>PREVIOUS EDITION UNUSABLE

STANDARD FORM 30 (REV. 10-83)<br>Prescribed by GSA FAR (48 CFR) 53.243

1. **Amend Block 15 (Deliver To) on the SF 1449 as follows:**

Federal Bureau of Prisons, Various Institutions, Room 5006, Washington, D.C. 20534. TO: Federal Bureau of Prisons, Various Locations.

2. **Amend to add Attachment 1-Business Questionnaire refered to in Section A of the solicitation.**

All Business Questionnaires need to be completed and returned by August 21, 2003.

3. **Section IV, Billing,:**

a. In the SOW, Section IV Billing, the first sentence of the second paragraph is changed to read "Billing for specimens tested will be directed to the specific billing address provided for each collection site". The "and supplies used" was removed due to the fact that charges for supplies are to be included in the specimen charges as stated in Section II, Specimens, of the SOW.

4. **Amend the Schedule of Supplies and Services as follows:**

Revised Expert Witness Line Nos. 0006, 0014 and 0021 to changed the quantity to 20 hours and the unit to hours. Added a total cost line for the Base Year and each of the Option Year periods. See attachment 1 for the updated Schedule of Supplies and Services.

5. **Amend Section A.20 52.212-2, Evaluation-Commercial Items (JAN 1999):**

Factor 1, Past Performance is amended to include sub-factor 5 "Cost Control" which was a sub-category of the Past Performance Questionnaire included in the solicitation. All sub-factors of the past performance are equal in importance.

6. **The following clauses are incorporated by reference:**

FAR 52.203-6, Restrictions on Subcontractor Sales to the Government with Alternate I (July 1995)
FAR 52.222-41, Service Contract Act of 1965 as Amended (May 1989)
FAR 52.222-42, Statement of Equivalent Rates for Federal Hires (May 1989)
FAR 52.222-43, Fair Labor Standards Act and Service Contract Act-Price Adjustment Multiple Year and Option Contracts (May 1989)
FAR 52.225-1, Buy American Act-Supplies (June 2003)

Page 2 of 6

FAR 52.232-33, Payment by Electronic Funds Transfer-Central Contractor Registration (May 1999)

7.    **The following FAR clauses are deleted in there entirety:**

FAR 52.232-34, Payment by Electronic Funds Transfer-Other then Central Contractor Registration (May 1999)
FAR 52.232-38, Submission of Electronic Funds Transfer Information with Offer (May 1999)

8.    **The fill-in information for the following FAR clauses are amended to read as follows:**

**52.217-8 Option to Extend Services, Option to Extend Services (Nov 1999)**

**-Last sentence amended to read:** The Contracting Officer may exercise the option by written notice to the Contractor by the last day of the current performance period.

**52.217-9 Option to Extend the Term of the Contract (Mar 2000)**

The first sentence of FAR 52.217-9(a) is amended to read:

(a) The Government may extend the term of this contract by written notice to the Contractor by the first day of the ensuing option period; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires.

52.217-9(c) is amended to read:
The total duration of this contract, including the exercise of any options under this clause, shall not exceed 3 years.

**52.232-19 Availability of Funds for the Next Fiscal Year (Apr 1984)**

The first sentence is amended to read:

Funds are not presently available for performance under this contract beyond September 30.

The third sentence is amended to read:
No legal liability on the part of the Government for any payment may arise for performance under this contract beyond September 30, until funds are made available to the Contracting

Page 3 of 6

Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

9. **Amend to add the following clause in its entirety:**

**JAR 2852.233-70, PROTESTS FILED DIRECTLY WITH THE DEPARTMENT OF JUSTICE  (JAN 1998)**

(a) The following definitions apply in this provision:

(1) "Agency Protest Official" means the official, other than the contracting officer, designated to review and decide procurement protests filed with a contracting activity of the Department of Justice.

(2) "Deciding Official" means the person chosen by the protestor to decide the agency protest; it may be either the Contracting Officer or the Agency Protest Official.

(3) "Interested Party" means an actual or prospective offeror whose direct economic interest would be affected by the award of a contract or by the failure to award a contract.

(b) A protest filed directly with the Department of Justice must:

(1) Indicate that it is a protest to the agency.

(2) Be filed with the Contracting Officer.

(3) State whether the protestor chooses to have the Contracting Officer or the Agency Protest Official decide the protest. If the protestor is silent on this matter, the Contracting Officer will decide the protest.

(4) Indicate whether the protestor prefers to make an oral or written presentation of arguments in support of the protest to the deciding official.

(5) Include the information required by FAR 33.103(d)(2):

(i)   Name, address, facsimile number and telephone number of the protestor.

(ii)  Solicitation or contract number.

(iii) Detailed statement of the legal and factual grounds for the protest, to include a description of resulting prejudice to the protestor.

(iv)  Copies of relevant documents.

(v)   Request for a ruling by the agency.

(vi)  Statement as to the form of relief requested.

Page 4 of 6

(vii) All information establishing that the protestor is an interested party for the purpose of filing a protest.

(viii) All information establishing the timeliness of the protest.

(c) An interested party filing a protest with the Department of Justice has the choice of requesting either that the Contracting Officer or the Agency Protest Official decide the protest.

(d) The decision by the Agency Protest Official is an alternative to a decision by the Contracting Officer. The Agency Protest Official will not consider appeals from the Contracting Officer's decision on an agency protest.

(e) The deciding official must conduct a scheduling conference with the protestor within five (5) days after the protest is filed. The scheduling conference will establish deadlines for oral or written arguments in support of the agency protest and for agency officials to present information in response to the protest issues. The deciding official may hear oral arguments in support of the agency protest at the same time as the scheduling conference, depending on availability of the necessary parties.

(f) Oral conferences may take place either by telephone or in person. Other parties may attend at the discretion of the deciding official.

(g) The protestor has only one opportunity to support or explain the substance of its protest. Department of Justice procedures do not provide for any discovery. The deciding official may request additional information from either the agency or the protestor. The deciding official will resolve the protest through informal presentations or meetings to the maximum extent practicable.

(h) An interested party may represent itself or be represented by legal counsel. The Department of Justice will not reimburse the protester for any legal fees related to the agency protest.

(i) The Department of Justice will stay award or suspend contract performance in accordance with FAR 33.103(f). The stay or suspension, unless over-ridden, remains in effect until the protest is decided, dismissed, or withdrawn.

(j) The deciding official will make a best effort to issue a decision on the protest within twenty (20) days after the filing date. The decision may be oral or written.

(k) The Department of Justice may dismiss or stay proceeding on an agency protest if a protest on the same or similar basis is filed with a protest forum outside the Department of Justice.

Page 5 of 6

10.  **The Competitive Bidding Event (CBE) dates are amended as follows:**

Bidders Selection and Notification          August 21, 2003
Bidders Training by Freemarkets             August 21, 2003
Date of CBE                                 September 5, 2003

Page 6 of 6

**?.##**                                **ATTACHMENT I**

**BUSINESS MANAGEMENT QUESTIONNAIRE**

(a)  Provide the work distribution, by percentage, among commercial contracts and Government contracts (including prime and subcontracts).

Commercial: _____percent        Government: _____percent

(b)  List the last three contracts awarded to your firm which are of a related nature, indicating for each the following:

(1)  (a)  Customer & Address: _____

_____

(Phone)_____

(b)  Contract Number: _____
(c)  Person to Contract: _____
(Phone)_____
(d)  Type of Work: _____
(e)  Amount of Contract: $_____
(f)  Contract Status:    [  ] Active    [  ] Complete

(2)  (a)  Customer & Address: _____

_____

(Phone)_____

(b)  Contract Number: _____
(c)  Person to Contract: _____
(Phone)_____
(d)  Type of Work: _____
(e)  Amount of Contract: $_____
(f)  Contract Status:    [  ] Active    [  ] Complete

(3)  (a)  Customer & Address: _____

_____

(Phone)_____

(b)  Contract Number: _____
(c)  Person to Contract: _____
(Phone)_____

(d)  Type of Work: _____

(e)  Amount of Contract: $_____

(f)  Contract Status:   [  ] Active    [  ] Complete

(4)  Bank Reference:

(a) Name of Bank: _____

(b) Address: _____

_____

(Phone)_____

(c) Person to Contact: _____

(Phone)_____

(5)  Total estimated amount of work under this contract that your firm will complete (excluding subcontractors): _____ percent

(6)  Please provide your DUNS (Data Universal Numbering System) number/

_____

(7)  If applicable, please provide your Parent Company's DUNS number.

_____

SCHEDULE OF SUPPLIES/SERVICES

| ITEM NO. | SCHDEULE OF SUPPLIES/SERVICES | QTY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | Base Year (date of award through 12 months) | | | | |
| 0001 | Primary Test Panel | | EA | | |
| 0002 | Special Test Panel | | EA | | |
| 0003 | Individual Special Test-Steroid | | EA | | |
| 0004 | Individual Special Test-LSD | | EA | | |
| 0005 | Individual Special Test-Fentanyl | | EA | | |
| 0006 | Subject Matter Expert Testimony | | HR | | |
| 0007 | Other Methodology | | EA | | |
| | Total Cost for Base Year | | | | |
| | Option Year One (13 months through 24 months) | | | | |
| 0008 | Primary Test Panel | | EA | | |
| 0009 | Special Test Panel | (b)(4) | EA | | |
| 0010 | Individual Special Test-Steroid | | EA | | |
| 0011 | Individual Special Test-LSD | | EA | | |
| 0012 | Individual Special Test-Fentanyl | | EA | | |
| 0013 | Other Methodology | | EA | | |
| 0014 | Subject Matter Expert Testimony | | HR | | |
| | Total Cost for Option Year One | | | | |
| | Option Year Two (25 months through 36 months) | | | | |
| 0015 | Primary Test Panel | | EA | | |
| 0016 | Special Test Panel | | EA | | |
| 0017 | Individual Special Test-Steroid | | EA | | |

| 0018 | Individual Special Test-LSD | (b)(4) | EA | | |
|------|------------------------------|--------|----|--|--|
| 0019 | Individual Special Test-Fentanyl | | EA | | |
| 0020 | Other Methodology | | EA | | |
| 0021 | Subject Matter Expert Testimony | | HR | | |
| 0031 | Individual Special Test-Steroid | | EA | | |
| | Total Cost for Option Year Two | | | | |

Attachment 1

09/26/2003 FRI 07:39 FAX 661 322 4322 National Toxicology      @002/007
09/26/03  FRI 06:49 FAX 2023077346         NCP                 @002

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1. CONTRACT ID CODE | | PAGE OF PAGES 1  2 |
|---|---|---|---|

| 2. AMENDMENT/MODIFICATION NO. 0008 | 3. EFF. DATE 06/04/2003 | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) 72M |
|---|---|---|---|

| 6. ISSUED BY          CODE | 7. ADMINISTERED BY (If other than item 6)    CODE |
|---|---|
| Federal Bureau of Prisons<br>National Contracts and Policy<br>320 First Street, N.W., Room 5006<br><br>Washington          DC 20534 | Acquisitions Branch<br>National Contracts and Policy<br>320 First Street, N.W., Room 5006<br><br>Washington          DC 20534 |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and Zip Code) | | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| | X | RFP-NCP-010-02 |
| | | 9B. DATED (SEE ITEM 11)    02/21/2003 |
| | | 10A. MODIFICATION OF CONTRACT/ORDER NO. / |
| CODE          FACILITY CODE | | 10B. DATED (SEE ITEM 13) |

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[X] The above numbered solicitation is amended as set forth in item 14. The hour and date specified for receipt of Offers [X] is extended,       is not
extended. Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing items 8 and 15, and returning       1       copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer
submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT
TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF
YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each
telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|
| B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (Such as changes in paying office, appropriation date, etc. ) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). |
| C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor [ ] is not [ ] is required to sign this document and return       copies to issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)
   Solicitation RFP-NCP-010-02 is hereby amended to reflect the following: (1)
   Extend the closing date of the solicitation Inmate Urinalysis Testing; (2)
   Revise period of performance; (3) Revise section A.20, 52.212-2,
   Evaluation-Commercial Items; (4) Revise basic laboratory screening procedures;
   and (5) Revise the Competitive Bidding Event Information (CBE).
   See page 2 for details.

Except as provided herein, all terms and conditions of the document referenced in item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) Joseph J. Roltram |
|---|---|
| 15B. CONTRACTOR/OFFEROR<br><br>(Signature of person authorized to sign) | 15C. DATE SIGNED 9/26/03 | 16B. UNITED STATES OF AMERICA BY<br><br>(Signature of Contracting Officer) | 16C. DATE SIGNED |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA FAR (48 CFR) 53.243

1. The solicitation due date for submission of proposals for Inmate Urinalysis Testing is hereby extended to June 18, 2003, at 2:00 PM.

2. The contract period of performance and test requirement quantities are clarified as follows:

   (a) Base Year (date of award through 12 months) and estimated test requirement quantities remain the same as stated in the original solicitation.
   (b) Option Year One (13 months through 24 months) and estimated test requirement quantities remain the same as stated in the original solicitation.
   (c) Option Year Two (25 months through 36 months) and estimated test requirement quantities remain the same as stated in the original solicitation.
   (d) Option Year Three and test requirements for option year three are removed in their entirety.
   (e) Option Year Four and test requirements for option year four are removed in their entirety.

3. Section A.20, 52.212-2, Evaluation—Commercial Items, paragraph (a), is amended as follows:

   Technical proposals will be evaluated on a Go/No-Go basis for compliance with the requirements and specifications stated in the Statement of Work of the solicitation.

4. Part V, Section C, Basic Laboratory Screening Procedures, is revised as follows:

   The requirement in the first paragraph of paragraph C.1, as added by Amendment 0007, for a SAMHSA-certified laboratory is removed.

5. The solicitation closing, offeror notification and Competitive Bidding Event (CBE) dates are revised as follows:

   | | |
   |---|---|
   | Solicitation Closing: | June 18, 2003, 2:00 pm |
   | Bidders Selections and Notification: | June 25, 2003 |
   | Bidders Training by FreeMarkets: | To be determined by Offeror |
   | Date of CBE: | July 10, 2003, 11:00 am |

   NOTE: Offerors must submit their technical proposal, price proposal and past performance information by the solicitation closing date in order to be considered for participation in the CBE. Offerors whose technical proposals are evaluated as "Go" will be notified accordingly and may then proceed to participate in the CBE.

6. All other terms and conditions remain unchanged.

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | | PAGE OF | PAGES |
|---|---|---|---|---|---|
| | | | | 1 | 3 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFF. DATE | 4. REQUISITION/PURCHASE REQ. NO. | | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|---|
| 0007 | 05/12/2003 | | | 72M |

| 6. ISSUED BY          CODE | | 7. ADMINISTERED BY *(If other than Item 6)*        CODE | |
|---|---|---|---|
| Federal Bureau of Prisons <br> National Contracts and Policy <br> 320 First Street, N.W., Room 5006 <br><br> Washington                    DC  20534 | | Acquisitions Branch <br> National Contracts and Policy <br> 320 First Street, N.W., Room 5006 <br><br> Washington                    DC  20534 | |

| 8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and Zip Code)* | | |
|---|---|---|
| National Toxicology Laboratories, Inc. <br> 1100 California Ave.' <br> Bakersfield, CA  93304 | X | 9A. AMENDMENT OF SOLICITATION NO. <br> RFP-NCP-010-02 |
| | | 9B. DATED *(SEE ITEM 11)*          02/21/2003 |
| | | 10A. MODIFICATION OF CONTRACT/ORDER NO. <br> / |
| CODE                     FACILITY CODE | | 10B. DATED *(SEE ITEM 13)* |

| 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS |
|---|
| [X] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [X] is extended, [ ] is not extended. Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: <br><br> (a) By completing Items 8 and 15, and returning ___1___ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified. |

| 12. ACCOUNTING AND APPROPRIATION DATA *(If required)* |
|---|
| |

| 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14. |
|---|
| A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(Such as changes in paying office, appropriation date, etc. )* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b). |
| C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| D. OTHER *(Specify type of modification end authority)* |
| E. IMPORTANT:  Contractor [ ] is not [ ] is required to sign this document and return ___ copies to issuing office. |

| 14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)* |
|---|
| This amendment 0007 hereby amends solicitation RFP-NCP-010-02 as follows: <br><br> 1. The solicitation closing date is extended to May 21. 2003. <br><br> 2. The contract period of performance is changed to a Base Year plus two one year option periods. <br><br> 3. Section A.20, 52.212-2 Evaluation-Commercial Items (a) is amended as follows: <br>    (a) Factor II is deleted in its entirety. |
| Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect. |

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* | |
|---|---|---|---|
| Thomas Sneath        President | | Joseph J. Rofrano | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| *(Signature of person authorized to sign)* | 5/19/03 | BY _____ <br> *(Signature of Contracting Officer)* | |

NSN 7540-01-152-8070 <br>
PREVIOUS EDITION UNUSABLE

STANDARD FORM 30 (REV. 10-83) <br>
Prescribed by GSA FAR (48 CFR) 53.243

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT - Continuation | | 1. CONTRACT ID CODE | | |
|---|---|---|---|---|
| 2. AMENDMENT/MODIFICATION NO. 0007 | 3. EFF. DATE 05/12/2003 | 4. REQUISITION/PURCHASE REQ. NO. | PAGE OF 2 | PAGES 3 |

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

(b) Technical remains a Go/No-Go basis, as amended in Amendment 0004.

4. The Statement of Work is amended, as follows:

(a) Section I. Onsite Pilot Program Testing is amended to allow the FBOP to conduct pilot programs using onsite drug testing technologies without penalty.

(b) Section IV. Billing amended as follows:
(1) first paragraph, has been reworded but does not change the scope of the paragraph or Section.
(2) Delete the last sentence of paragraph one.
(3) Delete the first sentence of the second paragraph.
(4) In the fourth sentence of the second paragraph replace "Contracting Officer's Technical Representative (COTR)" with "Contracting Officer".

(c) Section V. Specifications of Methodology. A. Sensitivity is amended as follows:
(1) Primary Test Panel, Screen Method is amended to add "or a Certified Comparable Testing Technology".
(2) Primary Test Panel, Confirmation Method is amended to add "or a Certified Comparable Testing Technology".
(3) Change second sentence of paragraph one on page four from "Captain" to "Program Manager".
(4) Special Test Panel, Screen Method is amended to add "or a Certified Comparable Testing Technology".
(5) Special Test Panel, Confirmation Method is amended to add "or a Certified Comparable Testing Technology".

(d) Section V. B. Basic Laboratory Screening Procedures has been moved and renumbered to Section C. and amended as follows:
(1) first paragraph has been deleted and new paragraph added to clarify that the contract laboratory must be certified through the Dept of Health and Human Services and meet standards of Subpart C of the Mandatory Guidelines for Federal Work Place Drug Testing Program (59 FP 29916, 29925) to engage in urine drug testing for the FBOP.
(2) First sentence in paragraph two has been amended to replace "industry standard" with "certified laboratory procedures".

(e) Section C becomes Section D. and Section D becomes Section E.

(f) Section E was moved to Section B and reworded. In the second sentence, "Contracting Officer Technical Representative (COTR)" is amended to read "Program Manager".

(g) Section VI. Reporting of Results. paragraph two sentence two has been deleted.

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT - Continuation | | 1. CONTRACT ID CODE | | |
|---|---|---|---|---|
| 2. AMENDMENT/MODIFICATION NO. 0007 | 3. EFF. DATE 05/12/2003 | 4. REQUISITION/PURCHASE REQ. NO. | PAGE OF 3 | PAGES 3 |

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

    (h) Section VII. Retention of Urine Specimen. paragraph two is amended to replace "Contracting Officer's Technical Representative (COTR)" with "Program Manager".

    (i) Section IX. Delete Confidentiality & Control-Privacy Act.

5. The Competitive Bidding Event (CBE) dates are amended as follows:

| | |
|---|---|
| Solicitation Closing: | May 21. 2003. 2:00PM |
| Bidders Selection and Notification | May 30. 2003 |
| Bidders Training by FreeMarkets | to be determined |
| Date of CBE | June 12. 2003. 11:00AM |

Note: Offerors shall submit their price proposal along with technical and past performance information for evaluation. selection and participation in the CBE.

6. All other terms and conditions remain unchanged.

STANDARD FORM 30 (REV. 10-83)

 

# DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

The contractor is to test inmate urine samples submitted by the Federal Bureau of Prisons (FBOP) for drugs. The contractor must adhere to the following minimum specifications and other conditions:

I.    **Onsite Pilot Program Testing:**

The contractor will allow the FBOP to conduct pilot programs using onsite drug testing technologies without a penalty to the FBOP.

II.   **Specimens:**

Samples submitted to the contractor for testing will contain a minimum of 25 milliliters of urine. The contractor will furnish the following:

\*\*    SPECIMEN BOTTLE/CUP AND CAP (Sterile with temperature indicator strip on the bottle/cup)

\*\*    SPECIMEN IDENTIFICATION LABEL (with unique specimen identification number)

\*\*    SHIPPING CONTAINERS

\*\*    SINGLE DONOR CHAIN OF CUSTODY/SPECIMEN REPORT FORM

\*\*    SHIPPING LABELS

\*\*    All charges for supplies to include bottles, caps, shipping containers, identification labels are to be included in the specimen charges. The expense of the shipping charges is the responsibility of the contractor. Addressed prepaid shipping mailers will be provided.

\*\*    The identification labels and the chain of custody forms will have preprinted corresponding unique specimen numbers to insure proper accountability.

\*\*    On occasion the FBOP may replace the Contractor supplied bottle and cap with another bottle and cap, such as an on-site cup, but still use the Contractor supplied Identification Label, Shipping Container, and Chain of Custody/Specimen Report form.

1

III.    **Report Forms:**

The contractor will supply appropriate chain of custody forms consisting of two (2) self carbonized parts (an original and one copy). FBOP staff will record the specimen identification information on the forms, retain the original form at the collecting institution and return to the contractor the copy, along with the specimen.

The chain of custody form will provide a space to document at a minimum the following information:

COLLECTION PROCEDURES (Pre-Printed) (collection procedures will be provided by the Federal Bureau of Prisons)
COLLECTION SITE NAME AND ADDRESS (Pre-Printed)
SPECIFIC ACCOUNT NUMBER FOR COLLECTION SITE (Pre-Printed)
SPECIMEN NUMBER (Pre-Printed)
SPACE FOR NOTE - "SPECIAL TEST REQUEST"
TEST REASON (Collector to check one)
     * Random
     * Suspect
     * Community
     * Disruptive Group
     * Saturation Group Testing
DONOR'S (Inmate's) NAME AND REGISTER NUMBER (Inmate data to be camouflaged on contractor's copy of the form).
DATE COLLECTED (mm/dd/yy)
TIME REQUESTED (24 hour clock - "Military Time")
TIME PROVIDED (24 hour clock - "Military Time")
COLLECTOR'S CERTIFICATION/VERIFICATION (Staff's)
DONOR'S CERTIFICATION/VERIFICATION (Inmate's)
WITNESS SIGNATURE BLOCK (To be used when donor refuses or cannot sign).

IV.    **Billing:**

There are approximately 156 collection sites throughout the United States, Hawaii and Puerto Rico, with another 14 locations to be added over the life of the contract. Some institutions have more than one collection site. The contractor must provide each site, an exclusive identification (account) number to identify each site from other locations.

Billing for specimens tested and supplies used will be directed to the specific billing address provided for each collection site. Billing should be monthly. Approximately 50% of the billing sites will be for multiple collection sites.

A list of FBOP facilities can be obtained at <www.BOP.gov> by clicking on BOP Directory. Institutions will be added or deleted by the Contracting Officer. As new institutions are activated, the Contracting Officer will advise the contractor in writing, who will, within 14 days of notification, establish the account, provide all necessary collection supplies and forms, and be prepared to initiate the program at the new site.

2

V.    **Specifications of Methodology:**

A.    **Sensitivity**

The contractor will detect and identify at least the following drugs and metabolites by basic screen at the minimal levels or lower as indicated.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*PRIMARY TEST PANEL\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| DRUG/SUBSTANCE CONFIRMATION | SCREEN METHOD | SCREEN LEVEL | CONFIRMATION METHOD | CUTOFF |
|---|---|---|---|---|
| Amphetamines<br>Amphetamine<br>Methamphetamine | Enzyme Multiplied Immunoassay Technique<br>or a<br>Certified Comparable Testing Technology | 1000 ng/ml | Gas Chromatography<br>or a<br>Certified Comparable Testing Technology | 300 ng/ml |
| Barbiturates<br>Amobarbital<br>Butabarbital<br>Butalbital<br>Pentobarbital<br>Phenobarbital<br>Secobarbital | Enzyme Multiplied Immunoassay Technique<br>or a<br>Certified Comparable Testing Technology | 300 ng/ml | Gas Chromatography<br>/<br>Mass Spectrometry<br>or a<br>Certified Comparable Testing Technology | 300 ng/ml |
| Benzodiazepines | Enzyme Multiplied Immunoassay Technique<br>or a<br>Certified Comparable Testing Technology | 300 ng/ml | Gas Chromatography<br>or a<br>Certified Comparable Testing Technology | 200 ng/ml |
| Cannabinoids<br>(THC/Marijuana) | Enzyme Multiplied Immunoassay Technique<br>or a<br>Certified Comparable Testing Technology | 50 ng/ml | High Performance Thin Layer Chromatography<br>or a<br>Certified Comparable Testing Technology | 50 ng/ml |
| Cocaine<br>Benzoylecgonine | Enzyme Multiplied Immunoassay Technique<br>or a<br>Certified Comparable Testing Technology | 300 ng/ml | Gas Chromatography<br>or a<br>Certified Comparable Testing Technology | 300 ng/ml |



| Methadone | Enzyme Multiplied Immunoassay Technique or a Certified Comparable Testing Technology | 300 ng/ml | Gas Chromatography or a Certified Comparable Testing Technology | 300 ng/ml |
|---|---|---|---|---|
| Opiates Codeine Hydromorphone Morphine | Enzyme Multiplied Immunoassay Technique or a Certified Comparable Testing Technology | 300 ng/ml | Gas Chromatography or a Certified Comparable Testing Technology | 300 ng/ml |
| Phencyclidine | Enzyme Multiplied Immunoassay Technique or a Certified Comparable Testing Technology | 25 ng/ml | Gas Chromatography or a Certified Comparable Testing Technology | 25 ng/ml |

The following drugs will only be tested upon the request of the FBOP as a "Special Test." All Special Test Panel tests must be approved by the Program Manager of the institution requesting the test. A special test may consist of one or all of the substances listed as part of the Special Test Panel below. The individual drug requested will be indicated on the chain of custody form. It will be written in the block identified as "Special Test."

*******************SPECIAL TEST PANEL************************

| DRUG/SUBSTANCE CONFIRMATION | SCREEN METHOD | SCREEN LEVEL | CONFIRMATION METHOD | CUTOFF |
|---|---|---|---|---|
| Methaqualone (Quaalude) | Enzyme Multiplied Immunoassay Technique or a Certified Comparable Testing Technology | 300 ng/ml | Gas Chromatography or a Certified Comparable Testing Technology | 500 ng/ml |

4



| Quinine | Thin Layer Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml | Thin Layer Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml |
|---|---|---|---|---|
| Meperidine (Demerol) | Thin Layer Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml | Gas Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml |
| Pentazocine (Talwin) | Thin Layer Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml | Gas Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml |
| Phenmetrazine (Preludin) | Thin Layer Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml | Gas Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml |
| Propoxyphene (Darvon) | Thin Layer Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml | Gas Chromatography or a Certified Comparable Testing Technology | 1.0 g/ml |

**B.    Individual Special Test Requests:**

The contractor will provide testing and confirmation for **Steroids, LSD**, and **Fentanyl**. This request must be done in advance of any test and only with the approval of the Program Manager. The rate of incident for this service will be less than .08% per year of all specimens submitted.

**C.    Basic Laboratory Screening Procedures:**

The contractor's laboratory must be certified through the Department of Health and Human Services and meet standards of Subpart C of the Mandatory Guidelines for Federal Work Place Drug Testing Programs (59 FR 29916, 29925) to engage in urine drug testing for the FBOP.

The Contractor is required to test each specimen for **adulteration, substitution**, and **dilution** using certified laboratory procedures for measuring specific gravity, creatinine, ph, and test for the presence of glutaraldehyde and nitrates. The Contractor should be able to provide FDA clearance certification to conduct such adulterant tests.

5

**D.    Confirmation of Positive Tests:**

The approved laboratory methods of confirmation of specimens testing positive are listed in both the Primary and Special test panels above, confirmation tests must be done on all initial positives. Authorized confirmation methodologies include Thin Layer Chromatography (TLC), High Performance Thin Layer Chromatography (HPTLC), Gas Chromatography (GC) or another certified comparable testing technology. The positive rate of all samples is estimated to be between 6% and 7%.

**E.    Retest:**

The contractor will, upon request, perform specific determinations involving additional tests. The results of such determinations will be reported on the report form. Upon request of the FBOP, the contractor will retest a specimen previously tested and reported. If the retest fails to confirm the results of the original test, there will be no cost to the FBOP. The rate of incident will be less than .05% per year of all specimens submitted.

**VI.    Reporting of Results:**

At the completion of the test, the contractor will provide the originating FBOP facility the results of the test. Both negative and positive results will be forwarded by the contractor to a designated staff member at the respective facility submitting the sample within seventy two (72) hours by first class U.S. Mail, fax, or e-mail transmission.

The method used to transmit results will be the option of the submitting facility, and not the contractor.

Negative reports may be reported singularly, or in batch (multiple results on a single report). However, confirmed positives must be reported on a single result laboratory confirmation report to the collection site.

**VII.    Retention of Urine Specimen:**

Urine specimens testing negative can be discarded immediately by the contractor. Specimens that test positive must be retained for a period of at least 60 days by the contractor in appropriate storage that will insure the specimen is preserved in a condition suitable for retesting.

Approximately 50 specimens a year may require retention for an undetermined length of time in cases of major litigation and/or prosecution. The contractor will be advised in writing (via faxed request) by the Program Manager when this need occurs. As with the 60 day retention period, these specimens must be preserved in a condition suitable for

retesting.

VIII.  **Contract Award:**

The contractor must ship requested supplies and offer full service to the individual testing sites within sixty (60) calendar days of official notification of the contract award. Expenses for shipping supplies will be born by the contractor.

Upon award of contract, a three month supply (Forty-Five 12 pack containers and Twenty 18 pack containers including bottles) of collection supplies and documentation forms will be provided to each testing location/collection sites. After the initial delivery of supplies and forms, it will be the responsibility of the collection site to advise the contractor when additional supplies and forms are required. The contractor must be able to replenish supplies and forms within 14 calendar days of verbal notification from each testing collection site.

All billing for testing will occur upon completion of the test and reporting of test results to the collection site. Billing will be forwarded to each collection site and payment will be processed from that facility.

IX.  **Electronic Data Collection:**

The Contractor will provide the FBOP Office of Research & Evaluation staff with data collected for each specimen processed and reported monthly. The data will be in a standard flat text format and e-mailed to the appropriate Office of Research & Evaluation staff no later than the seventh (7) day of the proceeding month. (Example: Data for the month of June must be provided to Office of Research & Evaluation staff no later than July 7th.) Only specimens that have completed the testing process and have been reported to the collection site will be included. The data will include the following:

*   Specific account number for collection site
*   Specimen identification number
*   Special test requested (if applicable)
*   Test reason:
    -   Random
    -   Suspect
    -   Community
    -   Disruptive Group
    -   Saturation Group
*   Date collected (mm/dd/yy)
*   Test Results (Positive or Negative)
*   Drugs Detected (only on confirmed positives)
*   No Test Reason (coded)

7



Except for "No Test Reason," " Test Results," and "Drugs Detected," all data will be obtained from the Chain of Custody form.

X.    **Subject Matter Expert Testimony:**

The contractor will be required to provide subject matter expert testimony when required to address such issues as chain of custody, testing methodologies, and test results. The offer must include the cost of this requirement.

Reimbursement for travel expenses authorized in providing expert witness testimony will be consistent with Federal Travel Regulations. Any travel must have the prior approval of the FBOP Contract Officer's Technical Representative (COTR).

XI.    **"No Test" Criteria**

The contractor will not perform testing on the following specimens submitted:

*    Specimens with a tampered seal  [the tamper-resistant seal must be intact for testing to be performed]

*    Specimens with tampered resistant seals not initialed by both the collector and donor and dated  [tamper-resistant seals must be initialed and dated for testing to be performed]

XII.    **Definitions:**

| | | |
|---|---|---|
| ng/ml | = | nanogram (1/1/,000,000,000 of a gram) per milliliter |
| ±/ml | = | micrograms (1/1,000,000 of a gram) per milliliter |
| EMIT | = | Enzyme Multiplied Immunoassay Technique |
| TLC | = | Thin Layer Chromatography |
| HPTLC | = | High Performance Thin Layer Chromatography |
| GC | = | Gas Chromatography |
| GC/MS | = | Chromatography/Mass Spectrometry |



## DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

The contractor is to test inmate urine samples submitted by the Federal Bureau of Prisons (FBOP) for drugs. The contractor must adhere to the following minimum specifications and other conditions:

I.    **Onsite Testing**:

The contractor will allow the FBOP to use onsite drug testing technologies, solely as an initial internal screening instrument, without a penalty to the FBOP.

II.   **Specimens**:

Samples submitted to the contractor for testing will contain a minimum of 25 milliliters of urine. The contractor will furnish the following:

> SPECIMEN BOTTLE AND CAP (Sterile with temperature indicator strip on the bottle)
> SPECIMEN IDENTIFICATION LABEL (with unique specimen identification number)
> ** SHIPPING CONTAINERS
> SINGLE DONOR CHAIN OF CUSTODY/SPECIMEN REPORT FORM
> SHIPPING LABELS

**    (All shipping charges are the responsibility of the contractor. All charges for supplies to include bottles, caps, shipping containers, identification label are to be included in the specimen charges. Addressed prepaid shipping mailers will be provided).

**    Any unused surplus of supplies/form provided to collection sites will be returned to the contractor at no cost to the Government upon completion of the contract.

The identification labels and the chain of custody forms will have preprinted corresponding unique specimen numbers to insure proper accountability.

On occasion the FBOP may replace the Contractor supplies bottle and cap with another bottle and cap, such as an on-site cup, but still use the Contractor supplied Identification Label, Shipping Container, and Chain of Custody/Specimen Report form.

III.  **Report Forms**:

The contractor will supply appropriate chain of custody forms consisting of two (2) self carbonized parts (an original and one copy). FBOP staff will record the specimen identification information on the forms, retain the original form at the collecting institution and return to the contractor the copy, along with the specimen.

The chain of custody form will provide a space to document at a minimum the following information:

 

COLLECTION PROCEDURES (Pre-Printed) (collection procedures will be provided by the Federal Bureau of Prisons)
COLLECTION SITE NAME AND ADDRESS (Pre-Printed)
SPECIFIC ACCOUNT NUMBER FOR COLLECTION SITE (Pre-Printed)
SPECIMEN NUMBER (Pre-Printed)
SPACE FOR NOTE - "SPECIAL TEST REQUEST"
TEST REASON (Collector to check one)
* Random
* Suspect
* Community
* Disruptive Group
* Saturation Group Testing
DONOR'S (Inmate's) NAME AND REGISTER NUMBER (Inmate data to be camouflaged on contractor's copy of the form).
DATE COLLECTED (mm/dd/yy)
TIME REQUESTED (24 hour clock - "Military Time")
TIME PROVIDED (24 hour clock - "Military Time")
COLLECTOR'S CERTIFICATION/VERIFICATION  (Staff's)
DONOR'S CERTIFICATION/VERIFICATION  (Inmate's)
WITNESS SIGNATURE BLOCK (To be used when donor refuses or cannot sign).

IV    **Billing:**

There are 105 Institutions throughout the United States with another 14 locations to be added over the life of the contract some of these Institutions will have more then one collection point. There is  approximately 156 collection points. Each collection point must be provided, by the contractor, an exclusive identification (account) number to identify each collection point  from other collection points. *Each Institution will also act as a "billing site".*

Billing for specimens tested,  will include supplies used,  will be directed to the specific billing address provided for each collection site.  Billing should be monthly. Approximately 50% of the billing sites will be for multiple collection sites.

A list of FBOP facilities is provided in Section J. A list of  facilities can also be obtained at <www.BOP.gov> by clicking on BOP Directory.  Institutions will be added or deleted by the Contracting Officer.  As new institutions are activated, the Contracting Officer's Technical Representative (COTR) will advise the contractor in writing, who will within 14 days of notification,  establish the account,  and provide all necessary collection supplies, forms and be prepared to initiate the program at the new site.

V    **Specifications of Methodology:**

A.    Sensitivity



The contractor will detect and identify at least the following drugs and metabolites by basic screen at the minimal levels or lower as indicated.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*PRIMARY TEST PANEL\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| DRUG/SUBSTANCE CONFIRMATION | SCREEN METHOD | SCREEN LEVEL | CONFIRMATION METHOD | CUTOFF |
|---|---|---|---|---|
| Amphetamines<br>Amphetamine<br>Methamphetamine | EMIT | 1000 ng/ml | GC | 300 ng/ml |
| Barbiturates<br>Amobarbital<br>Butabarbital<br>Butalbital<br>Phenobarbital<br>Phenobarbital<br>Secobarbital | EMIT | 300 ng/ml | GC/MS | 500 ng/ml |
| Benzodiazepines | EMIT | 300 ng/ml | GC | 200 ng/ml |
| Cannabinoids (THC/Marijuana) | EMIT | 50 ng/ml | HPTLC | 50 ng/ml |
| Cocaine<br>Benzoylecgonine | EMIT | 300 ng/ml | GC/MS | 300 ng/ml |
| Methadone | EMIT | 300 ng/ml | GC | 300 ng/ml |
| Opiates<br>Codeine<br>Hydromorphone<br>Morphine | EMIT | 300 ng/ml | GC | 500 ng/ml<br>1000 ng/ml<br>200 ng/ml |
| Phencyclidine | EMIT | 25 ng/ml | GC | 200 ng/ml |

The drugs listed will only be tested upon the request of the FBOP as a "Special Test." All Special Tests Panel tests must be approved by the Captain of the institution requesting the test. A special test may consist of one or all of the substances listed as part of the Special Test Panel below. The individual drug requested will be indicated on the chain of custody form. It will be written in the block identified as "Special Test."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*SPECIAL TEST PANEL\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| DRUG/SUBSTANCE CONFIRMATION | SCREEN METHOD | SCREEN LEVEL | CONFIRMATION METHOD | CUTOFF |
|---|---|---|---|---|
| Methaqualone (Quaalude) | EMIT | 300 ng/ml | GC | 500 ng/ml |
| Quinine | TLC | 1.0 ±g/ml | TLC | 1.0 ±g/ml |
| Meperidine (Demerol) | TLC | 1.0 ±g/ml | GC | 1.0 ±g/ml |
| Pentazocine (Talwin) | TLC | 1.0 ±g/ml | GC | 1.0 ±g/ml |
| Phenmetrazine (Preludin) | TLC | 1.0 ±g/ml | GC | 1.0 ±g/ml |
| Propoxyphene (Darvon) | TLC | 1.0 ±g/ml | GC | 1.0 ±g/ml |

B.    **Basic Laboratory Screening Procedures:**

All primary initial screen tests will be with Enzyme Multiplied Immunoassay Technique (EMIT) as indicated, with SPECIAL test initial screen being either EMIT or Thin Layer Chromatography (TLC), as indicated under the SPECIAL test group. There are no other methods approved for substitution of these requirements.

The Contractor is required to test each specimen for adulteration, substitution, and



dilution using the industry standards for measuring specific gravity, creatinine, ph, and test for the presence of glutaraldehyde and nitrates.

The Contractor should be able to provide FDA clearance certification to conduct such adulterant tests.

C.    **Confirmation of Positive Tests:**

The approved laboratory methods of confirmation of specimens testing positive are listed in both the Primary and Special test panels above, confirmation tests must be done on all initial positives. Authorized confirmation methodologies include Thin Layer Chromatography (TLC), High Performance Thin Layer Chromatography (HPTLC), and Gas Chromatography (GC). No substitutions can be made of these methods. The positive rate of all samples is estimated to be between 6% and 7%.

D.    **Retest:**

The contractor will, upon request, perform specific determinations involving additional tests. The results of such determinations will be reported on the report form. Upon request of the FBOP, the contractor will retest a specimen previously tested and reported. If the retest fails to confirm the results of the original test, there will be no cost to the FBOP. The rate of incident will be less than .05% per year of all specimens submitted.

E.    **Individual Special Test Requests:**

The contractor will provide other methodology upon request such as Gas Chromatography/Mass Spectrometry (GC/MS) confirmation and testing for Steroids, LSD, and Fentanyl. This request must be done in advance of any test and only with the approval of the Contracting Officer's Technical Representative (COTR). The rate of incident for this service will be less than .08% per year of all specimens submitted.

VI    **Reporting of Results:**

At the completion of the test, the contractor will provide the originating FBOP facility the results of the test. Both negative and positive results will be forwarded by the contractor to a designated staff member at the respective facility submitting the sample within seventy two (72) hours by first class U.S. Mail, Fax, or e-mail transmission.

The method used to transmit results will be the option of the submitting facility, and not the contractor. It is estimated that approximately 45% of the collection sites prefer first class U.S. Mail, 50% Fax, and the remaining 5% computer e-mail.

Negative reports may be reported singularly, or in batch (multiple results on a single report). However, confirmed positives must be reported on a single result laboratory



confirmation report to the collection site.

**VII    Retention of Urine Specimen:**

Urine specimens testing negative can be discarded immediately by the contractor.
Specimens that test positive must be retained for a period of at least 60 days by the
contractor in appropriate storage that will insure the specimen is preserved in a condition
suitable for retesting.

Approximately 50 specimens a year may require retention for an undetermined length of
time in cases of major litigation and/or prosecution. The contractor will advised the
Contracting Officer's Technical Representative (COTR) when this need occurs. As with
the 60 day retention period, these specimens must be preserved in a condition suitable for
retesting.

**VIII    Contract Award:**

Upon award of contract a three month supply (Forty-Five 12 pack containers and Twenty
18 pack containers including bottles) of collection supplies and documentation forms will
be provided to each testing location/collection sites. The contractor must offer full
service to the individual testing sites within sixty (60) calendar days of official
notification of the contact award. Expenses for shipping supplies will be born by the
contractor. Afterward, it will be the responsibility of the collection site to advise the
contractor when additional supplies are required. The contractor must be able to
replenish supplies within 14 calendar days of verbal notification from each testing
collection site. Billing for collection supplies, if itemized separately from the cost of the
test, will occur when the supplies are used (at time of test).

All billing for testing will occur upon completion of the test and reporting of test results
to the collection site. Billing will be forwarded to each collection site and payment will
be processed from that facility.

**IX    Confidentiality & Control - Privacy Act**

A.    The Contractor agrees:

To comply with the Privacy Act of 1974 and the rules and regulations issued
pursuant to the Act in the design, development or operation of any system of
records on individuals in order to accomplish an agency function when the
contract specifically identifies (1) the system or system of records, and (2) the
work to be performed by the contractor in terms of any one or combination of the
following: (i) design, (ii) development, or (iii) operations.

In the event of violation of the Act, a civil action may be brought against the
agency involved where the violation concerns the design, development or

 

operation of a system of records on individuals to accomplish an agency function, and criminal penalties may be imposed upon the officers or employees of the agency where the violation concerns the operation of a system of records on individuals to accomplish the agency function.

For the purpose of the Act, when the contact is for the operation of a system of records on individuals to accomplish an agency function, the contractor and any employee of the contractor is held to the same strict standards as an employee of the agency.

B.    The terms used in this clause have the following meanings:

    \*    "Operations of a system of records" means performance of any of the activities associated with maintaining the system of records including the collection use, and dissemination of records.

    \*    "Records" means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his/her name, [or the identifying particular assigned to the individual, such as a finger or voice print or a photograph.

    \*    "System of records" on individuals means a group of any records under the control of any agency from which information is retrieved by name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

## X    Electronic Data Collection:

The Contractor will provide the appropriate FBOP Office of Research & Evaluation staff with data collected for each specimen processed and reported monthly. The data will be in a standard flat text format and e-mailed to the appropriate Office of Research & Evaluation staff no later than the seventh (7) day of the proceeding month. (Example: Data for the month of June must be provided to Office of Research & Evaluation staff no later than July 7th.) Only specimens that have completed the testing process and have been reported to the collection site will be included. The data will include the following:

    \*    Specific account number for collection site
    \*    Specimen identification number
    \*    Special test requested (if applicable)
    \*    Test reason:
        -    Random
        -    Suspect
        -    Community
        -    Disruptive Group
        -    Saturation Group
    \*    Date collected (mm/dd/yy)
    \*    Test Results (Positive or Negative)
    \*    Drugs Detected (only on confirmed positives)
    \*    No Test Reason (coded)



Except for "No Test Reason," " Test Results," and "Drugs Detected," all data will obtain be obtained from the Chain of Custody form.

XI    **Subject Matter Expert Testimony:**

The contractor will be required to provide subject matter expert testimony when required to address such issues as chain of custody, testing methodologies, and test results. The offer must include the cost of this requirement.

Reimbursement for travel expenses authorized in providing expert witness testimony will be consistent with Federal Travel Regulations. Any travel must have the prior approval of the Contracting Officer's Technical Representative.

XII   **"No Test" Criteria**

The contractor will not perform testing on the following specimens submitted:

*      Specimens with a tampered seal  [the tamper-resistant seal must be intact for testing to be performed]

*      Specimens with tampered resistant seals not initialed by both the collector and donor and dated  [tamper-resistant seals must be initialed and dated for testing to be performed]

XIII  **Definitions:**

| | | |
|---|---|---|
| ng/ml | = | nanogram (1/1/,000,000,000 of a gram) per milliliter |
| +/ml | = | micrograms (1/1,000,000 of a gram) per milliliter |
| EMIT | = | Enzyme Multiplied Immunoassay Technique |
| TLC | = | Thin Layer Chromatography |
| HPTLC | = | High Performance Thin Layer Chromatography |
| GC | = | Gas Chromatography |
| GC/MS | = | Chromatography/Mass Spectrometry |

John L. Richardson
Intelligence Section

Correctional Services Branch




4. All other terms and conditions remain unchanged.